**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**JENK'S BEST LIVING, LLC**

THE INTERESTS IN THIS COMPANY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THAT ACT AND THE APPLICABLE STATE SECURITIES LAWS, OR THE COMPANY WILL HAVE RECEIVED AN OPINION OF COUNSEL (WHICH COUNSEL AND OPINION WILL BE SATISFACTORY TO THE COMPANY'S COUNSEL) THAT REGISTRATION OF SUCH SECURITIES UNDER THAT ACT AND UNDER THE APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

THE INTERESTS IN THIS COMPANY ARE SUBJECT TO THE RESTRICTIONS AND PROVISIONS OF THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT AND MAY ONLY BE DISPOSED OF OR ENCUMBERED IN COMPLIANCE HEREWITH.

Amended and Restated Operating Agreement

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**JENK'S BEST LIVING, LLC**

THIS AMENDED AND RESTATED OPERATING AGREEMENT ("**Agreement**") is made and entered into as of September 7, 2021 ("**Effective Date**"), by and among the Persons whose signatures appear on the signature page hereof, each of whom is executing this Agreement as a Member of the Company and all of whom constitute all of the Members of the Company, and is joined by Jenk's Best Living, LLC, a Kansas limited liability company (the "**Company**"), Vesta Realty, LLC, a Kansas limited liability company (the "**Manager**"), Jenk's Best Living Investors, LLC, a Kansas limited liability company (the **"Vesta Member'"**), PSC Thrive, LLC a Maryland limited liability company (the "**PSC Member**"), Pratt Street Capital, LLC, a Maryland limited liability company (the **"PSC Promote Member")** and Vesta Capital, LLC, a Kansas limited liability company (the "**Vesta Promote Member**"), for the purpose of the covenants made in this Agreement by and for the benefit of the Company and Manager.  Company and the Members are hereinafter sometimes referred to collectively as the "**Parties**".

WHEREAS, the Company has operated pursuant to that certain Operating Agreement dated as of October 24, 2017 (the "**Prior Agreement**");

WHEREAS, the Company intends to refinance the mortgaged Loan encumbering the Property, as hereby amended, with Berkadia Commercial Mortgage LLC, to be insured by HUD under Section 207 pursuant to Section 223(f) of the National Housing Act, as amended;

WHEREAS, the Members and Manager hereby adopt this Agreement as the amended and restated operating agreement of the Company under the Act to set forth the rules, regulations and provisions regarding the management and business of the Company, the governance of the Company, the conduct of its business, and the rights and privileges of its Member and the Manager.

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND RULES OF INTERPRETATION

1.1     Definitions. For the purpose of this Agreement, the following terms shall have the following meanings, unless the context otherwise requires:

(a)     "Act" or "Kansas Act" mean, the Kansas Limited Liability Company Act referenced in K.S.A. § 17-7662, as amended from time to time.

(b)     "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year after giving effect to the following adjustments:

(a) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections I.704-1(b)(2)(ii)(c) 1.704-2(g)(l), and l.704-2(i); and

(b) debiting to such Capital Account the items described in Treasury Regulations Section l.704-1(b)(2)(ii)(d)(4), (5), and (6).

(c) "Affiliate" of a subject Person means any other Person (i) who directly or indirectly controls, is controlled by, or is under common control with the subject Person; (ii) who owns or controls fifty percent (50%) or more of the subject Person's outstanding voting securities or equity interests; (iii) of whom the subject Person owns or controls fifty percent (50%) or more of the outstanding voting securities or equity interests; (iv) who is a director, manager, partner, or trustee of the subject Person; (v) of whom the subject Person is a director, manager, partner, or trustee; or (vi) who is a Family Member of the subject Person. An "Affiliate" of the Manager further includes any officer, employee, or agent of a Manager that is an entity.

(d) "Agreement" or "Operating Agreement" means this Amended and Restated Operating Agreement of Jenk's Best Living, LLC, as amended or restated from time to time.

(e) "Applicable Federal Rate" means the minimum rate established pursuant to Code Sections 483 and 1274 necessary to avoid any imputed interest or original issue discount being attributed.

(f) "Applicable Law" means all applicable provisions of: (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations. or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

(g) "Articles of Organization" means the Articles of Organization of the Company filed with the State of Kansas, as amended or restated from time to time.

(h) "Asset Management Fee" means a fixed tee payable by the Company to the Vesta Promote Member and the PSC Promote Member (or their designated Affiliates). The Asset Management Fee (a) will be equal to two percent (2%) of the gross revenue from the Property; (b) will accrue monthly and be payable each calendar month to the recipients; and (c) will be payable one-half to each of the Vesta Promote Member and the PSC Promote Member (or their designated Affiliates) for so long as each is a Member and is not a Defaulting Member. If any such Member is a Defaulting Member, then for so long as such Member is a Defaulting Member it shall not (nor shall its Affiliate) be entitled to receive its portion of the Asset Management Fee, which instead shall be paid to tl1e Member (or its Affiliate) who is not a Defaulting Member.

(i) "Assignee" means a Person who has acquired Units in the manner described in Section 10.6. An Assignee shall have the status of an assignee as described in the Act. Without limiting the foregoing, an Assignee shall be entitled to receive Tax Allocations and distributions under this Agreement as if the Assignee were a Member. Otherwise, an Assignee shall not be a Member and shall have no rights of a Member, including no right to participate in the management of the Company and no right to vote on, consent to, or approve any matter.

3

(j)    "<u>Authorized Representative</u>" means a natural person appointed from time to time by a Member, by notice to the other Member, to give approvals and consents on behalf of such Member. The initial Authorized Representative of the Vesta Member and the Vesta Promote Member will be Marc Kulick, and the initial Authorized Representative of the PSC Member and PSC Promote Member will be C. N. David Reischer ("PSC Manager"). In the event that Marc Kulick is no longer the Authorized Representative of the Vesta Member or the Vesta Promote Member (a **"'Vesta Control Event"),** and the PSC Member did not approve such replacement Authorized Representative of such Members, which PSC Member may withhold in its sole discretion, then the PSC Member shall have the unilateral right to cause the Company market and sell the Property on an arm length basis to a third party.

(k)    "<u>Bankruptcy</u>" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member'sassets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due: (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

(l)    "<u>Book Depreciation</u>" means, with respect to any Company asset for each Fiscal Year: the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation will be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis: provided that, if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive Book Depreciation will be detennined with reference to such beginning Book Value using any pennitted method selected by the Managing Member in accordance with Treasury Regulations Section I.704-1(b)(2)(iv)(g)(3).

(m)    "<u>Book Value</u>" means, with respect to any Company asset, the adjusted basis of such asset forfederal income tax purposes, except as follows:

    (a)    the initial Book Value of any Company asset contributed by a Member to the Company will be the gross Fair Market Value of such Company asset as of the date of such contribution;

    (b)    immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset will be adjusted to its gross Fair Market Value as of the date of such distribution;

    (c)    the Book Value of all Company assets will be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Members, as of the following times:

        (i)    the acquisition of an additional Membership Interest by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

4

(ii)    the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest; and

(iii)    the liquidation of the Company within the meaning of Treasury Regulations Section I.704-1(b)(2)(ii)(g);

provided that, adjustments pursuant to clauses (i) and (ii) above need not be made if the Managing Member reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)    the Book Value of each Company asset will be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-l(b)(2)(iv)(m); provided that, Book Values will not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would othe1wise result in an adjustment pursuant to this paragraph *(d);* and

(e)    if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) above, such Book Value will thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

(n)    "Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of Tulsa, Oklahoma are authorized or required to close.

(o)    "Capital Contribution" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property actually contributed (or deemed contributed) to the Company by such Member, including, for purposes of clarity, any Additional Capital Contributions (including any Additional Capital Contributions deemed made by a Member as a result of a Member Loan).

(p)    "Capital Sharing Ratio" initially for each Member, means the percentages set forth on Schedule 1, as may be adjusted pursuant to the terms of this Agreement.

(q)    "Code" means the Internal Revenue Code of 1986, as amended.

(r)    "Company Lender" or "Lender" means, unless otherwise specifically identified in this Agreement, any Person providing credit or cash to the Company (i) where the indebtedness obligation(s) of the Company is/are secured by the Property or equity interests in the Company, and (ii) whose lien is then currently outstanding.

(s)    "Company Minimum Gain" means, 'partnership minimum gain'' as defined in Treasury Regulations Section l. 704-2(b)(2), substituting the term "'Company" for the term 'partnership' as the context requires.

(t)  "Default Rate" means, a rate equal to the greater of (i) 18% per annum (compounded annually), or (ii) the maximum rate permitted by Applicable Law.

(u)  "Electronic Transmission" means, any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(v)  "Emergency or Necessary Expenditure" means (i) any expenditure by the Company relating to an emergency situation, to eliminate or mitigate a condition that poses a threat to life or an immediate riskof injury, or is necessary to protect the Property against damage associated with such emergency situation, (ii) any expenditure by the Company to comply with applicable law if the failure to comply could result in the imposition of material penalties, and (iii) any expenditure to pay real prope1ty taxes, utility costs or insurance premiums required to be maintained under any Approved Financing or pursuant to the terms hereof.

(w)  "Fair Market Value" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined jointly by the Members.

(x)  "Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year will be the period that conforms to its taxable year.

(y)  "Governmental Authority" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the regulations, or orders of such organization or authority have the force of law),or any arbitrator, court, or tribunal of competent jurisdiction.

