IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | | |
|---|---|---|
| In re: | ) | Case No. 26-17757-MMH |
| | ) | (Chapter 11) |
| PSC Thrive, LLC | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | Case No. 26-17758-MMH |
| In re: | ) | (Chapter 11) |
| | ) | |
| Jenk's Best Living, LLC | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| Jenk's Best Living, LLC | ) | Adv. Case No. 26-176-MMH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Marc Kulick; Vesta Realty, LLC; Vesta | ) | |
| Capital, LLC; YSA Investments 1, LLC; | ) | |
| and Bocaire Tulsa Lender, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

This bankruptcy arises from defendant Marc Kulick's repeated decision to use plaintiff's apartment complex as collateral for obligations plaintiff never incurred, never guaranteed, and never authorized. Plaintiff's Operating Agreement expressly prohibited Kulick from mortgaging, transferring, or otherwise encumbering the Property without the unanimous consent of all Members. That consent was never obtained. Nevertheless, Kulick knowingly executed a series of

1

unauthorized transactions purporting to burden plaintiff's sole substantial asset. YSA Investments 1, LLC knowingly accepted those transactions even though Kulick expressly advised it that he lacked authority to pledge plaintiff's Property. YSA now seeks to convert those unauthorized transactions into ownership of plaintiff's apartment complex, operational control of the Property, and the right to collect plaintiff's rental income. Unless restrained, defendants will continue attempting to obtain, by unilateral action, what they have yet to establish any legal right to obtain through judicial process.

Plaintiff Jenk's Best Living, LLC owns an apartment complex in Jenks, Oklahoma. Under plaintiff's Operating Agreement, no manager has authority to mortgage, pledge, transfer, or otherwise encumber the Property absent the unanimous consent of all Members. That consent was never obtained. Nevertheless, Kulick knowingly purported to encumber plaintiff's only substantial asset to secure numerous obligations plaintiff never incurred, never guaranteed, and from which it received no benefit. Because Kulick lacked the authority to execute those transactions, they conveyed no lawful interest in plaintiff's Property.

Everything defendants now claim flows from those unauthorized transactions. YSA, through its principal, Efraim Diveroli, has recorded a deed purporting to transfer title to plaintiff's Property to itself, declared itself the owner of the apartment complex, demanded control of plaintiff's property management platform, attempted to divert plaintiff's rental income, and caused the property manager's operating accounts to be frozen. Every one of those actions depends entirely upon the validity of transactions that Kulick had no authority to execute.

YSA's knowledge eliminates any suggestion that it innocently relied upon Kulick's authority. Before the transactions were consummated, Kulick expressly advised YSA and Diveroli that he lacked authority to mortgage or pledge plaintiff's Property. YSA accepted it anyway and

2

now seeks to transform transactions it knew were unauthorized into ownership and operational control of plaintiff's most valuable asset.

This is not a dispute over competing chains of title or the interpretation of ambiguous loan documents. Every right the defendants claim rises or falls with Kulick's authority to encumber plaintiff's Property. Because Kulick lacked that authority, defendants acquired no ownership interest, no right to plaintiff's rents, no right to plaintiff's operating accounts, and no right to interfere with plaintiff's possession or operation of the Property. Defendants can stand in no better position than Kulick. If Kulick lacked authority to encumber plaintiff's Property, defendants acquired no greater rights than Kulick possessed, regardless of the number of documents later recorded or demands later made.

Moreover, even if Kulick had authority, the conveyance of the plaintiff's Property would be a hornbook preference and fraudulent conveyance. The plaintiff took absolutely nothing in this transaction but, in turn, lost its sole asset; this is the epitome of the foundation for a Chapter 5 cause of action.

