**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND, BALTIMORE DIVISION**

| | |
|---|---|
| JENK'S BEST LIVING, LLC, | |
| Plaintiff, | |
| *v.* | **Case No. 26-17758-MMH** <br> **Adv. Case No. 26-176-MMH** |
| MARC KULICK; <br> VESTA REALTY, LLC; <br> VESTA CAPITAL, LLC; <br> YSA INVESTMENTS 1, LLC; and <br> BOCAIRE TULSA LENDER, LLC, | |
| Defendants. | |

**DEFENDANT YSA INVESTMENTS 1, LLC'S RESPONSE TO**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER,**
<u>**PRELIMINARY INJUNCTION, AND FOR EXPEDITED HEARING**</u>

## PRELIMINARY STATEMENT

Plaintiff Jenk's Best Living, LLC ("Plaintiff" or "Jenk's") asks this Court to grant, on an emergency basis and before any discovery, substantially the same relief it seeks at the end of this adversary proceeding: to unwind a completed prepetition conveyance, divest YSA Investments 1, LLC ("YSA") of recorded title to a multifamily apartment complex, restore Plaintiff to operational control of the Property, and invalidate the series of transactions that culminated in YSA's acquisition of title. Stripped of its emergency framing, the Motion asks a bankruptcy court in Maryland to enter an order directly contrary to a judgment entered against Marc Kulick, after trial, by the Delaware Court of Chancery.

The chronology tells the story, and Plaintiff's Motion largely omits it. On November 13, 2025, Kulick and his personal investment vehicles sued YSA in the Court of Chancery to invalidate the very second mortgages Plaintiff challenges here. Kulick sought a preliminary injunction and lost it, the Chancery Court holding that the relief he requested would alter rather than preserve the status quo and conditioning any interim relief on security of approximately $22.37 million— security Kulick never posted. The case proceeded to trial. After live testimony from Kulick himself and more than two hundred exhibits, the Court of Chancery entered judgment for YSA on June 9, 2026, holding that the Joinder Kulick proposed bound the title-owning entities, Jenk's among them, as additional pledgors; that the governing power of attorney authorized YSA in its sole discretion to act against their real property; and that YSA was entitled to record the mortgage Plaintiff now asks this Court to void.

What followed was a migration to the bankruptcy courts. Three days after the Delaware judgment, on June 12, 2026, four Kulick-affiliated entities filed chapter 11 petitions in United States Bankruptcy Court for the Western District of Oklahoma, each ultimately owned by an entity

singularly controlled by Kulick, and each filed on the heels of a receivership entered over those same debtors in Oklahoma County. On June 17, 2026, Jenk's and YSA executed an Agreement for Deed and Transfer in Lieu of Foreclosure, and a Special Warranty Deed conveying the Property to YSA was recorded in the Tulsa County land records on June 23, 2026. Only after record title had passed—and only after the Delaware judgment had foreclosed the theory on which every count of the Complaint depends—did Plaintiff commence this chapter 11 case, on July 20, 2026, and file this adversary proceeding and the present Motion the same day. The Motion fails before the Court ever reaches the familiar Rule 65 factors.

*First*, the Motion seeks to relitigate issues that were actually litigated and decided in Delaware. Although Plaintiff attempts to characterize the Delaware litigation as involving different questions, the Court of Chancery necessarily determined that Kulick's Joinder bound Jenk's as an additional pledgor, that the governing power of attorney authorized YSA to act against the Property in its discretion, and that YSA properly exercised those rights by recording the mortgage against the Property. Plaintiff's present request depends upon this Court reaching the opposite conclusion.

*Second*, even if the Court reaches Rule 65, Plaintiff cannot satisfy the demanding standard governing mandatory injunctive relief. Plaintiff does not seek merely to preserve existing conditions pending adjudication. It seeks to divest YSA of recorded title, restore Plaintiff to possession and operational control of the Property, and unwind completed prepetition transactions. Such relief alters—not preserves—the status quo and is available only upon a heightened showing that Plaintiff cannot make.

Nor can Plaintiff establish any of the traditional prerequisites for extraordinary equitable relief. Plaintiff is unlikely to succeed on the merits in light of the Delaware judgment, the governing transaction documents, and the authority conferred upon Kulick by the Operating

3

Agreement itself. The balance of equities favors maintaining the existing legal and status quo pending adjudication of the merits, not undoing completed transactions on an emergency basis.

More fundamentally, Plaintiff has not demonstrated that it was even authorized to file the underlying chapter 11 case, which is the sole basis for this Court's jurisdiction over this adversary proceeding. Section 8.2 of its Operating Agreement requires unanimous member approval before the Company may commence a bankruptcy case and before certain fundamental governance actions may be taken. Plaintiff's resolutions purporting to authorize the bankruptcy filings, which are signed by the Plaintiff's purported chief restructuring officer, calls into question whether the bankruptcy petition was properly authorized.

The Motion should therefore be denied. And to the extent the Court was inclined to grant interim relief, YSA respectfully requests that the Court require Jenk's to post a Rule 65(c) securibond commensurate with the extraordinary relief sought.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Various Bankruptcy and Legal Proceedings Involving Plaintiff

Jenk's is a Kansas limited liability company formed to own and operate a multifamily apartment complex. Compl. ¶¶ 9, 17–19. On June 12, 2026, a group of four related debtors, all affiliated with Jenk's, filed Chapter 11 cases in the United States Bankruptcy Court for the Western District of Oklahoma. Those cases include: Fairfax Investors, LLC (Case No. 26-11984); Fairfax Best Living, LLC (Case No. 26-11985); Woodland Oaks Best Living, LLC (Case No. 26-11986); and Woodland Oaks Investors, LLC (Case No. 26-11987). *See* Exs. Y01–Y04.

