**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MARC KULICK, VESTA HOLDINGS, LLC, and ASSET HOLDER, LLC | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2025-1319-KSJM |
| YSA INVESTMENTS 1, LLC, | ) ) ) | |
| Defendant. | ) ) ) | |
| YSA INVESTMENTS 1, LLC, | ) ) ) | |
| Counterclaim-Plaintiff and Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| MARC KULICK, VESTA HOLDINGS, LLC, et al., | ) ) ) ) | |
| Counterclaim-Defendants and Third-Party Defendants. | ) ) ) ) | |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: April 9, 2026
Date Decided: June 9, 2026

Sean J. Bellew, BELLEW LLC, Wilmington, Delaware; Benjamin H. Brodsky, Michael Fisher, BRODSKY FOTIU-WOJTOWICZ, PLLC, Miami, Florida; *Counsel for Plaintiffs and Counterclaim-Defendants, Marc Kulick, Vesta Holdings, LLC, and Asset Holder, LLC.*

Sarah R. Martin, Samuel L. Moultrie, GREENBERG TRAURIG LLP, Wilmington, Delaware; Joel Tasca, Kerry Kleinman, GREENBERG TRAURIG LLP, Las Vegas, Nevada; *Counsel for Defendant and Counterclaim and Third-Party Plaintiff YSA Investments 1, LLC.*

**McCORMICK, C.**

Plaintiff Marc Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas. Beginning in October 2024, Defendant YSA Investments 1, LLC loaned the Kulick-led plaintiff entities millions of dollars. In February 2025, Kulick asked YSA for another loan. Because the amount requested was twice as large as any previous loan, YSA demanded better terms and additional security. In response, cash-strapped Kulick proposed an extremely favorable interest rate and agreed to pledge his entire real estate portfolio. YSA accepted the terms. And Kulick signed a joinder committing all entities that he owned, in whole or part, or managed or controlled directly or indirectly, to the obligations in the loan agreements. Kulick later defaulted on four loans, including the February loan, and YSA placed second mortgages on properties in Kulick's portfolio. Kulick filed this litigation to require that YSA remove the second mortgages and to enjoin YSA from recording additional second mortgages. The case proceeded to trial.

The key issue is whether YSA had the right to record mortgages on the properties. Kulick argues that the loan agreements identified as collateral interests in the holding companies, and not the properties at issue. But this argument does not matter, because the loan documents granted YSA expansive rights to take actions against real property owned by the collateral, including the properties. YSA exercised that right by recording the second mortgages. Kulick also argues that the loans cannot be enforced because their terms were predatory, usurious, and against public policy. Setting aside the fact that Kulick proposed the loan terms about which

he now complains, this defense fails for a more basic reason—Delaware law does not extend usury defenses to limited liability companies like the plaintiff entities. This decision therefore enters judgment for YSA.

## I.  FACTUAL BACKGROUND

The facts are drawn from the 222 joint trial exhibits, live testimony from four witnesses, deposition testimony from two fact witnesses, and 22 stipulations of fact. These are the facts as the court finds them after trial.[1]

### A.  Marc Kulick And The Vesta Entities

Kulick controls and manages a portfolio of 34 multifamily real estate assets in Oklahoma, Arkansas, and Kansas (the "Properties").[2] The Properties are owned by

---

[1] This decision cites to: C.A. No. 2025-1319-KSJM docket entries (by "Dkt." number); trial exhibits (by "JX-" number); the trial transcript, Dkt. 98 (by "Trial Tr. at"); stipulated facts set forth in the parties' Joint Pre-Trial Order, Dkt. 88 ("PTO"); and the Transcript of the November 25, 2025 hearing on Plaintiffs' Motion for Expedited Proceedings and Motion for Expedited Preliminary and Permanent Injunction, Dkt. 25 ("11/25/25 Hr'g Tr."). The parties called the following fact witnesses: Marc Kulick (owner and controller of Plaintiffs Vesta and Asset Holder); Efraim Diveroli (YSA's principal); Robert Miley (YSA's Rule 30(b)(6) representative); John Hall (Defendant's expert). The parties submitted the deposition transcripts of the live witnesses, except for John Hall, and called the following witnesses by deposition only: Kara Thomas (Controller at Vesta Realty) and Courtney Merritt (Controller at Vesta Realty). The transcripts of the witnesses' respective depositions are cited using the witnesses' last name and "Dep. Tr." The decision notes in citation form where a witness was designated to testify under Rule 30(b)(6). This decision cites the following declaration by the declarant's last name: Christopher Rogers (Partner at Capital Fund Law Group), Dkt. 86 ("Rogers Decl.").

[2] JX-185; Trial Tr. at 6:23–7:4 (Kulick). Some of Kulick's 34 assets have a tenancy in common ("TIC") ownership structure that results in two or more entities serving as the ultimate owners of the TIC assets. Trial Tr. at 7:5–8:1 (Kulick).

34 separate, single-purpose limited liability companies (the "Title Owners").[3]  Each Title Owner is owned by one or more holding company (the "Intermediate Holding Companies").[4]  The Title Owners are capitalized by investments at the Intermediate Holding Company level.[5]

Plaintiffs Vesta Holdings, LLC and Asset Holder, LLC (with Kulick, the "Plaintiffs")[6] are Kulick's personal investment vehicles.[7]  Kulick is the sole owner and manager of Vesta and Asset Holder.[8]  Vesta and Asset Holder hold membership interests in several Intermediate Holding Companies.[9]  Kulick also holds an interest in all the Title Owners.[10]

### B.  Plaintiffs Seek Short-Term Loans From Defendant.

In 2024, Kulick was in search of short-term financing for one of the Properties.[11]  An acquaintance introduced Kulick to Efraim Diveroli.  Diveroli is the

---

[3] Trial Tr. at 7:5–8:1, 115:22–116:17 (Kulick); JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A; *compare* PTO ¶ 6 *with* JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803.

[4] Trial Tr. at 7:5–8:1 (Kulick); *see* JX-198.

[5] Trial Tr. at 7:5–8:1 (Kulick).

[6] *Id.* at 8:7–18 (Kulick).

[7] *Id.* at 8:7–24 (Kulick).

[8] *Id.* at 8:7–8:18 (Kulick).

[9] *Id.* at 9:2–9:14 (Kulick).

[10] *Id.* at 49:17–51:1 (Kulick).

[11] JX-3 at 1; Trial Tr. at 9:18–10:8 (Kulick); Trial Tr. at 146:21–147:22 (Diveroli).

3

principal of Defendant YSA Investments 1, LLC ("Defendant" or "YSA"),[12] a special purpose vehicle for Diveroli's commercial lending.[13] Kulick connected with Diveroli in September 2024. Kulick urged Diveroli to finance some of his loans, claiming "[i]t's the easiest money you'll ever make" and that Diveroli has no reason to worry about losing his investment.[14]

On September 7, 2024, Kulick provided YSA a form agreement for the proposed loan.[15] On September 29, Kulick and his counsel provided YSA's counsel and Diveroli the material loan terms.[16] The terms included: a loan of $775,000, an interest rate of 7% per month (84% annualized), a 2% closing fee for YSA, and a right of first refusal in favor of YSA.[17] Kulick, Diveroli, and YSA's counsel discussed the proposed loan.[18] After, YSA's counsel proposed more detailed descriptions of the material terms, and

---

[12] Dkt. 81 ¶ 12.

[13] Trial Tr. at 146:10–20 (Diveroli); *see* Dkt. 81 ¶ 12.

