## UNITED STAES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. FEDERAL NATIONAL MORTGAGE ASSOCIATION | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| 1. MARC KULICK | ) ) | |
| 2. JOHN ALEXANDER UPPERMAN | ) ) | |
| 3. IRA MONDRY | ) ) | |
| 4. KEVIN D. MOORE | ) ) | |
| 5. VESTA REALTY, LLC | ) ) | |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW** Plaintiff Federal National Mortgage Association ("Fannie Mae"), by and through its counsel of record, McAfee & Taft, a Professional Corporation, and for its Complaint against Defendants Marc Kulick, John Alexander Upperman, Ira Mondry, Kevin D. Moore, and Vesta Realty, LLC, states, alleges and avers as follows:

### Parties

1. Plaintiff Fannie Mae is a government-sponsored enterprise and a federally chartered entity that Congress created to enhance the nation's housing-finance market. Under its federal statutory charter, Fannie Mae has a public mission to provide liquidity, stability, and affordability to the U.S. housing market, including the market for quality, affordable rental house. Fannie Mae is operating under the conservatorship of the Federal Housing Finance Agency ("FHFA"), which is an independent agency of the United States created in 2008 to supervise certain

1

Fannie Mae Confidential

Government Sponsored Enterprises including Fannie Mae. *See* 12 U.S.C. § 4511 et seq. Among other powers Congress granted the Director of FHFA the authority to place Fannie Mae into conservatorship under certain, statutorily defined conditions, which the Director did in 2008. As Conservator, FHFA has broad statutory powers, including the powers to preserve and conserve Fannie Mae's assets and property, and to collect obligations due Fannie Mae. FHFA's ability to exercise its statutory powers and functions as Conservator is protected by federal law. *See, e.g.,* 12 U.S.C. § 4617(f). For diversity purposes, Fannie Mae is a citizen of Washington, D.C.

2. Defendant Marc Kulick is a resident of Johnson County, Kansas, and can be served at 6500 W. 110th Street, Suite 201, Overland Park, Kansas 66211.

3. Defendant John Alexander Upperman is a resident of Jackson County, Missouri, and can be served at 511 Oak Street, Kansas City, MO 64106.

4. Defendant Ira Mondry is a resident of Oakland County, Michigan, and can be served at 187 South Old Woodward Avenue, Suite 200, Birmingham, Michigan 48009.

5. Defendant Kevin D. Moore is a resident of Boulder County, Colorado, and can be served at 510 30th Street, #7522, Boulder, Colorado 80310.

6. Defendant Vesta Realty LLC is a Kansas limited liability company with a principal place of business in Tulsa, Oklahoma, and, upon information and belief, none of its members are residents of Washington D.C.

7. Collectively, Kulick, Upperman, Mondry, and Moore are referred to as the "Guarantor Defendants."

### Jurisdiction and Venue

8. Pursuant to 28 U.S.C. § 1332, jurisdiction is proper in this Court because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and it is

2

between citizens of different States.

9. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial portion of the events giving rise to the claim occurred in—and several of the mortgaged properties are located in—the Western District of Oklahoma.

**Factual Background**

10. This action relates to nine Loan Agreements Fannie Mae entered into for multi-family apartment complexes located in Oklahoma:

a. Remington Ranch Apartments, located at 1815 North Boomer Road, Stillwater, OK 74075;

b. The Capitol on 28th Apartments, located at 215 Northeast 28th Street, Oklahoma City, OK 73105;

c. Woodscape Apartments, located at 4200 North Meridian Avenue, Oklahoma City, OK 73112;

d. Copperfield Apartments, located at 2400 NW 30th Street, Oklahoma City, Ok 73112;

e. One Eton Square Apartments, located at 8111 East 60th Street, Tulsa, OK 74145;

f. Villas at Midtown Apartments, located at 2001 East Skelly Drive, Tulsa, OK 74105;

g. Barcelona Apartments, located at 5160 South Yale Avenue, Tulsa, OK 74135;

h. Canopy Apartments, located at 9201 Kanis Road, Little Rock, AR 72205; and

3

Fannie Mae Confidential

i.    Lexington Commons Apartments, located at 5530 Colony Way, Bartlesville, OK 74006.

Collectively, Remington Ranch Apartments, The Capitol on 28th, Woodscape Apartments, Copperfield Apartments, One Eton Square, Villas at Midtown, Barcelona Apartments, Canopy Apartments, and Lexington Commons Apartments are referred to herein as "The Apartment Complexes."

