Tulsa County Clerk - MICHAEL WILLIS
Doc #: 2025099639 Page(s): 40 Recorded: 10/31/2025 12:54:44 PM
Receipt #: 2025-67261 Fees: $96.00

Tulsa County Treasurer - JOHN M FOTHERGILL
Mortgage Tax: $1498.74 Deputy: gflatt
Receipt #: 48791

*****ELECTRONICALLY FILED DOCUMENT*****

This instrument was prepared by and
after recording should be returned to:

David P. Limekiller, Esq.
GableGotwals
110 N. Elgin, Suite 200
Tulsa, Oklahoma 74120
(918) 595-4800

# MORTGAGE, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT, AND FIXTURE FILING

(Tulsa County, Oklahoma)

(This document serves as a fixture filing under § 1-9-502 of the Oklahoma Uniform Commercial Code.)

**A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE. A POWER OF SALE MAY ALLOW THE MORTGAGEE TO TAKE THE MORTGAGED PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE GRANTOR UNDER THIS MORTGAGE**

THIS MORTGAGE, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT, AND FIXTURE FILING (this "**Mortgage**") is made as of October 29th, 2025, by Jenk's Best Living LLC, a Kansas limited liability company, (the "**Grantor**"), having a mailing address at 6911 S 66th East Ave Suite 100 Tulsa, OK 7413, in favor of YSA Investments 1, LLC, a Delaware limited liability company (together with its successors and/or assigns, the "**Mortgagee**"), having a mailing address at 8 The Green #23817 Dover, DE 19901.

## RECITALS

A.   Mortgagee as lender, extended credit to the Borrower Parties through multiple loans (the "Loans") and pursuant to the terms of the loan documents.

B.   The Borrower Parties defaulted on the payment and performance of the Loans and loan documents.

C.   The Borrower Parties own equity interests in Grantor or otherwise are affiliated with Grantor, and Grantor will derive substantial and material direct or indirect benefits from the execution and delivery of this Mortgage.

4860-2926-3509, v. 4

D.      Borrower Parties and guarantor of the Loans have granted Lender a Power of Attorney authorizing the Mortgage.

NOW, THEREFORE, Grantor, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, and for the purpose of securing the Secured Obligations (as subsequently defined), hereby agrees with Mortgagee as follows:

1.      **Grant of Security**. Grantor hereby irrevocably GRANTS, BARGAINS, SELLS, CONVEYS, TRANSFERS, ASSIGNS, PLEDGES, MORTGAGES, and SETS OVER and has by these presents GRANTED, BARGAINED, SOLD, CONVEYED, TRANSFERRED AND ASSIGNED, to Mortgagee, with the power of sale and right of entry and possession, all of Grantor's right, title and interest, whether now owned or hereafter acquired, in the land described in the attached Exhibit A (the "**Land**"), together with: (i) all the buildings and other improvements now on or that may be placed hereafter on the Land during the existence of this lien; (ii) Grantor's rights and interests in all fixtures or other property now or hereafter attached to, installed in, or used in connection with the buildings and other improvements now erected or hereafter to be erected on the Land; (iii) Grantor's rights and interests in all leases, easements, rights-of-way, permits, licenses and all other interests which are appurtenant to, relate to or used in connection with the Land, whether or not such right, title and interest be correctly, fully or sufficiently described or referred to herein; (iv) Grantor's rights and interests in any streets, ways, alleys and strips of land adjoining the Land or any part thereof; and (v) all rights, estates, powers and privileges appurtenant or incident to the foregoing (the Land together with such other property, rights and/or interests described in (i) though (iv) above are hereafter collectively referred to as the ("**Mortgaged Property**").

TO HAVE AND TO HOLD the Mortgaged Property unto the Mortgagee and its successors or and assigns, upon the terms, provisions and conditions of this Mortgage.

In order to secure the payment and performance of the Secured Obligations, Grantor also grants to Mortgagee a security interest in each of the following now owned or acquired in the future by Grantor (the "**Collateral**") and all proceeds of the Collateral:

      (i)      all goods, equipment, furnishings, fixtures, furniture, chattels and personal property of whatever nature now or hereafter attached or affixed to or used in and about the buildings or other improvements now erected or hereafter to be erected on the Land, or otherwise located on such land, and all fixtures, accessions and appurtenances thereto, and all renewals or replacements of or substitutions for any of the foregoing;

      (ii)      all building materials and equipment now or hereafter delivered to the Mortgaged Property and intended to be installed therein;

      (iii)      all security (including cash deposits, letters of credit, stock warrants, bonds or other forms of security) and all advance rentals under lease agreements now or at any time hereafter covering or affecting any of the Mortgaged Property or any of the Collateral and held by or for the benefit of Grantor;

      (iv)      all monetary deposits which Grantor has been required to give to any public or private utility with respect to utility services furnished to the Mortgaged Property;

(v) all issues and profits from any part of the Mortgaged Property or any of the Collateral;

(vi) all proceeds (including premium refunds) of each policy of insurance relating to the Mortgaged Property or any of the Collateral;

(vii) all proceeds from the taking of the Mortgaged Property, any of the Collateral, or any part of either of them, or any interest therein or right or estate appurtenant thereto, by eminent domain or by purchase in lieu thereof;

(viii) all contracts related to the Mortgaged Property or any Collateral;

(ix) all money, funds, cash, cash equivalents, securities, investment property, accounts, instruments, documents, general intangibles (including copyrights, trademarks, trade names, trade dress, domain names, symbols and licenses of the foregoing used in connection therewith), and notes or chattel paper (whether tangible or intangible chattel paper or electronic chattel paper) arising from or related to the Mortgaged Property or any Collateral, including any funds deposited or set aside for the payment of taxes or insurance premiums related to the Mortgaged Property or any Collateral;

(x) all permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Mortgaged Property or any Collateral;

(xi) all plans, specifications, maps, surveys, reports, architectural, engineering and construction contracts, books of account, insurance policies and other documents or records of whatever kind or character, relating to the use, construction upon, occupancy, leasing, sale or operation of the Mortgaged Property or any Collateral;

(xii) all proceeds and other amounts paid or owing to Grantor under or pursuant to any and all contracts and bonds or commercial tort claims relating to the construction, erection renovation, or otherwise of the Mortgaged Property or any Collateral; and

(xiii) all of Grantor's interest in oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other hydrocarbons and other minerals produced, saved from, attributable to or transported through any Mortgaged Property and all products processed or obtained therefrom, the proceeds thereof, and all accounts and general intangibles under which such proceeds may arise, together with any sums of money that may now or at any time hereafter become due and payable to Grantor by virtue of any and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or character arising under any and all present and future oil, gas and mining leases covering the Mortgaged Property or any part thereof.