(z)  "Guaranty Fee" means a fixed fee payable by the Company to the Vesta Promote Member (or their designated Affiliates) who provide Project Guaranties in connection with the initial Approved Financing as a Guarantor). The Guaranty Fee payable to the Guarantor (a) will be equal to $240,000.00; and (b) will be placed in an escrow account held by the Company at the closing of the acquisition of the Property. The Guaranty Fee will be released to the Guarantor 1/6 each six months after Closing as set forth below unless, prior to the three-year anniversary of the closing of the initial Approved Financing ("Financing Closing"), the Property is sold or the initial Approved Financing is refinanced with a different lender, and the Guarantor is released from his or its obligations under the Project Guaranties (a "GF Clawback Event"), then the remaining funds held by the Company as the Guaranty Fee shall be released to the Company and there shall not be any further obligations under the Guaranty Fee. The Guaranty Fee shall be released to the Guarantor as follows: (i) after the sixth-month anniversary of the Financing Closing and each six month anniversary thereafter until the Guaranty Fee has been fully disbursed, the Guarantor will be disbursed $40,000.00 of the Guaranty Fee unless there is a GF Clawback Event prior to such time.

(aa)  "Internal Rate of Return" shall mean, as of any date and with respect to any Member, the discount rate: expressed as an annual percentage rate at which the difference between (a) the net present value of all Capital Contributions made (or deemed made) by such Member, and (b) the net present value of all distributions made or deemed made to such Member, equals zero, taking into account, in computing such Internal Rate of Return, the dates on which each Capital

6

Contribution was made (or deemed made) and the dates on which each distribution was made (or deemed made). The Internal Rate of Return shall be calculated using the X-IRR function of Microsoft Excel.

(bb)   "Managing Member" means the Vesta Promote Member, or such other Person as may be designated or become the managing member of the Company pursuant to the terms of this Agreement.

(cc)   "Member" means (a) the Vesta Member, the PSC Member, PSC Promote Member and the Vesta Promote Member, and (b) each Person who is hereafter admitted as a member of the Company in accordance with the terms of this Agreement and the Kansas Act. The Members will constitute the "'Members" (as that term is defined in the Kansas Act) of the Company.

(dd)   "Member Nonrecourse Debt" means "partner nonrecourse debt" as defined in Treasury Regulations Section l.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

(ee)   "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section I.704-2(i)(3).

(ff)   "Member Nonrecourse Deduction" means "partner nonrecourse deduction" as defined in Treasury Regulations Section l.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

(gg)   "Membership Interest" means an equity interest in the Company owned by a Member, which ownership is evidence of a Member's right to: (a) a distributive share of Net Income, Net Loss, and other items of income gain, loss, and deduction of the Company; (b) a distributive share of the assets of the Company; (c) vote on, consent to, or otherwise participate in any decision of the Members; and (d) any and all other benefits that a Member may be entitled; each as further provided in this Agreement and the Kansas Act.

(hh)   "Net Income" and "Net Loss" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or taxable loss), but with the following adjustments:

(a)   any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)( l)(B), will be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)   any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section l.704-l(b)(2)(iv)(l) as items described in Code Section 705(a)(2)(B), will be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)   any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference

7

to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis will be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b )(2)(iv)(g);

(e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment will be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b), or 743(b) is required, pursuant to Treasury Regulations Section I .704 l(b){2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

(ii) "Non-Managing Member" means any Member that is not the Managing Member.

(jj) "Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

(kk) "Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section I.704-2(b)(3).

(ll) "Organizational Documents" means: (a) in the case of a Person that is a corporation, its articles or certificate of incorporation and its by-laws, regulations or similar governing instruments required by the laws of its jurisdiction of formation or organization; (b) in the case of a Person that is a partnership, its articl.es or certificate of partnership, formation or association and its partnership agreement (in each case, limited, limited liability, general or otherwise}; (c) in the case of a Person that is a limited liability company, its articles or certificate of formation or organization, and its limited liability company agreement or operating agreement; and (d) in the case of a Person that is none of a corporation, partnership (limited, limited liability, general or otherwise), limited liability company or natural person, its governing instruments as required or contemplated by the laws of its jurisdiction of organization.

(mm) "Permitted Budget Deviations" means expenses in excess of the applicable Business Plan & Budge as the case may be, as long as such expenditure would not (i) cause the applicable line item in such budget to be exceeded by more than ten percent (10%) of the amount approved for such line item (taking into account the amounts expended to date and reasonable anticipated expenses in connection with such line item), or (ii) cause the aggregate amount of the applicable Business Plan & Budget to be exceeded (taking into account the amounts expended to date and reasonable anticipated expenses) by more than five percent (5%); *provided* that amounts required for Emergency or Necessary Expenditures shall be deemed to constitute Permitted Budget Deviations.

(nn) "Person" means an individual, corporation, partnership joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

(oo) "Promote Sharing Ratio" initially, for each Member, means the percentages set forth on Schedule l, as may be adjusted by the terms of this Agreement.

8

(pp)   "Property" means all right, title, and interest in and to the real property located at 204 South Riverbend Drive, Jenks, Oklahoma, together with all rights, privileges, interests, easements, improvements, hereditaments, and appurtenances thereunto belonging or appertaining, and all fixtures, equipment, and appliances thereon and any additions thereto.

(qq)   "Property Management Agreement" means that certain management and operating agreement entered into between the Company and the Property Manager, which provides for the management of the day-to-day operations of the Property.

(rr)   "Property Manager" means Vesta Realty, LLC, or any other Person approved or permitted by the Managing Member to manage the day-to-day operations of the Property in accordance with this Agreement.

(ss)   "Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

(tt)   "Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which will be in effect at the time.

(uu)   "Subsidiary" means any entity formed and owned, in whole or in part, by the Company.

(vv)   "Transfer" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar disposition. "Transfer" when used as a noun wi1l have a correlative meaning. "Transferor" and "Transferee" mean a Person who makes or receives a Transfer respectively.

(ww)   "Treasury Regulations" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

**Section 1.2.   Interpretation.**

(a)   For purposes of this Agreement:

(i)   the words "include," "includes," and "'including" will be deemed to be followed by the words "without limitation";

(ii)   the word "or" is not exclusive; and

(iii)   the words "herein", "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

(b)   The definitions given for any defined terms in this Agreement will apply equally to both the singular and plural forms of the terms defined.

(c)   Whenever the context may require, any pronoun will include the corresponding masculine, feminine, and neutral forms.

(d)   Unless the context otherwise requires, references in this Agreement:

Amended and Restated Operating Agreement

(i)     to articles, sections, and exhibits mean the articles and sections of, and exhibits attached to, this Agreement;

(ii)     to an agreement instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and

(iii)     to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

(e)     This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

(f)     The exhibits referred to herein will be construed with, and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II
## ORGANIZATION

**Section 2.1. Formation**.

(a)     The Company was formed pursuant to the provisions of the Kansas Act upon the filing of the Articles with the Secretary of State of the State of Kansas, and the Members desire to continue such limited liability company pursuant to the Kansas Act and this Agreement.

(b)     This Agreement will constitute the "Operating Agreement" (as that term is used in the Kansas Act) of the Company. The rights, powers. duties, obligations, and liabilities of the Members will be determined pursuant to the Kansas Act and this Agreement. To the extent that the rights, powers, duties, obligations, and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Kansas Act in the absence of such provision, this Agreement will, to the extent permitted by the Kansas Act, control.

**Section 2.2. Name.** The name of the Company is "Jenk's Best Living, LLC" or such other name or names as may be designated by the Managing Member; provided that, the name will always contain the word "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC". The Managing Member will give prompt notice to the Members of any change to the name of the Company.

**Section 2.3. Principal Office.** The principal office of the Company is located at 6400 W. 110th Street, Ste. 201, Overland Park, KS 66211, or such other place as may from time to time be determined by the Managing Member. The Managing Member will give prompt notice of any such change to each of the Members.

**Section 2.4.** **Registered Office; Registered Agent.**

(a)   *Registered Office.* The registered office of the Company will be the office of the initial registered agent named in the Articles or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by the Kansas Act and Applicable Law.

(b)   *Registered Agent.* The registered agent for service of process on the Company in the State of Kansas will be the initial registered agent named in the Articles or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by the Kansas Act and Applicable Law.

**Section 2.5.** **Purpose; Powers.**

(a)   The Company is organized for the object and purpose of (i) owning the Property; (ii) directly or indirectly facilitating the operation of the Property as a multi-family living facility for the production of a profit; (iii) refinancing, selling, or otherwise disposing of, in whole or in part, the Property; and (iv) causing the Company to incur indebtedness (including, without limitation any Approved Financing) to enable the activities set forth herein.

(b)   In connection with the purpose set forth in Section 2.5(a), the Company may engage in any lawful transaction and in any lawful activity permitted to be conducted by a limited liability company under the Kansas Act or any other Applicable Law as may be necessary, incidental, or convenient to carry out the business of the Company (as contemplated by this Agreement); provided the Company will not, without the prior written consent of all Members, (i) form any Subsidiary or own any equity interests in any other Person, (ii) enter into any agreement relating to, or otherwise engaging in, the merger or consolidation of the Company or any Subsidiary with any Person, or (iii) change or reorganize the Company into any other legal form. The Company may execute, deliver, and perform all contracts agreements, and other undertakings and engage in all activities and transactions as may in the opinion of the Managing Member be necessary or advisable to achieve the purposes of the Company.

**Section 2.6. Term.** The term of the Company commenced on the date the Articles was filed with the Secretary of State of the State of Kansas and will continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.  Notwithstanding any term or provisions in this Agreement to the contrary, the existence of the Company will continue at least as long as the Loan remains outstanding.

**Section 2.7. Qualification in Other Jurisdictions.** The Managing Member will cause the Company and each Subsidiary to be qualified, formed or registered under assumed or fictitious names or other limited liability company statutes or similar laws of any jurisdiction in which the Company or an applicable Subsidiary owns property or transacts business if and to the extent that such qualification, formation, or registration is necessary in order to protect the limited liability of the Members or to permit the Company or such Subsidiary lawfully to own property or to transact business. The Managing Member will execute, file and publish all such certificates, notices, statements, or other instruments necessary to permit the Company and each Subsidiary to conduct business as a limited liability company in all jurisdictions in which the Company or each Subsidiary owns property or elects to do business, or to maintain the limited liability of the Members.