Unless immediately restrained, this pattern of conduct will continue. Defendants will continue claiming estate assets, wrongfully encumbering the property, diverting rental income, interfering with plaintiff's contractual relationships, disrupting plaintiff's financing, and impairing the operation of an occupied apartment community. Those injuries are immediate and ongoing and cannot be remedied by an award of money damages. Plaintiff has demonstrated a strong likelihood that defendants' asserted rights rest entirely upon transactions that never lawfully conveyed any interest in the Property. Plaintiff therefore respectfully requests that the Court enter a Temporary Restraining Order and Preliminary Injunction preserving plaintiff's ownership, possession, and operational control of the Property pending final resolution of this action.

3

**FACTUAL BACKGROUND**

This lawsuit arises from Marc Kulick's repeated decision to use plaintiff's sole substantial asset as collateral for obligations plaintiff never incurred, never guaranteed, and from which plaintiff received no benefit. Despite his lack of authority, Kulick knowingly entered into agreements that are now clouding title to plaintiff's Property, run the risk of breaching plaintiff's authorized financing, and are interfering with the orderly management of the Property. Most urgently, defendant YSA has undertaken an ongoing effort to improperly and illegally seize control of plaintiff's apartment complex to collect on hard money loans (some carrying a 7,000% interest rate) to Kulick.

Plaintiff owns the Property. Defendants do not. Yet relying upon transactions that Kulick lacked authority to execute, defendants have undertaken an escalating campaign to wrest title, possession, operational control, and rental income away from plaintiff before this Court has had any opportunity to determine whether their claimed interests are valid. *See* Complaint ¶¶ 17-54.

The underlying dispute is straightforward. Plaintiff's Operating Agreement strictly limits the authority of any manager to encumber the Property. Complaint ¶¶ 23-30. It expressly requires the unanimous consent of all Members before the Property may be mortgaged, pledged, transferred, or otherwise burdened. Complaint ¶¶ 23-24. That consent was never obtained. Complaint ¶¶ 78. Nevertheless, Kulick purported to use plaintiff's only significant asset as collateral for obligations owed by other entities, even though plaintiff never borrowed the money, never guaranteed the debt, never received any loan proceeds, and never authorized the transactions. *See* Complaint ¶¶ 71-78; Ex. 1 to Complaint, Operating Agreement §§ 8.2, 9.1(b), 14.3; Ex. 1, Declaration of Yaakov Spatz ¶¶ 3-4.

4

YSA's knowledge eliminates any suggestion that it innocently relied upon Kulick's authority. Kulick has admitted under oath that he expressly warned YSA before these transactions occurred that he lacked authority to pledge plaintiff's Property. Ex. 2, Declaration of Marc Kulick ¶¶ 3-4. YSA proceeded anyway. *Id.* ¶¶ 5-7. YSA chose to accept plaintiff's Property as collateral and now seeks to capitalize on transactions it knew were subject to serious legal defects. *Id.* ¶¶ 3-10.

YSA has recorded a deed purporting to transfer ownership of plaintiff's apartment complex to itself. Ex. 3, Deed. YSA has repeatedly represented itself as the owner of plaintiff's Property and has begun acting as though title has already been adjudicated in its favor. *See* Complaint ¶¶ 47-53; Ex. 1, Declaration of Yaakov Spatz ¶¶ 5-8.

Recording the deed was only the beginning. Armed with the deed it claims transferred title, YSA has launched an aggressive effort to seize operational control of the Property. It has repeatedly contacted Entrata, the software platform through which the Property is managed and rents are collected, demanding that plaintiff's access be terminated, that YSA be installed as the administrator of the Property, and that rental proceeds be diverted away from plaintiff. *See* Ex. 4, Letter. Declaration of Yaakov Spatz ¶¶ 5-6.

YSA has simultaneously demanded that plaintiff's property manager's banking institution recognize YSA as the owner of the operating accounts associated with the Property. Those demands have already caused plaintiff's property manager's accounts to be frozen, depriving it of access to the funds necessary to operate the apartment complex and placing ordinary business operations in immediate jeopardy. *See* Ex. 5, YSA Letter to First United; Ex. 6, Vesta Letter to First United; Declaration of Yaakov Spatz ¶¶ 7-8.