Each of the debtors is entirely owned by an entity that is believed to be singularly controlled by Marc L. Kulick. *See* Exs. Y05–Y08 [List of Equity Security Holders, Case No. 26-11984, Doc. 40 (Vesta Fairfax, LLC); *see also* Case No. 26-11985, Doc. 38 (Fairfax Holding Company, LLC); Case No. 26-11986, Doc. 39 (W.O. Sole Member, LLC); Case No. 26-11987,

4

Doc. 40 (W.O. Holding Co., LLC)]. Kulick has used these entities as "personal investment vehicles" to manage and control an interconnected and comingled web of investments. *See* Ex. Y09 (Post Trial Memorandum Opinion, Delaware Ct. of Chancery, C.A. No. 2025-1319-KSJM) at 3, 17 n.107.

Shortly before the debtors filed their Chapter 11 bankruptcies, a receiver was appointed over the debtors in Oklahoma County. *See* Ex. Y10 [Okla. Receiver Order]. This appointment follows allegations and trial court findings that the debtors' manager, Kulick, has developed a habit of siphoning funds for improper use. Ex. Y09 at 17 n.107.

To start, the Delaware Court of Chancery found that Kulick, the Debtors' manager and control person, has a history—and even admitted to—mismanaging, comingling, and siphoning funds, for his own personal use, from entities he controls. *Id.* at 17 n.107 ("Kulick acknowledged comingling his personal funds with Vesta's to create a 'lending pool' to move cash around to pay the debts of one property with proceeds from another. YSA's forensic accountant confirmed as much, based on his limited review of Kulick's bank accounts.")

Kulick, along with some of his investment entities, were later sued on June 25, 2026 in the District Court for the Northern District of Oklahoma for racketeering related activities, including: wire fraud, mail fraud, and money laundering. Ex. Y11 [*Upperman v. Kulick*, 4:26-cv-383 (N.D. Okla. June 25, 2026), Verified Complaint, ¶¶ 86–100]. In addition to other state law fraud claims, these claims are supported by allegations and findings from a forensic accountant (American Fiduciary Services) that "found account activity 'highly correlated with classic Ponzi-like schemes and highly demonstrative of commingled sources and uses of funds.'" [*Id.* ¶ 34]. This included more than $5 million of transfers to pay for personal credit cards and automobile loans. [*Id.* ¶ 34(a)-(c)]. The investigation also revealed "up to $37,473,988 in credit-card charges with no

apparent business purpose; $10,241,940 in net transfers to Kulick-controlled accounts through 93 transactions; and $4,406,608 in disbursements to Raymond James & Associates" along with other suspect transactions. [*Id.* ¶ 35].

On June 12, 2026, Kulick and Vesta were sued by Fannie Mae for similar allegations in the District Court for the Western District of Oklahoma. *See* Ex. Y12 [*Fed. Nat'l Mortg. Ass'n v. Kulick*, 5:26-cv-1400 (W.D. Okla. June 12, 2026), Complaint]. Fannie Mae alleges that, "Kulick and his company Vesta Realty are . . . collecting almost $2 million in rents every month" but "[t]hat money is not being used to maintain the property, make repairs, protect the tenants, or pay off liens (among other items) but presumably is being diverted for undisclosed purposes." *Id.* ¶ 29. The WDOK Complaint also alleges that "[Kulick] and Vesta Realty are currently defending more than 15 lawsuits that, in the aggregate, allege he owes the various plaintiffs more than $100 million . . . ." *Id.* ¶ 29 n.1. It is against that backdrop that this bankruptcy proceeding was filed on July 20, 2026, seeking to unwind YSA's acquisition of the Thrive apartment complex located in Jenks, Oklahoma.

**B.** **Jenk's Operating Agreement Identifies Marc Kulick as the Company's Designated Representative and Vests Management Authority in the Managing Member**

YSA's acquisition of the Thrive apartment emanates from Jenk's Amended and Restated Operating Agreement, dated September 7, 2021 (the "Operating Agreement"). Compl. Ex. A § 15.11. The Operating Agreement vests management authority in the Managing Member—Vesta Capital, LLC—and grants the Managing Member "full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as it deems necessary or appropriate." Operating Agreement § 8.1. It further provides that "[t]he actions of the Managing Member taken in accordance with the provisions of this Agreement will bind the Company." *Id.* The Operating

6

Agreement likewise identifies Marc Kulick by name as the Company's designated representative for matters involving the Property:

> Borrower has designated Marc L. Kulick as its official representative for all matters concerning the Property that require HUD consent or approval. The signature of this representative will bind Borrower in all such matters.

Operating Agreement § 14.3(i). Thus, the very agreement Plaintiff contends placed YSA on notice of alleged limitations on Kulick's authority simultaneously represents to third parties that Kulick is Jenk's designated representative and that his signature binds the Company with respect to matters concerning the Property. Plaintiff itself alleges that Kulick exercised management authority on behalf of Jenk's throughout the transactions at issue. Compl. ¶¶ 22, 29–30.

### C. The Delaware Court of Chancery Rejected the Premise That Kulick Lacked Authority to Bind the Title-Owning Entities

The central premise of Plaintiff's Motion—that Kulick lacked authority to subject Jenk's property to YSA's collateral package—was litigated in the Delaware Court of Chancery before this bankruptcy case was filed. Following expedited proceedings, the Court of Chancery denied preliminary injunctive relief after concluding that the requested injunction would alter, rather than preserve, the status quo and conditioned any interim relief upon the posting of security of approximately $22.37 million. The plaintiffs did not post the required bond.

The case then proceeded to trial. After hearing live testimony—including testimony from Kulick himself—and considering more than two hundred trial exhibits, the Court entered judgment for YSA. Ex. Y09 at 2–4.  Among other findings, the Court determined that:

- Kulick himself proposed expanding the collateral package through "a joinder to the portfolio as a whole" and instructed counsel to "add a joinder that joins any asset controlled by any affiliate of mine."

- Kulick controlled or managed the title-owning entities and executed the Joinder on their behalf.

- By operation of the Joinder, the title-owning entities—including Jenk's—became additional pledgors under the Collateral Pledge and Security Agreements.

- The governing power of attorney authorized YSA, in its discretion, to take action against the real property owned by those entities in order to protect its collateral.

- YSA properly exercised that authority by recording the mortgage against the Property owned by Jenk's.

Plaintiff's present Motion seeks relief that depends upon this Court reaching conclusions fundamentally inconsistent with those findings.