[14] JX-3 at 4; JX-4 (attaching a draft loan agreement). The initial draft of the loan document contemplated an interest rate of 20% per annum, compounding annually. JX-4 at 2. Kulick explained his goal for the interest rate was to provide Diveroli "10% over the 3-month term." JX-3 at 10.

[15] JX-4 (providing Diveroli initial versions of a promissory note and a collateral pledge and security agreement); JX-3 at 2–12; *see* JX-6 at 4. The "form agreement" Kulick provided the borrower would have "[n]o right of rescission, setoff, abatement, diminution, counterclaim, or defense . . . with respect to this Note or any other Loan Documents." JX-4 at 4.

[16] JX-6; Trial Tr. at 10:11–13 (Kulick).

[17] JX-5 at 1–2 ("Efraim and I have basically finished our deal for Parc 1010 EM."); JX-3 at 2–12.

[18] *See* JX-46.

4

the parties deferred to Kulick's counsel to revise the documents consistent with that proposal.[19]

Kulick agreed to the revised terms on October 2 and his attorney agreed to update the drafts.[20]

The parties closed the transaction on October 8, 2024 (the "October 8 Loan").[21] The October 8 Loan included a Promissory Note ("Note"), a Collateral Pledge and Security Agreement ("CPSA"), and a Personal Guaranty and Right of First Offer (the "Guaranty" and collectively, the "Loan Documents").[22]

The October 8 Loan made Asset Holder the Borrower, Vesta the Pledgor, and YSA as the Lender.[23] YSA loaned Asset Holder $775,000, maturing ninety days after closing.[24] Asset Holder and Pledgor secured the October 8 Loan with "Collateral" defined as "Unencumbered Interests" and "Encumbered Interests" in the form of membership interests that Kulick held in the Intermediate Holding Companies.[25]

---

[19] JX-5 at 1–2 (noting that Kulick's counsel "prefer[ed] to make the initial edits" to the documents Kulick previously provided); JX-46 at 7–8.

[20] JX-6.

[21] PTO ¶ 7; JX-10.

[22] Kulick Day 1 Dep. Tr. at 28:19–23.

[23] JX-10 at 1.

[24] *Id.*

[25] *Id.* at 9. For the October 8 Loan, the Unencumbered Interests were Kulick's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC, Remington Ranch Investors, LLC, Copperfield Investors, LLC, and Putnam Investors, LLC. *Id.* Kulick represented that Asset Holder, as borrower, "owns the Unencumbered Collateral absolutely and free of any . . . encumbrance" and Asset Holder "has the unencumbered and unrestricted right to pledge the Unencumbered Collateral." *Id.* at 11.

The CPSA included a Power of Attorney provision applicable in the event of a borrower breach proposed by YSA on October 3.  That day, YSA's counsel asked Kulick to provide a list of suits filed against "Vesta and its affiliated entities" and to identify any UCC liens.[26]  A UCC search precipitated YSA's request.[27]  Kulick then identified nine civil actions and stated that "none of the entities that are a party to this loan have any UCCs filed against them[.]"[28]  YSA proposed additional terms, including the Power of Attorney provision.  The Power of Attorney provision, quoted more fully in the below legal analysis, gave YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests . . . includ[ing] but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral."[29]  Kulick agreed to most of the proposed terms but noted that he would need a few hours to consider the Power of Attorney,[30] which Kulick later agreed to.[31]

---

[26] JX-7 at 4.

[27] *Id.*

[28] *Id.* at 3.

[29] JX-9 at 2–3.

[30] *Id.* at 2; JX-3 at 15; JX-46 (discussing representations and warranties of the loan). For instance, Kulick agreed to "waive any defense or asset protection mechanism that may be available in the event of a default."  JX-9 at 2.

[31] Trial Tr. at 54:2–56:5 (Kulick); JX-46.

6

The October 8 Loan was due with interest on January 8, 2025,[32] when Kulick was obligated to remit payment of $829,250.[33] But Kulick requested a one-week extension on January 8,[34] when he informed Diveroli he was short over $500,000.[35] Diveroli agreed to a short extension on the condition that Kulick pay an additional $25,000.[36] Kulick paid the $829,250 and additional $25,000 on January 21.[37] And YSA continued loaning Kulick money.

### C.   Defendants Provide Additional Loans Subject To A Joinder.

By February 2025, YSA had loaned Kulick $4,775,000 over six loans.[38] That month, Kulick approached YSA requesting a $1,500,000 loan, nearly twice the amount of any previous Loan.[39] Diveroli wanted to loan the money to Kulick. Diveroli considered Kulick "a fantastic salesman" and "very persist[ent]," noting that Kulick "presents as trustworthy."[40]

---

[32] *Id.* at 2; JX-3 at 22–23 ("If money doesn't come in as expected would you be open to a week extension for an additional 25k of interest paid today.").

[33] JX-10 at 2.

[34] JX-3 at 22–24.

[35] JX-3 at 23.

[36] *Id.* at 22–24.

[37] JX-58; JX-22.

[38] JX-10 at 1 (October 8 Loan for $775,000); JX-60 at 2 (loaning Plaintiffs $750,000 on January 21, 2025); JX-63 at 2 (loaning Plaintiffs $750,000 on January 24, 2025); JX-65 at 2 (loaning Plaintiffs $800,000 on January 30, 2025); JX-67 at 2 (loaning Plaintiffs $850,000 on February 4, 2025); JX-71 at 2 (loaning Plaintiffs $850,000 on February 10, 2025).

[39] Trial Tr. at 149:3–22 (Diveroli); Rogers Decl. ¶ 4; *compare* JX-16 at 1 *with* JX-71 at 2.

[40] Trial Tr. at 151:19–152:5 (Diveroli).

But given that Kulick repaid the October 8 Loan late, and the amount requested, YSA "made it crystal clear" it would need "significantly more collateral" before agreeing to Kulick's request.[41]  Diveroli directed his office to "cease almost all other activities" to review Kulick's portfolio of assets prior to extending additional capital.[42]  And YSA searched for a consultant "familiar with multi-family residential real estate" who could assist in "making sure [YSA] [is] as protected by the collateral" as it was made to believe.[43]

On February 13, YSA requested that Kulick provide preliminary diligence materials.[44]  Kulick resisted YSA's requests initially,[45] expressing his desire to end the parties' relationship, and even requested that YSA "release all liens . . . from the [October 8 Loan]."[46]

Kulick then changed his tune.  The next morning, Kulick offered to move forward if YSA would accept a subset of the requested materials.[47]  YSA agreed based on Kulick's offer to provide: "[a]ll tax returns"; "[a]ll mortgage statements"; "a

---

[41] *Id.* at 149:23–152:5 (Diveroli).

[42] *Id.* at 149:23–151:10 (Diveroli); JX-73; *see* JX-222.

[43] JX-222; *see* JX-73.

[44] JX-76 at 2 (Defendant requested the following materials: (i) bank statements for the preceding six months for all entities; (ii) financial statements from the last three years; (iii) tax returns from the last three years; (iv) internal analytics for the properties Kulick developed; (v) "all Loan Documents related to loans currently encumbering one or multiple properties that will be securing the loan"; and (vi) "[a]ny and all active UCC filings related to any of the entities/properties.").

[45] JX-73.

[46] JX-76 at 1.