11.    Each of the Apartment Complexes is owned by an LLC that is a special purpose entity, or SPE, meaning that each LLC's only tangible asset is the apartment complex it owns and each LLC's only business asset is the operation of that apartment complex.

12.    Defendant Marc Kulick is an owner in each of the SPEs that own the Apartment Complexes. He is designated in all of the relevant loan documents as the "Key Principal" for each of the Apartment Complexes, and he is a guarantor on each of the loans except the Lexington Commons loan.

13.    Mr. Kulick is also the founder and Chief Executive Officer of Vesta Realty, an Oklahoma-based multifamily real estate investment firm. Vesta Realty is, by contract, the property manager for each of the Apartment Complexes. Thus, as a practical matter, Mr. Kulick and Vesta Realty control the operation of the Apartment Complexes, including, *inter alia*, their use of the rent money they receive from tenants.

14.    Fannie Mae entered into nine separate loan agreements for the SPEs to purchase the Apartment complexes. In total, Fannie Mae loaned Mr. Kulick and his entities more than $187 million.

15.    Defendants Upperman, Mondry, and Moore are each guarantors on some of the loans. The following chart indicates which guarantors guaranteed which loans:

4

Fannie Mae Confidential

| Borrowing Entity | Kulick | Upperman | Mondry | Moore |
|---|---|---|---|---|
| Barcelona | Yes | Yes | No | Yes |
| Woodscape | Yes | Yes | No | No |
| Villas at Midtown | Yes | Yes | Yes | No |
| Capitol on 28th | Yes | Yes | No | No |
| Canopy | Yes | Yes | No | No |
| Remington Ranch | Yes | Yes | No | No |
| One Eton | Yes | Yes | No | No |
| Copperfield | Yes | Yes | No | No |
| Lexington Commons | No | No | No | No |

16. The Loans are non-recourse, meaning that in a normal event of default, Fannie Mae's primary remedy is against the collateral. However, under the Loan Agreements, there are certain acts that the SPE Borrowers can take that trigger additional liability. And because the guaranties obligate the Guarantor Defendants to the full extent of the respective SPE Borrowers' liabilities, those same acts create liability for the Guarantor Defendants.

17. Among the acts that can trigger personal liability under the guaranties are:

a. Failure to pay as directed by Lender upon demand after an Event of Default all Rents to which Lender is entitled under the Loan Documents; and the amount of all security deposits then held or thereafter collected by Borrower from tenants and not properly applied pursuant to the applicable Leases;

b. Failure to maintain all insurance policies required by the Loan Documents;

c. Failure to apply all insurance proceeds received by Borrower;

5

Fannie Mae Confidential

d. Failure to apply Rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts; and

e. Waste or abandonment of the Mortgaged Property.

**Defaults and Triggering of Personal Liability**

18. All of the loans are in payment default. Each of the loan agreements requires the SPE Borrowers to make monthly payments to Fannie Mae. While some entities have made payments more recently than others, none of them has made any monthly mortgage payments to Fannie Mae that are attributable to the calendar year 2026. And because the loans are still in their "interest only" period, Fannie Mae is still owed the full unpaid principal balance of more than $187 million (in addition to accruing interest).

19. Under the Mortgages for the Apartment Complexes, the SPE Borrowers are given a revocable license to collect rents, but are required to "to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property."

20. Furthermore, the Loan Agreements require that when there is a default, the SPE Borrowers' revocable license to collect rents is terminated, and rents must be assigned directly to Fannie Mae. The Borrowers were notified of the termination of their right to collect rents and directed to pay the proceeds to Fannie Mae.

21. Vesta Realty, as the property manager for each of the Borrowers, is (according to the most recent rent rolls prepared by Vesta Realty and submitted to Fannie Mae) collecting more than $1.9 million a month in rents for the 9 Apartment Complexes. Not one dollar in rent has been assigned to Fannie Mae.

Fannie Mae Confidential

22.     What's more, it does not appear that the monies collected in rents are being spent on the Apartment Complexes.

23.     Indeed, occupancy at each of the Apartment Complexes is dropping rapidly.  The rent rolls for the Apartment Complexes indicate that this drop is almost entirely (if not entirely) attributable to one fact: When tenants move out, the units those tenants occupied aren't being "turned over" to be ready for new tenants to move in.