The Mortgaged Property and the Collateral are sometimes collectively called the "**Property**".

1. **Secured Obligations**.

(a) This Mortgage is made to secure the full and timely payment and performance of the following (collectively, the "**Secured Obligations**"):

(i)     The sum of $7,493,673.51 and all indebtedness, now existing or arising in the future, including any extensions, modifications, substitutions, amendments, replacements, rearrangements and renewals thereof, whether for principal, interest, fees, expenses, indemnification or otherwise, including all interest and all reasonable costs and out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with any exercise of its rights or remedies hereunder; and

(ii)     all future advances and re-advances made for Borrower Parties' or Grantor's benefit or to protect any of the Property or any of the rights of Mortgagee and out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred by Mortgagee in connection with any exercise of its rights or remedies hereunder, pursuant to the terms of this Mortgage; and

(iii)     all other obligations, debts and liabilities, plus interest thereon, of Grantor or Borrower Parties to Mortgagee, as well as all claims by Mortgagee against Grantor or Borrower Parties, whether arising from a loan or a purchased obligation, whether incurred for a consumer or a business purpose, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Loans, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor or Borrower Parties may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

(b)     The initial principal amount and initial maturity date of the Mortgage is $7,493,673.51 and November 7th 2025, respectively.

2.     **Title**.  Grantor has good, indefeasible, marketable and insurable fee simple title of record to the Property, free and clear of all liens, encumbrances and charges except for permitted encumbrances. Grantor shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Mortgage and shall forever warrant and defend the same to Mortgagee against the claims of all Persons whomsoever.

3.     **Covenants and Agreements**.  So long as any Secured Obligations remain unpaid or outstanding, Grantor covenants and agrees with Mortgagee as follows:

(a)     Operation of Property.  Grantor shall operate and keep the Property in accordance with all applicable restrictive covenants, zoning ordinances and building codes, flood disaster laws in all material respects, and all other applicable laws and shall pay all reasonable fees or charges necessary in connection therewith, in each case except where the failure to do so could not reasonably be expected to have a material adverse effect.

(b)     Taxes.  Grantor shall cause to be paid prior to delinquency all taxes and assessments heretofore or hereafter levied or assessed (i) against the Property or any part thereof or (ii) against the Mortgagee for or on account of the Secured Obligations or the interest created by this Mortgage. Notwithstanding the foregoing, Grantor may in good faith and with

adequate reserves to pay, contest, by any and all appropriate administrative, trial or appellate proceedings, or any combination thereof, the amount, validity, enforceability or application of any imposition that Grantor is required to pay or perform to any person other than Mortgagee.

(c)   Repair and Maintenance.  Grantor shall not, without the prior written consent of Mortgagee, make any significant alterations to the Mortgaged Property that would materially reduce the value of the Mortgaged Property at the time made. Grantor will keep the Property (or cause the Property to be kept) in first class order, repair, operating condition and appearance, causing all necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Property to be misused, abused or wasted or to deteriorate.

(d)   Condemnation.  Grantor shall notify Mortgagee immediately of any threatened or pending proceeding for condemnation affecting the Property or arising out of damage to the Property, and Grantor shall, at Grantor's expense, diligently prosecute any such proceedings. Mortgagee shall have the right (but not the obligation) to participate in any such proceeding and to be represented by counsel of its own choice.  Mortgagee shall be entitled to receive all sums which may be awarded or become payable to Grantor for the condemnation of the Property, or any part thereof, for public or quasi-public use, or by virtue of private sale in lieu thereof, and any sums which may be awarded or become payable to Grantor for injury or damage to the Property.  Grantor shall, promptly upon request of Mortgagee, execute such additional assignments and other documents as may be necessary from time to time to permit such participation and to enable Mortgagee to collect and receipt for any such sums.  All such sums are hereby assigned to Mortgagee, and shall, after deduction therefrom of all reasonable expenses actually incurred by Grantor, including attorneys' fees, and at Mortgagee's sole option be (1) applied (upon compliance with such terms and conditions as may be required by Mortgagee) to repair or restore the Property, or (2) applied to the payment of the Secured Obligations in such order and manner as Mortgagee, in its sole discretion, may elect, whether or not due.  After such payment, the unpaid portion of the Secured Obligations shall remain in full force and effect. Mortgagee shall not be, under any circumstances, liable or responsible for failure to collect or to exercise diligence in the collection of any such sum or for failure to see to the proper application of any amount paid over to Grantor.  Mortgagee is hereby authorized, in the name of Grantor, to execute and deliver valid acquittances for, and to appeal from, any such award, judgment or decree.  All costs and expenses (including but not limited to attorneys' fees) incurred by Mortgagee in connection with any condemnation shall be a demand obligation owing by Grantor and added to the Secured Obligations.

(e)   Insurance.  Grantor will maintain policies of insurance (including general liability and property insurance) with financially sound and reputable insurance companies, in such amounts, and with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties and acceptable to Lender. Lender shall be named as loss payee, as its interest may appear, and/or additional insured with respect to any such insurance, and each provider of any such insurance shall agree, by endorsement upon the policy that it will give Lender thirty (30) days' prior written notice before any such policy or policies shall be altered or canceled

(f)   Environmental Compliance.  The Property and the intended use thereof by Grantor will comply with all applicable Environmental Laws (as defined herein). "Environmental Laws" means, collectively, any local, state or federal law, rule or regulation,

order, decree, together will all amendments thereto, pertaining to the environment, natural resources, pollution, or public health including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851 *et seq.*).