Amended and Restated Operating Agreement

### ARTICLE III
### MEMBERSHIP INTERESTS

**Section 3.1. Membership Schedule.** The aggregate equity ownership interests in the Company will be represented by issued and outstanding Membership Interests.

### ARTICLE IV
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 4.1. Initial Capital Contributions.** Contemporaneously with the execution of this Agreement, each of the Vesta Member and the PSC  Member has made an  initial contribution of capital to the Company set forth opposite such Member's name on the Members Schedule. The Managing Member will update the Members Schedule upon the issuance or Transfer of any Membership Interest to any new or existing Member in accordance with this Agreement.

**Section 4.2.  Additional Required Contributions.**

(a)      The Members shall make such additional cash contributions to the Company as are determined and requested by (X) the Managing Member and PSC Manager from time to time (i) to fund budgeted equity described in the then approved Business Plan & Budget, and (ii) to fund Emergency or Necessary Expenditures, or (Y) by any Member to fund the reimbursement of a Guaranty Payment (the **"Additional  Capital Contributions"**).  In the event that the Managing  Member (in the case of (X) above) or any Member (in the case of (Y) above) determines that an Additional Capital Contribution is required, the applicable Member shall send all of the other Members a written request for such Additional Capital Contributions, which shall include a reasonably detailed description of the proposed  use and purpose of such Additional Capital Contributions, and the date on which such Additional Capita] Contributions need to be made by the Members to the Company (which date shall be no earlier than five (5) Business Days after such written request). All Additional Capital Contributions shall be made, on or before the date therefor specified in such request, by the Members pro rata in accordance with their respective Capital Sharing Ratios.

**Section 4.3. Failure to Make Contributions.**

(a)    Any Member who fails to timely contribute, or notifies the Managing Member that it will not contribute, all or any portion of its pro rata share of Additional Capital Contributions (each, a **"Defaulting Member")** will be in breach of this Agreement, and the non-Defaulting Member(s) who have fully funded their respective portion of Additional Capital Contributions (the **"Funding Member"**) may (in its sole discretion):

    (i)      Directly institute proceedings or cause the Company to institute proceedings against the Defaulting Member to obtain payment of its portion of the Additional Capital Contributions which have not been funded (the **"Shortfall Amount"**), together with interest thereon at the Default Rate from the date that such Additional Capital Contributionswere due until the date that such Additional Capital Contributions are made;

    (ii)     Make a Member  Loan pursuant to the terms of Section 4.3(c);

    (iii)    Make a Capital Contribution pursuant to Section 4.3(d); or

    (iv)    Cause the Company to return and pay back to the Funding Member the Additional Capital Contributions made by the Funding Member pursuant to the capital call.

Amended and Restated Operating Agreement

(b)    If a Member is characterized as a Defaulting Member, then, so long as the Member remains a Defaulting Member, it and its corresponding affiliate Member will forfeit and no longer be entitled to any consent or voting rights granted in this Agreement.

(c)    At its election and in its sole discretion, the Funding Member may advance the Shortfall Amount as a **"Member Loan"** to the Defaulting Member in accordance with the provisions of this Section. ln the event that a Funding Member makes a Member Loan, then the amount of such Member Loan shall be paid directly to the Company on behalf of and shall be deemed to be a non-recourse demand loan from the Funding Member to the Defaulting Member (except to the extent of the Defaulting Member's distributions), shall bear interest at the Member Loan Interest Rate (as hereinafter defined), and shall constitute a Capital Contribution of the amount of such Member Loan from the Defaulting Member to the Company. Any such non-recourse loan shall be repaid to the Funding Member from available cash otherwise distributable to the Defaulting Member hereunder. Any available cash used to repay such loan shall be applied first to interest on and then to principal of the Member Loan. The Funding Member shall not have a right to seek repayment of the Member Loan from any source other than any available cash (and fees, if applicable) distributable (or payable) by the Company to the Defaulting Member and its Affiliates. The "**Member Loan Interest Rate"** shall mean an annual rate equal to 18% per annum (compounded annually).

(d)    At its election and in its sole discretion, the Funding Member may fund the Shortfall Amount to the Company, and treat the Shortfall Amount so funded as an additional Capital Contribution to the Company by the Funding Member. In such event, the Capital Sharing Ratio of the Defaulting Member shall be immediately reduced and the Capital Sharing Ratio of the Funding Member shall be immediately increased, in each case, by the number of percentage points equal to the product of (x) a fraction, the numerator of which is the Shortfall Amount and the denominator of which is the total amount of Capital Contributions then made by all Members to the Company times (y) one hundred fifty percent (150%). By way of example only, if the Defaulting Member fails to make an Additional Capital Contribution in response to a capital call resulting in a Shortfall Amount equal to $100,000 and the total contributed Capital Contributions at the time is $5,000,000.00, then the Defaulting Member's Capital Sharing Ratio would be decreased, and the Contributing Partner's Capital Sharing Ratio would be increased, by 3.00 percentage points (calculated in the following manner: (($100,000+$5,000,000) x 1.5 = 3.00 percentage points)). In addition, so long as the Member remains a Defaulting Member, its Promote Sharing Ratio shall be reduced to 0% (and the Promote Sharing Ratios of the other Members with Promote Sharing Ratios will be increased proportionately).

**Section 4.4. Maintenance of Capital Account .** The Company will establish and maintain for each Member a separate capital account (a **capital Account")** on its books and records in accordance with this Section 4.4. Each Capital Account will be established and maintained in accordance with the following provisions:

(a)    Each Member's Capital Account will be increased by the amount of:

    (i)    such Member's Capital Contributions;

    (ii)    any Net Income or other item of income or gain al1ocated to such Member pursuant to ARTICLE VI; and

    (iii)    any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

Amended and Restated Operating Agreement

(b)    Each Member's Capital Account will be decreased by:

    (i)    the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VII and Section 13.3(c);

    (ii)    the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE VI; and

    (iii)    the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 4.5. Succession Upon Transfer.** In the event that a Membership Interest is Transferred in accordance with the terms of this Agreement, the Transferee will succeed to the Capita) Account of the Transferor to the extent it relates to the Transferred Membership Interest and, subject to Section 6.4, will receive allocations and distributions pursuant to ARTICLE VI, ARTICLE VII, and ARTICLE XIII in respect of such Membership Interest.

**Section 4.6.  Negative Capital Accounts.**  In the event that any Member will have a deficit balance in its Capital Account, such Member will have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any contributions of capital to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 4.7.  No Withdrawals From Capital Accounts.**  No Member will be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement. No Member, including the Managing Member, will receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income gain, loss, and deduction among the Members and will have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 4.8. Treatment of Loans From Members.** Loans by any Member to the Company will not be considered Capital Contributions and will not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 4.4(a)(iii) if applicable.

**Section 4.9.  Modifications.**   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section l.704•l(b) and will be interpreted and applied in a manner consistent with such Treasury Regulations. If the Managing Member determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Managing Member may authorize such modifications.

**ARTICLEV**
**MEMBERS**

**Section 5.1.  Members Schedule.**  The name, address, Capital Sharing Ratios and Promote Sharing Ratios of each member of the Company are set forth on Schedule 1, attached hereto (as amended, the "**Members Schedule"**). The Members Schedule will be revised from time to time by the Managing Member to reflect any of the following accomplished in compliance with the terms of this Agreement: (i) the withdrawal or admission of a member of the Company; (ii) any change in the name or address of a Member; and (iii) any change in

14

the Capita1 Sharing Ratio or Promote Sharing Ratio of a Member.  A Member can modify their address at any time by providing the Managing Member at least five (5) days advance written notice of the same.

**Section 5.2.  Admission of New Members**

(a)     *Additional Members.* No Persons will be admitted to the Company as additional members of the Company except as approved by all Members, and following such approval by the Members (including the terms and conditions thereof) the Managing Member may cause the Company to admit any Person as an additional member of the Company upon (i) the issuance of an additional Membership Interest to such Person, or (ii) any Transfer of a Membership Interest made in accordance with ARTICLE XL.

(b)     *Joinder.* In order for any Person (not already a Member) to be admitted as a member of the Company, whether pursuant to an issuance or Transfer of a Membership Interest, such Person will be required to execute and deliver to the Company a written joinder agreement, the form and substance of which wi11 be determined by the Members. Upon the amendment of the Members Schedule by the Managing Member and the satisfaction of any other applicable conditions, including, without limitation, the receipt by the Company of payment for the issuance of the applicable Membership Interest, such Person will simultaneously be (i) admitted as a member of the Company, (ii) deemed listed as such on the books and records of the Company, and (iii) issued his, her, or its Membership Interest. The Managing Member will adjust the Capital Accounts of the Members, as necessary, upon the admission of any additional Person as a member of the Company.

**Section 5.3. Representations and Warranties of Members.** All Members, whether admitted as of the Effective Date or pursuant to Section 5.2, represent and warrant to the Company and the other Members, and acknowledge that:

(a)     the Membership Interests have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering, and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)     such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Membership Interests;

(c)     such Member's Membership Interest is being acquired for its own account solely for investment purposes and not with a view to resale or distribution thereof:

(d)     such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(e)     with respect to the tax and other legal aspects of investment in the Company and the acquisition and ownership of a Membership Interest, such Member is relying solely upon the advice of such Member's own tax and legal advisors and not upon any representation by any other Member or representative thereof;

Amended and Restated Operating Agreement

(f)       such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(g)       the execution, delivery, and performance of this Agreement by such Member (i) have been duly authorized and do not require such Member to obtain any consent that has not been obtained, and (ii) will not contravene or resu1t in a default under (A) any provision of any law or regulation applicable to such Member, (8) the Organizational Documents of such Member. or (C) any other agreements or instruments to which such Member is a party or by which such Member is bound;

(h)       this Agreement is valid, binding, and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity);

(i)       such Member has been duly organized and is validly existing and in good standing under the laws of the state of its organization; and

(j)       there is no such action or proceeding, pending or threatened, against or affecting such Member before or by any court, administrative agency, or other Governmental Authority that (i) brings into question the validity of the transactions contemplated by this Agreement, (ii) would interfere with or impede in any way the ability of such Member to comply with the terms of this Agreement, (iii) could material1y and adversely affect such Member or any of its respective properties, assets or Affiliates, or (iv) could materially and adversely affect the legality, validity, or enforceability of this Agreement.