The consequences are immediate and substantial. Apartment communities require constant management. Employees must be paid. Vendors must be compensated. Repairs must be performed. Tenants expect uninterrupted services and responsive management. If defendants succeed in diverting rental income, freezing operating funds, or assuming control of plaintiff's management systems, plaintiff's ability to operate the Property will quickly deteriorate. Plaintiff will be unable to pay staff, conduct basic maintenance or repairs, pay vendors or suppliers, and supply contractual services to tenants. Damage to plaintiff's relationships with tenants, staff, or vendors because plaintiff does not have funds to fulfill its contractual obligations cannot be calculated and restored through money damages. The Property's reputation cannot be reconstructed through an award of money damages. *See* Ex. 1, Declaration of Yaakov Spatz ¶ 7; Ex. 2, Declaration of Marc Kulick ¶ 9. Moreover, without funds plaintiff cannot pay its actual mortgage, and runs the very real risk of losing this property to foreclosure by the legitimate lender.

The danger does not end with YSA. As detailed in the Complaint, Kulick granted multiple unauthorized interests in plaintiff's Property. *See* Complaint ¶¶ 71-72. Unless restrained, any holder of those purported interests could attempt the very same strategy by recording additional instruments, initiating foreclosure proceedings, asserting ownership, or interfering with plaintiff's operations before this Court determines whether any of those interests are legally enforceable. *See* Complaint ¶¶ 86-89; Ex. 1, Declaration of Yaakov Spatz ¶¶ 9-14.

Kulick was the Managing Member of plaintiff. He has since been replaced by PSC Thrive, LLC. However, Kulick has demonstrated that the absence of legal authority will not deter him from burdening the Property. *See* Complaint ¶¶ 10-11. Unless restrained, Kulick may well continue to purport to burden the Property during the pendency of this litigation, and the holders of those purported interests could also attempt the same strategy.

6

Plaintiff does not seek preliminary relief to obtain an advantage on the merits. It seeks only to preserve the last actual, peaceable status before defendants undertook their campaign to seize plaintiff's Property, and avoid further harm from defendants during the pendency of the litigation. Unless defendants are restrained now, they will continue attempting to accomplish outside the courtroom what they have not yet proven they are entitled to accomplish inside it.

## ARGUMENT

Defendants are attempting to seize title to plaintiff's apartment complex, assume operational control, divert rental income, and alter the parties' rights before this Court has determined whether defendants possess any lawful interest in the Property. Equity exists precisely to prevent that result. Plaintiff has demonstrated an overwhelming likelihood of success on the merits, ongoing irreparable harm, the absence of any meaningful prejudice to defendants from preserving the status quo, and a compelling public interest in preventing unauthorized interference with property rights pending judicial resolution. Accordingly, plaintiff is entitled to a Temporary Injunction restraining defendants from asserting control over the Property, further clouding title, or taking any additional action to interfere with plaintiff's ownership and the proper operation of the Property during the pendency of this action. Plaintiff further requests that the Court immediately enter a Temporary Restraining Order to restore and preserve the last actual, peaceable status quo until a hearing can be conducted on plaintiff's request for a Temporary Injunction.

A. Legal Standards

This Court has the authority to grant a temporary injunction "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." F.R.C.P. 65 as incorporated in Bankruptcy R. 7065. It is well settled that the grounds for issuing a temporary

7

injunction are: (1) the likelihood of success on the merits, (2) irreparable harm to the party seeking injunctive relief if relief is denied, (3) the balance of equities tip in favor of an injunction, and (4) the injunction is in the public interest. *W. Virginia Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102, 113 (4th Cir. 2026) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The standard for a temporary restraining order and preliminary injunction are the same. *Young v. Ditech Fin., LLC*, No. CV PX 16-3986, 2017 WL 3066198, at *8 n.4 (D. Md. July 19, 2017).

The purpose of a temporary injunction is to maintain the status quo prior to the wrongful acts that are the subject of the action. The status quo preserved "is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy. To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *Aggarao v. MOL Ship Mgmt. Co*., 675 F.3d 355, 378 (4th Cir. 2012) (internal citations and quotation omitted). Here, the status quo to be preserved by the injunction is the status quo before defendant YSA Investment 1, LLC's sudden change of the title of the Property.