### D.      Before the Petition Date, YSA Exercised the Rights Upheld in Delaware and Acquired Record Title to the Property

After the Court of Chancery issued its post-trial opinion, YSA exercised the contractual rights recognized in that decision. On June 17, 2026, Jenk's and YSA entered into an Agreement for Deed and Transfer in Lieu of Foreclosure. Ex. Y13. The Agreement recites that the Borrower Parties had defaulted under the loan documents, that YSA held a recorded mortgage against the Property pursuant to the governing powers of attorney, and that YSA possessed the right to foreclose that mortgage. *Id.* §§ Recitals, 3. The Agreement further provides that Jenk's would convey the Property to YSA by Special Warranty Deed. *Id.* §§ 1–2. Consistent with that Agreement, a Special Warranty Deed conveying the Property to YSA was executed on June 17, 2026, and recorded in the Tulsa County land records on June 23, 2026—before the commencement of this bankruptcy case. Ex. Y14. The deed expressly references the previously recorded mortgage, confirms that it was delivered pursuant to the deed-in-lieu agreement, and provides that

8

the mortgage would remain in effect notwithstanding the conveyance. Plaintiff commenced this chapter 11 case and filed this adversary proceeding only after those transactions had been completed and recorded.

## ARGUMENT

I. **THE DELAWARE JUDGMENT PRECLUDES RELITIGATION OF THE PREMISE ON WHICH THE MOTION DEPENDS**

Every count of the Complaint shares a single premise: that Kulick lacked authority to encumber the Property, and that each instrument flowing from that authority is therefore void. The Court of Chancery tried that premise and rejected it. Ex. Y09 at 26–30. After a trial at which Kulick testified, the Court held that the Joinder Kulick himself proposed bound the Title Owners, Jenk's among them, as Pledgors under the Collateral Pledge and Security Agreements, that the power of attorney authorized YSA to act against their real property in YSA's sole discretion, and that YSA was entitled to record the resulting mortgages.

Plaintiff now asks this Court to reach the opposite conclusion on the same questions. It may not. For one, the Rooker-Feldman doctrine bars Plaintiff from seeking federal review of a state court ruling. Beyond the Rooker-Feldman doctrine, 28 U.S.C. Section 1738 requires that the Delaware judgment receive the effect Delaware courts would give it, and Delaware precludes relitigation of issues actually litigated, decided, and necessary to a prior judgment. Each doctrine—Rooker-Feldman and collateral estoppel—is discussed more fully below.

A. **The Rooker-Feldman Doctrine Bars Plaintiff's Claims**

First, the Rooker-Feldman doctrine bars this Court from exercising jurisdiction over Plaintiff's claims. The doctrine recognizes that the Supreme Court alone has "appellate jurisdiction to review and modify or reverse a state-court judgment; the lower federal courts do not." *Mitchell v. Durham Enters., Inc.*, 99 F.4th 978, 986 (7th Cir. 2024) (citing *Exxon Mobil Corp.*

9

*v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291–92 (2005)). It is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Mitchell*, 99 F.4th at 986 (quoting *Exxon*, 544 U.S. at 284).

Generally speaking, the Rooker-Feldman doctrine applies narrowly; the Supreme Court has held that, to be a state-court loser, the party against whom the doctrine is invoked must have been a party to the underlying state-court proceeding. *See Lance v. Dennis*, 546 U.S. 459, 466 (2006) ("The Rooker-Feldman doctrine does not bar actions by nonparties to the earlier state-court judgment."). In *Lance*, however, the Supreme Court declined to address "whether there are any circumstances, however limited, in which Rooker-Feldman may be applied against a party not named in an earlier state proceeding." *Id*. at 465 n.2. To illustrate the open question, the Court provided an example: "e.g., where an estate takes a de facto appeal in a district court of an earlier state decision involving the decedent." *Id.* In such a scenario, where a federal court litigant "simply steps into the [state court plaintiff's] shoes," the federal court litigant "cannot seek de facto appellate review of a state-court judgment in district court." *Mitchell*, 99 F.4th at 986. Such is the case here; Jenk's is merely stepping into the same shoes as Kulick.

The Delaware proceeding was initiated by Kulick himself, along with his personal investment vehicles Vesta Holdings, LLC and Asset Holder, LLC. On November 13, 2025, Kulick and those entities filed a complaint against YSA in the Court of Chancery seeking an order requiring YSA to remove the second mortgages it had recorded against the Properties. Ex. Y09 at 18. The Amended Complaint asserted a single claim—that the second mortgages were invalid—

and sought a declaratory judgment coupled with a permanent injunction directing YSA to execute and record releases of those mortgages. *Id.* at 19.

The central legal question that Kulick litigated in Delaware is identical to the question Jenk's now asks this Court to decide. In Delaware, Kulick argued that YSA lacked the right to record second mortgages on properties owned by the Title Owners, including Jenk's. The Delaware Court framed the key issue as "whether YSA had the right to record mortgages on the properties." *Id.* at 1. The Court found that it did: Kulick controlled or managed each of the Title Owners, and because each Title Owner was a Guarantor Entity under the February CPSA, each assumed "all obligations of Pledgor under the [CPSA] for all purposes thereof on the terms set forth therein" by operation of the Joinder, rendering each Title Owner an additional Pledgor. *Id.* at 29. The Power of Attorney granted YSA the right to take "whatever steps that it deems necessary in its sole discretion to secure and protect its interests," and the Court held that right was not tied to or limited by the definition of Collateral. *Id.* at 29–30. The Court concluded that YSA exercised that right by recording the second mortgages on real property owned by the Collateral—the Properties. *Id.* at 32.

Jenk's was itself one of those Title Owners. YSA recorded second mortgages against at least 25 Properties located in Oklahoma and Kansas, including properties owned by Jenk's. *Id.* at 17. Kulick—who the Complaint concedes "was the designated representative" of the Vesta entities and "exercised their management authority with respect to the Debtor," and who controlled and managed Jenk's (Compl. ¶ 22)—brought the Delaware action specifically to have those mortgages removed. He litigated the precise theory that Jenk's now advances here: that the loan documents did not authorize YSA to encumber the Properties. He lost after a trial on the merits.