[47] *Id.*

portfolio p&l" statement; and "[c]onstant live access to data curated between [Kulick's] team and [YSA]."[48]

YSA's counsel reviewed the materials. Because the materials did not clearly identify the entity associated with each property, YSA's counsel requested additional information.[49] YSA also asked whether any encumbrances on the properties would be senior to the contemplated loan.[50] Kulick provided additional documentation, including a broker's valuation opinion for one property and operating agreements for five of the entities.[51]

The following morning, Kulick texted Diveroli and Robert Miley, YSA's counsel, to check on the status of the Loan.[52] Miley responded by sharing an image of the CPSA provision that defined "Unencumbered Interests" and "Encumbered Interests."[53] Miley asked Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, could you please send me a paragraph that I can copy into it with the other entities?"[54]

Kulick immediately responded stating: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole[.]"[55]

---

[48] *Id.*

[49] JX-77 at 2–3.

[50] *Id.*

[51] JX-77 at 1.

[52] JX-12.

[53] *Id.* at 2.

[54] *Id.*

[55] *Id.*

9

Miley then asked the group for "consensus on the entity language for the collateral agreement."[56]  He noted that, given certain covenants in the CPSA, it was critical to keep the unencumbered and encumbered interests separate.[57]  Kulick responded stating: "Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?"[58]

Miley said that the joinder "may" work.[59]  Miley then emailed Kulick updated drafts of the Confession of Judgment and Guaranty.[60]  In the same email, Miley again flagged for the group Kulick's suggestion of adding a joinder to the CPSA.  He noted that the CPSA does not clearly state which entities are intended to be "unencumbered vs encumbered."[61]  Kulick responded: "No change to this document at all except to add a joinder that joins *any asset controlled by any affiliate of mine*."[62]  YSA's counsel circulated a revised CPSA that included a one-paragraph joinder consistent with Kulick's proposal (the "February Joinder").[63]

On February 18, 2025, the parties entered the new loan agreement (the "February 2025 Loan").[64]  The February 2025 Loan comprises: a promissory note (the

---

[56] *Id.* at 3.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] JX-13 at 1.

[61] *Id.*

[62] *Id.* (emphasis added).

[63] JX-15 at 1, 18, 32.

[64] PTO ¶ 7; *see generally* JX-16.

"February Note"); a collateral pledge and security agreement (the "February CPSA"), a Personal Guaranty and Right of First Offer (the "February Guaranty"); and a Joinder.[65]  The February 2025 Loan is governed by Delaware law.[66]

Section 5(c) of the February Guaranty requires Kulick, as Guarantor, to "deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor. . . ."[67]  Kulick delivered the required schedule of real estate owned, which identified the Title Owners.[68]  Again, requiring a schedule of real estate owned by Kulick, the Guarantor, reinforces the terms and purpose of the February Joinder.

The February Guaranty, like the February CPSA, granted YSA a broad power of attorney (the "February Guaranty POA").[69]  The February POA, in relevant part, provided: "Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests. . . ."[70]

---

[65] JX-16

[66] *Id.* at 6–7.

[67] *Id.* at 26.

[68] JX-27 at 39–40; JX-169 §§ 1–3, Ex. A (providing Louis Investments, LLC an entity solely owned and managed by Kulick "directly or indirectly, owns or controls" the entities listed on Exhibit A, which includes the Title Owners).

[69] JX-16 at 28.

[70] *Id.*

### D.      Plaintiffs Default On Four Loans.

Plaintiffs ultimately defaulted on four loans (the "Defaulted Loans"): (1) the February 2025 Loan; (2) the "April 2025 Loan"; (3) the "July 16, 2025 Loan"; and (4) the "July 31, 2025 Loan."[71]  Each Defaulted Loan followed the format of the February 2025 Loan,[72] in that each involved a Note, a CPSA, a Guaranty, and a Joinder.[73]

The principal amount of the February 2025 Loan is $1,500,000.  Plaintiffs defaulted on May 19, 2025.[74]  The interest rate is 133.333% per annum, compounded monthly.[75]  Plaintiffs owe approximately $3.3 million under the February 2025 Loan.[76]

The principal amount of the April 2025 Loan is $300,000.[77]  The purpose of the April 2025 Loan was to finance Kulick's closing costs related to the acquisition of Parc

---

[71] JX-16; JX-17; JX-20; JX-21; *see* JX-28.

[72] Trial Tr. at 14:2–8, 51:6–54:12 (Kulick).

[73] *See generally* JX-16; JX-17; JX-20; JX-21.The identity of the Borrower Entity providing the "Encumbered Interests" and the Pledgor Entity providing the "Unencumbered Interests" differ.  JX-16 at 9 (identifying Vesta as Pledgor and Asset Holder as Borrower); JX-17 at 11 (identifying Kulick Manager, LLC as Pledgor and Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC as Borrowers); JX-20 at 9 (identifying Vesta as Pledgor and Borrower); JX-21 at 9 (identifying Vesta as Pledgor and Borrower). The April 2025 Loan included one bespoke feature, a membership interest pledge and assignment agreement ("MIPAA").  JX-17 at 34–42.  The April 2025 Loan stands apart from the other Defaulted Loans in that regard.  The MIPAA is not relevant to the resolution of this action.

[74] JX-94; JX-201; JX-28 at 2–4; *see* JX-104.

[75] JX-16 at 1.

[76] JX-28 at 2–4.

[77] PTO ¶ 17. The loan went to three entities owned by Kulick Manager, LLC—Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC.  PTO ¶ 17.

12

1010, an apartment complex in Tulsa, Oklahoma.[78] It was a short-term loan, due to be repaid ten days after closing.[79] But the transaction never closed.[80] The interest rate of the April 2025 Loan was 1,500% per annum, compounded monthly. [81] Plaintiffs owe approximately $3 million on the loan.[82]

---

Kulick manages each of the entities.  JX-17 at 8–9.  Under the April 2025 Loan, Parc 1010 HoldCo., LLC, Parc 1010 GP, LLC, and Parc 1010 Investors, LLC are each a "Borrower" and the "Pledgor" is Kulick Manager, LLC.  *Id.* at 1.

[78] PTO ¶ 17.

[79] *Id.* at 1–2.

[80] Trial Tr. at 117:20–118:1  (Kulick).

[81] JX-17 at 1.  Kulick proposed repaying YSA $425,000, inclusive of principal and interest, in exchange for April 2025 Loan with a face value of $300,000.  JX-3 at 53.

[82] Diveroli consistently messaged Kulick seeking payment once Kulick defaulted on the April 2025 Loan.  JX-3 at 56–82; *see* JX-99 at 1.  On June 16, Diveroli contacted Kulick to work out a plan for the two defaulted Loans, Kulick responded asking for a new loan and stating that: "you already have way more secure loan docs than anything else I've ever used."  JX-3 at 83; *see* JX-104 at 1.  On June 15, Kulick requested a new loan of $315,000 from Diveroli (the "June 2025 Loan").  JX-104.  Kulick proposed satisfying the June 2025 Loan by repaying Diveroli $515,000 by July 1.  *Id.*  Kulick acknowledged he was in default under the April 2025 Loan and that failure to satisfy that Loan "would be a default on this loan."  *Id.*  Kulick also proposed including a $1,000,000 penalty if the June 2025 Loan negatively impact either the February 2025 Loan or the April 2025 Loan.  *Id.*  On June 19, Kulick and YSA closed on the June 2025 Loan.  JX-108; JX-109; JX-110; JX-111.  The June 2025 Loan included a Note, an Affidavit of Confession of Judgment, a CPSA, and a Guaranty.  JX-108; JX-109; JX-110; JX-111.  The June 2025 Loan reflected the terms proposed by Kulick.  *Compare* JX-104 *with* JX-108.  The principal amount of the June 2025 Loan was $315,000 and Kulick was obligated to repay $515,000 by July 1.  JX-108 at 1–2.  The interest rate of the June 2025 Loan is for 1565% per annum, compounded daily.  JX-108 at 1.  Also on June 19, Kulick executed a Confidential Side Letter Related to the February 2025 Loan, April 2025 Loan, and June 2025 Loan granting YSA the right to seek repayment from reserves held by entities identified on Schedule 3.  JX-112; Trial Tr. at 114:4–116:22 (Kulick).  The properties on Schedule 3 appear to overlap significantly with properties owned by the Title Owners.  *Compare* JX-112 at Schedule 3 *with* PTO ¶ 6.  Exhibit C to the Confidential Side Letter does not provide the full names of the listed entities and, since the names of the Title Owner