24.     Apartments not being "turned" for new tenants are described in the rent rolls prepared by Vesta Realty as units that are "Vacant Unrented Not Ready."  The March 2026 rent rolls for the properties—which, again, are prepared by Vesta Realty and submitted to Fannie Mae—show the following information regarding the proportion of units that have the "Vacant Unrented Not Ready" designation:

| Property | Percent of Units Vacant Unrented Not Ready |
|---|---|
| Villas at Midtown | 38.32%. |
| Remington Ranch | 33.79% |
| Woodscape | 27.99% |
| One Eton Square | 27.63% |
| Canopy | 26.47% |
| Capitol on 28th | 15.15% |
| Barcelona | 13.54% |
| Copperfield | 9.92% |
| Lexington Commons | 9.27% |

Fannie Mae Confidential

25. The rent money collected is also not being paid to contractors who do work on the properties, as each of the properties has at least one (most have several) mechanics and materialmen's liens filed against them.

26. The rent money is also not being used to pay for property insurance. In February 2026, the insurance for all 9 Apartment Complexes was set to lapse, and Fannie Mae had to force place policies to ensure the Apartment Complexes have continuous coverage.

27. The rent money is also not being used to pay taxes on the property. Under the loan documents, the SPE Borrowers are required to pay property taxes. They have not done so, and Fannie Mae has had to come out-of-pocket to pay property taxes as to each of the properties.

28. In addition to all this, there was a sizable property insurance claim made as to the One Eton Square Apartments in early 2025. Upon information and belief, Vesta Realty, as property manager for One Eton Square Apartments, collected more than $500,000 in connection with this insurance claim and diverted those funds as well. As noted above, failure to apply insurance policies is a basis for personal liability under the guaranties. It is also a breach under the loan agreements, which require assignment of insurance proceeds to Fannie Mae.

29. Fannie Mae submits that all this paints a clear picture as to what is going on. Kulick and his company Vesta Realty are (according to the rent rolls prepared by Vesta Realty and submitted to Fannie Mae) collecting almost $2 million in rents every month. That money is not being used to maintain the property, make repairs, protect the tenants, or pay off liens (among other items) but presumably is being diverted for undisclosed purposes.[1]

---

[1] Fannie Mae does not have access to the Borrowers' financials. However, there is significant evidence in the public record of allegations that Mr. Kulick is, at a minimum, mismanaging significant amounts of funds. He and Vesta Realty are currently defending more than 15 lawsuits that, in the aggregate, allege he owes the various plaintiffs more than $100 million (in addition to what is owed to Fannie Mae). A forensic accounting filed in one suit, in Delaware, notes that, in

8

30.   Upon information and belief, at least some of the rent money received is being taken by Kulick personally and/or being used to fund his personal obligations.

## COUNT I – BREACH OF GUARANTY AGREEMENTS
### (Guarantor Defendants)

31.   Fannie Mae incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

### *Remington Ranch Apartment Loan*

32.   Fannie Mae's loan to the borrower, is evidenced by a Multifamily Note dated April 29, 2024, in the original principal amount of $13,470,000.00.

33.   Mr. Kulick and Mr. Upperman personally guaranteed the Remington Ranch Loan.

34.   By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

35.   Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

36.   The borrower defaulted by failing to pay required debt service in January 2026.

37.   The borrower further defaulted by failing to maintain the property, including failing to provide heat and hot water and allowing unsafe conditions to persist.

38.   The borrower was also subject to municipal nuisance findings and failed to comply with required repairs and notices.

---

certain months, he was paying more than $1 million a month in personal expenses using money from Vesta Realty's bank accounts. Mr. Kulick is also featured in online videos gambling hands of poker worth more than $500,000.

Fannie Mae Confidential

39. The unpaid indebtedness includes $13,470,000.00 plus accrued interest, default interest, and contractual charges.

40. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters, the failure to repair and maintain the property, and allowing unsafe conditions at the property to persist, all of which have contributed to a decline in the occupancy of the property).

41. Fannie Mae is the owner and holder of the Guaranty.

### *Capitol on 28th Loan*

42. The Capitol on 28th Loan is evidenced by a Multifamily Note dated February 15, 2024, in the original principal amount of $21,408,000.00.

43. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

44. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

45. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

46. The borrower defaulted by failing to make required debt service payments during late 2025 and early 2026.

10

Fannie Mae Confidential

47.     The borrower also failed to provide notice of extensive litigation involving key principals and permitted unauthorized liens and a second mortgage.

48.     The unpaid indebtedness includes $21,408,000.00 in principal together with accrued and default interest.

49.     The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

50.     Fannie Mae is the owner and holder of the Guaranty.

### *Woodscape Apartments Loan*

51.     The Woodscape loan is evidenced by a Multifamily Note dated April 21, 2023, in the original principal amount of $33,800,000.00.