4.      **Right of Mortgagee to Perform**.  If Grantor fails to perform any act or to take any action which hereunder Grantor is required to perform or take, or to pay any money which hereunder Grantor is required to pay, or takes any action prohibited hereby, Mortgagee may, but shall not be obligated to, perform or cause to be performed such act or take such action or pay such money or remedy any action so taken, and any expenses so incurred by Mortgagee, and any money paid by Mortgagee in connection therewith, shall be a demand obligation owing by Grantor to Mortgagee and Mortgagee, upon making such payment, shall be subrogated to all of the rights of the person receiving such payment.  Any amounts due and owing by Grantor to Mortgagee pursuant to this Mortgage shall bear interest from the date such amount becomes due until paid at the default rate, (Lender and Grantor intend that the Mortgage strictly comply with applicable usury law) will be part of the Secured Obligations and shall be secured by this Mortgage and by any other instrument securing the Secured Obligations.

5.      **Assignment of Rents, Income, Profits and Proceeds**.

(a)      Assignment. Grantor absolutely and unconditionally assigns, transfers and sets over to Mortgagee any leases (the "**Leases**") now or hereafter covering the Mortgaged Property, or any part of the Mortgaged Property, and all of the rents, income, receipts, revenues, issues, profits and other sums of money (collectively, "**Rent**") that are now or at any time hereafter become due and payable to Grantor under the terms of, or arising or issuing from or out of, the Leases or from or out of the Mortgaged Property.  Rents covered by this assignment will include but not be limited to minimum rents, additional rents, percentage rents, deficiency rents and liquidated damages following default, security deposits, advance rents, and all proceeds payable under any policy of insurance covering the loss of any such rents, income, receipts, revenues, issues or profits.  Rents covered by this assignment shall also include any money Grantor is entitled to recover from any lessee in bankruptcy or other similar insolvency proceeding such as, without limitation, money recoverable for use and occupancy of any part of the Mortgaged Property and damage claims arising out of Lease defaults, including rejections, under any applicable bankruptcy law or other similar insolvency or debtor relief law.  This assignment shall include, without limitation, the immediate and continuing right to collect and receive Rent.

(b)      Collections Before and After Default.  Until receipt from Mortgagee of notice of the occurrence and continuance of an Event of Default (a "**Notice of Default**"), each lessee under the Leases may pay Rent directly to Grantor and Grantor shall have the right to receive such Rent.  Upon receipt from Mortgagee of a Notice of Default, each lessee under the Leases is hereby authorized and directed to pay directly to Mortgagee all Rent thereafter accruing and the receipt of Rent by Mortgagee shall be a release of such lessee to the extent of all amounts

so paid. The receipt by a lessee under the Leases of a Notice of Default shall be sufficient authorization for such lessee to make all future payments of Rent directly to Mortgagee and each such lessee shall be entitled to rely on such Notice of Default and shall have no liability to Grantor for any Rent paid to Mortgagee after receipt of the Notice of Default. After a Notice of Default, any Rent received by Grantor shall be held in trust for Mortgagee and Grantor shall immediately deliver such rent to Mortgagee. Rent received by Mortgagee for any period prior to foreclosure under this Mortgage or acceptance of a deed in lieu of foreclosure shall be applied by Mortgagee to the payment (in such order as Mortgagee shall determine) of: (i) all expenses of managing the Property reasonably incurred, including but not limited to the salaries, fees and wages of a managing agent and such other employees as Mortgagee may deem reasonably necessary or desirable; all expenses of operating and maintaining the Property, including but not limited to all taxes, assessments, charges, claims, utility costs and premiums for insurance, and the cost of all reasonable alterations, renovations, repairs or replacements; and all expenses incident to taking and retaining possession of the Property or collecting Rent due and payable under the Leases; and (ii) the indebtedness secured by this Mortgage, reasonable attorneys' and collection fees and other amounts, in such order as Mortgagee in its sole discretion may determine. In no event will the assignment under this Section 5(b) reduce the Secured Obligations except to the extent (dollar for dollar), if any, that Rent is actually received by Mortgagee and applied upon or after receipt to the Secured Obligations in accordance with the preceding sentence. Without impairing its rights hereunder, Mortgagee may, at its option, at any time and from time to time, release to Grantor any Rent received by Mortgagee. As between Grantor and Mortgagee, and any Person claiming through or under Grantor, other than any lessee under the Leases who has not received a Notice of Default under this Section 5, the assignment under this Section 5 is intended to be absolute, unconditional and presently effective and the provisions of this Section 5 for notification of lessees under the Leases upon the occurrence and continuance of a default are intended solely for the benefit of each such lessee and shall never inure to the benefit of Grantor or any Person claiming through or under Grantor, other than a lessee who has not received such notice. It shall never be necessary for Mortgagee to institute legal proceedings of any kind whatsoever to enforce the provisions of this Section 5. At any time during which Grantor is receiving Rent directly from lessees under the Leases, Grantor shall, upon receipt of written direction from Mortgagee, make demand and sue for all Rent due and payable under one or more Leases, as directed by Mortgagee, as it becomes due and payable, including Rent which is past due and unpaid. In the event Grantor fails to take such action, or at any time during which Grantor is not receiving Rent directly from lessees under the Leases, Mortgagee shall have the right (but shall be under no duty) to demand, collect and sue for in its own name all Rent due and payable under the Leases, as it becomes due and payable, including Rent which is past due and unpaid. Mortgagee shall not be deemed to have taken possession of the Mortgaged Property except on the exercise of any option Mortgagee may have to do so, evidenced by its demand and overt act for such purpose.