**Section 5.4. No Personal Liability.**  Except as otherwise provided in the Kansas Act, by Applicable Law, or expressly in this Agreement no Member will be obligated personally for any debt, obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**Section 5.5. No Withdrawal.** So long as a Member continues to hold a Membership Interest, such Member will not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company will be null and void. As soon as any Person who is a Member ceases to hold a Membership Interest, such Person will no longer be a Member. A Member will not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in the Kansas Act.

**Section 5.6. No Interest in Company Property.**  No real or personal property of the Company will be deemed to be owned by any Member individually, but will be owned by, and title will be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for pa1lition with respect to the property of the Company.

**ARTICLE VI**
**ALLOCATIONS**

**Section 6.l.     Allocation of Net Income and Net Loss.**  For each Fiscal Year(or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and. to the extent necessary, individual items of income gain, loss, or deduction of the Company) will be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.2, the Capital Account balance of each Member

16

immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to Section 13.3(c) if the Company were dissolved, its affairs wound up, and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with Section l3.3(c) to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain computed immediately prior to the hypothetical sale of assets.

**Section 6.2.** **Regulatory and Special Allocations.** Notwithstanding the provisions of Section 6.1:

(a) If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d) during any Fiscal Year, each Member will be allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated will be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and I .704-2(i)(2). This Section 6.2 is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section I.704-2(i) and will be interpreted consistently therewith.

(b) Member Nonrecourse Deductions will be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain will be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph will be determined in accordance with Treasury Regulations Sections l.704-2(i). This Section 6.2(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and will be interpreted consistently therewith.

(c) Nonrecourse Deductions will be allocated to the Members in accordance with their Capital Sharing Ratios.

(d) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section l.704 l(b)(2)(ii)(d)(4), (5) or (6), Net Income will be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This Section 6.2(d) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-2 (b)(2)(ii)(d) and will be interpreted consistently therewith.

(e) The allocations set forth in paragraphs (a), (b), (c) and (d) above (the **"Regulatory Allocations")** are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this ARTICLE VI (other than the Regulatory Allocations), the Regulatory Allocations will be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member will be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 6.3.  Tax Allocations.**

17

(a)    Subject to <u>Section 6.3(b), Section 6.3(c),</u> and <u>Section 6.3(d),</u> all income, gains, losses, and deductions of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions pursuant to <u>Section 6.1</u> and <u>Section 6.2</u>, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions will be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in <u>Section 6.1</u> and <u>Section 6.2</u>.

(b)    Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company will be allocated among the Members in accordance with Code Section 704(c) and the traditional method with curative allocations of Treasury Regulations Section 1.704-3(c), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)    If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in <u>clause (c)</u> of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)    Allocations of tax credit, tax credit recapture and any items related thereto will be allocated to the Members according to their interests in such items as determined by the Managing Member taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)    Allocations pursuant to this <u>Section 6.3</u> are solely for purposes of federal, state and local taxes and will not affect or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 6.4.**    **Allocations in Respect of Transferred Membership Interests.**  In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of <u>ARTICLE XI,</u> Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year will be determined using the interim closing of the books method.

**ARTICLE VII**
**DISTRIBUTIONS**

**Section 7.1.**    **Distributions of Cash Flow and Capital Proceeds.**

(a)    Unless otherwise set forth in this Agreement, any available cash of the Company, after allowance for all reasonable costs and expenses incurred by the Company and for such reasonable reserves as the Managing Member and PSC Manager will establish, will be determined by the Managing Member and PSC Manager on a quarterly basis (on January 10, April 10, July 10 and October 10 of each calendar year) and any such available cash shall be distributed to the Members in the following order of priority:

      (i)    *First,* one hundred percent (100%) to the Members pro rata in accordance with their Capital Sharing Ratios, until each of the PSC Member and the Vesta Member has received

18

aggregate distributions (taking into account all distributions made or deemed made in prior periods) in an amount sufficient to achieve an Internal Rate of Return of twelve percent (12%); then

   (ii) *Second,* sixty-six and two-thirds percent ($66^{2/3}$%) to the Members pro <u>rata</u> in accordance with their Capital Sharing Ratios, and thirty-three and one-third percent ($33^{1/3}$% ) to the Members pro rata in accordance with their Promote Sharing Ratios.

(b) If a Member Loan is outstanding, any amount(s) that otherwise would be distributed to a Defaulting Member pursuant to <u>Section 7.l(a)</u> or <u>Section 13.3(c)</u> (up to the amount of such outstanding Member Loan together with interest accrued thereon) will not be paid to such Defaulting Member but will be deemed distributed to such Defaulting Member and applied on behalf of such Defaulting Member pursuant to <u>Section 4.3(c}.</u>

(c) Notwithstanding any provision to the contrary contained in this Agreement, the Company will not make any distribution to Members if such distribution would violate the Kansas Act or other Applicable Law.

(d) Notwithstanding any provision to the contrary contained in this Agreement, any distributions under Section 7. l(a)(ii) above to be distributed, directly or indirectly, to Marc Kulick as a Vesta Promote Member, following the Transfer of the all Property or any part thereof (other than with respect to any loan or refinancing to the Company) shall be distributed to the PSC Promote Member until such assignment of distributions shall be equal to Sixty-Six Thousand Six Hundred and Sixty-Six Dollars ($66,666.00).

## Section 7.2. Tax Withholding; Withholding Advances.

(a) *Tax Withholding.* If requested by the Managing Member, each Member will, if able to do so, deliver to the Managing Member:

   (i) an affidavit in form satisfactory to the Managing Member that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign, or other Applicable Law;

   (ii) any certificate that the Managing Member may reasonably request with respect to any such laws; and

   (iii) any other form or instrument reasonably requested by the Managing Member relating to any Member's status under such law.

 If a Member fails or is unable to deliver to the Managing Member the affidavit described in <u>Section 7.2(a),</u> the Managing Member may withhold amounts from such Member in accordance with <u>Section 7.2(b).</u>

(b) *Withholding Advances.* The Company is hereby authorized at all times to make payments **("Withholding Advances")** with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local, or foreign taxing authority (a **"Taxing Authority")** with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this <u>Section 7.2(b)</u> will nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

19

(c)  *Repayment of Withholding Advances.*  Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member will, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum (the **"Company Interest Rate"):**

    (i)  be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member will not constitute a Capital Contribution, but will credit the Member's Capital Account if the Managing Member will have initially charged the amount of the Withholding Advance to the Capital Account); or

    (ii)  with the consent of the Managing Member, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount will be deemed to have been distributed to the Member, but which will not further reduce the Member's Capital Account if the Managing Member will have initially charged the amount of the Withholding Advance to the Capital Account).

Interest will cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)  *Indemnification.* Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this Section 7.2(d) and the obligations of a Member pursuant to Section 7.2(c) will survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interest. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.2, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e)  *Over-witholding.* Neither the Company nor the Managing Member will be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an over-withholding, a Member's sole recourse will be to apply for a refund from the appropriate Taxing Authority.

**Section 7.3.      Distributions in Kind.**

(a)  The Managing Member is hereby authorized, as it may reasonably determine, to make distributionsto the Members in the form of securities or other property held by the Company. In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 7.l(a).

(b)  Any distribution of securities will be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

Amended and Restated Operating Agreement

## ARTICLE VIII
## MANAGEMENT

**Section 8.1.    Management of the Company.** The business and affairs of the Company will be managed by the Managing Member. Subject to the provisions of Section 8.2, the Managing Member will have full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set forth in Section 2.  The actions of the Managing Member taken in accordance with the provisions of this Agreement will bind the Company.  No Non-Managing Member will have any authority or right to act on behalf of or bind the Company, unless otherwise provided herein or unless specifically authorized by the Managing Member pursuant to a resolution expressly authorizing such action, which resolution is duly adopted by the Managing Member.

**Section 8.2.    Limitations of Material Actions.**  Notwithstanding anything to the contrary contained in this Agreement, the Managing Member will not cause or permit the Company or a Subsidiary to engage in or peform any of the following acts (each, a **"Material Action"**) without (y) the approval of all Members, and (z) the approval (to the extent required) of a Company Lender, except to the extent such matter is expressly permitted in any then-current Business Plan & Budget:

(a)    Adopt or amend the Business Plan & Budget;

(b)    Modify, deviate from, or make any expenditure not provided for in the Business Plan & Budget, subject to Permitted Budget Deviations;

(c)    Transfer any interest in the Property, except as otherwise provided in this Agreement;

(d)    Acquire, by purchase, ground lease, or otherwise., any land or other real property or interest therein, other than the Property;

(e)    Institute proceedings to adjudicate the Company or any Subsidiary bankrupt, or consent to (i) the filing of (A) a bankruptcy proceeding against the Company or any Subsidiary, (B) a petition or answer consenting to or seeking the reorganization of the Company or any Subsidiary under the bankruptcy code or any other similar applicable federal or state 1aw or (C) any such petition against the Company or any Subsidiary, (ii) the appointment of a receiver, liquidator, or trustee or assignee in any bankruptcy or insolvency proceedings involving the Company or any Subsidiary or their respective assets (or any portion thereof), or (iii) the making of an assignment for the benefit of creditors of the Company or any Subsidiary, or (iv) an admission by the Company or any Subsidiary of an inability to pay debts generally as they become due;

(f)    Terminate and dissolve the Company (or causing or consenting to any such action relating to a Subsidiary);

(g)    Take any action in contravention of, or amend, modify, or waive, the provisions of this Agreement, the Articles, or the Organizational Documents of any Subsidiary;

(h)    Approve or enter into any real property lease comprising more than twenty percent (20%) of the gross leasable area of the Property;

(i)    Create, incur, or become obligated for any bank indebtedness other than the Approved Financing, or refinance the Approved Financing indebtedness;

21

(j)     Institute or settle any legal action or any insurance claim involving the Company, any Subsidiary, or any of their respective assets, or any condemnation action with respect to the Property (or any portion thereof) involving a claim that is not covered by insurance or that is greater than or equal to $100,000;

(k)     Removing or redeeming any Member, or approving the admission to any Subsidiary of a successoror an additional partner or member or other equity owner;

(l)     Submit a Company (or Subsidiary) claim to arbitration or engaging, terminating and/or replacing counsel to defend or prosecute on behalf of the Company (or any Subsidiary) any action or proceeding, specifically excluding, however, audits, enforcement of rights and remedies under leases and other recorded instruments, and other customary matters relating to the continued operation of the Company and each Subsidiary, to the extent the same are less than or equal to $100,000; or

(m)     Alter the nature of the business of the Company or its subsidiaries from that set forth in Section 2.5.