B.  <u>Plaintiff is Likely to Succeed on the Merits</u>

Although the purpose of temporary injunctive relief is to "balance the equities as litigation moves forward" and not "conclusively determine the rights of the parties," *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017), at this stage the "most important" factor is the likelihood of success on the merits. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949 (D. Md. 2020), *order dissolved sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18, 2023). Plaintiff need not prove a "certainty of success" on

final judgment at this stage. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). Rather, it need only make a clear showing that they are "likely" to succeed at trial. *Id*.

Plaintiff has done considerably more. Kulick lacked the authority to encumber plaintiff's apartment complex with mortgages, deeds, assignments of rents, negative pledges, option agreements, and other security interests securing obligations that plaintiff never incurred and from which plaintiff received no benefit. Plaintiff's Operating Agreement expressly withholds from the Managing Member the authority to borrow money, mortgage the Property, grant security interests, transfer interests in the Property, or otherwise encumber plaintiff's sole asset without the unanimous consent of all Members. Complaint ¶¶ 23-24; Ex. 1 to Complaint (Operating Agreement) §§ 8.2; 9.1(b); 14.3.

The undisputed evidence establishes that no such consent was ever obtained. Yaakov Spatz, General Counsel for two of plaintiff's Members, states under oath that Pratt Street Capital, LLC and PSC Thrive, LLC never authorized the challenged loans, mortgages, security interests, deeds, assignments of rents, or any other encumbrances affecting the Property. Declaration of Yaakov Spatz ¶¶ 3 to 4. Defendants cannot manufacture authority where the governing contract expressly withheld it.

Moreover, Kulick had no apparent authority to enter into these transactions. The transactions were suspicious on their face, burdening plaintiff's sole asset in exchange for loans to other entities. *See* Complaint ¶¶ 41-50; 62-69. Defendants either saw or should have seen the Operating Agreement, which clearly states Kulick's lack of authority. *Id.* They knew, or at the very least, recklessly and in bad faith turned a blind eye to Kulick's lack of authority to encumber the Property in exchange for loans to his personal entities. *Id.*

9

Kulick did not have authority to bind plaintiff, but knowingly entered into these transactions regardless, in violation of his fiduciary duties to plaintiff. Plaintiff will succeed in voiding these transactions, and enjoining Kulick from continuing to enter into transactions which are not authorized under the Operating Agreement.

Perhaps most significant, plaintiff's principal factual allegation is confirmed by the very individual who executed the challenged transactions. Marc Kulick admits under oath that, before YSA recorded the challenged encumbrances, he specifically informed YSA that the entities pledging collateral "did not own or control the underlying assets and did not have the right or power to mortgage or pledge the property owned by Jenk's Best Living, LLC." Declaration of Marc Kulick ¶ 4. He further admits that, despite that knowledge, YSA nevertheless proceeded to encumber plaintiff's Property. *Id.* at ¶¶ 5 - 6.

Those admissions are extraordinary. YSA cannot plausibly portray itself as an innocent lender relying upon Kulick's apparent authority. According to Kulick himself, YSA was expressly advised before any of these transactions occurred that Kulick lacked authority to pledge plaintiff's Property. Nevertheless, YSA proceeded to record mortgages, accept a purported deed transferring title to itself, and now claims ownership of plaintiff's apartment complex. Ex. 2, Declaration of Marc Kulick ¶¶ 5-10.

The documentary evidence likewise demonstrates that defendants' present claims depend entirely upon the validity of those unauthorized transactions. After recording the challenged encumbrances, YSA recorded a deed purporting to transfer ownership of the Property to itself. Ex. 3. It then notified Entrata that YSA "now owns" the Property, demanded exclusive control over plaintiff's property management platform, directed Entrata to revoke plaintiff's administrative authority, and demanded that all rental proceeds thereafter be paid exclusively to YSA. Ex. 4 at 2.