11

Jenk's Complaint makes this de facto appellate posture impossible to obscure. Plaintiff alleges that Kulick "acting through entities he controlled, pledged the Debtor's sole asset as collateral" without authority and seeks a declaration that the recorded instruments are invalid. Compl. ¶ 1. That is the claim Kulick prosecuted and lost in Delaware. The Motion for TRO acknowledges the Delaware litigation but characterizes it as "decided an entirely different question"—that the Delaware Court "interpreted the parties' rights under the loan documents between Kulick and YSA" and "did not determine whether Kulick possessed authority under plaintiff's Operating Agreement to encumber plaintiff's Property." Pl.'s App. for TRO at 11.

That characterization is incorrect and, in any event, does not alter the Rooker-Feldman analysis. Whether the label on the claim is "breach of contract" or "lack of corporate authority," the injury Jenk's asserts is the same one the Delaware judgment resolved: the validity of the second mortgage on the Property. A federal litigant cannot reframe a state-court loser's injury as a new legal theory and thereby escape the bar on de facto appellate review. Jenk's is not bringing a new claim—it is asking this Court to reach the opposite conclusion on the same instruments against the same defendant that prevailed in Delaware. That is precisely what Rooker-Feldman forbids.

### B.  Collateral Estoppel Independently Bars Relitigation of Issues Already Decided by the Delaware Chancery Court

Even if Rooker-Feldman did not deprive this Court of jurisdiction, collateral estoppel independently bars Plaintiff from relitigating the issues on which its Motion depends. Under 28 U.S.C. § 1738, the Delaware judgment must receive the same preclusive effect Delaware courts would give it. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380–81 (1985). Under Delaware law, collateral estoppel applies where: (i) the issue previously decided is identical to the one presented; (ii) the prior action was finally adjudicated on the merits; (iii) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and

(iv) that party had a full and fair opportunity to litigate. *In re Moran*, 413 B.R. 168, 181 (Bankr. D. Del. 2009). Each element is satisfied.

*Identical issues.* Plaintiff's declaratory-judgment count asks this Court to declare that Kulick lacked authority to encumber the Property and that YSA's recorded instruments are therefore void. Compl. ¶¶ 99–100. The Court of Chancery decided each constituent question after trial:

- Whether Kulick controlled the Title Owners, so that a joinder executed on their behalf reached them. He did. Ex. Y09 at 29 ("Kulick controls or manages the Title Owners, as he testified at trial"); *see also id.* at 34 n.197 (Kulick asked that the parties "add a joinder that joins any asset controlled by any affiliate of mine").

- Whether the Joinder bound the Title Owners—Jenk's among them—as additional Pledgors under the CPSAs. It did. *Id.* at 29 (because each Title Owner is a Guarantor Entity, each "assumed 'all obligations of Pledgor under the [CPSA]' . . . by operation of the Joinder," rendering each "an additional Pledgor under the CPSA").

- Whether the power of attorney authorized YSA to take action against real property owned by those entities. It did, in YSA's sole discretion. *Id.* at 30–31 (the power of attorney "grants YSA the right, if YSA deems it necessary, to 'secure' its interests against those entities bound by the Joinder, including the Title Owners"; YSA entitled to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interest").

- Whether YSA was entitled to record the second mortgages against Title Owner property, including the Property. It was. *Id.* at 32 ("YSA exercised that right by recording the second mortgages on real property owned by the Collateral"); *id.* at 24 (judgment for YSA "even under Plaintiffs' interpretation").

13

- Whether the Property specifically fell within the scope of that authority. It did. *Id.* at 17 n.107 (identifying JX-170, the second mortgage granted on Jenk's Best Living on October 30, 2025).

Each holding was necessary to the judgment and each forecloses the premise that YSA's recorded interest in the Property arose from an unauthorized act.

*Final adjudication on the merits.* The Court of Chancery entered a post-trial judgment for YSA on June 9, 2026, following full discovery, briefing, and a trial at which Kulick himself testified. *See Kulick v. YSA Invs. 1, LLC*, No. 2025-1319-KSJM (Del. Ch. Nov. 13, 2025).

*Privity.* Jenk's is bound by the Delaware judgment because it was in privity with Kulick and the Vesta entities. A nonparty is bound where it controlled or substantially participated in the prior litigation. *Montana v. United States*, 440 U.S. 147, 154 (1979); *see Taylor v. Sturgell*, 553 U.S. 880, 895 (2008). Under the operative Delaware standard, a non-party is bound when it "controls or substantially participates in the control of the presentation on behalf of the party." *In re Columbia Pipeline Grp.*, 2021 WL 772562, at *16, 21 (Del. Ch. Mar. 1, 2021) (quoting Restatement (Second) of Judgments § 39).

Kulick's control of Jenk's is established by the Operating Agreement Plaintiff attached to its own Complaint. Kulick is the named initial Authorized Representative of both the Vesta Member and the Vesta Promote Member, Operating Agreement § 1.1(j); designated as the Company's official representative whose signature "will bind Borrower," *id.* § 14.3(i); and executed the Agreement in three separate capacities on behalf of Jenk's managing entities, *id.* at 40–43. Plaintiff concedes as much: Kulick "was the designated representative of those entities and exercised their management authority with respect to the Debtor." Compl. ¶ 22. The Court of Chancery found the same after trial. Ex. Y09 at 29. That control extended to the Delaware litigation

itself—Kulick, as named plaintiff and sole owner and manager of the plaintiff entities, directed the prosecution of that action, selected counsel, and testified in support of the precise claim Jenk's now reasserts. The relief sought there was relief for Jenk's benefit: invalidation of the second mortgage recorded against the Property that Jenk's owned.

*Full and fair opportunity to litigate.* Kulick had every opportunity. He filed suit, moved for a preliminary injunction, conducted discovery, submitted post-trial briefing, and testified at trial. Nothing more is required.

That Plaintiff is now managed by a chief restructuring officer who is "adverse" to Kulick is of no moment. The premise of preclusion is control at the time of the prior litigation, not at the time preclusion is invoked. A losing party cannot escape a judgment by replacing the managers who litigated and lost; a rule to the contrary would make every adverse judgment provisional on a change in corporate control. *See In re Columbia Pipeline Grp.*, 2021 WL 772562, at *21.