13

The principal amount of the July 15, 2025 Loan is $365,000.[83] Plaintiffs defaulted on July 30, 2025.[84] The interest rate is 960% per year, compounded daily.[85] Plaintiffs owe approximately $5 million on the loan.[86]

The principal amount of the July 31, 2025 Loan is $317,000. Plaintiffs defaulted on August 5, 2025.[87] The interest rate is 7,000% per year, compounded daily.[88] Plaintiffs owe a staggering $921 million on the loan.[89]

Kulick testified that he proposed the interest rates on each loan by reverse engineering whatever payment he thought appropriate on the loan amount.[90] He calculated that payment amount assuming timely payment.[91] But he knew that YSA implied the interest rate that appeared in the Loan Documents from those amounts.[92]

When asked at trial about the interest rates of the Defaulted Loans, Kulick testified that "I'm not playing the victim on paying high interest rates on my loans. I

---

and Intermediate Holding Companies share some names, it is difficult to discern the exact identity of each entity provided on Exhibit C. Also around this time, Diveroli offered Kulick a $5 to $10 million payoff option, which Kulick declined. Trial Tr. at 188:17–189:13 (Diveroli).

[83] JX-20 at 1

[84] *Id.*

[85] *Id.*

[86] JX-28 at 2.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 3.

[90] Trial Tr. at 91:9–19 (Kulick).

[91] *Id.* at 29:9–18 (Kulick).

[92] *Id.* at 91:9–93:3 (Kulick).

14

understand that, you know, my cash position was bad, it was stressed. I was having trouble getting investors to fund pro rata capital calls."[93]  He also acknowledged that he kept returning to YSA because he was "desperate" for funding.[94]

### E.    Defendant Records Second Mortgages.

By August 2025, Plaintiffs had defaulted on four loans and owed approximately $900 million under the Defaulted Loans.[95]  (By trial, Plaintiffs owed $932,149,606.85 under the Defaulted Loans.)[96]

In October 2025, Diveroli and two YSA representatives visited Kulick in Tulsa, Oklahoma, to diligence the Properties in connection with a contemplated loan where YSA would provide Plaintiffs tranche financing.[97]  Diveroli asked to see "the worst units at the worst properties" to evaluate whether it made sense to move forward

---

[93] *Id*. at 94:20–24 (Kulick).

[94] *Id.* at 29:11–17, 84:16–18, 122:24–123:1 (Kulick).

[95]  JX-28 at 4; *see* JX-24 (informing Kulick he owed $897,744,576 under the Defaulted Loans on December 2, 2025).  Kulick complained throughout this litigation about Defendant's delays in providing a payoff summary.  He testified that he made multiple requests for a payoff summary as early as November 2025.  Dkt. 22 ¶ 28 ("On December 2, 2025, Defendant informed Plaintiffs that it would "limit" the amount owed to approximately $900 million dollars. . . .").  At trial Kulick testified he did not receive a payoff from YSA until February 6, 2026.  Trial Tr. at 45:15–46:5 (Kulick); Dkt. 103 at 11.  But in the Amended Complaint Plaintiffs plead having received a payoff summary on December 2, 2025, which is supported by contemporaneous evidence.  JX-24.

[96] JX-28 at 2.

[97] Trial Tr. at 29:22–35:7 (Kulick).

with the requested tranche financing.[98]  After the tour, they asked Kulick to join for a meeting at their hotel conference room.[99]

During the meeting, Diveroli informed Kulick that he owed them "well over a billion dollars" due to the compounding interest rates.[100]  Diveroli told Kulick that he could "either do this *the easy way or the hard way*[.]"[101]  As Kulick recalled, "[t]hey told me that basically they *now own my entire portfolio*[.]"[102]  Kulick understood the "easy way" would entail handing over to YSA the deeds to the Properties in lieu of YSA seeking to foreclose on the Properties.[103]  Kulick claims YSA offered cash if he were to hand over the deeds.[104]  Kulick understood the "hard way" as involving litigation, as YSA had brought a draft complaint to the meeting.[105]  YSA also threatened to alert persons in Kulick's professional network, including his Rabi and wife.[106]

---

[98] *Id.* at 32:2–24 (Kulick).

[99] *Id.* at 33:1–20 (Kulick).

[100] *Id.* at 33:1–19 (Kulick).

[101] *Id.* at 33:13–33:19 (Kulick) (emphasis added).

[102] *Id.* (Kulick) (emphasis added).

[103] *Id.* at 34:6–35:6 (Kulick).

[104] *Id.* (Kulick).

[105] *Id.* at 34:6–37:14 (Kulick).

[106] *Id.* at 34:19–35:6 (Kulick); *see* JX-23 (providing Plaintiffs and Plaintiffs' counsel the Complaint YSA filed in Superior Court noting "YSA also intends to submit litigation preservation letters to various third parties, including but not limited to Vesta employees, investors, and lenders that are believed to have either benefited from or borne witness to Defendants' misconduct").  In addition to attaching the Superior Court Complaint, YSA shared with Plaintiffs and Plaintiffs' counsel drafts of an amended complaint and motion for a temporary restraining order and noted

Diveroli pursued the hard way.[107]  On October 31, 2025, YSA recorded second mortgages against at least 25 Properties located in Oklahoma and Kansas.[108]  The Properties are owned by the Title Owners.[109]  Kulick identified the Properties in compliance with Section 5(c)'s requirement under the February Guaranty to provide YSA the "complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly)" by Kulick, in connection with the February

"YSA is willing to forego further litigation, including the filing of the amended complaint, in exchange for Mr. Kulick executing deeds-in-lieu of foreclosure voluntarily turning over ownership of each of the subject properties. . . ."  *Id.*

[107] Diveroli testified that it was only because YSA "discovered the fraud and deceit" coupled with the poor conditions of the Properties that YSA decided to record the second mortgages.  Trial Tr. at 188:21–189:13 (Diveroli).  Kulick acknowledged at trial that he repeatedly recorded second mortgages on properties owned by Title Owners.  *Id.* at 110:24–113:7 (Kulick).  Kulick admitted that two weeks before commencing this action he granted a second mortgage on another property owned by a Title Owner.  *Id.* at 112:1–20 (Kulick); JX-170 (granting second mortgage on Jenk's Best Living on October 30, 2025); JX-168 (granting second mortgage on Eaton Place Best Living, LLC on October 24, 2025); JX-155 (granting second mortgage on Bartlesville Best Living, LLC on September 24, 2025).  Kulick explained that 32 of Vesta's 34 properties routinely need cash, and his solution was to have Vesta make a loan to the cash-strapped property, to allow the property to get their reserve funded, and then subsequently pay back to the loan to Vesta. Trial Tr. at 115:7–116:18 (Kulick).  Kulick acknowledged comingling his personal funds with Vesta's to create a "lending pool" to move cash around to pay the debts of one property with proceeds from another.  Trial Tr. at 128:15–18, 129:9–13, 131:6–22 (Kulick).  YSA's forensic accountant confirmed as much, based on his limited review of Kulick's bank accounts. JX-198; JX-194 ("In summary, from November 2024-July 2025 $33.2 million was deposited from the associated real estate portfolio of Vesta and from the net operational flows of the Vesta accounts, and these $33.2 million were comingled and sent to unidentified entities controlled by the controller.").