52.     Mr. Kulick and Mr. Upperman personally guaranteed the loan.

53.     By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

54.     Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

55.     The borrower defaulted by failing to make debt service payments from October 2025 through February 2026.

11

Fannie Mae Confidential

56. The borrower further defaulted by failing to provide notice of litigation involving key principals.

57. The borrower also permitted unauthorized liens and a second mortgage while failing to complete required life-safety repairs identified in a Property Condition Assessment demand.

58. Fannie Mae accelerated the loan on January 9, 2026, and the unpaid balance includes $33,800,000.00 in principal plus interest and charges.

59. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters, the failure to repair and maintain the property, and allowing unsafe conditions to persist, all of which have contributed to a decline in the occupancy of the property).

60. Fannie Mae is the owner and holder of the Guaranty.

### *Copperfield Apartments Loan*

61. The Copperfield loan transaction is evidenced by a Multifamily Note dated July 14, 2023, in the original principal amount of $17,641,000.00.

62. The Copperfield Loan is further governed by a corresponding Multifamily Loan and Security Agreement and secured by a Multifamily Mortgage encumbering the Copperfield Property.

12

63. The Note incorporates the terms of the Loan Agreement and provides that, upon an Event of Default, the entire unpaid balance may be accelerated and become immediately due and payable.

64. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

65. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

66. Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

67. The borrower defaulted by failing to make required monthly debt service payments in February and March 2026.

68. The borrower further defaulted by failing to provide required notice of multiple lawsuits involving key principals as required by the Loan Agreement.

69. The borrower also defaulted by allowing unpermitted liens and a second mortgage to encumber the property without timely notice to the lender.

70. Fannie Mae provided written notice of default and accelerated the indebtedness on January 9, 2026. The outstanding indebtedness includes the unpaid principal balance of $17,641,000.00, together with accrued interest, default interest, fees, and continuing contractual charges.

71. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt

13

Fannie Mae Confidential

Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

72.     Fannie Mae is the owner and holder of the Guaranty.

### *One Eton Square Loan*

73.     The One Eton Square loan is evidenced by a Multifamily Note dated September 21, 2022, in the original principal amount of $35,027,000.00.

74.     The Note is governed by a Loan Agreement and secured by a Mortgage encumbering the One Eton Square Property.

75.     Mr. Kulick and Mr. Upperman personally guaranteed the loan.

76.     By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

77.     Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

78.     The borrower defaulted by failing to make required debt service payments from November 2025 through February 2026.

79.     The borrower further defaulted by failing to maintain and repair the property following a fire loss.

80.     The borrower also defaulted by failing to comply with municipal safety requirements and abatement orders.

81.     The borrower additionally failed to provide required notice of litigation involving key principals.

14

Fannie Mae Confidential

82.    Fannie Mae accelerated the loan by written notice on December 23, 2025.

83.    The unpaid indebtedness includes the principal amount of $35,027,000.00 plus accrued interest, default interest, and contractual charges.

84.    The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, failure to apply all insurance proceeds received by Borrower, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters, the failure to repair and maintain the property, allowing unsafe conditions at the property to persist, and causing insurance proceeds to not be directed to repairs at the property, all of which have contributed to a decline in the occupancy of the property).

85.    Fannie Mae is the owner and holder of the Guaranty.

### *Villas at Midtown Loan*

86.    The Villas loan is evidenced by a Multifamily Note dated February 14, 2023, in the original principal amount of $24,868,000.00.

87.    Mr. Kulick, Mr. Upperman, and Mr. Mondry personally guaranteed the loan.

88.    By executing a guaranty agreement in connection with the loans, Mr. Kulick, Mr. Upperman, and Mr. Mondry each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

89.    Fannie Mae relied on the Guaranty of Mr. Kulick, Mr. Upperman, and Mr. Mondry in extending credit to borrower.

Fannie Mae Confidential

90. The borrower defaulted by failing to make multiple required debt service payments during 2025 and 2026.

91. The borrower further defaulted by allowing unauthorized liens and additional mortgages to encumber the property.

92. The borrower also failed to comply with municipal violations and to complete required repairs.

93. The unpaid indebtedness includes $24,868,000.00 in principal plus accrued and default interest and other contractual amounts.

94. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

95. Fannie Mae is the owner and holder of the Guaranty.

### *Barcelona Apartments Loan*

96. The Barcelona loan is evidenced by a Multifamily Note dated May 28, 2021, in the original principal amount of $13,132,000.00.