(c)     Limitation of Mortgagee's Liability. Mortgagee shall not be liable for any loss sustained by Grantor resulting from Mortgagee's failure to let the Mortgaged Property, or any part thereof; or from any other act or omission of Mortgagee under or relating to any Lease unless such loss is due to Mortgagee's gross negligence or willful misconduct. Nor shall Mortgagee be obligated to perform or discharge any obligation, duty or liability under the Leases by reason of the assignment set forth in this Section 5 or the exercise of rights or remedies hereunder. Without limiting the foregoing, Mortgagee shall not be liable for its failure to collect, or its failure to exercise diligence in the collection of rent, but shall be

accountable only for rent that Mortgagee actually receives. This Section 5 shall not operate to place responsibility upon Mortgagee for the control, care, management or repair of the Mortgaged Property, nor for the carrying out of any of the terms and conditions of any Lease.

6.      **Events of Default and Remedies**.

(a)     Events of Default. Each of the following shall constitute an "**Event of Default**" under this Mortgage whether voluntary or involuntary and whether occurring by operation of law or otherwise: (i) the occurrence of a default under the Loans, or any loan document, (ii) Grantor's failure to perform any obligation or condition under this Mortgage, (iii) the bankruptcy or dissolution of the Grantor; or (v) the liens, mortgages or security interests of Mortgagee in any of the Property become unenforceable in whole or in part, or cease to be of the priority herein required, (or the validity or enforceability thereof, in whole or in part, shall be challenged or denied by Grantor or any person obligated to pay any part of the Secured Obligations).

(b)     Remedies. If an Event of Default is continuing, Mortgagee may, at its option, and without prior notice or demand, exercise, and hereby is authorized and empowered by Grantor so to exercise, any or all of the remedies set forth in the Mortgage (including enforcement of the Assignment of Rents), or otherwise permitted by law or in equity.

(c)     Foreclosure. During the continuance of an Event of Default, Mortgagee has the option and is authorized and empowered to enforce this Mortgage and to commence foreclosure proceedings against the Mortgaged Property through judicial proceedings or by advertisement, pursuant to the statutes in such case made and provided, and to sell the Mortgaged Property or to cause the same to be sold at public sale, and to convey the same to the purchaser, in accordance with said statutes in a single parcel or in several parcels. Any sale made by Mortgagee hereunder may be as an entirety or in parcels, and any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as is required by applicable law. To the extent permitted by applicable law, Grantor hereby waives its right, if any, to require that the Mortgaged Property be sold as separate tracts or units. The sale by Mortgagee of less than the whole of the Mortgaged Property shall not exhaust the power of sale herein granted, and Mortgagee is specifically empowered to make successive sale or sales under such power until the whole of the Mortgage Property shall be sold; and, if the proceeds of such sale of less than the whole of the Mortgaged Property shall be less than the aggregate of the Secured Obligations and the expenses thereof, this Mortgage and the lien hereof shall remain in full force and effect as to the unsold portion of the Mortgaged Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Mortgaged Property but Mortgagee shall have the right, at its sole election, to sell less than the whole of the Mortgaged Property. If any sale hereunder is not completed or is defective in the opinion of Mortgagee, such sale shall not exhaust the power of sale hereunder and Mortgagee shall have the right to cause a subsequent sale or sales to be made hereunder. Any and all statements of fact or other recitals made in any deed or deeds given by Mortgagee or any successor or substitute appointed hereunder as to nonpayment of the indebtedness secured hereby, or as to the continuance of any Event of Default, or as Mortgagee having declared all of such indebtedness to be due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to the refusal, failure or inability to act of Mortgagee, or as to any other act or thing having been duly done by Mortgagee, shall be taken

as prima facie evidence of the truth of the facts so stated and recited. Mortgagee may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale held by Mortgagee, including the posting of notices and the conduct of sale, but in the name and on behalf of Mortgagee. In any action to foreclose this Mortgage by judicial proceedings, appraisement of the Mortgaged Property is hereby waived or not waived at the option of the Mortgagee

(d)     Proceeds of Sale. The proceeds of any sale held by the Mortgagee in foreclosure of the Mortgage granted herein shall be applied in accordance with applicable law.

(e)     Receiver. Upon the occurrence of an Event of Default, Mortgagee, without regard to the value of the Property or the adequacy of the security for the Secured Obligations and other sums secured hereby, shall be entitled as a matter of right and without any additional showing or proof, at Mortgagee's election, to either (i) the appointment by the court of a receiver (without the necessity of Mortgagee posting a bond) to enter upon and take possession of the Property and to collect all Rents, income and other benefits thereof and apply the same as the court may direct or (ii) to be placed by the court into possession of the Property as mortgagee in possession with the same power herein granted to a receiver and with all other rights and privileges of a mortgagee in possession under law.

(f)     Mortgagee as Purchaser. Mortgagee has the right to become the purchaser at any sale held by Mortgagee or by any receiver or public officer, and if Mortgagee purchases at any such sale, it has the right to credit bid the Secured Obligations.

(g)     Uniform Commercial Code Rights and Remedies. During the continuance of an Event of Default, Mortgagee may exercise its rights of enforcement with respect to the Collateral under the Uniform Commercial Code as in effect in the State of Oklahoma, as amended from time to time.

(h)     Remedies Cumulative. All remedies herein expressly provided for are cumulative of any and all other remedies existing at law or in equity under applicable law and may be exercised independently, concurrently or successively in Mortgagee's sole discretion and as often as occasion therefor shall arise. Mortgagee's delay or failure to exercise any other remedy upon the occurrence of an Event of Default shall not be deemed a waiver of such right or remedy. No partial exercise by Mortgagee of any right or remedy will preclude further exercise thereof. Mortgagee will not be deemed as a consequence of its delay or failure to act, or any forbearance granted, to have waived or be estopped from exercising any of its rights or remedies.