**Section 8.3. Officers.** The Managing Member may appoint individuals as officers of the Company (the **"Officers"**) as it deems necessary or desirable to carry on the business of the Company and the Managing Member may delegate to such Officers such power and authority as the Managing Member deems advisable.  No Officer is required to also be a Member.  Any individual may hold two or more offices of the Company. Each Officer will hold office until his successor is designated by the Managing Member or until  his earlier death, resignation, or removal. Any Officer  may  resign  at any time upon  written  notice to the Managing Member. Any Officer may be removed by the Managing Member with or without cause at any time. A vacancy in any office occurring  because of death,  resignation,  removal or otherwise, may. but need not, be filled by the Managing Member.

**Section 8.4. Action Without Meeting.** Any matter that is to be voted on, consented to, or approved by Members may be taken  without a meeting, without  prior notice and  without a vote if consented  to, in writing or by Electronic Transmission, by a Member or Members having not less than the minimum number of votes that would  be necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A record will be maintained by the Managing Member of each such action taken by written consent of a Member or Members.

**Section 8.5. Informational Rights.** In addition to the information required to be provided pursuant to ARTICLE XII, the Managing  Member  will keep the other Members  reasonably  infom1ed  on a timely  basis of any material fact, information, litigation, employee relations, or other matter that could reasonably be expected to have a material impact on the operations or financial position of the Company, including, but not limited to, any modification of any loan or other financing to the Company. The Managing Member will provide all material information relating to the Company or the management or operation of the Company as any Member may reasonably request from time to time.

**Section 8.6.  Business Plan** & **Budget.**

(a)     The Members shall seek to approve the initial business plan and annual budget for the Company through the Fiscal Year ending December 31, 2018 (the **"Business Plan** & **Budget'·)** within 90 days after October 24, 2017. The Managing Member will use its commercially reasonable efforts to operate the Company in accordance with the Business Plan & Budget.

(b)  At least thirty (30) days before the beginning of each Fiscal Year (commencing with the FiscalYear ending December 31, 2019), the Managing Member will prepare and submit to the Non- Managing Members proposed revisions (including any extensions thereof) to the Business Plan & Budget for such upcoming Fiscal Year. Not later than fourteen (14) days following receipt of the proposed revisions, the Non-Managing Members will, by written notice to the Managing Member, either approve or disapprove the revised Business Plan & Budget. If the Non-Managing Members do not respond in writing to the proposed revisions prior to the end of such fourteen (14)-day period, the Non-Managing Members will be deemed to have approved the revised Business Plan & Budget. If the Non-Managing Members disapprove of the proposed revisions, then the Members will use good faith efforts to agree on a revised Business Plan & Budget. The Managing Member will continue to operate the Company in accordance with the existing Business Plan & Budget until a revised Business Plan & Budget is approved by all Members.

(c)  At any time during each Fiscal Year, the Managing Member in consultation with the Non-Managing Members, may prepare and submit proposed revisions to the Business Plan & Budget for that Fiscal Year. Not later than fourteen (14) days following receipt of the proposed revisions, the Non-Managing Members will, by written notice to the Managing Member, either approve or disapprove the revised Business Plan & Budget. If the Non-Managing Members do not respond in writing to the proposed revisions prior to the end of such fourteen (14)-day period, the Non- Managing Members will be deemed to have approved the revised Business Plan & Budget.

**Section 8.**7. **Other Business Activities.** Nothing contained in this Agreement will prevent any Member, including the Managing Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the business of the Company. None of the Members or their Affiliates will be obligated to account to theCompany or to the other Member for any profits or income earned or derived from other such activities or businesses. None of the Members or their Affiliates will be obligated to inform the Company or the other Member of any business opportunity of any type or description.

**Section 8.8.  Compensation and Reimbursement of Managing Member.**  The Managing Member will not be compensated for its services as the managing member of the Company, but the Company will reimburse the Managing Member and PSC Member for all necessary expenses incurred by the Managing Member on behalf of the Company in carrying out the Company's business activities. All reimbursements for expenses will be reasonable in amount and will not exceed amounts set forth in the Business Plan & Budget for any Fiscal Year.

**ARTICLE IX**
**COMPANY OPERATION**

**Section 9.1.  Approved Financings.** The following indebtedness obligations have been authorized and approved by the Members (each, an **"Approved Financing"):**

(a)  *Mortgage Loan.*  The non-recourse loan in the original principal amount of $_____ made by Berkadia Commercial Mortgage LLC, as the Company Lender, to be insured by HUD under Section 207 pursuant to Section 223(f) of the National Housing Act, as amended, to the Company ("**Borrower**"), which obligations are secured by a lien upon the Property.

(b)  *Future Indebtedness.* The Members agree that no other indebtedness obligation or financing arrangement will be made by the Company or ay Subsidiary without the consent of all Members.

**Section 9.2.  Guaranties.**

23

(a)   *Project Guaranties.* To the extent requested by the Company Lender(s), the Managing Member will cause its Affiliates to provide environmental indemnities and non-recourse carve-out guaranties (collectively, the **"'Project Guaranties,"** and each, a **' Project Guaranty")** to Company Lender(s) in form and substance acceptable to the Managing Member.

(b)   *Satisfaction of Guaranty Obligations.* If a Member or its Affiliate is required to make a contribution of capital to the Company or remit payment to a Company Lender under any applicable Project Guaranty (each such required contribution or payment, a **"Guaranty Obligation"),** then such Member will, and will cause its Affiliates who have executed a Project Guaranty to, satisfy such Guaranty Obligation, in full and when due (the satisfaction of any Guaranty Obligation in full and when due by a Member or such Affiliates, a **"Guaranty Payment"**), upon initial notice from such Company Lender or a Member, in each case, without any additional notice from any other Member.

*(c)   Treatment & Classification of Guaranty Payments.*

   (i)   Guaranty Payments made by an Affiliate of a Member will be deemed made by such Member for purposes of this Agreement

   (ii)   Notwithstanding Section 9.3 to the contrary, Guaranty Payments will be deemed expenses of the Company and subject to the reimbursement provisions of Section 9.3(b) and subject to being funded by Additional Capital Contributions; provided that, a Guaranty Payment made by a Member as a result of the fraud, willful misconduct, or gross negligence of such Member or its Affiliates will not be deemed expenses of the Company or subject to the reimbursement provisions of Section 9.3(b).

**Section 9.3.   Company Expenses.**

(a)   *Expenses Not Borne by the Company.* Each Member will pay, without reimbursement by the Company, all of its own ordinary administrative and overhead expenses in connection with the activities of the Company, including all costs and expenses on account of salaries, wages, bonuses, and other employee benefits, but excluding any costs or expenses incurred or paid by a Member that were included as expenses of the Company in any then-applicable approved Business Plan & Budget.

(b)   *Ongoing Company Expenses.* On an ongoing basis, except for the expenses provided for in Section 9.3la), the Company will pay or reimburse the Members or their Affiliates (as applicable) for all costs, expenses, liabilities, and obligations paid by such Members or their Affiliates on behalf of the Company relating to the Company's business, investments, and activities (collectively, the **"Company Expenses")** that are approved in a Business Plan & Budget or are otherwise approved by the Members.

**Section 9.4.   Property Sale Upon Deadlock.**

(a)   *Deadlock.* If the Members are unable to agree on any of the matters described in Section 8.2, and such disagreement continues for fifteen (15) days despite good faith deliberations by the Members, then either the PSC Member or the Vesta Member (for purposes hereof, the **"Evoking Member")** will have the right to unilaterally elect to cause the Company to solicit offers from prospective third party purchasers to buy the Property (each, a **"Property Sale Offer"**). Upon determining to solicit a Property Sale Offers, the Evoking Member (A) will notify the Members, in writing, of any such election (a **"Property Sale Election"**), and (B) request that the Managing Member prepare an information package on the Property that includes (y) a form sale contract reasonably approved by the Members

Amended and Restated Operating Agreement

(to be executed by any such prospective third-party purchaser), and (z) the other material terms and conditions on which the Evoking Member is prepared to have the Company sell and otherwise dispose of the entire Property.