10

YSA simultaneously demanded that First United Bank revoke plaintiff's authority over the property manager's operating accounts, terminate plaintiff's access, recognize YSA as the sole authorized account holder, and transfer exclusive control of funds to YSA. Ex. 5 at 3-4.

Those actions do not strengthen defendants' legal position. They underscore that defendants' entire effort to seize plaintiff's Property depends upon the validity of the challenged encumbrances, and that YSA is aggressively seeking to seize assets based on those invalid encumbrances. If those encumbrances are void because Kulick lacked authority to create them, every subsequent act predicated upon those encumbrances necessarily fails as well.

Defendants may oppose this application by relying on a recent Delaware Court of Chancery decision in litigation between Kulick and YSA. That reliance is misplaced because the Delaware litigation decided an entirely different question. The Delaware Court interpreted the parties' rights under the loan documents between Kulick and YSA, and whether Kulick authorized YSA to record second mortgages, assuming the validity of the loan documents. It did not determine whether Kulick possessed authority under plaintiff's Operating Agreement to encumber plaintiff's Property, whether unanimous Member consent was required or obtained, or whether defendants acquired any enforceable interest in Oklahoma real property. Those are the issues before this Court.

Additionally, it bears noting that even if the conveyance of the Property were somehow allowed, such would not alter the fundamental character of the conveyance being an avoidable preference and a fraudulent conveyance. The indisputable facts of the matter make clear that if the plaintiff has actually lost its property, such loss would have been (i) to YSA, an entity purporting to be a creditor with a claim secured by the plaintiff's assets, 11 U.S.C. § 547(b)(1); (ii) on account of an aged debt that YSA maintains to have matured, 11 U.S.C. § 547(b)(2); (iii) made at a time when the liabilities of the plaintiff vastly exceeded the assets of the plaintiff (a necessary reality if

11

the debt to YSA is actually valid), 11 U.S.C. § 547(b)(3); (iv) within ninety days of the petition date, 11 U.S.C. § 547(b)(4); and (v) enabling of YSA to take more than it would in a hypothetical chapter 7 liquidation, where the plaintiff's senior secured creditor would have been able to take the property in satisfaction of its claim, 11 U.S.C. § 547(b)(5).

Similarly, given the wholesale lack of any consideration tendered to plaintiff, it cannot be said reasonably equivalent value was realized through this transaction, 11 U.S.C. § 548(a)(1)(B)(i). Nor may it be posited that the plaintiff was solvent if the plaintiff did, in fact, hold a singular asset encumbered by the extraordinary obligation putatively due to YSA, 11 U.S.C. § 548(a)(1)(B)(i)(I).

All of which means that the plaintiff does not believe it has lost the Property and, to the contrary, maintains there is a strong likelihood of success on the declaratory merits establishing such. But even if, *arguendo*, the Property was lost, such loss would be avoidable under chapter 5 of the Bankruptcy Code, and plaintiff has a strong likelihood of success on the bankruptcy-centric avoidance actions.

C.  Plaintiff Has Demonstrated Irreparable Harm

Irreparable harm is established with a showing of "actual and imminent" harm that cannot be rectified after final judgment. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,* 915 F.3d 197, 218 (4th Cir. 2019). Monetary damages can be irreparable if they are difficult to ascertain, inadequate, or uncollectable. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 793 (D. Md. 2025). In this regard, "land is unique" and monetary damages are not an adequate alternative remedy to replace a specific piece of land. *CNX Land Res. Inc. v. Williams,* No. 5:12CV112, 2013 WL 4538686, at *4 (N.D.W. Va. Aug. 27, 2013) (citing 71 Am. Jur. 2d Specific Performance § 130).

This case presents both forms of irreparable injury. Plaintiff faces the potential loss of unique real property, along with ongoing injuries to its business operations and contractual relationships that cannot be measured or remedied by an award of money damages.