## II.     PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARD FOR THE MANDATORY INJUNCTION IT SEEKS

Federal Rule of Civil Procedure 65, made applicable by Federal Rule of Bankruptcy Procedure 7065, authorizes preliminary injunctive relief only upon a clear showing that the movant is likely to succeed on the merits, likely to suffer irreparable harm absent relief, that the balance of equities favors an injunction, and that the injunction serves the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009). The movant bears the burden on each factor, and failure to establish any one of them defeats the request for extraordinary relief.

Plaintiff's burden is even greater because the relief requested is not prohibitory. Plaintiff does not ask the Court merely to preserve existing conditions while the parties litigate the merits. Rather, it seeks to divest YSA of record title, restore Plaintiff to operational control of the Property,

15

and undo completed prepetition transactions. Such relief alters—not preserves—the status quo and therefore constitutes a mandatory injunction, which is disfavored and should issue only in the most compelling circumstances. *See Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). Plaintiff cannot satisfy that heightened standard.

A.     **Plaintiff Has Not Made the Clear Showing of Likely Success Required for Mandatory Injunctive Relief**

Plaintiff's likelihood-of-success showing fails for several independent reasons. The Delaware Court of Chancery has already rejected the central factual premise underlying the Motion. The Operating Agreement itself confers broad authority on the Managing Member and expressly identifies Kulick as a representative whose signature binds Jenk's. The transaction documents repeatedly acknowledge YSA's rights. And Plaintiff's evidentiary presentation depends substantially on a declaration from Kulick that is difficult to reconcile with his prior sworn testimony. Taken together, those circumstances fall well short of the clear showing required for *mandatory* injunctive relief.

1.     **The Operating Agreement Supports Actual Authority Rather Than Plaintiff's Theory of Complete Incapacity**

Section 8.1 of the Operating Agreement vests management in Vesta Capital, LLC as Managing Member and grants it "full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as it deems necessary or appropriate." Operating Agreement § 8.1. The same provision states that actions of the Managing Member taken in accordance with the Agreement "will bind the Company." *Id.*

That allocation of authority is consistent with Kansas law. Where an operating agreement provides for management of a limited liability company by a manager, Kansas law vests management in that manager to the extent provided by the agreement. K.S.A. § 17-7693. Kansas

16

law also recognizes a manager's broad ability to delegate management rights and powers to agents and other persons unless the operating agreement provides otherwise. K.S.A. § 17-7698.

Plaintiff relies principally on Sections 8.2 and 9.1(b), but those provisions do not establish the sweeping proposition Plaintiff attributes to them. Section 8.2 restricts what the Managing Member may "cause or permit the Company" to do without specified member approvals. That language is naturally read as an internal governance restriction among the Members, not necessarily as a limitation on the Company's capacity to be bound as against a third party dealing with its designated management.

Section 8.2(i) is narrower still. It addresses the creation of "bank indebtedness other than the Approved Financing." YSA is not a bank, and the obligations at issue are not bank indebtedness. Plaintiff therefore relies on Section 9.1(b), which provides that "[t]he Members agree" that no other indebtedness obligation or financing arrangement will be made by the Company without unanimous consent. Operating Agreement § 9.1(b). By its terms, that provision states an agreement among the Members. It does not expressly state that a transaction entered by the Managing Member is void as to a third party, nor does it state that the Managing Member lacks all power to bind the Company whenever an internal approval requirement is not satisfied.

Plaintiff's Complaint assumes otherwise. It alleges that the Operating Agreement was the "exclusive source" of authority and that any act taken without unanimous approval was therefore unauthorized and void. Compl. ¶¶ 25, 29–30. But Plaintiff cites no Kansas authority establishing that an unrecorded internal approval requirement automatically defeats the rights of a third party dealing with a manager whom the operating agreement otherwise grants broad authority to bind the company.

17

Kansas law strongly protects the enforceability of operating agreements and the parties' contractual allocation of management authority. *See* K.S.A. §§ 17-7672, 17-76,134. But that principle does not answer the analytically distinct question Plaintiff skips: whether a breach of an internal consent covenant necessarily deprives the Managing Member of authority as against a third party or instead gives rise to remedies among the Members and the Company. On this record, Plaintiff has not clearly established the former.

2.      The Operating Agreement and Jenk's Prior Conduct Independently Support Apparent Authority

Even assuming Plaintiff could establish a defect in actual authority, the present record supports apparent authority. Apparent authority turns on manifestations traceable to the principal, not merely on an agent's unsupported assertion that the agent possesses authority. Restatement (Third) of Agency §§ 2.03, 3.03; *Caribbean Sun Airlines Inc. v. Halevi Enters. LLC*, 339 A.3d 24, 36 (Del. 2025). Plaintiff anticipates that doctrine by alleging that Jenk's "never represented, directly or indirectly, that Mr. Kulick possessed authority" and that any appearance of authority resulted solely from Kulick's own conduct. Compl. ¶¶ 79–80. The Operating Agreement contradicts that allegation.

Section 14.3(i) designates Kulick by name as Jenk's "official representative for all matters concerning the Property that require HUD consent or approval" and states expressly that "[t]he signature of this representative will bind Borrower." Operating Agreement § 14.3(i). That is a written manifestation by Jenk's itself, contained in the Company's governing agreement and approved by the PSC Member and PSC Promote Member. Section 8.1 supplies another manifestation. Jenk's represented in its Operating Agreement that the Managing Member possessed "full and complete discretion" over the Company's affairs and that the Managing Member's actions would bind the Company. Operating Agreement § 8.1. Jenk's prior course of

18

conduct is consistent with those written manifestations. In 2021, Jenk's executed its HUD-insured multifamily mortgage through Marc Kulick as its duly authorized representative. Ex. Y15 at 45.

That transaction is directly relevant because it shows that Jenk's previously held Kulick out to lenders and governmental actors as an authorized representative capable of acting with respect to the Property. These manifestations came from the principal. They do not depend solely on Kulick's own description of his authority. At minimum, they create a substantial factual and legal dispute concerning apparent authority that cannot be resolved in Plaintiff's favor on an emergency record.