[108] Dkt. 81 ¶ 21; JX-27; PTO ¶ 6.

[109] JX-27 at 1, 41, 81, 121, 136, 175, 192, 207, 229, 249, 264, 304, 343, 383, 398, 413, 453, 468, 508, 550, 567, 584, 599, 639, 680, 721, 763, 803; *see* JX-221; JX-215; JX-11; JX-169 §§ 1–3, Ex. A.

2025 Loan.[110]   Kulick testified that he personally owns interests in each Title Owner.[111]

### F.   Plaintiffs File This Litigation.

Plaintiffs were first to file litigation.  On November 13, 2025, Plaintiffs filed their Complaint against YSA, seeking an order from this Court requiring Defendant to remove the second mortgages.[112]  At the same time, Plaintiffs moved for expedition and separately moved for expedited preliminary and permanent injunctive relief.[113]

On November 25, 2025, the court heard argument on Plaintiffs' motions to expedite and for injunctive relief.[114]   In seeking preliminary injunctive relief, Plaintiffs claimed "many of these properties are under contract or actively being marketed for sale" including one property set to close the next day.[115]   At the

---

[110] JX-16 at 26 ("By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of provided as of [Date] remains true, correct and complete as of February 14, 2025, in lieu of resubmitting the schedule of real estate.  The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof."); JX-27 at 39–40.

[111] Trial Tr. at 8:2–9:11 (Kulick).

[112] Dkt. 1 ¶¶ 37–44.

[113] Dkt. 1 at Plaintiffs' Motion to Expedite; Dkt. 1 at Plaintiffs' Motion for Expedited Preliminary and Permanent Injunction.

[114] Dkt. 14.

[115] 11/25/25 Hr'g Tr. at 4:6–5:10.

preliminary stage, Plaintiffs also claimed Kulick lacked authority to record second mortgages directly on the Title Owners' properties.[116]

The court denied Plaintiffs' request for preliminary injunctive relief because the relief requested—ordering Defendant to lift the second mortgages—was mandatory in nature and thus foreclosed, absent discovery to resolve factual disputes.[117] But the court granted expedition. The court directed the parties to "take some targeted discovery" to allow the court to determine "whether the defendant has the authority to impose these mortgages on a full discovery record that reflects the parties' intent." [118] The court did enjoin YSA from imposing additional second mortgages.[119]

On December 5, Plaintiffs filed their Amended Complaint.[120] The Amended Complaint asserts one claim.[121] Plaintiffs claim that Defendant unlawfully recorded the second mortgages and seek a declaratory judgment that the second mortgages are void, coupled with an order from this court directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[122]

---

[116] *Id.* at 15:24–17:5.

[117] *Id.* at 42:17–43:8.

[118] *Id.* at 44:1–8.

[119] *Id.* at 43:9–24.

[120] Dkt. 22.

[121] *Id.* ¶¶ 39–48 (alleging the second mortgages "are invalid" and seeking a "permanent injunction directing Defendant to immediately execute and record withdrawals, cancellations, or releases of the invalid second mortgage[s].").

[122] *Id.* ¶¶ 42–48.

Plaintiffs again moved for Expedited Preliminary and Permanent Injunctive relief (the "Motion").[123]  Defendant opposed the Motion.[124]

After the court preliminarily enjoined additional second mortgages, Defendants moved to set an injunction bond under Court of Chancery Rule 65 (the "Bond Motion").[125]  On December 30, the court granted the Bond Motion, requiring Plaintiffs to post a bond in the amount of $22,368,257.93.[126]  On January 7, 2026, Defendant informed the court that Plaintiffs were unable to post the bond.[127] Plaintiffs' failure to post bond caused the ordered injunction to dissolve by operation of law.[128]

On February 11, Defendant filed an Amended Answer and brought counterclaims and third-party claims.[129]  Defendant asserted counterclaims against Kulick and Vesta and brought third-party claims against 46 named third-party defendants and Does 1-100 and Roe Entities 1-100.[130]  On March 6, Plaintiffs

---

[123] Dkt. 23.

[124] Dkt. 32.

[125] Dkt. 29; Ct. Ch. R. 65(c).

[126] Dkt. 60 ("In connection with this Court's entry of a temporary restraining order [] in connection with the above-captioned action, within five (5) calendar days of the entry of this Order, Plaintiffs shall post with this Court a secured bond. . . .").

[127] Dkt. 64.

[128] Ct. Ch. R. 65(c).

[129] Dkt. 81.

[130] *Id.* ¶¶ 4–49.

20

answered the Counterclaims.[131]  In May, Defendant began to effectuate service on the counterclaim/third-party defendants.[132]

The court held trial on March 5, 2026.[133]  The parties completed post-trial briefing on March 26, 2026.[134]

## II.     LEGAL ANALYSIS

Plaintiffs seek permanent injunctive relief, asking the court to order Defendant to immediately execute and record withdrawals, cancellations, or releases of the second mortgages.[135]  To obtain a permanent injunction, "a party must show (i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) a balancing of the equities that favors an injunction."[136]  A party need not show imminent irreparable harm to obtain a permanent injunction.[137] There are other ways to demonstrate no adequate remedy at law.[138]

Permanent injunctive relief comes in one of two forms: prohibitive or mandatory.  "A permanent injunction is a form of final relief that prohibits a party

---

[131] Dkt. 93.

[132] Dkt. 107; Dkt. 108; Dkt. 109; Dkt. 110; Dkt. 111; Dkt. 112; Dkt. 113.

[133] Dkt. 92.

[134] Dkt. 103.

[135] Dkt. 22 ¶ 48.

[136] *In re COVID-Related Restrictions on Religious Svcs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022), *aff'd*, 326 A.3d 626 (Del. 2024).

[137] *Id.* at 1228–31; 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2944 (3d ed.) ("[I]rreparable injury is not an independent requirement for obtaining a permanent injunction; it is only one basis for showing the inadequacy of the legal remedy.").

[138] *Id.* at 1230.

from taking action or compels a party to take action."[139] Its negative version serves as a prohibitive injunction, "whereby defendant is perpetually inhibited from the assertion of an assumed right, or perpetually restrained from the commission of an act which would be contrary to equity and good conscience."[140] Its affirmative or mandatory version compels a party to take specific action.[141]

An order directing YSA to undertake specific affirmative actions to remove the second mortgages is mandatory in nature.[142] Kulick bears the burden of proving that the second mortgages are "invalid" as a matter of law and that he has "clearly established" the legal right to have the court order YSA to cancel the second mortgages.[143] To show success on the merits, therefore, Plaintiffs must "clearly establish" the legal right they seek to enforce.[144] "The showing on the merits required

---

[139] *Glob. Cap. P'rs LLC v. Green Sapphire Hldgs., Inc.*, 2026 WL 709819, at *45 (Del. Ch. Mar. 13, 2026), *judgment entered*, (Del. Ch. 2026).

[140] *Id.* (quoting James L. High, *A Treatise on the Law of Injunctions as Administered in the Courts of the United States and England* § 3, at 4 (1879)); *see In re COVID*, 285 A.3d at 1228; *NEC Fund VI HE Lender, LLC v. Hecate Hldgs. LLC*, 2026 WL 527007, at *7 (Del. Ch. Feb. 25, 2026).