97. Mr. Kulick, Mr. Upperman, and Mr. Moore personally guaranteed the loan.

98. By executing a guaranty agreement in connection with the loans, Mr. Kulick, Mr. Upperman, and Mr. Moore agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

16

Fannie Mae Confidential

99. Fannie Mae relied on the Guaranty of Mr. Kulick, Mr. Upperman, and Mr. Moore in extending credit to borrower.

100. The borrower defaulted by failing to pay required debt service in February 2026.

101. The borrower further failed to disclose litigation involving key principals and allowed unauthorized liens and a second mortgage.

102. The unpaid indebtedness includes $13,132,000.00 plus accrued interest, default interest, and fees.

103. The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such have harmed Fannie Mae and triggering events include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

104. Fannie Mae is the owner and holder of the Guaranty.

### *Canopy Apartments*

105. The Canopy Loan is evidenced by a Multifamily Note dated December 14, 2020, in the original principal amount of $13,565,000.00.

106. Mr. Kulick and Mr. Upperman personally guaranteed the loan.

107. By executing a guaranty agreement in connection with the loans, Mr. Kulick and Mr. Upperman each agreed to be personally liable for the indebtedness and certain enumerated obligations triggered by events of default or bad acts.

17

Fannie Mae Confidential

108.    Fannie Mae relied on the Guaranty of Mr. Kulick and Mr. Upperman in extending credit to borrower.

109.    The borrower defaulted by failing to make required debt service payments during late 2025 and early 2026.

110.    The borrower also failed to provide notice of extensive litigation involving key principals and permitted unauthorized liens and a second mortgage.

111.    The unpaid indebtedness includes $13,565,000.00 in principal together with accrued and default interest.

112.    The borrower's various defaults have triggered guaranty obligations that remain unsatisfied. Such triggering events have harmed Fannie Mae and include, but are not limited to, failure to assign rents, failure to maintain all insurance policies, failure to apply rents to the ordinary and necessary expenses of owning and operating the Mortgaged Property and Debt Service Amounts, and waste (as exemplified, *inter alia*, by the failure to "turn" unoccupied units so that they would be ready for new renters and the failure to repair and maintain the property, both of which have contributed to a decline in the occupancy of the property).

113.    Fannie Mae is the owner and holder of the Guaranty.

### COUNT II – TORTIOUS INTERFERENCE
### (Vesta Realty and Marc Kulick)

114.    Fannie Mae realleges and incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

115.    Vesta Realty is, by contract with the Borrowers, the property manager for each of the Apartment Complexes.  It handles, *inter alia*, all of Borrowers' finances, and it directs how they use all monies they receive.

18

Fannie Mae Confidential

116. On December 23, 2025 for the Remington Ranch Loan and on January 9, 2026 for the remaining eight loans, Fannie Mae delivered to the Borrowers, Key Principals, Guarantors, and Vesta Realty for each of the loans on the Apartment Complexes a Notice of Acceleration (the "Notices"). Each of the Notices included a paragraph stating:

> UNDER THE SECURITY INSTRUMENT EXECUTED BY BORROWER IN FAVOR OF FANNIE MAE, BORROWER'S LICENSE TO COLLECT RENTS HAS TERMINATED, AND FANNIE MAE IS NOW ENTITLED TO ALL RENTS AS THEY BECOME DUE AND PAYABLE, INCLUDING RENTS CURRENTLY DUE AND UNPAID. UNTIL FURTHER NOTICE, ANY RENTS BORROWER RECEIVED AFTER THE OCCURRENCE OF THE EVENT OF DEFAULT SHALL BE RECEIVED AND HELD BY BORROWER IN TRUST FOR THE BENEFIT OF FANNIE MAE. UNTIL FURTHER NOTICE, ALL SUCH RENTS SHALL BE APPLIED ONLY TO BONA FIDE CURRENT OPERATING EXPENSES TO THIRD PARTIES IN CONNECTION WITH THE OPERATION OF THE PROPERTY WITH EXCESS PAID TO FANNIE MAE, TO BE APPLIED IN ACCORDANCE WITH THE LOAN DOCUMENTS.

117. Since that time, Borrowers have had a contractual obligation to assign all rents they receive to Fannie Mae. They also have an obligation to assign insurance proceeds they receive.