(i)     Power of Sale. In addition to all other remedies available to Mortgagee under this Mortgage and the other Loan Documents, Grantor confers on Mortgagee the power to sell the Mortgaged Property, upon the occurrence and during the continuation of an Event of Default, in the manner and pursuant to the procedures set forth in the "Oklahoma Power of Sale Mortgage Foreclosure Act" (46 O.S. §§ 40-49), as amended from time to time (the "**Power of Sale Act**"), or pursuant to other applicable statutory or judicial authority. If an Event of Default is not cured in the time period provided in the Power of Sale Act, Mortgagee may accelerate the Secured Obligations without further notice and may then proceed in the manner and subject to the conditions of the Power of Sale Act to send Grantor and other necessary parties a notice of sale and may sell and convey the Mortgaged Property in accordance with

the Power of Sale Act. Mortgagee may enforce this Mortgage by exercising its power of sale or, at Mortgagee's sole option, by judicial foreclosure proceedings as provided by applicable law. No action of Mortgagee based upon the provisions contained in this Mortgage or in the Power of Sale Act, including, without limitation, the giving of the notice of intent to foreclose by power of sale or the notice of sale, will constitute an election of remedies that would preclude Mortgagee from accelerating the Secured Obligations and pursuing judicial foreclosure before or at any time after commencements of the power of sale foreclosure procedure. Grantor fully understands the consequences of conferring on Mortgagee the above-described power of sale, and if Mortgagee elects to foreclose this Mortgage by exercising this power of sale, Grantor expressly waives, to the fullest extent permitted by applicable law, any right to a judicial hearing before the sale of the Mortgaged Property.

(j)     Costs and Expenses. As often as any proceedings are taken to foreclose this Mortgage, whether pursuant to the power of sale or by judicial proceedings or to foreclose the security interest granted to Mortgagee, Grantor agrees to pay to Mortgagee, in addition to all other sums due, all reasonable costs and out-of-pocket expenses, including reasonable attorney fees, incurred by Mortgagee.

(k)     Waiver of Marshalling; Additional Rights of Mortgagee. Grantor waives any and all right to have the Property (and/or any other property that secures any of the Secured Obligations) marshaled. In exercising its rights and remedies, Mortgagee may sell all or any part of the Property together or separately, in one sale or by separate sales. If an Event of Default occurs and is continuing, Mortgagee may pursue any of its remedies and rights under this Mortgage with respect to the Property and Grantor to collect payment in full of the Secured Obligations, regardless of whether Mortgagee first proceeds against any other collateral for the Secured Obligations. Additionally, Grantor acknowledges and agrees that, upon the occurrence of an Event of Default, Mortgagee, in its sole discretion, (i) may proceed against the Property pursuant to this Mortgage, or against any other party obligated under, or collateral for, the Secured Obligations, as Mortgagee deems appropriate, and (ii) may exercise any right, power, or remedy to which it is entitled under applicable law simultaneously or separately, and in such order, as Mortgagee deems appropriate.

7.     **Miscellaneous**.

(a)     Release. Upon the payment and satisfaction in full of the Secured Obligations and termination of all obligations (if any) on the part of Mortgagee to extend credit to the Borrower Parties, all rights under this Mortgage will automatically terminate and the Property will become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Mortgagee in due form at Grantor's cost. Without limitation, all provisions herein for indemnity of Mortgagee shall survive discharge of the Secured Obligations and any foreclosure, release or termination of this Mortgage.

(b)     Waiver by Mortgagee. Mortgagee may at any time and from time to time (i) waive or not enforce compliance by Grantor with any covenant herein made by Grantor; (ii) consent to Grantor doing any act which hereunder Grantor is prohibited from doing, or consent to Grantor failing to do any act which hereunder Grantor is required to do; (iii) release any part of the Property, or any interest therein, from the lien and security interest of this Mortgage, or (iv) release any party liable, either directly or indirectly, for the Secured Obligations or for any covenant herein or in any other instrument now or hereafter securing the

payment of the Secured Obligations, without impairing or releasing the liability of any other party. No such act shall in any way impair the rights of Mortgagee hereunder except to the extent specifically agreed to by Mortgagee in a signed writing.

(c)     Actions by Mortgagee. The lien, security interest and other rights of Mortgagee hereunder shall not be impaired by any indulgence, moratorium or release granted by Mortgagee, including but not limited to (i) any renewal, extension, increase or modification which Mortgagee may grant with respect to any of the Secured Obligations, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Mortgagee may grant in respect of the Property, or any part thereof or any interest therein, or (iii) any release or indulgence granted to any endorser, guarantor or surety of any of the Secured Obligations or any security for the Secured Obligations.

(d)     Entire Agreement. The Mortgage constitutes the entire understanding and agreement between Grantor and Mortgagee with respect to the Mortgage and supersede all prior written or oral understandings and agreements between Grantor and Mortgage with respect to the matters addressed in the Mortgage.

(e)     Authority. If Grantor, or any signatory who signs on behalf of Grantor, is a corporation, partnership, limited liability company or other legal entity, Mortgagor and any such signatory, and the person or persons signing for it, represent and warrant to Lender that this instrument is executed, acknowledged and delivered by Grantor's duly authorized representatives

(f)     Rights of Mortgagee. Mortgagee may waive any Event of Default without waiving any other prior or subsequent Event of Default. Mortgagee may remedy any Event of Default without waiving the Event of Default remedied. Neither the failure by Mortgagee to exercise, nor the delay by Mortgagee in exercising, any right, power or remedy upon any Event of Default shall be construed as a waiver of such Event of Default, nor shall it be construed as a waiver of the right to exercise any such right, power or remedy at a later date. No single or partial exercise by Mortgagee of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time. No modification or waiver of any provision hereof nor consent to any departure by Grantor therefrom shall in any event be effective unless the same shall be in writing and signed by Mortgagee and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to nor demand on Grantor in any case shall of itself entitle Grantor to any other or further notice or demand in similar or other circumstances. Acceptance by Mortgagee of any payment in an amount less than the amount then due on any of the Secured Obligations shall be deemed an acceptance on account only and shall not in any way affect the existence of any Event of Default hereunder.

(g)     Notification of Account Debtors.  Mortgagee may at any time during the continuance of an Event of Default notify the account debtors or obligors of any accounts, chattel paper, negotiable instruments or other evidence of indebtedness included in the Collateral to pay Mortgagee directly.

(h)     Fixture Filing. This Mortgage shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property and is to be filed for

record in the real estate records in the Office of the County Clerk where the Property (including such fixtures) is situated. The mailing address of Grantor is set forth above. The address of Mortgagee from which information concerning the security interest may be obtained is as follows: 8 The Green #23817 Dover, DE 19901, Attention: Northwest Registered Agent.