(b)     *Property Sale Notice.* If the Company obtains a Property Sale Offer within six (6) months after delivery of a Property Sale Election, and an Evoking Member determines, in its sole discretion, that the Company should accept such Property Sale Offer, such Evoking Member will provide written notice **("Property Sale Notice")** to the Members of its desire to accept such Property Sale Offer. The non-Evoking Member(s) will have fifteen (15) Business Days from the delivery of any Property Sale Notice to notify the Evoking Member, in writing, of the election (the **"Election Notice"**) of the non-Evoking Member(s) to either:

(i)     approve the Property Sale Offer in which case the Evoking Member will be authorized to effect a sale of the entire Property, in the name and on behalf of the Company, on the terms and subject to the conditions set forth in the applicable Property Sale Offer; or

(ii)    purchase (or cause their assigns to purchase) the Property on substantially the same terms and conditions as set forth in the applicable Property Sale Offer (net of any commission that would customarily be payable by the Company in the event of a sale of the property to a third party), provided the non-Evoking Member(s) must close such purchase within nine (9) months following the Evoking Member's delivery of any Property Sale Notice;

provided that (y) failure to deliver an Election Notice on or before fifteen (15) Business Days from the delivery of any Property Sale Notice will be deemed to be an election of Section 9.4(b)(i) and (z) in order for a Property Sale Offer to be valid, it must be a bona fide, arm's length, all-cash offer from a third party for the entire Property, and must be accompanied by a signed contract of sale.

(c)     *Property Sale.* The Company will not sell or Transfer the Property without the prior written consent of all Members except in accordance with this Section 9.4.

**Section 9.5.     Property Management.**

(a)     Subject to the terms and conditions of this Agreement and the Property Management Agreement, the Property Manager will be engaged to oversee the management of the Property.

(b)     The Company will be permitted to pay a fixed fee to the Property Manager in accordance with the Property Management Agreement (the **"Property Management Fee"**); provided that the Property Management Fee will at all times not exceed three and one-half percent (3.5%) of the gross revenue from the Property; and (b) the Property Management Fee will accrue monthly and be payable to the Property Manager each calendar month.

**Section 9.6.     No Brokers.**

(a)     No Member has engaged a broker in connection with the transactions contemplated by this Agreement.

(b)     Each Member will indemnify, defend, and hold ha1mJess the other Members and their Affiliates for all claims for any commissions or fees made by any Person that. allege to have dealt with such Member or its Affiliates in connection with the transactions contemplated by this Agreement.

25

**Section 9.7.  Authorized Representatives.**

(a)     Each Authorized Representative appointed by a Member will act as an authorized representative of such Member (under the sole and exclusive direction and control  of such Member) and will  be free to represent the views and positions, of such appointing Member.

(b)     Where reference is made in this Agreement to the consent, approval, or agreement by the Authorized  Representatives or the Members, such consent, approval,  or agreement  will  be granted or withheld by the Members acting through their Authorized Representatives.

(c)     Each Member may change its Authorized Representative at any time by written notice to the other Member(s), but each Member must at all times have at least one currently appointed Authorized Representative who may act in all matters for such Member.

**Section 9.8.  Non-Solicitation.**  In light of each Member's access to Confidential  Information and position of trust and confidence with the Company, each Member agrees that it will not, directly or indirectly through one or more of any of its respective Affiliates, solicit or entice, or attempt to solicit or entice any current or prospective tenants of the Company or any Subsidiary for purposes of diverting their business from the Company and which would result in an adverse effect to the Company. If any court of competent jurisdiction determines that any covenant set forth in this Section 9.8 is unenforceable because of the duration or geographic scope of such provision, such court will have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Section 9.8, or by making such other modifications as it deems warranted to carry out the intent and agreement of the Members as embodied herein to the maximum extent permitted by Applicable Law. The Members expressly agree that this Agreement as so modified by the court will be binding upon and enforceable against each of them.

### ARTICLEX
### EXCULPATION  AND INDEMNIFICATION

**Section 10.1. Exculpation of Covered Persons.**

(a)     *Covered Persons.* As used herein, the term **"Covered Person'** will mean (i) each Member, including the Managing Member; (ii) each officer, director, stockholder, partner, member, Affiliate, employee, agent or representative of each Member, and each of their Affiliates; and (iii) each Officer, employee, agent, or representative of the Company.

(b)     *Standard of Care.* No Covered Person will be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement by such Covered Person or is not made in knowing violation of the provisions of this Agreement.

(c)     *Good Faith Reliance.* A Covered Person will be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial  statements and information, opinions, repo11s or statements as to the value or amount of the assets liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more Officers or employees of the Company;

26

Amended and Restated Operating Agreement

(iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence will in no way limit any Person's right to rely on infom1ation to the extent provided in the Kansas Act.

**Section 10.2.   Company Indemnification.**

(a) *General Indemnification Obligation.*  To the fullest extent permitted by the Kansas Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement, only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Kansas Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company will indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and an losses, claims, damages, judgments, fines, Guaranty Payments or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, Guaranty Payments or liabilities, and any amounts expended in settlement of any claims (collectively, **"Losses"**) to which such Covered Person may become subject by reason of:

 (i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member, or any direct or indirect subsidiary of the foregoing in connection with the business of the Company; or

 (ii) such Covered Person being or acting *in* connection with the business of the Company as a member, stockholder, Affiliate, manager, director, officer, employee, guarantor or agent of the Company, any Member, or any of their respective Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, guarantor or agent of any Person including the Company;

provided that, (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud, gross negligence, or willful misconduct, or knowing violation or material breach of this Agreement, in either case, as detem1ined by a final, non-appealable order of a court of competent jurisdiction.  In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal  proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person s conduct constituted  fraud, gross negligence, willful misconduct or a knowing violation or material breach of this Agreement. For purposes of this Section 10.2, the Business Plan & Budget will be separate and apart from the Agreement and not deemed part of this Agreement even though it is attached hereto as an exhibit.

(b) *Control of Defense.* Upon a Covered Person's discovery of any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 10.2, the Covered Person will give prompt written notice to the Company of such claim., lawsuit or proceeding, provided that, the failure of the Covered Person to provide such notice will not relieve the Company of any indemnification obligation under this Section 10.2, unless the Company will have been materially prejudiced thereby. Subject to the approval of the disinterested Members the

Amended and Restated Operating Agreement

Company will be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.   After notice from the Company to the Covered  Person of its election to assume the defense of any such claim, lawsuit or proceeding, the Company will not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred  by the Covered  Person in connection  with investigating, preparing  to defend or defending any such claim, lawsuit or other proceeding. ff the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit or proceeding, the Covered Person will have the right to assume  the defense of such claim,  lawsuit or proceeding  as it deems appropriate,  but it will not settle any such claim, lawsuit or proceeding without the consent of the Company (which consent will not be  unreasonably  withheld. conditioned or delayed).

(c)      *Reimbursement.* The Company will promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) by such Covered Person in connection with investigating, preparing to defend, or defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 10.2; provided that, if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section I0.2, then such Covered Person will  promptly reimburse the Company  for any reimbursed or advanced  expenses.

(d)      *Entitlement to Indemnity.* The indemnification provided by this Section 10.2 will not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 1 0.2 will continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 10.2 and will inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)      *Insurance.*  To the extent available on commercially reasonable terms, the Company may purchase, at its expense,  insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managing Member may reasonably determine; provided that, the failure to obtain such insurance will not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage then such Covered Person will, to the extent that such recovery is duplicative. reimburse  the Company  for any amounts previously  paid  to such Covered  Person  by the Company in respect of such Losses.

(f)      *Funding of Indemnification Obligation.* Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in **Section 10.2** will be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) will have personal liability on account thereof or wi11 be required to make additional contributions of capital to the Company to help satisfy such indemnity by theCompany.

(g)      *Savings Clause.* If this Section 10.2 or any portion hereof will be invalidated on any ground by any court of competent jurisdiction, then the Company will nevertheless indemnify and hold harmless each Covered  Person pursuant to this Section 10.2 to the fullest extent permitted by any

Amended and Restated Operating Agreement

applicable portion of this Section 10.2 that will not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)     *Amendment.* The provisions of this Section 10.2 will be a contract between the Company on the one hand, and each Covered Person who served in such capacity at any time while this Section 10.2 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification, or repeal of this Section 10.2 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification, or repeal will apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 10.3.    Survival.** The provisions of this ARTICLE X will survive the dissolution, liquidation, winding up, and termination of the Company.

**ARTICLE XI**
**TRANSFER**

**Section 11.1.    Restrictions on Transfer.**

(a)     Except as otherwise provided in this ARTICLE XI, (i) no Member will Transfer all or any portion of its Membership Interest without the written consent of the other Members (which consent may be granted or withheld in the sole discretion of the other Member), and (ii) no Transfer of a Membership Interest to a Person not already a Member will be deemed completed until the prospective Transferee is admitted as a member of the Company in accordance with Section 5.2(b).

(b)     Notwithstanding any other provision of this Agreement, each Member agrees that it will not Transfer all or any portion of its Membership Interest, and the Company agrees that it will not issue any Membership Interest:

   (i)      except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of a Membership Interest, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

   (ii)     if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section I. 7704-1(h)(l )(ii), including the look-through rule in Treasury Regulations Section 1. 7704-1(h)(3);

   (iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Kansas Act;

   (iv)     if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

   (v)      if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

Amended and Restated Operating Agreement

(vi)     if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vii)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)    Any Transfer or attempted Transfer of a Membership Interest in violation of this Agreement will be null and void, no such Transfer will be recorded on the Company's books and the purported Transferee in any such Transfer will not be treated (and the purported Transferor will continue be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)    For the avoidance of doubt, any Transfer of a Membership Interest permitted by this Agreement will be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and will not be deemed a sale, transfer, assignment, or other disposal of any  less than all of the rights and  benefits described  in the definition of the term "Membership Interest," unless otherwise explicitly agreed to by the parties to suchTransfer.