Defendants are not merely threatening future injury. They have already begun inflicting it. YSA has already recorded a deed purporting to transfer title to Plaintiff's apartment complex to itself. Because land is unique, that wrongful assertion of ownership alone constitutes irreparable harm.

Defendants' conduct threatens Plaintiff's existing HUD financing. Yaakov Spatz explains that these unauthorized deeds, mortgages, and competing claims to title place Plaintiff in default under its HUD loan documents. Ex. 1, Declaration of Yaakov Spatz ¶¶ 16 to 17. If that financing is accelerated or foreclosure proceedings commence, Plaintiff could lose the Property altogether before this Court adjudicates the parties' rights. No award of money damages can compensate for the forced loss of unique real property.

But defendants have not stopped there. Relying upon that purported ownership, YSA has sought to seize Plaintiff's operating accounts, divert rental income, and assume control over the systems through which the Property is managed. Ex. 1. Declaration of Yaakov Spatz ¶¶ 6 to 8, 15. If successful, Plaintiff will lose the ability to pay employees, maintain the Property, satisfy vendors, and provide services to tenants. Ex. 1, Declaration of Yaakov Spatz ¶ 7; Ex. 2, Declaration of Marc Kulick ¶ 9. No damages model can reliably measure the long-term consequences of deteriorating tenant relationships, deferred maintenance, disrupted operations, lost goodwill, or diminished occupancy resulting from months of operational paralysis. *See e.g., Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (loss of customers or employees is irreparable harm).

13

The threat is also continuing, not historical. The evidence establishes that Kulick repeatedly granted unauthorized interests in plaintiff's Property to multiple lenders. Nothing presently prevents him, or those claiming under those purported interests, from creating still additional clouds on title while this litigation proceeds or encumbering the estate. The harm from additional encumbrances being granted or additional parties acting against the Property based on previously granted interests is also very real but difficult to calculate. Every additional mortgage, assignment, deed, foreclosure effort, or purported transfer compounds the uncertainty surrounding title, increases the cost of restoring clear ownership, and creates additional disputes with innocent third parties. Plaintiff is faced with multiple aggressive parties claiming security interests, an LLC Member with a proven history of flagrantly granting unauthorized security interests to predatory lenders who historically and currently weaponize litigation, and an unknown number of additional individuals who may already hold unauthorized security interests.

The situation will continue to deteriorate drastically if an injunction freezing the status quo is not granted. If defendant Kulick grants another unauthorized mortgage on the property, or multiple additional mortgages, plaintiff cannot calculate the costs to defend and remove those mortgages. If another known or unknown purported secured party forecloses on an unauthorized mortgage, or if YSA "sells" the Property to someone else using its invalid deed, the cloud on plaintiff's title would worsen, and the costs and difficulty of clearing it would increase greatly.

The threat of irreparable harm is immediate, ongoing, and escalating. Plaintiff could lose its unique land at any time to YSA or HUD. Although some of the harms, including the reputational harm from YSA's actions and the costs of defending title from further clouding, are difficult to calculate, this weighs in favor of the injunction, not against it. Unless this Court preserves the

14

status quo now, defendants may accomplish through unilateral conduct precisely what they ask this Court to authorize only after trial.

D. The Balance of Equities and Public Interest Decisively Favor Injunctive Relief

The remaining equitable factors overwhelmingly support immediate injunctive relief. Most importantly, the requested injunction does not alter the parties' respective rights. It preserves them. Plaintiff does not ask this Court to decide ownership of the Property today. Plaintiff asks only that defendants be prevented from acting as though they have already won.

The "balance of equities" weighs strongly in favor of plaintiff. *W. Virginia Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102, 113 (4th Cir. 2026). Plaintiff has demonstrated irreparable harm. *Id.* If plaintiff is correct, then defendants' actions are a breach of fiduciary duty and completely unauthorized; there cannot be harm from enjoining unlawful acts. *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011).