3.      The Delaware Judgment Confirms That Kulick Controlled the Title Owners and Bound Them Through the Joinder

The Court of Chancery's post-trial findings further undermine Plaintiff's likelihood-of-success showing. After trial, the Court found that Kulick controlled and managed the title-owning entities; that he proposed a joinder extending to the portfolio as a whole; that he instructed counsel to add a joinder covering assets controlled by his affiliates; and that, through the Joinder, the title-owning entities assumed the obligations of pledgors under the Collateral Pledge and Security Agreements. Ex. Y09 at 18–20. The Court further held that the governing power of attorney authorized YSA to take whatever steps it deemed necessary to protect its interests against entities bound by the Joinder, including action against real property owned by the title-owning entities. *Id.* at 21–22. Plaintiff attempts to distinguish the Delaware decision by focusing on internal limitations in Jenk's Operating Agreement. But that characterization does not erase the significance of findings entered after trial concerning Kulick's control, the breadth of the Joinder, the binding effect of the CPSAs, and YSA's authority to record the mortgages. Those findings alone make it impossible for Plaintiff to demonstrate a clear and undisputed likelihood of success.

19

4.      The Subsequent Transaction Documents Repeatedly Recognized YSA's Rights

The documents executed after the Mortgage was recorded also conflict with Plaintiff's assertion that YSA's rights were plainly nonexistent. The Mortgage identifies Jenk's as Grantor, YSA as Mortgagee, and recites that the Borrower Parties and guarantor granted YSA powers of attorney authorizing the Mortgage. Ex. Y16 at 1. It further states that Jenk's would receive substantial direct or indirect benefits from the transaction. *Id.* at 2. The June 17, 2026 Agreement for Deed and Transfer in Lieu of Foreclosure goes further. Ex. Y13. It recites that the Borrower Parties pledged the Property, that YSA received a mortgage through the powers of attorney, and that the Mortgage had been recorded. Section 3 expressly acknowledges that the Borrower Parties were in default, that YSA held a valid mortgage lien on the Property, and that YSA possessed the right to foreclose. The Special Warranty Deed then conveyed all of Jenk's right, title, and interest in the Property to YSA. It expressly states that the conveyance was made under the deed-in-lieu agreement, recognizes the previously recorded Mortgage, and provides that the Mortgage would remain in effect rather than merge into the deed.

5.      Plaintiff Did Not Promptly Disavow the Mortgage or the Asserted Authority on Which It Rested

The timing likewise undermines Plaintiff's request for emergency relief. The Mortgage was recorded on October 31, 2025. Ex. Y16. Yet the Complaint does not identify any prompt notice from Jenk's to YSA disputing Kulick's authority, any corrective instrument recorded in the land records, or any action brought by Jenk's to invalidate the Mortgage before the bankruptcy filing. Instead, the present action commenced in July 2026, after the Delaware trial, the Delaware judgment, the deed-in-lieu agreement, and the recorded conveyance. While that delay may not, standing alone, establish ratification or estoppel, it nevertheless weighs against Plaintiff's assertion that Kulick's lack of authority was obvious, undisputed, and immediately recognized by the

20

Company. It also reinforces why the issue should be resolved on a complete record rather than through mandatory interim relief.

6.      Plaintiff's Evidentiary Showing Depends on a Witness Whose Current Account Conflicts with His Prior Sworn Testimony

Finally, Plaintiff's showing depends substantially upon a declaration from Kulick—the individual who proposed the Joinder, executed the challenged documents, and testified at trial in Delaware. According to the Delaware record, Kulick previously testified that he possessed "full power and authority to bind the Affiliates," described himself as the "sole decision-maker," and stated that the operating agreements generally required little member approval. Ex. Y17 (Kulick Feb. 5, 2026 Dep. Tr.) at 643:24–644:3; Ex. Y18 (Kulick Dec. 30, 2025 Dep. Tr.) at 19:10–14, 149:3–6. His present declaration now supports Plaintiff's opposite contention that he lacked authority to bind Jenk's. The Court need not resolve Kulick's credibility at this stage. The inconsistency itself is enough. A motion for mandatory injunctive relief requires a clear evidentiary showing. A declaration materially at odds with the declarant's prior sworn testimony cannot supply that clarity, particularly where the written agreements and a post-trial judgment point in the other direction.

For all of these reasons, Plaintiff has not established a clear likelihood of success on the merits. The record instead presents substantial disputes concerning actual authority, apparent authority, the legal effect of internal consent provisions, the consequences of the Delaware judgment, and the credibility of Plaintiff's principal witness. Those disputes must be resolved through ordinary litigation, not by a mandatory injunction that effectively awards Plaintiff the central relief sought in its Complaint.

### B.        Plaintiff Has Not Demonstrated Irreparable Harm

Plaintiff likewise fails to establish irreparable harm. To obtain the extraordinary relief it seeks, Plaintiff must show harm that is actual and imminent and that cannot be remedied after final judgment. *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019). Harm measured in money qualifies only where damages would be difficult to ascertain, inadequate, or uncollectable. *Bethel Ministries, Inc. v. Salmon*, 2020 U.S. Dist. LEXIS 9789, at *20–21 (D. Md. Jan. 21, 2020). Speculation does not suffice. Plaintiff's showing fails.