[141] *In re COVID*, 285 A.3d at 1226 n.4; 43A C.J.S. Injunctions § 19 ("A mandatory injunction is an equitable remedy that commands the subject of the order to perform an affirmative act to undo a wrongful act or injury."); *Hughes Tool Co. v. Fawcett Publications, Inc.*, 315 A.2d 577, 579 (Del. 1974); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.02[c] (2025) ("[A] mandatory injunction requires an individual to perform a specific act.").

[142] Dkt. 22 ¶ 48.

[143] *DeMarco v. Christiana Care Health Servs., Inc.*, 263 A.3d 423, 434 (Del. Ch. 2021).

[144] *DeMarco*, 263 A.3d at 434; *Kingsbridge Cap. Gp. v. Dunkin' Donuts Inc.*, 1989 WL 89449, at *3 (Del. Ch. Aug. 7, 1989); *see Pomilio v. Caserta*, 215 A.2d 924, 925 (Del. 1965) ("There is no right to an injunction as a matter of course; and this is especially

22

by the 'clearly established' standard is 'more than a reasonable probability of success.'"[145]  Satisfying the 'clearly established' standard requires "a showing that the petitioner is entitled as a matter of law to the relief" sought.[146]

Plaintiffs' claim flounders on the first element—Plaintiffs have not clearly established the right at issue.  Plaintiffs' primary argument is that neither the CPSAs, nor the Joinders, nor the POAs, define Collateral to include properties held by the Title Owners.  In the alternative, Plaintiffs argue that the CPSAs are usurious and cannot be enforced even if the CPSAs support Defendant's right to record the second mortgages.[147]

## A.    Contractual Entitlement

Plaintiffs argue that Defendant must remove the second mortgages because the definition of "Collateral" in the Loan Documents did not create a security interest

---

so as to the mandatory writ which is issuable only in the exercise of extraordinary judicial caution.").

[145] *DeMarco*, 263 A.3d at 423 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 14.03[b][6], at 14-03.44 (2021)); *Stahl v. Apple Bancorp, Inc.*, 579 A.2d 1115, 1120 (Del. Ch. 1990) ("Upon an application for mandatory preliminary relief, however, plaintiff must show more than a reasonable probability of success on the merits; he must clearly establish the legal right he seeks to protect or the duty he seeks to enforce.").

[146] *Alpha Nat. Res., Inc. v. Cliff's Nat. Res., Inc.*, 2008 WL 4951060, at *2 (Del. Ch. Nov. 6, 2008); *Bertucci's Rest. Corp. v. New Castle Cnty.*, 836 A.2d 515, 519 (Del. Ch. 2003) ("[T]he Court of Chancery has consistently applied an exacting standard, requiring that an applicant seeking mandatory preliminary injunctive relief clearly establish the legal right he seeks to protect or the duty he seeks to enforce." (internal quotation omitted)).

[147] Dkt. 95 at 33.

in the Properties.[148]  Defendant disputes Plaintiffs' interpretation of Collateral but says that it does not matter, because Defendant had the right to record the second mortgages even assuming Plaintiffs' interpretation. [149]   This decision rules in Defendant's favor, concluding that Defendant had the right to record the mortgages even under Plaintiffs' interpretation.

The court's task is to interpret the Loan Documents in a way that carries out the parties' intent.[150]  Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[151]  The contract terms will be given their "plain, ordinary meaning."[152]  "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[153]  The court must "reconcile all the provisions of the instrument" if possible. [154]   When a

---

[148] *Id.* at 19–21.

[149] Dkt. 100 at 23–24; Dkt. 106 at 45.

[150] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[151] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[152] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing *City Investing Co. Liquid. Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).

[153] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985); *accord HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2020 WL 3620220, at *6 & n.40 (Del. Ch. July 2, 2020); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *50 & n.648 (Del. Ch. Dec. 3, 2018).

[154] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

24

transaction consists of multiple documents, Delaware courts will interpret the documents as one singular contract.[155]

Where language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions."[156] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[157] "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"[158] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[159] "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"[160] If ambiguity exists, then the court "may consider extrinsic evidence to resolve the ambiguity."[161]

---

[155] *See, e.g., E.I. du Pont de Nemours & Co.*, 498 A.2d at 1115 ("The specific provisions of these Agreements and the interrelationship thereof make it clear that the parties intended these two Agreements to operate as two halves of the same business transaction . . . Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such." (internal citations omitted)); *Karish v. SI Int'l, Inc.*, 2002 WL 1402303, at \*3 (Del. Ch. June 24, 2002).

[156] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010)).

[157] *Id.* (citing *Osborn*, 991 A.2d at 1160).

[158] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[159] *Id.* (quoting *Osborn*, 991 A.2d at 1160).

[160] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983)).

[161] *Salamone*, 106 A.3d at 374 (citation omitted).

Plaintiffs rest their contract claim on the definition of "Collateral" in the CPSAs.  Under the CPSAs, Borrower[162] and Pledgor[163] agreed to "pledge, grant, and assign to Lender a security interest in and lien upon the Collateral . . . to secure the payment and the performance of the Obligations . . . ."[164]  The CPSA defines "Collateral" to include "the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, . . ."[165]  The CPSAs define "Interests" with reference to two other defined terms—"Unencumbered Interests" and "Encumbered Interests."[166]  Those terms are defined as Borrower's and Pledgor's "membership interest[s]" in the Intermediate Holding Companies listed in the recitals of the CPSAs.[167]  In Plaintiffs' view, the

---

[162] Asset Holder, Vesta, and Parc 1010 HoldCo., LLC are each a "Borrower" under one of the Defaulted Loans.  JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[163] Vesta and Kulick Manager, LLC are each a "Pledgor" under one or more of the Defaulted Loans.  JX-16 at 1; JX-17 at 1; JX-20 at 1; JX-21 at 1.

[164] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[165] JX-16 at 10; JX-17 at 11–12; JX-20 at 10; JX-21 at 10.

[166] JX-16 at 9; JX-17 at 11; JX-20 at 9; JX-21 at 9.

[167] *See, e.g.*, JX-16 at 9 (defining the Unencumbered Interests as the Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); *id.* (defining the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living

26

definition of "Collateral" does not extend to the assets held by these entities, which include the Properties.[168] Rather, the CPSAs gave Defendant a security interest in Plaintiffs' *membership interests* in the entities, full stop.

Plaintiffs' argument is a red herring. Defendant concedes that the Loan Documents did not create a secured interest in the Properties.[169] Rather, they created a secured interest in the entities that own the Properties. The Loan Documents also gave Defendant the right to take action against real property owned by those entities, including the Properties.

Defendant's interpretation begins with the Joinder. The Joinder states that:

> [Marc Kulick], as a manager, member or other authorized person *of any and all Guarantor Entities* and *any other entities in which the undersigned does now own or control or may herein after own or control* during the term of that certain [February CPSA, April CPSA, and July CPSAs] hereby agrees *to jointly and severally assume all obligations of Pledgor* under the [February CPSA, April CPSA, and July CPSAs] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [February CPSA, April CPSA, and July CPSAs] as fully as if [Marc Kulick] had personally and individually executed

---

Investors, LLC; Muntage Vesta Investors, LLC); JX-20 at 9 (identifying the Unencumbered Interests as Borrower's membership interest in the following Intermediate Holding Companies: Capitol on 28th Investors, LLC; Remington Ranch Investors, LLC; Copperfield Investors, LLC; Putnam Investors, LLC); JX-21 at 9 (identifying the Encumbered Interests as Pledgor's membership interest in the following Intermediate Holding Companies: Woodscape Investors, LLC; Barcelona Best Living, LLC; Riverpark Best Living Investors, LLC; Montgomery Vesta Investors, LLC; Fairfax Holding Company, LLC; OKC3 Investors, LLC; Eton Investor, LLC; Eaton Place Investor, LLC; W.O. Holding Co., LLC; Regency Holdings, LLC; Woodland Manor Holdings, LLC; 727-Classes Best Living Investors, LLC; Muntage Vesta Investors, LLC); *see* PTO ¶ 10.