118. Vesta Realty and Mr. Kulick are causing Borrowers to breach those contractual obligations.

119. Specifically, Vesta Realty, as the property manager for each of the Borrowers, and its CEO, Mr. Kulick have, since the date of the Notices—according to the rent rolls they prepared—continued to collect more than $1.9 million each month in rents for the 9 Apartment Complexes. Not one dollar in rent has been assigned to Fannie Mae.

120. The rents and insurance money received by Vesta Realty and Mr. Kulick have not been applied solely to bona fide current operating expenses to third parties in connection with the operation of the Apartment Complexes. Based on the information available, it appears the rents

19

Fannie Mae Confidential

and insurance money have been improperly diverted to serve Vesta Realty's and Mr. Kulick's separate interests, contrary to the interests of the SPE Borrower's.

121. Vesta Realty and Mr. Kulick knew of the various loan agreements entered into by Fannie Mae and the Borrowers. Indeed, Mr. Kulick, Vesta Realty's CEO, signed all of the loan agreements on behalf of the Borrowers.

122. Vesta Realty and Mr. Kulick intentionally, wrongfully, and maliciously interfered with Fannie Mae's loan agreements with the Borrowers by facilitating, encouraging, or assisting the Borrowers' continued acceptance of rents at the Apartment Complexes and the Borrowers' failure to deliver such to Fannie Mae.

123. Vesta Realty's and Mr. Kulick's malicious interference with Fannie Mae's loan agreements was not justified, privileged, or excusable.

124. The acts of Vesta Realty and Mr. Kulick described above were in their own interests and contrary to the interests of the SPE Borrowers. They were not in good faith.

125. As a direct and proximate result of Vesta Realty's and Mr. Kulick's tortious interference with Fannie Mae's loan agreements, Fannie Mae has suffered, and continues to suffer, damages in an amount in excess of $75,000, to be determined at trial.

126. Vesta Realty and Mr. Kulick have acted with reckless disregard for the rights of Fannie Mae such that it should be subjected to an award of punitive damages in an amount to be determined at trial.

## COUNT III: CONSTRUCTIVE TRUST
### (Vesta Realty and Marc Kulick)

127. In the alternative, as a result of the foregoing conduct, Vesta Realty and Mr. Kulick have been unjustly enriched in an amount to be proven at trial, including the full amount of rents received at each of the Apartment Complexes since the date each of the Notices were submitted.

20

Fannie Mae Confidential

128.     It would be inequitable for Vesta Realty and Mr. Kulick to retain these benefits without restoring to Fannie Mae the value of the rents Vesta Realty wrongfully accepted and retained following the termination of the Borrowers' licenses to collect rents.

129.     Fannie Mae seeks the imposition of a constructive trust over all amounts wrongfully retained by Vesta Realty and Mr. Kulick, together with pre- and post- judgment interest and attorneys' fees.

## COUNT IV: UNJUST ENRICHMENT
### (Vesta Realty and Marc Kulick)

130.     In the alternative, as a result of the foregoing conduct, Vesta Realty and Mr. Kulick have been unjustly enriched in an amount to be proven at trial, including the full amount of rents received at each of the Apartment Complexes since the date each of the Notices were submitted.

131.     Justice and equity require that Vesta Realty and Mr. Kulick return to Fannie Mae the value of the rents Vesta Realty wrongfully accepted and retained following the termination of the Borrowers' licenses to collect rents.

## COUNT V: MONEY HAD AND RECEIVED
### (Vesta Realty and Marc Kulick)

132.     In the alternative, as a result of the foregoing conduct, Vesta Realty and Mr. Kulick have received money that in equity and good conscience should belong to Plaintiffs.  They should be required to return the funds received.

## PRAYER

Fannie Mae requests that the Court grant the following relief:

a)     All legal and equitable relief to which Fannie Mae is entitled, to include compensatory and consequential damages in an amount in excess of $100,000, punitive damages, and all other relief to which Fannie Mae is entitled in law or in equity;

21

Fannie Mae Confidential

b)      An award of Fannie Mae's costs, including a reasonable attorneys' fees;

c)      That Plaintiffs be awarded such other relief as the Court may deem just, proper and equitable under the circumstances.

Respectfully submitted,

/s/ Christopher S. Scaperlanda
Christopher M. Scaperlanda, OBA #31703
Gatlin C. Squires, OBA #34795
McAfee & Taft A Professional Corporation
8th Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, Oklahoma 73120
Telephone:     (405) 235-9621
Facsimile:     (405) 235-0439
Christopher.scaperlanda@mcafeetaft.com
gatlin.squires@mcafeetaft.com

**Attorneys for Plaintiff Federal National Mortgage Association**

Fannie Mae Confidential