(i)     Dealing with Successors. If ownership of the Property or any part thereof becomes vested in a Person other than Grantor, Mortgagee may, without notice to Grantor, deal with such successor or successors in interest with reference to this Mortgage in the same manner as with Grantor, without in any way vitiating or discharging Grantor's liability hereunder or for the payment and performance of the Secured Obligations. No sale of the Property, no forbearance on the part of Mortgagee and no extension of the time for the payment or performance of any of the Secured Obligations given by Mortgagee shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Grantor hereunder or for the payment or performance of the Secured Obligations or the liability of any other Person hereunder or for the payment or performance of the Secured Obligations, except as agreed to in writing by Mortgagee.

(j)     Further Acts. Grantor, at Grantor's expense, agrees to take such further actions and execute such further documents as Mortgagee reasonably may request to carry out the intent of this Mortgage or to establish and protect the rights and remedies created or intended to be created in favor of Mortgagee hereunder or to protect the value of the Mortgaged Property and the liens and security hereby created in favor of Mortgagee. Grantor agrees to pay all filing, registration or recording fees or taxes, and all expenses incident to the preparation, execution, acknowledgment or filing/recording of this Mortgage or any such instrument of further assurance, except where prohibited by law so to do.

(k)     Notice. Any notice or communication required or permitted hereunder shall be given to the parties' addresses set forth in this Mortgage.

(l)     Successors and Assigns. The terms, provisions, covenants and conditions hereof shall be binding upon Grantor, and the successors and permitted assigns of Grantor including all successors in interest of Grantor in and to all or any part of the Property, and shall inure to the benefit of the Mortgagee and its successors, substitutes and permitted assigns and shall constitute covenants running with the land. All references in this Mortgage to Grantor or Mortgagee shall be deemed to include all such successors, substitutes and assigns.

(m)     Severability. A determination that any provision of this Mortgage is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Mortgage to any Person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other Persons or circumstances.

(n)     Gender and Number. Within this Mortgage, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context otherwise requires.

(o)     Counterparts. This Mortgage may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of

which when taken together shall constitute a single contract.

(p) <u>Modification or Termination</u>. This Mortgage may only be modified or terminated by a written instrument or instruments executed by the party against which enforcement of the modification or termination is asserted. Any alleged modification or termination which is not so documented shall not be effective as to any party.

(q) <u>Negation of Partnership</u>. Mortgagee has no fiduciary or other special relationship with Grantor. Nothing contained herein or in other Loan Documents is intended to create any partnership, joint venture or association between Grantor and Mortgagee, or in any way make Mortgagee a co-principal with Grantor with reference to the Property, and any inferences to the contrary are hereby expressly negated.

(r) <u>Modification by Subsequent Owners</u>. Grantor agrees that it shall be bound by any modification of this Mortgage made by Mortgagee and any subsequent owner of the Mortgaged Property, with or without notice to Grantor, and no such modification shall impair the obligations of Grantor under this Mortgage. Nothing in this Section permits any transfer of the Property that constitutes an Event of Default.

(s) <u>Governing Law</u>. THIS MORTGAGE WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF OKLAHOMA WITHOUT REGARD TO CHOICE OF LAW RULES.

(t) <u>Jurisdiction and Venue</u>. GRANTOR HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT SITTING IN THE COUNTY AND STATE WHERE THE MORTGAGED PROPERTY IS LOCATED WITH RESPECT TO ANY LEGAL ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING FROM OR RELATED TO THIS MORTGAGE AND WAIVES ALL OBJECTIONS WHICH IT MAY HAVE TO SUCH JURISDICTION AND VENUE. NOTHING HEREIN SHALL, PRECLUDE OR PREVENT MORTGAGEE FROM BRINGING ACTIONS AGAINST GRANTOR IN ANY OTHER JURISDICTION AS MAY BE NECESSARY TO ENFORCE OR REALIZE UPON THE SECURITY HEREIN PROVIDED.

(u) <u>WAIVER OF JURY TRIAL</u>. GRANTOR AND MORTGAGEE IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(v) <u>Future Advances</u>. This Mortgage secures future principal advances by Mortgagee to Borrower Parties.

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[SIGNATURE PAGE ATTACHED]*

THIS MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND FINANCING STATEMENT is executed and delivered by the undersigned as of the date indicated at the top of the first page.

**GRANTOR:**
**Jenk's Best Living LLC,**
a Kansas limited liability company

By: Vesta Capital LLC
A Kansas limited liability company, its managing member



By: _____

Aharon Diveroli, Authorized Representative of Lender, Attorney in Fact, on behalf of authorized representative Marc Kulick

STATE OF            )
                    ) ss.
COUNTY OF           )

The foregoing instrument was acknowledged before me on October , 2025, by Aharon Diveroli as authorized representative of YSA Investments 1, LLC as Attorney in Fact on behalf of authorized representative Marc Kulick.

_____
Notary Public

Notary Commission No. HH687186

My Commission Expires: 6/12/2029

[S E A L]

ANTONELLA PILAR YAZBAK
MY COMMISSION # HH 687186
EXPIRES: June 12, 2029

*SIGNATURE PAGE*
*MORTGAGE, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT, AND FIXTURE FILING*

## Exhibit A

### Legal Description

VILLAGE ON MAIN II, an Addition to the City of Jenks, Tulsa County, State of Oklahoma, according to the Recorded Plat thereof.

## COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A.    Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B.    Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ███████████████████████████; (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ████ ████████████████████████████; (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ███████████ ████████████████████████; (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ████████████████████ ████████.

C.    Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ███████████████████████; (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of █████████ ████████████████████████; (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of ███████████ ████████████████████████; (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of ███████████████████████████; (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of █████████████████████████; (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of █████████████████████████; (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ██████████ ████████████████; (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ██████████████ █████████████████; (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ████████████████ ████████; (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of ████████████████████ (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of ███████████████████████; (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of █████████████████████ and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of █████████████████████ █████.

D.    Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

E.   Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F.   In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1.   PLEDGE.

    1.1   SECURITY INTEREST.

        (a)   Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

        (b)   For clarity, it is acknowledged and agreed that the Collateral does not include a personal

residence.