(e)    Notwithstanding anything to the contrary in this Article XI, the Vesta Member or the Vesta Promote Member may at any time and from time to time, without the consent or approval of any other Member, Transfer all or any portion of its respective Membership Interest to any Affiliate of the Vesta Member or the Vesta Promote Member or any other Person so long as, in each case, theVesta Control Group retains management authority and control over such Membership Interest. In addition, direct and indirect ownership interests  in the Vesta Member or the Vesta Promote Member may be Transferred  to any Affiliate of the Vesta Member or  the Vesta Promote Member or to any other Person so Jong as, in each case the Vesta Control Group retain management authority and control over the Vesta Member or the Vesta Promote Member. Furthermore, but subject in all events to the continued compliance with the clauses above in this subsection (e), any owner of a direct or indirect interest in the Vesta Member or the Vesta Promote Member shall be permitted to Transfer all or a portion of such interest to one or more trusts for the benefit of any family member of such transferor. The **"Vesta Control Group"** means Marc Kulick, Josef Loeffler, Frank Loeffler and John Alex Upperman.

### ARTICLE XII
### ACCOUNTING; TAX MATTERS

**Section 12.l.    Financial Statements.** The Managing Member will cause the Company will furnish to each Member the following reports:

(a)    *Annual Financial Slatements.*  As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year, unaudited consolidated balance sheets of the Company as at the end of each such  Fiscal Year and unaudited conso1idated statements of income, cash flows, and Members' equity for such Fiscal Year,  in each case setting forth in comparative  form the figures for the previous Fiscal Year, all in reasonable detail.

(b)

   *Monthly Financial Statements.* As soon as available, and in any event within thirty (30) days after the end of each  monthly accounting  period, unaudited  consolidated  balance sheets of the Company as at the end of each such monthly period and for the current Fiscal Year to date and unaudited

consolidated statements of income, cash flows, and Members' equity for each such monthly period and for the current Fiscal Year to date, all in reasonable detail.

**Section 12.2. Inspection Rights.** Upon reasonable notice from a Member, the Company will afford each Member and its Representatives access during normal business hours to: (a) the Company's properties and facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters, andcommunications with Members (including the Managing Member), and to permit each Member and its Representatives to examine such documents and make copies thereof; and (c) any officers, senior employees and pub1ic accountants of the Company, and to afford each Member and its Representatives the opportunity to discuss and advise on the affairs, finances and accounts of the Company with such officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member and its Representatives such affairs, finances, and accounts).

**Section 12.3.    Income Tax Status.**  It is the intent of this Company and the Members that this Company will be treated as a partnership for U.S., federal, state, and  local income tax purposes.  Neither the Company nor any Member will make an election for the Company to be classified  as other than a  partnership pursuant to Treasury Regulations Section 301.7701-3.

**Section 12.4.  Tax Matters Member; Partnership Representative.**

(a)    *Appointment.* The Members hereby appoint the Managing Member as the "tax matters partner" (as defined in Code Section 6231 prior to its amendment by the Bipartisan Budget Act of 2015 C'**BBA"))** (the **"Tax Matters Member')** and the "partnership representative" (the **"Partnership Representative")** as provided in Code Section 6223(a) (as amended by the BBA). The Tax Matters Member or Partnership Representative may resign at any time if there  is another  Managing Memberto act as the Tax Matters Member or Partnership Representative.

(b)    *Tax Examinations and Audits.* The Tax Matters Member and Partnership Representative are each authorized  and required  to represent  the Company (at the Company's expense)  in connection  with all examinations of the Company's affairs by Taxing Authorities,  including  resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees that such Member will not independently act with respect to tax audits or tax litigation of the Company, unless previously authorized to do so in writing by the Tax Matters Member or Partnership Representative, which authorization may be withheld by the Tax Matters Member or Partnership Representative in its sole and absolute discretion. The Tax Matters Member or Partnership Representative will have sole discretion to determine whether the Company (either on its own  behalf or on  behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority.

(c)    *BBA Elections.* The Company will not elect into the partnership audit procedures enacted under Section I 10 J of the BBA (the **'"BBA Procedures")** for any tax year beginning before January 1, 2018, and, to the extent permitted by applicable law and regulations, the Company will annually elect out of the BBA Procedures for tax years beginning on or after January 1, 2018 pursuant to Code Section 6221(b) (as amended by the BBA). For any year in which applicable law and regulations do not permit the Company to elect out of the BBA Procedures, then within  forty-five (45) days of any notice of final partnership adjustment, the Company will elect the alternative procedure under Code Section 6226, as amended by Section 110 I of the BBA, and furnish to the Internal Revenue Service and each Member during the year or years to which the notice of final

31

partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

(d)     *Tax Returns and Tax Deficiencies.* Each Member agrees that such Member will not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any taxes imposed pursuant to Code Section 6226 as amended by the BBA) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.2(d).

(e)     *Income Tax Elections.* Except as otherwise provided herein, each of the Tax Matters Member and Partnership Representative will have sole discretion to make any determination regarding income tax elections it deems advisable on behalf of the Company; provided, that the Tax Matters Member or Partnership Representative will make an election under Code Section 754, if requested in writing by another Member.

**Section 12.5.    Tax Returns.**  At the expense of the Company, the Managing Member (or any Officer that it may designate pursuant to Section 8.3) will endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company own property or do business. The Managing Member will provide the Non-Managing Member, for its review and comment, copies of all tax returns prior to the filing thereof. As soon as reasonably possible after the end of each Fiscal Year, the Managing Member or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

**Section 12.6. Company Funds.** All funds of the Company will be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts. or held in its name in the form of such other investments as will be designated by the Managing Member. The funds of the Company will not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company will be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

**ARTICLE XIII**
**DISSOLUTION AND**
**LIQUIDATION**

**Section 13.1. Events of Dissolution.** The Company will be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a)     The determination of the Members to dissolve the Company;

(b)     The Bankruptcy of a Member, unless within ninety (90) days after the occurrence of such Bankruptcy, the other Members agree in writing to continue the business of the Company

(c)     The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d)     The entry of a decree of judicial dissolution under the Kansas Act.

32

Amended and Restated Operating Agreement

**Section 13.2. Effectiveness of Dissolution.**  Dissolution of the Company will be effective on the day on which the event described in Section 13.1 occurs, but the Company will not terminate until the winding upof the Company has been completed. the assets of the Company have been distributed as provided in Section 13.3 and the Articles will have been cancelled as provided in Section 13.4.

**Section 13.3. Liquidation.** If the Company is dissolved pursuant to Section 13.1, the Company will be liquidated and its business and affairs wound up in accordance with the Kansas Act and the following provisions:

(a)   *Liquidator.* The Managing Member will act as liquidator to wind up the Company (the **"Liquidator"),** unless the Company is being dissolved based on the Bankruptcy by the Managing Member, in which case the Liquidator will be appointed the Non-Managing Members. The Liquidator will have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)   *Accounting.* As promptly as possible after dissolution and again after final liquidation, the Liquidator will cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets., liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)   *Distribution of Proceeds.* The Liquidator will liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

   (i)   First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

   (ii)   Second, to the establishment of and additions to reserves that are determined by the Managing Member to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

   (iii)   Third, to the Members in the same manner as distributions are made under Section 7.1(a).

(d)   *Discretion of Liquidator.* Notwithstanding the provisions of Section 13.3(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.3(c), if upon dissolution of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabi1ities and reserves, and may distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.3(c) undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, any property to be distributed will be valued at its fair Market Value.

**Section 13.4. Cancellation of Articles.**  Upon completion of the distribution of the assets of the Company as provided in Section 13.3(c) the Company will be terminated and the Liquidator will cause the cancellation of the Articles in the State of Kansas and of all qualifications and registrations of the Company

Amended and Restated Operating Agreement

as a foreign limited liability company in jurisdictions other than the State of Kansas and will take such other actions as may be necessary to terminate the Company.

**Section 13.5. Survival of Rights, Duties, and Obligations.** Dissolution, liquidation, winding up, or termination of the Company for any reason will not release any party from any Losses that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up, or termination. For the avoidance of doubt, none of the foregoing will replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 10.2.

**Section 13.6. Recourse for Claims.** Each Member will look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss, and other items of income, gain, loss, and deduction, and will have no recourse therefor (upon dissolution or otherwise) against the Liquidator or any other Member.

### ARTICLE XIV
### HUD REQUIREMENTS

**14.1.  HUD Required Previsions.**  Notwithstanding any term or provision in the Articles of Organization or this Agreement to the contrary, and so long as the United States Department of Housing and Urban Development ("**HUD**"), or its successors or assigns, insures or holds any loan to Borrower (the "HUD-Insured Loan"), including the loan secured by a mortgage lien on the Property, the provisions set forth in this Article XIV shall apply.

**14.2. Definitions**.  The terms listed below shall have the following definition:

(a)  "Borrower" means Jenk's Best Living, LLC.

(b)  "Lender" means the entity identified as "Lender" in the first paragraph of the Security Instrument, or any subsequent holder of the HUD-Insured Note.

(c)  "HUD Regulatory Agreement" means the Regulatory Agreement between Borrower and HUD with respect to the Property, as the same may be supplemented, amended or modified from time to time.

(d)  "Security Instrument" means the mortgage or deed of trust from Borrower in favor of Lender, as the same may be supplemented, amended, or modified.

**14.3  Requirements.**  The following requirements shall be binding and enforceable with respect to this Agreement:

(a)  If any of the provisions of Borrower's organizational documents conflict with the terms of the HUD-Insured Note, Security Instrument, or HUD Regulatory Agreement ("**HUD Loan Documents**"), the provisions of the HUD Loan Documents shall control.

(b)  No provision required by HUD to be inserted into the organizational documents may be amended without HUD's prior written approval. Additionally, if there is a conflict between any HUD-required provisions inserted into this Agreement and any other provision of this Agreement, the terms of the HUD-required provisions will govern; and if there is a conflict between any of the provisions in the Articles of Organization and any HUD-required provisions of this Agreement, the HUD-required provisions will govern.