Defendants cannot claim any legitimate prejudice from maintaining the status quo while this Court determines the validity of their claimed interests. An injunction will not invalidate defendants' asserted liens, extinguish any claim, or deprive defendants of any remedy to which they may ultimately prove entitled. *Doe 1 v. Off. of the Dir. of Nat'l Intel.,* No. 25-1527, 2026 WL 1899902, at *10 (4th Cir. July 7, 2026) (finding this factor in favor of an injunction because following regulations "is a minimal burden" compared to the harm if procedures are not followed.). It merely requires defendants to do what every litigant must do: present their claims to the Court before taking possession of another party's property.

Plaintiff, by contrast, faces extraordinary prejudice if relief is denied. Defendants have already recorded a deed purporting to transfer title to themselves. They have already frozen plaintiff's operating accounts. They have already demanded control of plaintiff's property

15

management platform and sought to divert plaintiff's rental income. They have already put plaintiff in the position of potentially losing its unique land to a HUD foreclosure. If those efforts continue during this litigation, defendants will obtain the very relief they seek before trial, rendering the Court's eventual judgment substantially less meaningful. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,* 915 F.3d 197, 218 (4th Cir. 2019). By the time this case reaches final judgment, defendants may already have displaced plaintiff as owner and operator of the Property, disrupted tenant relationships, impaired plaintiff's financing, diverted months of rental income, and inflicted injuries that cannot be fully undone.

Equity exists precisely to prevent that result. The purpose of a preliminary injunction is to preserve the last actual, peaceable status before the alleged wrongful conduct occurred. It is not to reward the party who acts first. Courts have long recognized that a litigant may not create a new status quo through unilateral conduct and then invoke that altered condition as a reason to deny equitable relief. *Aggarao*, 675 F.3d at 378. That is exactly what defendants seek to do here.

The public policy, as stated by the Oklahoma legislature, likewise strongly favors an injunction. 16 O.S. § 66. In Oklahoma, courts, not private parties, decide disputed claims to real property. *Id.* ("the legislative purpose of simplifying real estate transactions by permitting purchasers to rely upon the status of title as reflected by the county records and by the decrees and judgments of the aforementioned courts."). The orderly administration of justice depends upon parties respecting that principle. If defendants genuinely believe they possess lawful rights in plaintiff's Property, they may present those rights to this Court and obtain an adjudication. What they may not do is seize title, assume operational control, freeze bank accounts, redirect rental income, and interfere with the management of an apartment community before any court has determined they are entitled to do so.

The public also has a substantial interest in the stable operation of residential housing. Plaintiff owns and operates a multifamily apartment community that houses numerous tenants, employs personnel, contracts with vendors, and is subject to ongoing financing obligations. Allowing competing parties to assert simultaneous control over the Property serves no legitimate public interest. It creates uncertainty for tenants, lenders, vendors, financial institutions, and property managers, while unnecessarily jeopardizing the continued operation of the Property.

Ultimately, defendants ask this Court to ratify a new status quo that they improperly and unlawfully created rather than using lawful process. Equity rejects that approach. Until this Court determines whether defendants possess any lawful interest in plaintiff's Property, defendants should not be permitted to exercise the rights they claim. The last actual, peaceable status must therefore be preserved through the entry of a Temporary Restraining Order and Preliminary Injunction.

## CONCLUSION

For the reasons set forth above, plaintiff requests that the Court enter a Temporary Restraining Order to preserve the status quo. Further, this Court should set this matter for hearing with respect to plaintiff's request for a preliminary injunction and grant plaintiff a preliminary injunction.

Respectfully submitted,

/s/ Ari S. Casper
Ari S. Casper (Bar # 14512)
Elimelech Baruch (Bar # 31855)
The Casper Firm, LLC
400 E. Pratt Street, Suite 903
Baltimore, MD 21202
Telephone: (410) 989-5097
Facsimile: (410) 630-7776
Email: acasper@casperfirm.com
*Proposed Special Counsel for Plaintiff*

17

AND

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. 18071
The VerStandig Law Firm, LLC
9812 Falls Road
#114-160
Potomac, Maryland 20854
(301) 444-4600
mac@mbvesq.com
*Proposed Counsel for the Debtor*