Plaintiff cannot reconcile its request for emergency equitable relief with the claims pleaded in its own Complaint. Counts III and IV seek avoidance of the challenged transfers under §§ 547 and 548, together with recovery under § 550—provisions that exist precisely to restore the Property to the estate if the transfers prove avoidable. Plaintiff thus asks the Court to hold simultaneously that the Code affords a complete mechanism to recover the Property after litigation and that only immediate mandatory injunctive relief can prevent irreparable injury. Although real property is often treated as unique, where the property is "commercial real estate used as an investment property," a plaintiff "can recoup its investment loss through money damages." *Mount Clemens Inv. Grp., L.L.C. v. Borman's Inc.*, 2010 U.S. Dist. LEXIS 108700, at *13 (E.D. Mich. Oct. 12, 2010); *see In re WB Coyle*, 2016 U.S. Dist. LEXIS 137211, at *23 (N.D. Cal. Oct. 3, 2016) ("Where the harm absent an injunction is loss of an interest in a commercial property, such loss is 'easily calculable and compensable in damages' upon conclusion of the litigation."); *Simone v. N.V. Floresta, Inc.*, 1999 U.S. Dist. LEXIS 9578, at *30 (S.D.N.Y. June 18, 1999) ("[T]he Property is not unique in the sense of being irreplaceable to this buyer who was merely investing in commercial real estate."). Moreover, uniqueness does not establish irreparable harm where

22

Congress has supplied a statutory remedy designed to return the very asset at issue should Plaintiff prevail. *See* 11 U.S.C. § 550(a). Plaintiff cannot invoke that doctrine as a shield while pleading an avoidance action that treats the conveyance as a recoverable transfer.

No certain, great, and actual harm will follow from denial. As set forth *infra* § II.C–D, the greater danger to the Property—and to others holding valid interests in it—lies in Plaintiff and Kulick remaining in control. YSA intends to stabilize rents and address the operational and habitability failures that have accumulated under that control. And Plaintiff's suggestion that Kulick might further encumber the Property is baseless: nothing indicates Kulick has actual or apparent authority to bind the current record owner.

C.   **The Balance of Equities Strongly Favors Maintaining the Existing Legal Status Quo**

The balance of hardships likewise favors YSA. YSA presently holds record title pursuant to instruments executed and recorded before the petition date. Those transactions followed litigation in which the Delaware Court of Chancery upheld the authority on which YSA acted. An injunction would require the Court, on an abbreviated record, to displace the existing legal status quo, transfer operational control of a significant multifamily housing project, and effectively grant Plaintiff much of the ultimate relief sought in this adversary proceeding. By contrast, denial of interim relief simply preserves the parties' respective legal positions while the merits are adjudicated. If Plaintiff ultimately prevails on its avoidance claims or other causes of action, the Bankruptcy Code provides mechanisms to unwind the challenged transactions. If YSA prevails, the extraordinary disruption associated with mandatory injunctive relief will have been avoided. Under these circumstances, the equities favor restraint rather than intervention.

D.   **The Public Interest Favors Preserving the Existing Legal Status Quo Pending a Decision on the Merits**

The public undoubtedly has a substantial interest in the continued stable operation of residential housing and the protection of tenants. Those concerns are not hypothetical—and the record of Plaintiff's own stewardship of the Property speaks for itself. Shortly before this bankruptcy filing, the City of Jenks declared two Vesta-managed properties—including the THRIVE Apartments that are the subject of this dispute—a public nuisance due to accumulated trash and deteriorating property conditions. *See* Ex. Y19 (Cal Day, *Jenks Declares Nuisance at Two Vesta Realty Apartment Complexes Over Trash Pickup*, Newson6.com (July 9, 2026), https://www.newson6.com/tulsa-oklahoma-news/jenks-declares-nuisance-at-two-vesta-realty-apartment-complexes-over-trash-buildup).

Local reporting further documents a pattern of operational failures under Vesta's management—unpaid utility bills, neglected maintenance obligations, and tenants left to bear the consequences of Plaintiff's mismanagement. *See* Ex. Y20 (Jake Ramsey, *When Landlords Don't Pay the Bills, It's the Tenants Who Struggle*, KGOU (July 13, 2026), https://www.kgou.org/housing/2026-07-13/when-landlords-dont-pay-the-bills-its-the-tenants-who-struggle). It is precisely this track record that led to the current state of affairs. The public interest is not served by restoring operational control of a residential apartment complex to the very entity whose mismanagement precipitated a municipal nuisance declaration and left tenants in substandard living conditions. To the contrary, the public interest demands orderly and stable management of the Property—not emergency judicial intervention that would immediately transfer control of the Property before the parties' competing rights have been adjudicated.

Moreover, this case is not about preserving existing conditions while the parties litigate the merits. Plaintiff asks the Court to undo completed pre-petition transactions, divest the record owner

24

of title, restore operational control of the Property, and effectively grant a substantial portion of the ultimate relief sought in the Complaint. The public interest is not served by employing Rule 65 to accomplish, on an emergency record, what ordinarily occurs only after full litigation on the merits. Indeed, Congress has already prescribed the mechanism by which debtors challenge allegedly avoidable transfers. *See* 11 U.S.C. §§ 544, 547, 548, 550. Plaintiff, for its part, has already invoked those rights through Counts III and IV of its Complaint. Compl. ¶¶ 111–23. The public interest is served by allowing those claims to proceed in the ordinary course of adversary litigation, where the parties may develop a complete evidentiary record and the Court may resolve disputed issues after full consideration of the facts and applicable law—not by granting mandatory equitable relief that effectively decides those issues at the outset of the case. *See Doe v. Del. State Univ. Bd. of Trs.*, 2021 WL 2036670, at *2 (D. Del. May 21, 2021) (an injunction is "mandatory" if it would "alter the status quo by commanding some positive act," and when seeking such relief, the movant's burden is "particularly heavy" and the right to relief must be "indisputably clear").

Finally, the public also has a significant interest in the stability and predictability of commercial transactions involving real property. Recorded mortgages, recorded deeds, and other publicly recorded instruments exist so that parties may rely upon them in structuring commercial affairs. *See Handler Constr., Inc. v. CoreStates Bank, N.A.*, 633 A.2d 356, 366 (Del. 1993) (noting that Delaware's recording statute is designed to afford notice of recorded instruments to promote "reliability and consistency"). That interest is particularly important where, as here, the challenged transactions were followed by litigation culminating in a post-trial judgment upholding the authority on which those transactions were based. Ex. Y09 at 29–30, 36. Granting mandatory injunctive relief under these circumstances would undermine confidence in the finality of both recorded property interests and judicial proceedings.

Accordingly, the public interest strongly favors preserving the parties' existing legal positions pending adjudication on the merits rather than issuing the extraordinary mandatory injunction Plaintiff requests.