[168] Dkt. 95 at 15–21.

[169] *See* Dkt. 100 at 18–24.

and delivered the [February CPSA, April CPSA, and July CPSAs] as of the date thereof.[170]

Kulick admitted at trial that he signed the Joinder and that he did so "as manager, member or other authorized person of" two broad categories of entities, including "any and all Guarantor Entities" and "any other entities in which [Kulick] does now own or control or may here after own or control . . . ."[171]

Under the CPSA, "Guarantor Entities" includes the Title Owners.[172] The CPSA defined "Guarantor Entities" as "any entity directly or indirectly controlled or managed by [Kulick]," or "directly or indirectly owned by [Kulick] in whole or in part with respect to which Guarantor receives notices in the ordinary course of business[.]"[173]

This definition of Guarantor Entities sweeps in the Title Owners in multiple ways. First, the definition includes entities that Kulick owns in part. At trial, Kulick admitted that he had an investment in each of the Title Owners and Properties.[174]

---

[170] Trial Tr. at 20:2–21:6, 61:12–65:15 (Kulick); JX-16 at 22; JX-17 at 25; JX-20 at 22; JX-21 at 22. The Joinders are substantively identical. The only difference among the Joinders is the identity of the Kulick-affiliated entities named as Pledgor under the respective CPSA. *See* JX-16 at 1 (identifying Vesta as Pledgor); JX-17 at 1 (identifying Kulick Manager, LLC as Pledgor); JX-20 at 1 (identifying Vesta as Pledgor); JX-21 at 1 (identifying Vesta as Pledgor).

[171] Trial Tr. at 61:12–62:7 (Kulick).

[172] JX-169 ¶¶ 1–3, Ex. A (providing Kulick is the "sole Member" and "100%" owner of Louis Investments, LLC, and identifying the Title Owners as "directly or indirectly" owned by Louis Investments, LLC).

[173] JX-16 at 12; JX-20 at 12; JX-21 at 12.

[174] Trial Tr. at 69:1–2 (Kulick) ("I have an investment in each property."); JX-169 ¶¶ 1–3, Ex. A.

28

And Kulick identified every one of the Title Owners in response to a provision in his Guaranty requiring him to provide a "complete schedule of . . . entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor."[175] Thus, at a minimum, Kulick "indirectly own[s] . . . in part" each Title Owner. Second, Kulick controls or manages the Title Owners, as he testified at trial.[176] That too brings them within the scope of the Guarantor Entities.

Because each Title Owner is a Guarantor Entity, each Title Owner assumed "all obligations of Pledgor under the [CPSA] for all purposes thereof on the terms set forth therein and to be bound by the terms of the [CPSA]" by operation of the Joinder.[177] Thus, the Joinder renders each Title Owner an additional Pledgor under the CPSA, subject to the Pledgor's obligations under the CPSA.

Each Pledgor has obligations under the Power of Attorney provision of the CPSA. The Power of Attorney states that:

> Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral.[178]

---

[175] JX-16 at 26; JX-27 at 39–40.

[176] Trial Tr. at 63:24–67:21 (Kulick); *see* JX-168 at Ex. A.

[177] JX-16 at 22; JX-20 at 22; JX-21 at 22.

[178] JX-16 at 13; JX-20 at 13; JX-21 at 13.

The first sentence of this provision gives YSA the right to "take whatever steps that it deems necessary in its sole discretion to secure and protect its interests."[179] This expressly includes "doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender."[180]  This power is not tied to or limited by the definition of Collateral.  The second sentence does reference "taking action against the Collateral" but as a non-exclusive right.  It reads: "This shall include *but not be limited to* taking any action against any of the Collateral. . . ."[181] By defining "action against the Collateral" as a non-exclusive right encompassed by the preceding sentence, the language and structure of the Power of Attorney indicate that the parties intended for YSA's rights to extend beyond the right to take "action against the Collateral."

Eliminating all doubt, the Power of Attorney provision uses the word "secure."[182]  It gives YSA the right to take "whatever steps that it deems necessary in its sole discretion to *secure* and protect its interests[.]," including "whatever . . . is necessary to . . . collect all amounts due" to YSA.[183]  The Power of Attorney thus grants YSA the right, if YSA deems it necessary, to "secure" its interests against those entities bound by the Joinder, including the Title Owners, to facilitate payment of

---

[179] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[180] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[181] JX-16 at 13; JX-20 at 13; JX-21 at 13 (emphasis added).

[182] JX-16 at 13; JX-20 at 13; JX-21 at 13.

[183] JX-16 at 13; JX-20 at 13; JX-21 at 13. (emphasis added).

30

amounts due to YSA.  YSA deemed the second mortgages necessary to protect its rights to collect amounts due to it.[184]  Plaintiffs do not argue otherwise.

Plaintiffs instead argue that Defendant's interpretation runs afoul of Article Nine of the UCC.[185]  According to Plaintiffs, the CPSAs had to describe the Collateral consistent with Article Nine of the UCC.[186]  Under Article Nine, and a recent case interpreting it, that description must "reasonably identif[y] what is described."[187] The Loan Documents provided the full name and state of incorporation of each Intermediate Holding Companies entity comprising the Collateral.[188]  But it did not list the details of the Properties.  It does not so much as list: the Title Owners, the Properties, or the Properties' addresses.[189]  Plaintiffs say that neither the CPSAs nor

---

[184] Trial Tr. at 190:15–191:13 (Diveroli); *id.* at 196:17–200:6 (Miley).

[185] Dkt. 95 at 20–21; Dkt. 103 at 3–6.

[186] Dkt. 103 at 3–6; *see Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995) ("Article 9 generally governs the creation, perfection, and enforcement of security interests in property and applies to 'any transaction (regardless of its form) which is intended to create a security interest in personal property.'" (quoting 6 *Del. C.* § 9-102(1)(a))).

[187] 6 *Del. C.* § 9-108(a) ("[A] description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described."); *Cannon v. Romeo Sys., Inc.*, 2025 WL 2848069, at *22 (Del. Ch. Oct. 7, 2025) ("[T]he description must objectively identify the collateral so that, at a minimum, it 'puts subsequent creditors on notice so that, aided by inquiry, they may reasonably identify the collateral involved.'" (quoting *Bishop v. All. Banking Co.*, 412 S.W.3d 217, 220 (Ct. App. KY, 2013))); *see* 6 *Del. C.* § 9-108, cmt. 2. ("The test of sufficiency of a description under this section . . . is that the description do the job assigned to it: make possible the identification of the collateral described. This section rejects any requirement that a description is insufficient unless it is exact and detailed (the so-called 'serial number' test).").

[188] JX-16 at 9; JX-20 at 9; JX-21 at 9.

[189] *See generally* JX-16; *see also* Trial Tr. at 205:24–206:6 (Miley).