1.2     ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3     UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2.      OBLIGATIONS.

2.1     SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2     DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3.      REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1     FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2     OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3     POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of

Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4    MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5    LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6    CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7    Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4.    COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1    OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

4.2   COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3   DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4   OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

> YSA Investments 1, LLC
> C/O Capital Fund Law Group, P.C.
> Attn: Christopher Rogers
> 405 Lexington Ave, 26th Floor
> New York, New York 10174
> email: ███████████████

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5   RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6   POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7   NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the

Case 26-00176   Doc 12-16   Filed 07/22/26   Page 21 of 41

Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8   INDEMNIFICATION.  In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default.  The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9   TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed $1/10^{th}$ of a percent.

4.10   DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5.   DEFAULT.

5.1   EVENTS OF DEFAULT.  Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

   (a)   a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

   (b)   a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

   (c)   a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

   (d)   a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

   (e)   Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver,

or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f)     an Event of Default occurs under the Note or any other Loan Document.

5.2    REMEDIES UPON DEFAULT. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a)    Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b)    Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c)    Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d)     It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("SEC") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e)     Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

    (i)     Lender conducts the sale in the State of Delaware;

    (ii)    the sale is conducted in accordance with the laws of the State of Delaware;

    (iii)   at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

    (iv)    the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

    (v)     the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

    (vi)    Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f)     Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6.     <u>LIMITATION AS TO PLEDGOR</u>.

6.1      OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2      LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7.      MISCELLANY.

7.1      CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2      PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3      WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4      TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5      CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation,

execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6    CLAIMS UNDER SEAL.   Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7    DEFAULT BY LENDER. Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8    ADDITIONAL WAIVERS.   BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9    MODIFICATIONS. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10    SEVERABILITY. In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11    FURTHER ASSURANCES. Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12    LIMITATIONS OF LAW. If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will

not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13   NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14   INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15   EXECUTION AND STORAGE.

(a)   This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b)   A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

ASSET HOLDER, LLC, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

**PLEDGOR**

VESTA HOLDINGS LLC, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA          )
                                              )
COUNTY OF TULSA            )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

[signature pages continue]

**LENDER**

**YSA INVESTMENTS 1, LLC**, a Delaware limited liability company

By: *Robert Miley*
Name: Robert Miley
Title: Authorized Representative

JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities, and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: _____

Name: Marc Kulick

Date:

STATE OF OKLAHOMA   )
                                 )
COUNTY OF TULSA       )

This instrument was acknowledged before me on February 18th 2025 by Marc Kulick, as and individual.

_____
(Signature of notarial officer)

My Commission Expires: 10|07|2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

## GUARANTY AND ROFO

July 31, 2025

**MARC KULICK**, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS 1, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: ▇▇▇▇▇▇▇▇▇▇▇▇▇ ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Vesta Holdings LLC, an Oklahoma limited liability company (the "**Company**") and Lender.

1.     GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2.     CERTAIN WAIVERS AND REQUIREMENTS.

    a.     The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

    b.     Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

    c.     If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

    d.     Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

    e.     Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

    f.     Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and

|1

effect until the Obligations are satisfied.

g.     Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3.     RIGHT OF FIRST OFFER.

    a.     CERTAIN DEFINITIONS.

        i.     "**Loan**" shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

        ii.     "**Opportunity Notice**" shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

    b.     ROFO.

        i.     Offer. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the "**ROFO**"). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

        ii.     Response. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

    c.     RENEWED RIGHT. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed

with respect thereto.

d.    TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4.    REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a.    This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b.    Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c.    As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d.    As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

e.    All of the items provided by Guarantor to Lender via email and access to one or more cloud storage environments prior to the Effective Date related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "**Material Change**"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

5.    COVENANTS.

a.    OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

        YSA Investments 1, LLC
        C/O Capital Fund Law Group, P.C.

13

Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: █████████████████

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c. SCHEDULE OF REAL ESTATE OWNED. By August 4, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of August 4, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of the date it was last provided to Lender remains true, correct, and complete as of August 4, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

d. TRAILING REPORTS. By or before August 4, 2025, Guarantor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

e. DOMO REPORTING ACCESS. By or before August 4, 2025, Guarantor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Guarantor provide additional information and data related to the same, and Guarantor shall make a good faith effort to provide such information and data to Lender.

6. EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an "**Event of Default**." Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7. MISCELLANY.

a. All notices, requests, consents, approvals, demands and other communications required or allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b. Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c. No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e. Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f. This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein—shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the

other party that pertains to or arises from this Guaranty. Notwithstanding anything in this Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g.   Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h.   Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i.   This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j.   This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k.   This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

**GUARANTOR**

**MARC KULICK**, an individual

STATE OF OKLAHOMA     )
                      )
COUNTY OF TULSA       )

This instrument was acknowledged before me on July 31, 2025 by Marc Kulick, an individual.

(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

[signature pages continue]

## JOINDER

Lender joins this Guaranty for the sole purpose of acknowledging and agreeing to §3 hereof.

YSA Investments 1, LLC, a Delaware limited liability company

By: *Robert Miley*
Name: Robert Miley
Title: Authorized Representative

18

**<u>Schedule</u>**

Doc #: 2025099639   Page 39   Page 39 of 41   Doc 12-16   Filed 07/22/26   Page 39 of 41   Case 26-00176   Page 39 of 40