Amended and Restated Operating Agreement

(c)  Unless otherwise approved in writing by HUD, Borrower's business and purpose shall consist solely of the acquisition, ownership, operation and maintenance of the Property and activities incidental thereto. Borrower shall not engage in any other business or activity. The Property shall be the sole asset of the Borrower entity, which shall not own any other real estate other than the aforesaid Property.

(d)  None of the following will have any force or effect without the prior written consent of HUD:

(i)  Any amendment that modifies the term of Borrower's existence;

(ii)  Any amendment that triggers application of the HUD previous participation certification requirements (as set forth in Form HUD2530, Previous Participation Certification, or 24 CFR § 200.210, et seq.);

(iii)  Any amendment that in any way affects the HUD Loan Documents;

(iv)  Except as permitted under subsection (i) below, any amendment that would authorize any member, manager, partner, owner, officer or director, other than the one previously authorized by HUD, to bind the Borrower entity for any matters concerning the Property which require HUD's consent or approval;

(v)  A change that is subject to the HUD TPA requirements contained in Chapter 13 of HUD Handbook 4350.1 REV-1;

(vi)  Any change in a guarantor of any obligation to HUD (including those obligations arising from violations of the HUD Regulatory Agreement); and

(vii)  Any grant of a security interest in any of Borrower's assets or mortgaged property.

(e)  Borrower is authorized to execute a Note and Security Instrument in order to secure a loan to be insured by HUD and to execute the HUD Regulatory Agreement and other documents required by the Secretary in connection with the HUD-Insured Loan.

(f)  Any incoming member/partner/owner of Borrower must, as a condition of receiving an interest in the Borrower entity, agree in writing to be subject to the HUD Loan Documents and all other documents required in connection with the HUD-insured loan, to the same extent and on the same terms as the other members/partners/owners.

(g)  Upon any dissolution, no title or right to possession and control of the Property, and no right to collect the rents from the Property, shall pass to any person or entity that is not bound by the HUD Regulatory Agreement in a manner satisfactory to HUD.

(g)  The key principals of Borrower identified in the HUD Regulatory Agreement are liable in their individual capacities to HUD to the extent set forth in the HUD Regulatory Agreement.

(h)  Borrower shall not voluntarily be dissolved or converted to another form of entity without the prior written approval of HUD.

(i)  Borrower has designated Marc L. Kulick as its official representative for all matters concerning the Property that require HUD consent or approval. The signature of this representative will bind

35

Amended and Restated Operating Agreement

Borrower entity in all such matters. Borrower may, from time to time, appoint a new representative to perform this function, provided that the individual so appointed is 2530 Previous Participation Certified, and within three business days of doing so, will provide HUD with written notification of the name, address, and telephone number of its new representative. When a person other than the person identified above has full or partial authority with respect to management of the Project, Borrower will promptly provide HUD with the name of that person and the nature of that person's management authority.

(j)        Any obligation of the Company to provide indemnification under this Agreement shall be limited to (i) amounts mandated by state law, if any, (ii) coverage afforded under any liability insurance carried by the Company, and (iii) available surplus cash of the Borrower as defined in the HUD Regulatory Agreement. Until funds from a permitted source for payment of indemnification costs are available for payment, the Company shall not pay funds to any members, partners, officers and directors, or pay the deductible on an indemnification policy for any members, partners, officers and directors.

## ARTICLE XIV
## MISCELLANEOUS

**Section 15.1. Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 15.2. Confidentiality.**

(a)        Each Member acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other fom1 or medium) (collectively, **"Confidential Information"**). In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member will, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information will take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)        Nothing contained in Section 15.2(a) will prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena interrogatories or other discovery

36

requests; (iv) to the extent necessary in connection with the exercise of any remedyhereunder; (v) to the other Member; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound bythe provisions of this Section 15.2 as if a Member; or (vii) to any potential permitted transferee in connection with a proposed Transfer of a Membership Interest from such Member, as long as such transferee agrees to be bound by the provisions of this Section 15.2 as if a Member; provided that, in the case of **clause (i) (ii), or (iii),** such Member will notify the Company and  other Member of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Member) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)    The restrictions of Section 15.2(a) will not apply to Confidential Information that: (i) is or becomes generally available to the public other than  as a  result of a disclosure  by a Member  in  violation  of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Member or any of their respective Representatives, provided that, such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)    The obligations of each Member under this Section 15.2 will survive (i) the termination, dissolution, liquidation and winding up of the Company, (ii) the withdrawal of such Member from the Company, and (iii) such Member's Transfer of its Membership Interest.

**Section 15.3. Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder will be in writing and will  be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or  (d) on the third day after the date mailed., by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for  a party as will be specified  in  a notice given  in accordance  with this Section  I4.3):

| | |
|---|---|
| If to the Vesta Member or Vesta Promote Member: | To the applicable address set forth on theMembers Schedule |
| If to the PSC Member or PSC Promote Member: | To the applicable address set forth on the Members Schedule |

37

**Section 15.4.   Headings.**  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 15.5. Severability.** If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such te1m or provision in any other jurisdiction.  Except as provided in Section 10.2(g) upon such determination that any term or other provision is invalid illegal or unenforceable, the parties hereto will negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 15.6.   Entire Agreement.**  This Agreement, together with the Articles and all related exhibits and schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings,agreements, representations, and warranties, both written and oral with respect to such subject matter.

**Section 15.7. Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 15.8. No Third-party Beneficiaries.** Except as provided in ARTICLE X, which will be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or will confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit., or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 15.9. Amendment.** No provision of this Agreement may be amended or modified except by an instrument in writing executed by all Members. Any such written amendment or modification will be binding upon the Company and each Member.  Notwithstanding the foregoing, the following amendments may be made by the Managing Member without the consent of or execution by any other Member: (a) amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of a Membership Interest in accordance with this Agreement; and (b) administrative amendments that are not materially adverse to any Member relative to other Members.

**Section 15.10. Waiver.** No waiver by any party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party will operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exerciseof any other right, remedy, power, or privilege. For the avoidance of doubt, nothing contained in this Section 15.l0 will diminish any of the explicit and implicit waivers described in this Agreement, including in Section 15.12.

**Section 15.11. Governing Law.** All issues and questions concerning the application, construction validity, interpretation, and enforcement of this Agreement will be governed by and construed in accordance with the internal laws of the State of Kansas without giving effect to any choice or conflict of

law provision or rule (whether of the State of Kansas or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Kansas.

**Section 15.12. WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATINGTO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 15.13. Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto will, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 15.14. Attorneys' Fees.** In the event that any party hereto institutes any legal suit. action, or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action, or proceeding will be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 15.15. Remedies Cumulative.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in ARTICLE X to the contrary.

**Section 15.16. Counterparts.** This Agreement may be executed in counterparts, each of which will be deemed an original, but al) of which together will be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of Electronic Transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank - signature page follows]*

INTENDING TO BE LEGALLY BOUND, the Company and the Members have caused this Agreement to be duly executed as the Operating Agreement of the Company, effective as of the Effective Date.

**COMPANY:**                                    **JENK'S BEST LIVING, LLC**

By: Vesta Realty, LLC, a Kansas
limited liability company,
as the Manager

By: _____

Marc Kulick, managing member

3

**MEMBERS:**

VESTA MEMBER

Jenk's Best Living Investors, LLC,
a Kansas limited liability company

By: _____
        Marc Kulick, manager

VESTA PROMOTE MEMBER

Vesta Capital, LLC,
a Kansas limited liability company

By: _____
        Marc Kulick, authorized signatory

PSC MEMBER

PSC Thrive, LLC,
a Maryland limited liability company

By: _____
        C.N. David Reischer, manager

PSC PROMOTE MEMBER

Pratt Street Capital, LLC,
a Maryland limited liability company

By: _____
        C.N. David Reischer, manager

Amended and Restated Operating Agreement       4

**MEMBERS:**

VESTA MEMBER

Jenk's Best Living Investors, LLC,
a Kansas limited liability company

By: _____
        Marc Kulick, manager

VESTA PROMOTE MEMBER

Vesta Capital, LLC,
a Kansas limited liability company

By: _____
        Marc Kulick, authorized signatory

PSC MEMBER

PSC Thrive, LLC,
a Maryland limited liability company

By: _____
        C.N. David Reischer, manager

PSC PROMOTE MEMBER

Pratt Street Capital, LLC,
a Maryland limited liability company

By: _____
        C.N. David Reischer, manager

4

Amended and Restated Operating Agreement

**MANAGER:**

The undersigned hereby accept the office of Manager of Jenk's Best Living, LLC and agree to be bound by the terms of the Amended and Restated Operating Agreement of Jenk's Best Living, LLC, in its capacity as Manager.

**Manager:**

Vesta Realty, LLC, a Kansas
limited liability company,

By: _____
Marc Kulick, managing member

5

Amended and Restated Operating Agreement

6

## SCHEDULE 1

| Member<br>*(Name and Address)* | Capital<br>Contributions | Capital<br>Sharing Ratio | PROMOTE SHARING<br>RATIO |
|---|---|---|---|
| **Vesta Member:** | | | |
| Jenk's Best Living Investors, LLC<br>6400 W. 110th Street, Ste. 201,<br>Overland Park, KS 66211 | $2,360,000 | 50% | *NIA* |
| **Vesta Promote Member:** | | | |
| Vesta Capital, LLC<br>6400 W. 110th Street, Ste. 201,<br>Overland Park, KS 66211 | *NIA* | *NIA* | 80% |
| **PSC Member:** | | | |
| PSC Thrive, LLC<br>IS Walker Ave,<br>Baltimore, MD 21208<br>Attention:<br>C. N. David Reischer | $2,360,000 | 50% | *NIA* |
| **PSC Promote Member:** | | | |
| Pratt Street Capital, LLC<br>I5 Walker Ave,<br>Baltimore, MD 21208<br>Attention: C. N. David Reischer | *NIA* | 0% | 20% |
| **Totals:** | **$4,720,000** | **100%** | **100%** |

7

Amended and Restated Operating Agreement