## III. PLAINTIFF LACKS AUTHORITY TO COMMENCE THIS CASE OR SEEK EXTRAORDINARY EQUITABLE RELIEF

Although the hearing for July 22 was principally scheduled to address Jenk's Motion for Temporary Restraining Order, there remains an overarching issue concerning Jenk's purported authority to even seek the relief it requests through this proceeding. It is, of course, basic that "[a] bankruptcy petition by an entity may only be filed under authority of those with the lawful power to so act." *In re Carolina Park Assocs., LLC*, 430 B.R. 744, 748 (Bankr. D. S.C. 2010) (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)). Accordingly, even before the Court reaches Rule 65, the Court should assess whether the persons purporting to act on behalf of Jenk's possessed authority to file bankruptcy, and by virtue of the bankruptcy petition, invoke this Court's jurisdiction. The threshold authority question arises from the same Operating Agreement on which Plaintiff bases every count of its Complaint.

First, Section 8.2 of the Operating Agreement provides that, "[n]otwithstanding anything to the contrary contained in this Agreement," the Company may not undertake specified "Material Actions" without "the approval of all Members." Operating Agreement § 8.2. Among those Material Actions is the commencement of a bankruptcy proceeding:

> Institute proceedings to adjudicate the Company bankrupt, or consent to the filing of a bankruptcy proceeding or petition seeking reorganization under the Bankruptcy Code.

Operating Agreement § 8.2(e). Plaintiff's Complaint treats Section 8.2 as the exclusive source of Kulick's authority and repeatedly alleges that actions taken without the approvals required by that provision are void. Compl. ¶¶ 25, 29–30. Yet Plaintiff has not demonstrated that the unanimous

26

member approval required by Section 8.2(e) preceded the filing of this chapter 11 case or this adversary proceeding. To the contrary, the present record suggests that the petition and related corporate actions were authorized only by the PSC-side members after the purported removal of the Vesta entities.[1]

Second, Plaintiff alleges that the Vesta entities were removed as Managing Member after the challenged transactions came to light. Compl. ¶¶ 81, 94. The Operating Agreement, however, appears to prescribe a different mechanism. Section 8.2 identifies the removal of members as a Material Action requiring unanimous approval. Operating Agreement § 8.2(k). Meanwhile, the Agreement specifically addresses the circumstance in which Kulick ceases to serve as the Authorized Representative of the Vesta entities—a "Vesta Control Event"—and grants the PSC Member the unilateral right to market and sell the Property. Operating Agreement § 1.1(j). Conspicuously absent is any comparable provision authorizing the PSC-side members unilaterally to remove the Managing Member or to install replacement management without the approvals otherwise required by the Operating Agreement. That omission matters because Plaintiff's present authority to prosecute this case depends upon precisely such a change in governance.

Where, as here, the authority of the persons purporting to act on behalf of the debtor is itself disputed—and where that dispute turns upon the same contractual provisions that form the basis of Plaintiff's merits claims—the Court should hesitate before issuing mandatory injunctive relief that would substantially alter the parties' legal and practical positions.

---

[1] If Plaintiff's interpretation of Section 8.2 is correct, that omission is consequential. Under Plaintiff's own theory, the Operating Agreement does not merely regulate internal governance—it deprives company representatives of authority to act at all absent unanimous approval. YSA does not ask the Court to resolve the ultimate validity of the bankruptcy petition in deciding the present Motion. Rather, the point is narrower. Plaintiff cannot rely upon Section 8.2 as an absolute limitation on authority when challenging YSA's conduct while simultaneously asking this Court to disregard the same contractual limitation when evaluating Plaintiff's own authority to invoke the extraordinary equitable powers of this Court.

**IV.     ANY RELIEF SHOULD BE CONDITIONED ON SECURITY UNDER RULE 65(c)**

Rule 65(c) permits a temporary restraining order or preliminary injunction to issue "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c), made applicable by Fed. R. Bankr. P. 7065. To the extent the Court grants Plaintiff's Motion, YSA respectfully requests that any such relief be conditioned upon the posting of a bond in an amount sufficient to compensate YSA for the costs and damages it would sustain if the injunction is later found to have been wrongfully issued.

**<u>CONCLUSION</u>**

For the foregoing reasons, YSA Investments 1, LLC respectfully requests that the Court deny the Motion in its entirety; or, in the alternative, condition any relief on security under Rule 65(c) in an amount commensurate with YSA's exposure; and grant such other and further relief as is just.

Dated: July 22, 2026          /s/ Justin Fasano
Baltimore, MD                 Justin Fasano (Bar No. 28659)
                              McNamee Hosea, P.A.
                              6404 Ivy Ln Ste 820,
                              Greenbelt, MD 20770
                              Telephone: + 1 (301) 441-2420
                              jfasano@mhlawyers.com


                              Tara M. Lee (Bar No. 17902)
                              Scott Lerner (Bar No. 13327)
                              Dechert LLP
                              1900 K Street NW
                              Washington, D.C. 20006
                              Telephone: + 1 (202) 261-3300
                              tara.lee@dechert.com
                              scott.lerner@ dechert.com

28

Marcus Helt (*pro hac vice forthcoming*)
Debbie Green (*pro hac vice forthcoming*)
Dechert LLP
2651 N Harwood St,
Dallas, TX 75201
Telephone: + 1 (214) 453-4900
marcus.helt@dechert.com
debbie.green@dechert.com

*Attorneys for Defendant YSA*
*Investments 1, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 22, 2026, a copy of the foregoing was served by CM/ECF to all

parties receiving notice thereby, including:

Ari Scott Casper
Email: acasper@casperfirm.com
*Attorney for Jenk's Best Living, LLC*

Maurice Belmont VerStandig
Email: mac@mbvesq.com
*Attorney for Jenk's Best Living, LLC*

Dated: July 22, 2026            <u>/s/ Justin Fasano</u>
Baltimore, MD                   Justin Fasano (Bar No. 28659)
                                McNamee Hosea, P.A.
                                6404 Ivy Ln Ste 820,
                                Greenbelt, MD 20770
                                Telephone: + 1 (301) 441-2420
                                jfasano@mhlawyers.com