31

any of the Loan Documents reasonably identify the Properties consistent with Article Nine.[190]  Plaintiffs, therefore, contend that Article Nine prevents a security interest from attaching to the Properties because the Properties are not mentioned, let alone described in the CPSAs.[191]

But again, Plaintiffs' argument is of no moment.  Defendant admits that the Loan Documents standing alone did not create a secured interest in the Properties. Defendant argues that they did not have to, because the Loan Documents gave Defendant the right in its "sole discretion to secure and protect its interests" by "taking any action against . . . . any real or personal property owned by the Collateral," including the Properties.  And the Loan Documents reasonably describe the Collateral by providing the full name and state of incorporation of each entity comprising the Collateral.

Contrary to Plaintiffs' contentions, the Loan Documents granted YSA expansive rights to take actions against real property owned by Collateral.  YSA exercised that right by recording the second mortgages on real property owned by the Collateral, in this case Properties owned by the Intermediate Holding Companies.

Parol evidence confirms what the plain language of the Loan Documents requires.  When Kulick requested a substantially larger loan from YSA, he had only

---

[190] Dkt. 95 at 20–21.

[191] *Id.* at 3, 20–21, 29–30.

just repaid the October 8 Loan three weeks late.[192]  YSA required more protection than it had on previous loans.[193]  In a February 10, 2025 email to his colleague, Miley explained that YSA needed to hire a lawyer or other professional to advise on "a loan whereby we would be providing funding to a multi-family real estate firm which would be secured by the firm's real estate portfolio."[194]

On February 18, 2025, Miley texted Kulick: "Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, can you please send me a paragraph that I can copy into it with the other entities?"[195]  Kulick was in a rush to get funded,[196] and so Kulick told Miley to leave

---

[192] JX-10 at 2 (identifying January 8, 2025 as the maturity date of the October 8 Loan); JX-58 (informing Diveroli on January 13, 2025 the October 8 Loan would be repaid on January 20); JX-22 (providing the October 8 Loan was repaid on January 21, 2025); JX-3 at 35 (requesting a "longer term" Loan on January 31); JX-222 (searching for a real estate consultant on February 10 regarding a "loan to Vesta" and seeking expertise to ensure YSA is "as protected by the collateral as we think we are").

[193] Trial Tr. at 149:23–151:24 (Diveroli); JX-77 at 2 (requesting Kulick identify the owner of each Property); JX-76 (requesting Kulick submit to "due diligence" in connection with the February 2025 Loan); JX-73 at 2.

[194] JX-222 at 1.

[195] JX-12 at 2.

[196] JX-73 at 2.  Shortly after Miley asked Kulick if he had a paragraph to use for the Joinder Kulick exclaimed, "[M]y biggest concern is as usual (lol) funding.  Do we have enough time to get this done?"  JX-12 at 2.  Less than 15 minutes later, Kulick asked: "Efraim can we please get sign off so we can push ahead[.]"  *Id.* at 3.  Two hours later, Kulick again pled for the Loan to be funded that day.  *Id.* at 3 ("Can we find a way to fund today still[?]").

it the same.[197]  Kulick texted back:  "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole."[198]

Putting a fine point on it, in the preceding text message, Miley asked two questions: (1) "are we expanding to rest of portfolio"; and (2) "can you please send me a paragraph?" Kulick responded to each in turn: (1) "yes"; and (2) "no."[199]  Yes, they were expanding to the rest of the portfolio.  No, no language was necessary.  Instead, Kulick suggested "a joinder to the portfolio as a whole."[200]  Vesta's website refers to the word "portfolio" as individual real properties owned or controlled by Vesta,[201] supporting that Kulick intended "portfolio" to refer to real properties.[202]

Kulick also referred in the exchanges that day to "a joinder with any asset controlled by any affiliate of mine," and "a joinder that joins any asset controlled by any affiliate of mine."[203]  If Kulick intended the Joinder to be limited to adding entities to stand behind the same Collateral in the CPSA, there would have been no reason to refer to joining "any asset of any affiliate."

---

[197] JX-12; *see* JX-13 ("No change to [CPSA] at all except to add a joinder *that joins any asset controlled by any affiliate of mine*." (emphasis added)).

[198] JX-12 at 2.

[199] *Id.*

[200] *Id.*

[201] JX-185.

[202] Trial Tr. at 149:23–151:9 (Diveroli); *id.* at 82:2–23 (Kulick).

[203] JX-13.

34

Consistent with this contemporaneous evidence, both Diveroli and Miley testified that, prior to the February 2025 Loan, Kulick agreed to pledge his entire portfolio to support the next loan.[204]

Plaintiffs also argue that it does not make sense that Kulick would pledge $900 million worth of additional property to support a $1.5–2 million loan. But Kulick wanted the loans, YSA wanted greater protection, this is the compromise that Kulick proposed and ultimately the deal the parties struck.[205]

### B.    Usury Defense

Plaintiffs separately raise a usury defense, contending that the interest rates of the Loans are "facially unreasonable[.]"[206] But Section 2306 forecloses any defense based on the interest rate charged because here the borrower of each Loan was a limited liability company.[207] Section 2306 provides: "No corporation, limited partnership, statutory trust, business trust or *limited liability company, . . . shall interpose the defense of usury in any action.*"[208] Delaware courts have consistently declined invitations to deviate from Section 2306's mandate, even where the

---

[204] Trial Tr. at 185:5–9 (Diveroli); *id.* at 196:17–197:7 (Miley).

[205] Trial Tr. at 29:9–17 (Kulick) (testifying that "[t]hroughout 2025 I was desperate for access to money to come into my business"); *id.* at 84:13–18 (Kulick) ("I was not of the opinion that they needed additional collateral. . . . But this was meant to solve an issue that was stopping us from getting the loan done that I desperately needed.").

[206] Dkt. 95 at 32–34.

[207] 6 *Del. C.* § 2306.

[208] *Id.* (emphasis added).

individual indorser or guarantor is a natural person.[209]  Because the defense of usury would not be available to the entity Borrowers under the Loan Documents, the defense is not available to Kulick.[210]

## III.    CONCLUSION

Because Plaintiffs have not demonstrated clear legal entitlement to the mandatory injunctive relief they seek, this decision need not reach the other elements of the claim or the other arguments raised by Defendant.[211]  Plaintiffs' failure to prove an essential element of their claim warrants judgment for Defendant.

---

[209] *Bank of Delaware v. NMD Realty Co.,* 325 A.2d 108, 111 (Del. Super. 1974) (holding that "individual defendants as accommodation indorsers are not entitled to assert the defense of usury inasmuch as it was not an available defense for the corporate maker of the notes"); *MacNeil v. Cusato*, 1998 WL 1029267, at \*4 (Del. Super. Nov. 30, 1998) ("Whether Defendant's position is termed privy, guarantor, or accommodation party, the result consistently is estoppel from asserting usury where such defense was not available to the original debtor. . . . Defendant, as guarantor, was no stranger to the corporation's preclusion from the defense of usury. Upon the Corporation's expiration, the Defendant-guarantor was not transformed into an individual-debtor who could then assert the defense of usury."); *River Bank Am. v. Tally-Ho Assocs., L.P.*, 1991 WL 35719, at \*6 (Del. Super. Feb. 22, 1991) ("Under Delaware law, an individual who is surety or guarantor of the corporate obligation is under the same disability to assert the defense of usury as the corporation.").

[210] *NMD Realty Co.,* 325 A.2d at 111.

[211] YSA raised other arguments including that Kulick, Vesta, and Asset Holder lacked standing because none hold title to the Properties subject to the second mortgages. Dkt. 100 at 12.  Having found that Plaintiffs failed to establish a right to have the second mortgages removed, the court need not reach any other argument.