Marc Kulick

**Schedule of Real Estate Owned**

| Property Name/Entity/ Effml | Address | City | State | Type | # of Units or Size | Class |
|---|---|---|---|---|---|---|
| Thrive Argenta | 501 N Magnolia St | North Little Rock | AR | Multifamily | 164 | A |
| Lexington Commons | 5530 Colony Way | Bartlesville | OK | Multifamily | 206 | B |
| Thrive Jenks | 204 S Peoria Ford Dr | Jenks | OK | Multifamily | 168 | A |
| Lakeside Place | 2386 S 99th E Ave | Tulsa | OK | Multifamily | 208 | B |
| Shoreline Apartments | 9661 E 31st Pl | Tulsa | OK | Multifamily | 464 | B |
| Remington Ranch | 1815 N Boomer Rd | Stillwater | OK | Multifamily | 292 | C |
| Seminole Ridge | 125 W Interstate 240 Service Rd | Oklahoma City | OK | Multifamily | 224 | C |
| Tuscany Village | 6900 London Way | Oklahoma City | OK | Multifamily | 316 | C |
| The Canopy Apartments | 9701 Kanis Rd | Little Rock | AR | Multifamily | 240 | B |
| Barcelona | 5160 S Yale Ave | Tulsa | OK | Multifamily | 252 | B |
| Wedgewood Village | 4101 Northwest Expy | Oklahoma City | OK | Multifamily | 308 | B |
| Esplanade By the Lake | 4691 W Nicklas Ave | Oklahoma City | OK | Multifamily | 136 | B |
| Mansion West | 8970 NW 50th St | Oklahoma City | OK | Multifamily | 79 | B |
| Salem West | 3970 NW 50th St | Oklahoma City | OK | Multifamily | 34 | B |
| 23 East | 11321 E 23rd St Unit 1 | Tulsa | OK | Multifamily | 236 | C |
| Villas at Midtown | 2001 E Skelly Dr | Tulsa | OK | Multifamily | 475 | C |
| The Classen | 2200 N Classen Blvd | Oklahoma City | OK | Multifamily | 56 | A |
| Putnam Green | 7525 Knight Lake Dr | Oklahoma City | OK | Multifamily | 250 | C |
| River Walk | 410 E Marion Rd | Wichita | KS | Multifamily | 558 | B |
| Riverpark Apartments | 7805 S Wheeling Ave | Tulsa | OK | Multifamily | 400 | B |
| Drexel Flats | 8800 Drexel Ave | Oklahoma City | OK | Multifamily | 400 | B |
| The Ridge | 3834 N Oak Grove Dr | Midwest City | OK | Multifamily | 278 | C |
| Lofts at North Penn | 15001 N Pennsylvania Ave | Edmond | OK | Multifamily | 192 | A |
| Village Creek at North | 6630 S Yates Ave | Tulsa | OK | Multifamily | 226 | C |
| The Montgomery | 500 W Main St | Oklahoma City | OK | Multifamily | 71 | A |
| 727 Lofts | 727 E Main Pl | Jenks | OK | Multifamily | 98 | A |
| The Montage | 5041 NW 41st St | Oklahoma City | OK | Multifamily | 165 | C |
| Fairfax Apartments | 7801 Ne 10th St | Midwest City | OK | Multifamily | 252 | C |
| Woodland Oaks | 7142 S 92nd East Ave | Tulsa | OK | Multifamily | 423 | B |



| | | | | | | |
|---|---|---|---|---|---|---|
| Bryan Hills | 7204 NW 36th St | Bethany | OK | Multifamily | 232 | C |
| Springdale Village | 4330 S Barnes Ave | Oklahoma City | OK | Multifamily | 128 | C |
| Summer Oaks | 5720 NW 16th St | Oklahoma City | OK | Multifamily | 132 | C |
| One Dion Square | 8111 E 69th St | Tulsa | OK | Multifamily | 448 | B |
| Wood and Manor | 8640 E 61st St | Tulsa | OK | Senior | 203 | B |
| Essex Place | 513 E Douglas Ave | Wichita | KS | Multifamily | 117 | A |
| Windhorse | 4217 N Meridian Ave | Oklahoma City | OK | Multifamily | 498 | B |
| Copperfield Apartments | 2437 NW 35th St | Oklahoma City | OK | Multifamily | 262 | B |
| Capitol on 28th | 215 NE 28th St | Oklahoma City | OK | Multifamily | 231 | B |

Warning: HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (U.S.C. 1001, 1012, 1012; 31 U.S.C. 3729, 3102)

Office of the County Treasurer
Tulsa County, Oklahoma
## MORTGAGE AFFIDAVIT

In a Real Estate Mortgage executed on the <u>29</u> day of <u>October</u>, <u>2025</u>,
by <u>Jenk's Best Living LLC</u>
MORTGAGOR and,
<u>YSA Investments 1, LLC</u>
MORTGAGEE
I hereby certify that:

The TERM of the mortgage or extension of mortgage is:

| | | |
|---|---|---|
| _____ | 5 years or more | |
| _____ | 4 years and less than 5 years | |
| _____ | 3 years and less than 4 years | |
| _____ | 2 years and less than 3 years | |
| **X** | Less than 2 years - 11.7.25 | |

The **current principal balance** of the mortgage/modification of mortgage is <u>$7,493,673.51</u>.

Mortgage Tax Payment of <u>$1,498.74</u> (excluding $5.00 certification fee) is the TOTAL TAX

DUE AT THIS TIME as provided by Oklahoma Statute Title 68 § 1901 *et. seq.*

If this mortgage is split between counties, states or multiple properties, state the amount of the mortgage applicable to this property/Tulsa County here: <u>N/A</u>

Is this mortgage being filed for additional collateral/abundance of caution only? Yes/No <u>No</u>

### COMPLETE THE SECTIONS BELOW FOR MODIFICATIONS/EXTENSIONS OF MORTGAGE:

Does the modification contain verbiage about new money/advancing new funds?  If Yes, state the amount of new money/funds advanced: _____.

List **ALL** prior mortgage tax payments below.  If more lines are needed, attach a separate sheet.

| Receipt # | Date Tax Paid | Amount Paid | Receipt # | Date Tax Paid | Amount Paid |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

I verify that all of the information provided in this affidavit is true and correct to the best of my knowledge, and that I am in a position of responsibility to have this knowledge.
I am <u>David Limekiller, Esq.</u>, the affiant, signing this affidavit for the above named Mortgagee.

DATE: <u>10/30/25</u>

_____
(Signature of Affiant)

Subscribed and sworn to before me this <u>30th</u> day of <u>October</u>, <u>2025</u>.

_____
Patricia J Hudson

(Seal)
Commission #
01010966

Notary Public

My Commission Expires: <u>07/02/2029</u>.