IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MARC KULIC, VESTA HOLDINGS, LLC, and    :
ASSET HOLDER, LLC,                       :
                                         :
              Plaintiffs,                :
                                         :
      v                                  : C. A. No.
                                         : 2025-1319-MTZ
YSA INVESTMENTS 1, LLC,                   :
                                         :
              Defendant.                  :

                        - - -

            Chancery Courtroom 12A
            Leonard L. Williams Justice Center
            500 North King Street
            Wilmington, Delaware
            Thursday, March 5, 2026
            9:15 a.m.

                        - - -

BEFORE: HON. KATHALEEN St.J. McCORMICK, Chancellor

                        - - -

PRELIMINARY AND PERMANENT INJUNCTION HEARING

CHANCERY COURT REPORTERS
500 N. King Street, Ste 11400, Wilmington, DE
(302) 255-0526

2

APPEARANCES:

      SEAN J. BELLEW, ESQ.
      Bellew LLC
            -and-
      BENJAMIN H. BRODSKY, ESQ.
      MICHAEL FISHER, ESQ.
      of the Florida Bar
      Brodsky Fotiu-Wojtowicz, PLLC
        for Plaintiffs

      SARAH R. MARTIN, ESQ.
      Greenberg Traurig, LLP
            -and-
      JOEL TASCA, ESQ.
      KERRY KLEIMAN, ESQ.
      of the Nevada Bar
      Greenberg Traurig, LLP
        for Defendant

                              - - -

THE COURT:  Good morning, everyone. Let's begin with introductions, please.

ATTORNEY MARTIN:  Good morning, Your Honor.  Sarah Martin from Greenberg Traurig on behalf of defendants.  With me today are my colleagues Joel Tasca --

ATTORNEY TASCA:  Good morning, Your Honor.

ATTORNEY MARTIN:  -- Ms. Kerry Kleiman, and also our paralegal, Hilari Alberto.

And, Your Honor, after we're finished introductions and I turn it over to Mr. Bellew, I have one short housekeeping matter before we start examinations.

THE COURT:  Sure.

ATTORNEY BELLEW:  May it please the Court.  Your Honor, with me -- obviously, I'm Sean Bellew on behalf of the plaintiff.  With me at counsel table are my co-counsel Ben Brodsky and our principal, Marc Kulick, and to his left is Michael Fisher.

THE COURT:  Thank you.

Let's go with the housekeeping matters.

ATTORNEY MARTIN:  So, Your Honor,

4

pursuant to paragraph 53 of the pretrial order, "If a Party intends to seek to present at trial videotaped deposition[s] [] in lieu of live testimony," the parties were supposed to designate "specific videotaped designations of the testimony to be presented."

As of yesterday, we had not received any notices of designation of videotaped testimony from plaintiffs.  And so we emailed them and said please let us know your designations; we haven't received them; you were supposed to send them under the pretrial order.  And the response we received is: We designate the entirety of the depositions of Mr. Diveroli and Mr. Miley.

The point of the designation process is so that they can play clips of the depositions and that we can provide objections to those clips and provide notice of counter-designations.  Obviously, we can't just play the entire deposition testimonies in court today.  First of all, both of those individuals are live witnesses here, but that would also eclipse the entire trial time.

So we object to the use of any deposition testimony as part of plaintiffs' case in

5

chief because they did not designate any deposition testimony or give us the opportunity to counter-designate in compliance with the pretrial order.

THE COURT:  Thank you.

Response?

ATTORNEY BRODSKY:  Your Honor, we're withdrawing any deposition designations.  We're going to proceed with just live testimony today.

THE COURT:  Anything further?

ATTORNEY MARTIN:  No, Your Honor.

THE COURT:  I thought there was a provision of the pretrial order that provided for the sequestration of witnesses.  Is that correct?

ATTORNEY MARTIN:  There is, Your Honor.  Mr. Kulick, I believe, is the first witness. So we don't object to his sequestration at this point. And none of our witnesses, with the exception of our expert witness, are present in the courtroom.

THE COURT:  Got it.  Thank you.

Another housekeeping matter.  I'm sorry, Mr. Kulick, but I think they spelled your name wrong in the caption in this case.  And in order for it to be fixed, you need to move to amend the caption.

**M. Kulick - Direct**

6

So if you don't, then his name will be spelled wrong when I issue a decision because I am bound by what you put before me.

All right.  Let's call our first witness.

ATTORNEY BRODSKY:  Your Honor, the plaintiffs will call Marc Kulick.

**MARC KULICK, having first been duly affirmed, was examined and testified as follows:**

ATTORNEY BRODSKY:  May it please the Court, Ben Brodsky on behalf of plaintiffs.  May I proceed?

THE COURT:  Yes.

**DIRECT EXAMINATION**

BY ATTORNEY BRODSKY:

Q.       Please state your name for the record.

A.       My name is Marc Kulick.

Q.       Marc, Mr. Kulick, what's your profession?  What do you do for a living?

A.       I have a property -- real estate property management company, and a subsequent real estate investment firm.

Q.       Do you manage a portfolio of multifamily real estate assets?

M. Kulick - Direct

7

A.          Yes, I do.

Q.          And how many multifamily real estate assets do you manage?

A.          At present, 34.

Q.          And how are those multifamily real estate assets that you manage, how are they owned? What's the ownership structure?

A.          They are owned in -- each asset is owned in a limited liability company. They're all single-purpose entities. And they're owned -- different structures throughout the portfolio.

Q.          Does each of the asset -- or is each of the assets held in a holding company structure?

A.          So there's typically -- there's typically an entity that owns the properties. And then there's going to be intermediary holding entities below that, however you say that. And the investors invest through the intermediary holdings entities. There are some of my ownership structures that have what's called a TIC or a tenancy in common, where there might be two direct or three direct borrowers.

Q.          In those TIC structures, is there similarly holding companies for each of the TIC owners with respect to the ownership of the real estate?

**M. Kulick - Direct**

8

A.        Yes, that's correct.

Q.        If I refer during your examination to the actual companies that own the fee, the property owners, as the title owners, will you know what I'm talking about?

A.        Yes.

Q.        Who are the plaintiffs in this case?

A.        The plaintiffs are myself, Asset Holder, LLC, and Vesta Holdings, LLC.

Q.        What's the relationship between you and Vesta Holdings and Asset Holder?

A.        Asset Holder and Vesta Holdings are owned and managed by me.

Q.        So Marc Kulick is the sole owner of each of those limited liability companies?

A.        That is correct, yes.

Q.        And the manager?

A.        That is correct.

Q.        And what is the relationship between Vesta Holdings and Asset Holder on the one side and the title owners on the other?

A.        Vesta Holdings and Asset Holder would be where I house my personal investments in some of these deals, in some of the multifamily assets that we

**M. Kulick - Direct**

9

own and operate.

Q.      And in that holding company structure we talked about, in which entity does Vesta Holdings and Asset Holder hold its interests?

A.      In the intermediary holdings entities.

Q.      So is it fair to say that Vesta Holdings and Asset Holder own an indirect interest through a holding company in some of the title owners that are at issue in this case?

A.      Yes.

Q.      Do Vesta Holdings and Asset Holder own anything other than membership interests in those intermediate holding companies?

A.      No.

Q.      Do you know somebody by the name of Efraim Diveroli?

A.      Yes, I do.

Q.      And how do you know Mr. Diveroli?

A.      I was introduced to Mr. Diveroli in April of 2024.

Q.      And what were the circumstances under which you were introduced to Mr. Diveroli?

A.      I have a partner, an investor, who was helping me secure either short-term or long-term

**M. Kulick - Direct**

10

funding arrangements.  And he had been introduced to Mr. Diveroli, and he thought that the introduction might be fruitful.

Q.      Did you discuss obtaining financing from Mr. Diveroli?

A.      Yes.  In April of 2024, we discussed potential -- a potential deal.  But it subsequently didn't happen.

Q.      Did you ultimately receive funding from Mr. Diveroli?

A.      Yeah.  In October of -- in October of '24, Mr. Diveroli and I actually did our -- completed what I would consider our first deal together.

Q.      And did Mr. Diveroli provide capital to you in his individual capacity or through a company?

A.      No.  It was through an entity called YSA Investments 1, LLC.

Q.      For this October 2024 transaction, just describe it to me generally.  What was the nature of the transaction?

A.      It was a $775,000 loan over a period of 90 days.  The payback was 90 days.  And I believe the interest rate was 85 percent.

**M. Kulick - Direct**

11

Q.      Did you give YSA -- let me back up.

Were you the borrower in your individual capacity?

A.      No.  The borrower was Asset Holder, LLC.

Q.      Did you or any of your entities pledge any collateral to secure repayment of the loan?

A.      Yes.

Q.      What was the collateral that was pledged for that October 2024 loan?

A.      The borrower, which was Asset Holder, LLC, pledged four membership interests in the intermediary holdings companies, and Vesta Holdings pledged 13 membership interests as pledgor.

Q.      So other than the membership interest in those 17 companies, was there any other collateral provided as security for the October 2024 loan?

A.      No, there was not.

ATTORNEY BRODSKY:  Your Honor, may I approach the witness with an exhibit?

THE COURT:  Yes.

ATTORNEY BRODSKY:  Would the Court like a copy?

THE COURT:  It would be easier if you

M. Kulick - Direct

12

gave me a copy.  Do you not have witness binders?

ATTORNEY BRODSKY:  I just have paper copies in folders.

THE COURT:  Please do give me a copy, yes.

BY ATTORNEY BRODSKY:

Q.      Mr. Kulick, do you recognize what I've handed to you as Joint Exhibit 10?

A.      Yes, I do.

Q.      What is this?

A.      This is the complement of loan documents between Asset Holder and YSA from October.

Q.      And what instruments comprise the loan documents for this October 2024 loan?

A.      There is a promissory note, a guaranty and ROFO, a collateral pledge and security agreement, and a confession of judgment.

Q.      Was this a short-term loan?

A.      Yes.  It would be reasonably short term.  90 days, yes.

Q.      After the loan was made, did YSA record UCC-1 financing statements against some of the membership interests that were pledged?

A.      Yes.  They filed UCCs on the

**M. Kulick - Direct**                    13

membership interests pledged by Asset Holder, LLC.

ATTORNEY BRODSKY:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY ATTORNEY BRODSKY:

Q.      Do you recognize Joint Exhibit 11?

A.      Yes, I do.

Q.      What is this?

A.      These are the filed UCC financing statements from the October 2024 loan.

Q.      And these were the UCC-1s filed by YSA?

A.      That is correct, yes.

Q.      Did YSA record any mortgages in connection with the October 2024 loan?

A.      No, they did not.

Q.      Was the October 2024 loan repaid?

A.      Yes, it was.

Q.      After the October 2024 loan, did you enter into additional loan transactions with YSA?

A.      Yes, I did.

Q.      Between October of 2024 and February 10, 2024, how many loan transactions did you and your entities enter into with YSA?

M. Kulick - Direct

14

A.          Five.

Q.          Were the loan documents that you used for those five additional transactions essentially identical in form to Joint Exhibit 10?

A.          Yes, they were.

Q.          Were they for more or less the same amount?

A.          Yes, they were.

Q.          Were these also short-term loans?

A.          Yes, but they were shorter in duration.

Q.          Days instead of months?

A.          That is correct, yes.

Q.          Was the same collateral pledged?

A.          Yes, it was.

Q.          Were those six loans, the October loan and the five that followed, all paid off?

A.          Yes, they were.

Q.          I want to focus on the next loan transaction that came to be after those six earlier ones paid off.

Did you enter into another loan transaction with YSA on February 18, 2025?

A.          Yes, I did.

**M. Kulick - Direct**
15

Q.        Was the amount of that February 18th loan the same as the prior loans?

A.        No.  It was a higher amount.

Q.        How much was it?

A.        1.5 million in facial value and a little bit over 1.25 net of the fees that YSA took at close.

Q.        Were the loan documents for the February 18th, 2025, loan transaction the same as the prior six loans?

A.        Substantially, yes, but they had a joinder that was affixed to the end of the collateral pledge and security agreement.

ATTORNEY BRODSKY:  May I approach, Your Honor?

THE COURT:  Yes.

BY ATTORNEY BRODSKY:

Q.        I'm showing you Joint Exhibit 16, which you have a copy.  Can you identify this document?

A.        These are -- this is the complement of loan documents from the February 18th, 2025, loan between Asset Holder and YSA.

Q.        And what instruments comprise the loan

**M. Kulick - Direct**                16

package for the February 18, 2025, loan?

A.          It's going to be the same instruments: the promissory note, the collateral pledge and security agreement, the guaranty and ROFO, and the confession of judgment.

Q.          I'm putting on the ELMO page 9 of Joint Exhibit 16.

What are we looking at here?

A.          These are the -- this is what was pledged under the collateral pledge and security agreement.

Q.          Now, the first page of the collateral pledge and security agreement has six recitals.

Do you see that?

A.          Yes, I do.

Q.          And Recital B, C, D, E, and F have some defined terms.

Do you see that?

A.          Yes, I do.

Q.          Is the term "Borrower Entit[y]" defined?

A.          Yes, it is.

Q.          What is a "Borrower Entity" under the CPSA?

If I refer to the collateral pledge and security agreement as the CPSA, will you know what I'm referring to?

A.          Yes, I will.

Q.          How is "Borrower Entity" defined under the CPSA?

A.          Those are the membership interests that are owned by Asset Holder, LLC.

Q.          Are they the membership interests or the entities in which the membership interests are held?

A.          They are specifically the Asset Holder, LLC ownership in that entity.

Q.          Well, what's the definition of "Unencumbered Interest[]"?

A.          "Unencumbered interests" are -- on the Asset Holder, LLC pledge, these assets were unencumbered by any other UCCs or liens or any sort of prioritization; whereas the Vesta Holdings had encumbrances previously.

Q.          So is it fair to say that what's listed here are unencumbered interests that "Borrower," defined as "Asset Holder," owns in certain entities defined as "Borrower Entity"?

M. Kulick - Direct

18

A.          Yes.

Q.          Is the term "Pledgor Entity" defined in Recital C?

A.          Yes, it is.

Q.          And what is a "Pledgor Entity"?

A.          Those were the membership interests owned by Vesta Holdings in the 13 limited liability companies that are listed on that document.

Q.          Is "Encumbered Interest[]" defined?

A.          Yes, it is.

Q.          What is an "Encumbered Interest[]"?

A.          Vesta Holdings' interests had a prior UCC filing.

Q.          So is it fair to say that what is defined in Recital C are the interests held by Vesta Holdings in 13 companies defined as the "Pledgor Entities"?

A.          That is correct, yes.

Q.          Recital D, what's the definition listed there?

A.          On "Interests"?

Q.          Yes.

A.          "Interests" are the combination of the unencumbered and the encumbered interests.

M. Kulick - Direct

19

Q.        So you understood that "Interest[]" was defined as your -- through entities you owned, membership interest in 17 limited liability companies?

A.        That is correct.

Q.        Recital E, what's the definition there?

A.        That the "Entities" are the borrower entities and the pledgor entities combined.

Q.        So the term, defined, "Entities" refers to those 17 limited liability companies in which you, through entities, own interests?

A.        That is correct, yes.

Q.        And is "collateral" a defined term in the document?

A.        Under 1.1, yes, it is.

Q.        And how is "Collateral" defined?

A.        The collateral is the -- is defined as the interests that are owned in the entities that are listed on the CPSA.

Q.        So the defined "Interests" owned in the 17 enumerated entities?

A.        That is correct, yes.

Q.        Does the "Collateral" definition, to your understanding, include any real property?

CHANCERY COURT REPORTERS
500 N. King Street, Ste 11400, Wilmington, DE
(302) 255-0526

M. Kulick - Direct

20

A.      No, it does not.

Q.      I think you mentioned the joinder in your earlier testimony.  Let's flip to that.  I'm looking at page 22 of Joint Exhibit 16.

Do you recognize this?

A.      Yes, I do.

Q.      What is this?

A.      This is the joinder that we affixed to the end of the CPSA, the February loan, February 18th loan.

Q.      Could you publish into the record what the joinder states?

A.      Would you like me to read the joinder in its entirety?

Q.      Yes, please.

A.      "The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of th[e] certain Collateral Pledge and Security Agreement dated February 18, 2025 (the 'Collateral Pledge and Security Agreement') hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral

Pledge and Security Agreement for all purposes thereof on the terms set forth therein to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof."

Q.      There's a capital P "Pledgor" in that language you just read; correct?

A.      Yes, there is.

Q.      Who is the capital P "Pledgor"?

A.      Vesta Holdings.

Q.      What did you understand the purpose of the joinder to be at the time you signed it?

A.      During the negotiations leading up to the February 18th loan, there had been a concern that had developed that I could -- because I have so many entities, so many investors, an expansive universe -- that I could move the collateral between, I could sell, I could -- I could somehow damage YSA's collateral, rendering the CPSA worthless.

So the concept of the joinder was to say if this collateral exists in the Vesta universe, no matter where it is, it's YSA's.

Q.      Had you had discussions with YSA

**M. Kulick - Direct**

22

before this joinder was prepared and executed about their concerns to that effect?

A.     Yes, I had.

Q.     Who prepared this joinder?

A.     It was YSA.  It would have been either Robert Miley or Christopher Rogers, or some combination of the two.

Q.     Did you make any edits to this?

A.     None whatsoever.

Q.     Why not?

A.     Because it says what I meant it to sign -- it says what I meant to sign.

Q.     Were you represented by a lawyer in this transaction?

A.     No, I was not.

Q.     Does this joinder reference any additional collateral being pledged?

A.     No, it does not.

Q.     Does it reference any right to record mortgages against real property?

A.     No, it does not.

Q.     Did you pledge any additional collateral through this joinder?

A.     No, I did not.

**M. Kulick - Direct**

23

Q.        Did you intend for the joinder to expand YSA's collateral to include additional collateral?

A.        No.  As a matter of fact, in the lead-up to the joinder being signed, I said no additional collateral would be pledged in this loan.

Q.        At any time in your negotiations with YSA, did you ever agree to pledge real property as collateral?

A.        In April we had a separate discussion. But no, we never pledged -- at no point did we ever pledge real property as collateral.

Q.        So you had discussions with somebody on the YSA side about giving a second mortgage, but that did not come to fruition?

A.        Yes.  That was on a separate loan transaction in April of 2025.

Q.        Let's talk about that April 2025 loan transaction.

          Was that loan different than the loan transactions that came before?

A.        Yes, it was.

Q.        How so?

A.        We were interested in acquiring a new

**M. Kulick - Direct**

24

property called Parc 1010 in Tulsa, Oklahoma.  YSA was evaluating a couple of different financing options and participation options.  And we discussed at one point, to further secure their position, granting a second mortgage on the property after acquisition.

Q.       Did you individually and through your entities enter into a loan transaction with YSA in April 2025?

A.       Yes, we did.

ATTORNEY BRODSKY:  May I approach, Judge?

THE COURT:  Yes.

ATTORNEY BRODSKY:  Sorry, Chancellor. I'm sorry.  I apologize.

THE COURT:  That's all right.

ATTORNEY BRODSKY:  Old habits die hard, I guess.

BY ATTORNEY BRODSKY:

Q.       Do you recognize what I've handed you as Joint Exhibit 17?

A.       Yes.  This is the April 9th, 2025, collection of documents for the loan agreement.

Q.       Was there an additional document as part of this April 2025 loan transaction that had not

**M. Kulick - Direct**                                    25

been executed in prior transactions between you and your entities and YSA?

A.        Yes, there was.  It's called a membership interest pledge agreement, or a MIPAA as it's generally referred to in our industry.

Q.        I'm putting up on the ELMO page 34 of Joint Exhibit 17.

Do you recognize this?

A.        Yes, I do.

Q.        What is it?

A.        This is the "Membership Interest Pledge and Assignment Agreement" assigned in the April 9th loan package.

Q.        Who prepared this document?

A.        It would have been somebody on the YSA side.  I don't know if it would have been Christopher Rogers or Robert Miley.

Q.        Did YSA insist that you execute this document in order to close the April loan transaction?

A.        Yes, they did.

Q.        What does the MIPAA provide?

A.        The MIPAA provides a pledge of Kulick Manager, LLC's membership interests in Parc 1010 -- in the Parc 1010 HoldCo.

**M. Kulick - Direct**

26

Q.      What is Kulick Manager, LLC?

A.      Kulick Manager, LLC is an entity that I own -- that I solely own and manage that does the same thing as Vesta Holdings and Asset Holder.  It holds membership interests, and it also has managerial rights over some of the entities.

Q.      When was Kulick Manager, LLC formed?

A.      It was formed somewhere in the fall of 2024.

Q.      So Kulick Manager, LLC was in existence as of February 2025?

A.      Yes, it was.

Q.      Would you have needed to pledge your interests in Kulick Manager, LLC if you had already pledged all your assets to YSA through the February 18, 2025, transaction?

A.      No, I would not have.

Q.      Did you have discussions with anybody at YSA about the MIPAA?

A.      Yes, we discussed the MIPAA.  At the same -- the MIPAA came about during the negotiations leading up to the loan, which was -- at first maybe a second mortgage was floated.  But the MIPAA was instead of the second mortgage.

**M. Kulick - Direct**                    27

Q.        When you were discussing the second mortgage, who were -- let me back up.

Who were you discussing the second mortgage with?

A.        I discussed the concept of a second mortgage with Efraim Diveroli directly.

Q.        Did Mr. Diveroli ever say to you, "Hey, I don't need a second mortgage because I already have the right to get second mortgages under the February 18th loan documents"?

A.        No, he did not.

Q.        Looking at page 35 of Exhibit 17, did you have to make certain representations to YSA as part of your -- as part of the MIPAA in the April loan package?

A.        Yes, I did.

Q.        Publish 3.2.

A.        "Liens, Claims, Encumbrances, []. Pledgor owns the Pledged Interest free and clear of any material liens, claims, encumbrances or security interests of any kind or nature whatsoever."

Q.        If you had pledged all of your assets to YSA in February 2025, would you have been able to truthfully make that representation?

M. Kulick - Direct

28

A.        No, I would not have.

Q.        Looking at the first page of Exhibit 17, what's the interest rate?

A.        The interest rate was 1,500 percent.

Q.        Did that interest rate compound?

A.        Yes, it did.  It compounded monthly.

Q.        After the April 2025 loan transaction, did you enter into any additional loan transactions with YSA?

A.        Yes.  We entered into a loan transaction in June of 2025 and then two in July of 2025.

Q.        I want to focus on the July ones. With respect to -- do you remember the dates of the July loan transactions?

A.        My belief is that one was July 16, 2025, and I know that the other one was July 31st, 2025.

Q.        Was the form of the July 16th and July 31st loan documents essentially identical to the February 18th, 2025, loan?

A.        Yes, they were.

Q.        What about the interest rates?

A.        The interest rates were higher than

**M. Kulick - Direct**                                    29

the February 2025 loan, significantly.

Q.        How much higher?

A.        The July 16th loan was, I believe, 985 percent, if I'm not mistaken.  And the July 31st loan was 7,000 percent interest.

Q.        Did those interest rates compound?

A.        At the time I didn't realize this, but, yes, they compound daily.

Q.        Why did you agree to rates of this magnitude?

A.        Throughout 2025, I was desperate for access to money to come into my business.  I was making agreements that I thought I could stand by and live with.  I did conceptualize those as fees rather than interest rates, and that was the comfort that I had.  And I really didn't conceptualize how it could be used against me later on.

Q.        Other than these loan transactions that we've been discussing, did you have other business discussions with YSA?

A.        Yes, we did.

Q.        And what were they say?

A.        In June  -- I think it was June  -- the conversations likely started in May.  By but

**M. Kulick - Direct**

30

June of 2025, YSA had sent me a term sheet under the title of "Philadelphia."  And that term sheet was to provide somewhere between 25 to $50 million of tranched financing into Vesta, into my organization.

And it had diligence requests which were substantial.  It had collateral demands which were substantial as well.  It had a lower interest rate because, in theory, it was higher -- the security was higher.

Q.      What was the value of the unsecured real estate across all the companies you manage in the portfolio?

A.      You mean just the total valuation of all the properties?

Q.      Yes.

A.      It varies on a month-to-month basis.  But call it in the July time frame, it would have been somewhere around $900 million.

Q.      As part of this Philadelphia transaction, did YSA engage in any due diligence?

A.      Yes, there was a substantial due diligence process.

Q.      Did you turn over documents to YSA?

A.      Between June of 2025 and October of

**M. Kulick - Direct**                    31

2025, we turned over what I would venture as almost every document in existence in Vesta.  They had full, unadulterated access to our third-party property management system when they came to visit us in October.  They had every -- I believe they had every operating agreement.  They had all property bank statements.  They had -- I don't know of anything that was left off of their diligence portfolio.

Q.        By virtue of the documents you provided to YSA, were they able to see other financing that you were bringing in at the time?

A.        Yes.  Yes, they were.

Q.        Did YSA ever ask you about that other financing you were taking?

A.        Sure.  We had conversations about other financing I was taking, yes.

Q.        And did you disclose to people at YSA, including Mr. Diveroli, that you were taking additional financing in addition to his?

A.        Yes, absolutely.

Q.        At any time during this Philadelphia process that began in May/June of 2025, did YSA take the position with you that they already had the right to record second mortgages on the title owners'

**M. Kulick - Direct**

32

properties?

A.          No, they did not.

Q.          At the end of the -- well, as part of the due diligence process for the Philadelphia transaction, did anybody from YSA ever come to where you do business to look at the assets?

A.          Yes.  In October of 2025, representatives of YSA and also Diveroli Investment Group came to Tulsa, which would have been Efraim Diveroli, Jonathan Berney, Parker Detweiler.  Those were the people that came to Tulsa.

Q.          And what happened during that trip in October 2025?

A.          It was a multiple-day trip.  They wanted to see -- they were not interested in seeing the nicest properties.  Their instruction was they wanted to see the worst units at the worst properties.

And the intention behind that, so they said -- which made sense to me at the time -- was they don't care how good things are; they want to know if they are going to be putting this sort of money in, how bad things were.  So we spent our time at the worst properties in the -- looking at the worst units in those properties.

M. Kulick - Direct

33

Q.        After doing those tours with YSA's representatives, did you have a meeting with them?

A.        Yes.  After the tours were done -- I believe it was the next day -- they asked me to come to their hotel, and we had a meeting in a conference room.

In that meeting, they -- again, it was Efraim Diveroli, Parker Detweiler, and Jonathan Berney.  When I sat down, they said, look -- Mr. Diveroli said because of the compounding and the late fees and all that, you owe us well over a billion dollars.

And I objected to that at the time.  I said that didn't sound like it was legal.  And they assured me that they found no case law in Delaware that would ever overturn such an interest rate.  They told me that basically they now own my entire portfolio, and I can either do this the easy way or the hard way was the concept.

Q.        So what was the outstanding principal balance at the time?

A.        I believe it was something between 2.4 million and 2.45 million.

Q.        So on 2.4 to $2.45 million of

**M. Kulick - Direct**

34

outstanding principal, Mr. Diveroli was saying you owe me billions and I own your entire portfolio?

A.        Yes, that is correct.  And at the time we had paid back 2.77.  So they were already in the black on that 2.45.

Q.        So you said something about the easy way or the hard way.  What was the easy way that Mr. Diveroli expressed to you?

A.        The easy way -- Mr. Diveroli and Mr. Detweiler said that they would accept deeds in lieu of foreclosure on every asset.  I expressed to them that not only did I think I could do that, but even if I did, it would likely land me in jail.

They claimed that they had a mechanism to protect me, which they called a "bomb shelter" approach.  And they offered me money if I were to accept their offer and do the deeds in lieu of foreclosure.

The hard way was they had drafted a complaint in -- I believe it was Delaware Superior Court.  I'm not 100 percent sure if it was Delaware Superior or Chancery.  The complaint was salacious. It accused me of all sorts of fraud and embezzlement.

It also included my wife as a

**M. Kulick - Direct**
35

"co-conspirator."  It included two of my lawyers.  It included my rabbi.  It included my COO.  And it was full of inaccuracies and misleading statements.  You know, it was pretty intense.

ATTORNEY BRODSKY:  May I approach the witness, Chancellor?

Q.      Do you recognize what I put on the screen as Exhibit 23?

A.      Yes, I do.

Q.      What is it?

A.      This was the email that the representative for YSA, Mr. Tasca, sent to my attorneys on November 7.

Q.      What did you understand that Mr. Tasca was communicating in this letter?

A.      In a more refined way, he was reiterating the same concept: we can do this the easy way or we can do this the hard way.

Q.      Did he attach a draft complaint to the email?

A.      Yes, he did.

Q.      And what were the nature of the allegations in the draft complaint?

A.      It was the same -- it was obviously --

**M. Kulick - Direct**                                        36

it was a version they had worked on of the same draft complaint that Mr. Diveroli and Mr. Detweiler and Mr. Berney had shown me in Tulsa a couple weeks before.

Q.      Did they allege your wife -- or name your wife as a defendant?

A.      Yes, they did.

Q.      And allege she was part of a fraud?

A.      Yes, they did.

Q.      Were there what you considered to be humiliating and degrading allegations in the complaint?

A.      Yes, there were.

Q.      Did the complaint mention me?

A.      Yes, it did.

Q.      What did it say about me?

A.      It said that you had helped me perpetrate a fraud against lenders.

Q.      Have I ever helped you perpetuate a fraud against lenders?

A.      Absolutely not.

Q.      Did this email also threaten to send preservation notices outlining the allegations against you to a list of people?

M. Kulick - Direct

37

A.        Yes.  It was a list of people that they had gathered from their diligence and it was -- I wouldn't say everybody that was important to me, but the list covered a great number of important investors, partners, mortgage lenders, rabbis.  I mean, it went from personal to more personal.

Q.        Was there a demand made in the email?

A.        Yes, there was.

Q.        What was the demand?

A.        A reiteration of the deeds in lieu of foreclosure.

Q.        Did YSA ever file the complaint that they threatened to file?

A.        Not at this time, no.

Q.        Did YSA ever send the preservation notices out that they threatened to send?

A.        At present, no, they have not.

Q.        Do you have an understanding of why YSA was doing this from your seat where you were sitting?

A.        Yeah.  From my perspective, it was an intimidation maneuver.  And I was terrified.  You know, I was -- it definitely kind of shattered my life.  But obviously the corollary of doing deeds in

**M. Kulick - Direct**

38

lieu of foreclosure and hurting the investors that have invested with me and the hundreds and millions of dollars at stake there was unacceptable as well.

Q.      Did you find out shortly after receiving this email that YSA had recorded second mortgages against some of the title owners' properties?

A.      I found out in -- at the same time of this email, yes; simultaneously.

ATTORNEY BRODSKY:  Your Honor, may I approach?

THE COURT:  Yes.

BY ATTORNEY BRODSKY:

Q.      Do you recognize what I've handed you as Joint Exhibit 27?

A.      Yes.  I haven't unbanded it, but I flipped through it.  These are the copies of the second mortgages that YSA filed throughout my portfolio.

Q.      Did you see these second mortgages when they were filed?

A.      No, I did not.

Q.      Did you agree to any of the terms in these second mortgages?

M. Kulick - Direct

39

A.         No, I did not.

Q.         Who signed the second mortgages?

A.         Mr. Diveroli's brother, Aharon Diveroli, signed them as attorney-in-fact for me.

Q.         What was the consequence to you personally of these second mortgages being filed?

A.         It's immense.  This is a full recourse trigger and immediate default under senior mortgages if done without their permission.  The numbers -- you know, there is a mechanism to get senior lenders behind a second mortgage, but there's usually -- the amounts are important, the rights of the creditor are important, all of that.

So this put me in immediate default. It put me as a full recourse trigger.  It also put me in jeopardy with my investors as well.

Q.         How much liabilities could you quantify you became personally liable for under the recourse condition?

A.         About $600 million.

Q.         What did it do to the title owners?

A.         It froze the title owners from any pending transactions.  So we can't sell.  We can't refinance.  We can't operate our business without the

M. Kulick - Direct

40

second mortgages being lifted.

Q.        Did any of the lenders -- are there first position lenders on these properties?

A.        Every property has a senior mortgage lender.

Q.        Did the senior mortgage lenders take any action as a result of these second mortgages?

A.        As everyone who has reviewed the record knows, 2025 was not a great year for us.  We had trouble throughout our portfolio.  So in addition to the troubles that we already had, the senior mortgage lenders now were dealing with the second mortgages for -- you know, that were in excess of -- you know, were a reasonable amount on the buildings. So seniors started calling more defaults.

It's been mentioned in every default letter we've received, to my knowledge.

Q.        Do you know approximately when the second mortgages were recorded?

A.        I believe there were two dates.  I believe -- well, there might be multiple dates.  I believe the majority of them were recorded on October 31st, 2025.

I believe that after we were unable to

M. Kulick - Direct

41

come up with the bond to substantiate the TRO, they filed second mortgages on the rest of the portfolio. And that would have been done -- some were done on January 8th, 2025, and some were done on January 9th, 2025.

Q.        When the first wave of the second mortgages were recorded on October 31st, 2025, were there any pending transactions with respect to the title owners?

A.        Yes, there were several.

Q.        I want to talk about one of them called Muntage.  Can you explain that transaction to me.

A.        Yeah.  Muntage might be, unfortunately, the worst deal we ever bought.  It's a '70s vintage asset in Oklahoma City.  It's a mile away from some really nice neighborhoods, really nice houses.  And that was the value we saw in it.  But circumstances have erased that value.

At present, it's probably -- it's in very bad physical condition.  It's probably worth $6 million at present.  There's a $12.7 million senior loan.

In conjunction -- in working with us,

M. Kulick - Direct

42

the senior lender helped find a buyer.  That buyer was willing to assume all of our obligations and take us off all of the recourse and all of the, you know, debtor obligations at the full 12.7 million.  So it was a win for us.

Q.      And YSA put a mortgage on the Muntage property?

A.      Yes, they did.

Q.      Did that mortgage stop that transaction that would have been extremely beneficial to you and the Muntage title owner?

A.      It still is, yes.

Q.      If the second mortgage had not been recorded, would you have been able to close that transaction?

A.      Yes.  We would have had to go through a normal process of closing, which would have included -- there was probably less than $150,000 in mechanic's liens.  We would have cleared the mechanic's liens and closed the asset.

Q.      Prior to the second mortgage being recorded, was it Muntage's intention to pay that less than $150,000 for the mechanic's liens to close that transaction out?

M. Kulick - Direct

43

A.    Yes.  Again, that's a normal part of every close.

Q.    Have there been any other transactions that YSA has impeded by virtue of the second mortgages?

A.    Yes.  We are currently -- we've been under contract since somewhere -- we've been trying to sell Lofts at North Penn in Oklahoma City.  I don't know what day we got under contract officially.  The first close date was supposed to be mid-December. That deal is in active foreclosure.

So it's been -- although it's worth more than -- the foreclosure is what's called a maturity default, so it's past the maturity, we weren't able to pay off the loan.  We have a buyer that will pay off -- not only pay off the loan, but some money will come back to the partnership.  And, at present, we have not been able to execute that.

And then we had a refinance called Village Creek on 67th, which was with the same lender and has the same issue as Lofts at North Penn.

Q.    And would that have resulted in cash?

A.    Yes.  Substantial, actually.

Q.    And have the YSA transactions

**M. Kulick - Direct**

44

prevented Lofts and Village Creek from closing?

A.        Yes, they have.

Q.        Let's talk about a property called Thrive Argenta.  Are you familiar with that?

A.        Yes, I am.

Q.        Did YSA try or at least attempt to put a second mortgage on Thrive Argenta?

A.        It's not clear to me what they attempted to do or not.  I had understood that a second mortgage existed on Thrive Argenta.  We were in the process of selling Thrive Argenta when the second mortgages hit.

And somewhere in about the second week of December, the potential buyer for Thrive Argenta called me and said, "Hey, I know you told us that there are second mortgages on, you can't close, but we pulled title and we're not seeing a second mortgage."

Q.        So is it your understanding that the buyer was able to get clean title, notwithstanding that YSA had attempted to record second mortgages?

A.        Yeah, again, I can't speak to what YSA attempted to do.  What I can speak to is that there was no second mortgage clouding title on Thrive Argenta.

M. Kulick - Direct

45

Q.      And that transaction closed?

A.      And that transaction closed, yes, it did.

Q.      But to be clear, Muntage, Lofts, and Village Creek cannot close because of the second mortgages?

A.      That is correct.

Q.      We talked about the total principal balance, which I think you said was around 2.35 million; is that right?

A.      A little bit under, correct.

Q.      Okay.  And you've made payments in excess of that principal balance?

A.      That is correct, yes.

Q.      Have you ever asked YSA for a payoff?

A.      Multiple times.

Q.      Have they ever given you one?

A.      The first time we got a payoff was, I would say two weeks ago -- two, three weeks ago, something like that.

ATTORNEY BRODSKY:  Chancellor, may I approach?

THE COURT:  Yes.

Q.      Do you recognize what I've shown you

M. Kulick - Direct

46

as 28?

A.       Yes, I do.

Q.       What is it?

A.       This is the February 6, 2026, payoff statement or accounting on the loans with YSA.

Q.       And do you note on the first page that YSA is contending that it stopped the interest from accruing as of September 12, 2025?

A.       Yes, I do.

Q.       Do you understand why YSA stopped accruing the interest as of that date?

A.       Yes.  That was the date of which they found that the interest exceeded their estimated value of the portfolio.

Q.       So, essentially, they at that point didn't need to let the debt run up anymore because they had already captured all the equity?

A.       That is correct.

Q.       Let's look at page 2.

What do you understand this to be?

A.       YSA's calculations of the money owed to them under each note.

Q.       Do you understand that Loan 7 is the February 18th loan transaction?

M. Kulick - Direct

47

A.        Yes, I do.

Q.        And Loan 9 is the April 2025 loan transaction?

A.        Yes, I do.

Q.        Loan 11 is the July 16th loan transaction?

A.        Yes.

Q.        And Loan 12 is the July 31st loan transaction?

A.        Yes.

Q.        With respect to No. 7, YSA is contending you owe a little less than $1.8 million in accrued interest; correct?

A.        That is correct.

Q.        So over seven months, they doubled their money?

A.        Correct.

Q.        Loan 9, which is the April loan transaction, over the course of approximately four months YSA received nine times their loan value in accrued interest?

A.        That is correct.  And one thing to note is that this doesn't take into account the payments I actually made under Loans 7, 9, and 11.

M. Kulick - Direct

48

Q.        Loan 11, that's the one from July 16th?

A.        Yes.

Q.        So over two months YSA accrued interest ten times the principal balance?

A.        In addition to the payments they got, yes.

Q.        Let's talk about Loan 12.  That's the July 31st loan?

A.        Yes.

Q.        $317,000 principal balance?

A.        Yes.

Q.        What's the accrued interest that YSA says it's owed?

A.        $919,740,361.28, plus an additional $1 million associated note penalty.

Q.        So a $317,000 loan accrued approximately $1 billion of interest in 42 days?

A.        Correct.

Q.        You understand that YSA is claiming that that's what it's owed and is entitled to foreclose?

A.        Yes.

Q.        And on top of that, there's penalties

M. Kulick - Cross                    49

too; right?

A.        Yeah.  That's the note penalties, yeah.

ATTORNEY BRODSKY:  Can I have a moment, Chancellor?

Q.        Did the delay in getting a payoff prejudice your right, your ability to pay these off?

A.        Yes, absolutely.  As a matter of fact, some of these I thought -- I think I have paid off.  So yes.

ATTORNEY BRODSKY:  Your Honor, we'll pass the witness.

ATTORNEY TASCA:  May it please the Court.  Joel Tasca, Your Honor.

**CROSS-EXAMINATION**

BY ATTORNEY TASCA:

Q.        Mr. Kulick, you testified that the plaintiffs in this case are you personally, Asset Holder, LLC, and Vesta Holdings, LLC; correct?

A.        Yes, that's correct.

Q.        To be clear, you don't hold the title to any of the properties on which YSA put a second mortgage; right?

A.        No, I don't hold the title.

M. Kulick - Cross

50

Q.          Nor does Asset Holder, LLC or Vesta Holdings, LLC hold the title to the properties at issue in this case; correct?

A.          No, we do not.

Q.          Now, the title owners, the actual title owners of the properties, they're not in this case at all, are they?

A.          Through me, but yes.

Q.          And I think you testified on direct that Vesta Holdings and Asset Holder have indirect interest in, I think the way you put it, on some of the title owners; right?

A.          Correct.

Q.          So it's not even all of the title owners that Vesta Holdings and Asset Holder has some sort of indirect interest in?

A.          It was 17 assets, as delineated in the collateral pledge and security agreement.

Q.          My question was, when you said some of the title companies, that means that there are certain -- title owners, that means there are certain title owners that the plaintiffs don't have any interest in at all; is that right?

A.          Well, I personally have an interest in

M. Kulick - Cross

51

every property.

Q.      You do.  Asset Holder does not?

A.      Not in every property, no.

Q.      And Vesta Holdings, LLC does not?

A.      Not in every property, no.

Q.      Now, your side supplied the forms for the loan documents at issue in this case; is that right?

A.      Yes, the initial draft -- the first draft was our form.

Q.      And then using those forms, you and your counsel, A.J. Jindal, then negotiated the terms of the initial YSA loan documents back in October of 2024; is that right?

A.      YSA made significant changes to the form.  But, yes, the negotiation was with A.J. Jindal as my counsel.

Q.      Let's just take a look at a couple of those documents here.  So I'd like to take a look at JX 46.

ATTORNEY TASCA:  Do we have a binder for Mr. Kulick?

ATTORNEY MARTIN:  If I may approach, Your Honor?

M. Kulick - Cross

52

THE COURT:  Thank you.

BY ATTORNEY TASCA:

Q.      So that should be Tab 1 in your binder, Mr. Kulick.

A.      Okay.

Q.      Are these the emails that reflect the back-and-forth involving you and Mr. Jindal on your side and the YSA folks on their side in negotiating the October 8, 2024, loan?

A.      Yes, it seems to be.

Q.      And then if we look at the next tab in your binder, Tab 2, which is Joint Exhibit 6, that contains more negotiations, does it not, of the October 8, 2024, loan?

THE COURT:  I don't have the binder you are looking at.

ATTORNEY TASCA:  Apologies, Your Honor.

THE COURT:  I have 2 of 2.

Do you have two binders, Mr. Kulick?

THE WITNESS:  I think I have one binder.

ATTORNEY MARTIN:  What does it say on the front of it?

M. Kulick - Cross                53

THE WITNESS:  "Volume 1 of 2."

ATTORNEY MARTIN:  If I may approach with 2.

BY ATTORNEY TASCA:

Q.      If you flip back to the draft loan documents attached to this exhibit, Mr. Kulick --

A.      Which exhibit are we talking about?

Q.      This is Joint Exhibit 6, and it's Tab 2 in your binder.  There are certain red lines in here in the various loan documents that are attached.

Aside from the red lines, the form is the form that your side supplied for this loan; correct?

A.      Yes, that is correct.

Q.      So if you take a look at, for example, Bates page -- well, JX 6, page 36 of 40.

A.      Okay.

Q.      Do you see there's a paragraph 2(g)?  It's a subordination clause, is it not?

A.      It seems to be.

Q.      So the subordination clause was in your own form that you supplied for this transaction; correct?

A.      My attorney A.J. would have provided

this.  But it looks like that.

Q.      And A.J. was representing you in the transaction; right?

A.      That is correct.

Q.      Now, if you flip back to Joint Exhibit 6, page 7 of 40, and if you look at paragraph 7.1, there's a provision regarding usury.  Correct?

A.      Yes.

Q.      And that was in your form loan document that Mr. Jindal supplied for purposes of the October 8th transaction?

A.      Yes.

Q.      Now, you personally made a number of comments during the negotiations of these loan documents, did you not?

A.      Yes, in conjunction with my counsel, yes.

Q.      So your counsel commented on it, and you commented on it as well; is that right?

A.      Yes.

Q.      And one of the proposed terms, if we flip back to Tab 1 -- this is Joint Exhibit 46, and it would be on page -- I believe it's 4.  And if you look under the "Breach" paragraph, paragraph 4 there, there

M. Kulick - Cross

55

was a change to the power of attorney that was suggested by YSA.  Correct?

A.      Let me see here.

Q.      It's "Breach", paragraph 4(f).

A.      4(f), okay.

Okay.

Q.      So you had an opportunity to comment on that power of attorney clause.  And you actually did comment on that power of attorney clause; correct?

A.      That is correct.

Q.      And there was also a provision in here that was suggested by YSA, waiver of -- defenses to prejudgment remedies.

Do you see that as well?

A.      Yes, I do.

Q.      That was another term that YSA proposed that you had the opportunity to comment on, as well as counsel having the opportunity to comment on; correct?

A.      That is correct.

Q.      Now, if you turn to Tab 3 of your binder, which is JX 10, this is the October 8, 2024, loan, correct, the various loan documents?

A.      Yes, it is.

M. Kulick - Cross

56

Q.        And if you turn to page 13 of 29 -- that would be the CPSA portion of the loan document -- and you look at 4.6, there's the power of attorney that you agreed to; correct?

A.        That is correct.

Q.        And this power of attorney contains a provision.  It says, "Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender."

Do you see that?

A.        Yes, I do.

Q.        And you don't see the word capital C "Collateral" in that sentence, do you, that I just read?

A.        Well, I'm not an attorney, but in the first lines of the power of attorney clause, limited to "Borrower and Pledgor each appoint Lender ...." And it further references the loan documents.  There's references to the capital C "Collateral" beneath that.

M. Kulick - Cross

57

My understanding of the power of attorney is it's limited to protecting the collateral.

Q.     In the sentence that I just read, does the word "collateral" appear anywhere, capital C or lowercase c?

A.     No.

Q.     There's also in this power of attorney a reference in the very next sentence to real property, is there not, "real or personal property"?

A.     That is correct, although there is no real property owned by the Collateral, capital C.  But that is correct, yes.

Q.     Understood.  But the power of attorney had a provision in here.  In the event that real property were to become part of this agreement, that would cover the real property, correct, under the POA?

A.     It would have had to have been done so on the collateral.  But I would agree with that, yes.

Q.     And that same language -- I'm going to try to keep us moving here.  But would you agree with me that same language that we just read in the POA is contained in the POA in your personal guaranty on this loan?

A.     I'd have to see it, but I --

M. Kulick - Cross

58

Q.        Sure, let's see it, then.  Why don't you flip back to JX 10, page 26, subprovision 7(h).

A.        That is correct.

Q.        And that POA contained in that language, that carried through to all of the CPSAs and all of the guaranties on all the loans you entered into with YSA; is that right?

A.        Yes.

Q.        And that waiver of prejudgment relief that we looked at, that also found its way into the final loan document and carried through to all of the other documents as well, right, to all of the other loans?

A.        I don't know that off the top of my head.

Q.        Let's take a look.  Look right above where we were there.  We were looking at 7(h).  Take a look at 7(f).

Do you see where it says, "Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full

M. Kulick - Cross                    59

performance"?

A.        I see that, yes.

Q.        Is that same language contained in the promissory note and the personal guaranty for all the loans?

A.        That's not something I know, but --

Q.        Documents will speak for themselves?

A.        Yeah.

Q.        You don't have any reason to disagree with me when I say that they do; correct?

A.        Correct, I have no reason to disagree with you.

Q.        There's also a provision in here, if we go to the note portion of -- we're still on Joint Exhibit 3.  If you go to page 3 of 29 -- I'm sorry, Joint Exhibit 10, Tab 3.  I apologize.

A.        Where are we?

Q.        Look down at paragraph No. 6.

A.        Okay.

Q.        This particular provision provides that the borrower waives all defenses to the enforcement of the note other than the defense of full performance.  Correct?

A.        Seems like it.

M. Kulick - Cross

60

Q.        And we can go back to it if we need to, but do you have any reason to disagree with me that in the documents we looked at when you were negotiating, your lawyer looked at that and wrote the word "done" underneath it when it was suggested by YSA, this particular provision?

A.        Yes.

Q.        No reason to disagree with me about that; right?

A.        No reason to disagree with you.

Q.        Again, this provision, the waiver, carried through to all the notes that you signed in connection with all the various YSA loans that you've taken; right?

A.        Yes, and it continues to mention the capital C "Collateral."  Yes.

Q.        As you know, the joinder is a big issue in this case; correct?

A.        Yes.

Q.        Let's take a look at the joinder. Let's go to Tab 4, which is Joint Exhibit 16.

Joint Exhibit 16, that's the February 18th loan package; correct.

A.        Yes.

M. Kulick - Cross

61

Q.        Flipping back to the joinder itself, which --

A.        What page am I going to?

Q.        Sure.  The joinder is on page 22 of 31 of Joint Exhibit 16, which is Tab 4 in your book. Joint Exhibit 16, which is Tab 4, and then I'm directing you to page 22 of 31.

A.        Okay.

Q.        You looked at this when Mr. Brodsky was examining you; correct?

A.        Yes.

Q.        And you signed this; right?

A.        Yes, I did.

Q.        In the first line it says here, "The undersigned" -- which is you; right?

A.        Correct.

Q.        -- "as a manager, member or other authorized person of" -- do you see that?  And it goes on.

A.        Yes, I do.

Q.        So based on that language, you were signing as a "manager, member or other authorized person of" the entities defined in the rest of that paragraph; right?

M. Kulick - Cross

62

A.       That is correct, yes.

Q.       And those entities were defined as "any and all Guarantor Entities and any other entities of which the undersigned does now own or control or may herein after own or control ...."

Do you see that?

A.       Yes, I do.

Q.       Focusing just on the "Guarantor Entit[ies]" piece of this that's defined earlier in the CPSA -- so just flip back a few pages -- under Section 3.5; right?

A.       What page?

Q.       Page 12 of 31 of Joint Exhibit 16. And it's Section 3.5.

A.       Okay.

Q.       Do you see that, 3.5?

A.       Yes.

Q.       So that contains a definition of "Guarantor Entit[ies]," does it not?

A.       Yes, it does.

Q.       And that definition is "any entity [] directly or indirectly controlled or managed by Guarantor" -- "Guarantor" is you; correct?

A.       Yes, it is.

M. Kulick - Cross

63

Q.          -- "directly or indirectly owned by Guarantor in" -- excuse me.

"[D]irectly or indirectly controlled or managed by Guarantor or [] directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business ...."

Now, what your counsel defined as the title owners, they would fall within the definition of "Guarantor Entities."  Correct?

A.          I guess that would be a legal conclusion that I don't feel okay to say.  I don't know if the title owners are indirect -- you'd have to make -- we'd have to believe that they are indirectly controlled or managed by me specifically.  There's no org chart where I indirectly personally control any of the entities.

Q.          Earlier in your testimony, at the very beginning when I started questioning you, you said that you personally owned indirectly a piece of every single title owner, did you not?

A.          I did not say that, no, not of every single title owner.

Q.          Okay.  We'll do this the hard way,

M. Kulick - Cross

64

then.  If we're looking at any entity directly or indirectly managed by you, okay -- one of your entities is Louis Investments, LLC; correct?

A.      Yes.  One of my entities -- yes, I am the sole member of Louis Investments, LLC.

Q.      Sole member of Louis Investments, LLC.  And Louis Investments, LLC is the manager of about ten of the title owners?

A.      That sounds correct.

Q.      Okay.  So would those ten title owners be guarantor entities based on that, based on the language in Section --

A.      Yeah.  Again, I don't -- look, I'm not trying to -- I don't know.  Legally speaking, I do not know if I personally -- if that pledge is to me personally or if that would be Louis Investments, LLC.

Q.      Would you agree with me that the ten entities where Louis Investments, LLC is the manager, that you directly or indirectly managed those entities?

A.      Yeah, I don't know the -- I feel like I don't know the answer to that question.  I feel like that's a legal concept.  From an operational perspective, you know, Louis Investments is solely

M. Kulick - Cross
65

owned by me.  So, you know, I'm the person that -- I am the human being behind Louis Investments, LLC.

Q.        So you'd agree with me that indirectly those entities are managed by you?

A.        Again, I don't know if you would consider that indirectly or not because I don't -- I don't know the interplay legally between is that Louis Investments or does that flow through to me personally.

That's also a concept implicit in nonrecourse lending; right?

So I don't know how to answer that question.  I'm trying the best that I can, but I don't know how to answer that question.

Q.        Louis Investments, LLC is also the manager of the manager of several of these entities, correct, these title owners?

A.        Louis Investments is the manager of Vesta Holdings.  I don't know off the top of my head what else Louis Investments manages other than Vesta Holdings as a manager of a manager.

Q.        Okay.  So who is the manager of Bryan Hills Best Living, LLC?

A.        Without the org chart -- I have --

M. Kulick - Cross

66

these org charts are very complicated.  I don't have them committed to memory.  We'd have to look at one.  We can dive through an org chart and specifics.  But they're all different.  All the org charts for all the entities are different.

Q.        Okay.  Thrive Argenta, that's one that's managed by you personally; correct?

A.        Incorrect.

Q.        Okay.  Who manages it?

A.        Thrive Argenta had four tenants in common.  Each tenant in common had its own membership or control or management.

Q.        Who was the manager of Thrive Argenta?

A.        Again, each of the -- Thrive Argenta had four TICs.  Each is a direct borrower and each had its own manager.  So that would not have been -- that's not one person.

Q.        Of those four, were you affiliated with any of the managers?

A.        Yes.  On the TIC that was Argenta's Best Living.

Q.        So would you disagree with me, then -- I know you don't have the org charts in front of me, but would you disagree with me that Louis Investors,

M. Kulick - Cross

67

[sic] LLC -- if we looked at the operating agreements, it reflects that Louis Investors, LLC is the manager of the manager of Bryan Hills Best Living, LLC; Fairfax Best Living, LLC; Lakeside Best Living, LLC; Muntage Best Living, LLC; One Eton TIC 1, LLC; Remington Ranch's Best Living, LLC; Riverwalk; Vesta Seminole; Shoreline; Springdale; Summer Oaks; Montgomery; Ridge Vesta.

Do you have any reason to disagree that if we looked at the operating agreements, it would show that Louis Investments, LLC is the manager of the manager of those entities?

A.      I would have to see it, but it could be correct.

Q.      Jenk's Best Living, LLC, that's managed by you and Vesta Realty, LLC; correct?

A.      Jenk's Best Living -- there's an additional manager which would be the PSC member.

Q.      But you managed that entity, at least in part; correct?

A.      Yes.

Q.      And the other piece of the "Guarantor" definitions -- leaving aside this management piece -- is the "directly or indirectly owned by Guarantor in

M. Kulick - Cross                68

whole or in part."

You said you're not willing to tell the Court today that you are an indirect owner in part of every one of those entities, as far as I understand?

A.      Well, Mr. Tasca, that goes back to something that we went through in the depositions and we didn't have an agreement on.  But my investments are in the intermediary holdings companies.  So my indirect ownership is an indirect ownership in the intermediary holdings companies.

Those intermediary holding companies go up chain to the title owners.  And, you know, I wasn't able to answer the question to your liking in the deposition, and I don't know that I can today.

Q.      And you're denying that you told your counsel that you have an interest in -- or that you have an interest in every one of these properties?

ATTORNEY BRODSKY:  Your Honor, I think that calls for privileged communication if he's asking what he told --

THE COURT:  No, I think he's referring to the direct examination.

ATTORNEY BRODSKY:  Okay.

M. Kulick - Cross

69

A.        Again, yes, I have invested in -- I have an investment in each property.  But no, that investment is not at the title owner level.  The title owners are a single purpose, sole member entity.  So you go from single member, sole purpose entity on down in the intermediary holding company and you get to, you know, Jenk's Best Living Investors, LLC, which is one off the top of my head.

Q.        And you're going to tell the Court that you are disputing whether you know whether that's considered indirect ownership?

A.        Well, I know that my indirect ownership, that I have an ownership interest in the Best Living Investors entity.  I'm a hundred percent sure of that.

What that means, how the Court would then -- the same thing I said to you a couple months ago, how the Court would take that to my ownership in the title owner, I simply don't know.

Q.        So on the February 18, 2025, loan when the joinder was added, I think you testified you were seeking $1.5 million after the fees.  It was net to you of like 1.25; correct?

A.        That is correct, yes.

M. Kulick - Cross

70

Q.        Okay.  Is it fair that that was substantially more than the loans that you had gotten before from YSA?

A.        Yes, it is.

Q.        Now, when you moved for a temporary restraining order in this case -- and I'll refer you to JX 209, Tab 5, which is -- it's Tab 5 of your binder.

A.        Tab 5.  Yes.

Q.        Do you recognize this document?

A.        This seems to be the filing that you referenced.

Q.        And this -- I apologize.  This is actually the reply brief, right, in your --

A.        Yes.

Q.        As part of your submissions to get your temporary restraining order.

In the original motion, you didn't mention a joinder at all, did you?  Your counsel just didn't mention it?

A.        I would have to see it in front of me. I don't know.

Q.        Do you believe I'm wrong about that, that the joinder was not mentioned?

M. Kulick - Cross

71

You were present at the oral argument; correct?

A.      Before I lost service and got kicked off the call, yes.

Q.      And do you recall there being a discussion about the joinder not being mentioned in the opening brief?

A.      My memory was that Vice Chancellor Zurn had questions on the joinder and it was discussed in the oral arguments.  I'm not sure -- no, I do not remember saying it was never mentioned in the opening brief, but I remember that that was -- the joinder was something that Vice Chancellor Zurn was interested in.

Q.      Focusing on the reply brief, which is Tab 5, that you submitted, then, after that initial brief, you did acknowledge the joinder here, did you not?

A.      Yes.

Q.      And the explanation you gave on your direct examination as to the purpose of the joinder, that's not in this reply brief, is it?

A.      Do we know, just a point of clarification, what the date of this was?

Q.      It looks like it was November 24,

M. Kulick - Cross

72

2025.

A.      So in the lead-up to the first depositions when we were working -- when we were working on understanding the case, we found the full documents and the emails leading up to the joinder. And I had thought everyone on my legal team already had understood what I had agreed to in the joinder. But the emails were what -- there was a moment of oh, we didn't have the full story or we didn't understand the full picture.

So I believe in November my legal team was still getting their arms around -- didn't have the emails and didn't know what the joinder actually ...

Q.      But in this particular reply brief, that position is not articulated.  And instead, on page 2, it says, "The Joinder itself is confusing and contradictory ...."

Do you see that?

A.      Yes, I do.

Q.      And then on the next page, it says, "it is unclear what the Joinder even says or what its legal import is."

Do you see that?

A.      I do.

M. Kulick - Cross

73

Q.        And then the next day at the oral argument, your counsel made essentially the same comment to the Court, right, at oral argument, that the joinder was confusing?

A.        Correct.  The joinder can only be explained when looking at the emails and talking to the parties about the negotiations behind the joinder. Once you have the full picture, my belief is that it says what it means to say.

THE COURT:  Let's take a 15-minute break.

(Recess taken from 10:47 a.m. to 11:05 a.m.)

THE COURT:  Please be seated.  Thank you.

You may resume, Mr. Tasca.

ATTORNEY TASCA:  Thank you, Your Honor.

BY ATTORNEY TASCA:

Q.        So, Marc, we left off -- Mr. Kulick, we left off, we were talking about the reply brief where you made these comments about joinder being confusing and contradictory, and then after you made that submission and your attorney made a similar comment at the oral argument, you in fact got a TRO,

M. Kulick - Cross                    74

did you not?

A.          Yes, we did.

Q.          If you go to the next tab, which is Tab 6, JX 183, that's the amended complaint you then filed, correct, after you got the TRO?

A.          That looks correct.

Q.          Paragraph 34, which is on page 12 of 17, here it says -- now you take a position that -- I'm quoting -- "The Joinder extends the Power of Attorney clauses to entities which Kulick individually owns or controls."

Do you see that?

A.          Yes, I do.

Q.          That was your position in the amended complaint; correct?

A.          Well, in 33, we go back actually -- if you go back to 33, you'll see the evolution of the case from our perspective, which is that the collateral doesn't extend to -- the collateral is what is pledged.  And, yes, my attorneys found the joinder confusing.  As I've testified, though, once I was able to show them the emails and get further explanations, it made it significantly less confusing.

So the argument has evolved over what

M. Kulick - Cross

75

the joinder is.  If clients could be their own lawyers, they'd do really badly on other things, and maybe some things they'd get the nail on the head.

Q.      So it required looking at those themselves to understand what the joinder meant?

A.      Yes.  The sequencing of how the negotiations for the joinder meant.

Q.      But you would agree with me that you also are taking the position in 34 that the joinder extends the power of attorney clauses to entities which Kulick individually owns or controls; correct?

A.      Yeah, that is what's written in 34.

Q.      And at deposition you confirmed that that was your position.  And I can read it to you if you'd like.

A.      In the deposition you and I had a long interchange on my -- on the joinder, and you called it -- I forget what you called it, but my attorneys ended up objecting to your characterization.  So I don't -- I think I was very clear in the deposition.

Q.      You didn't say to me that your position was that the joinder did exactly what -- I read you the reply brief, correct, at the deposition? Do you remember that?  The same statement I just read

M. Kulick - Cross

76

to you.

A.       No, I don't remember going over the reply brief.  But the joinder did exactly what it was intended to do.  And that's what I've been saying consistently.

Q.       And that's this other explanation that you articulated to me at deposition and to your counsel in direct exam; correct?

A.       That is correct.

Q.       And basically what you are saying is that the joinder was intended not to add anything, even though this was a much bigger loan than the loan prior, not add any sort of additional collateral, not pledge anything else; it was just going to make other entities in your universe liable for that same collateral in the event that you moved the collateral to that other entity?

A.       Yes.  Can we pull up the joinder -- would it be acceptable to pull up the joinder and read it?  That's exactly what it says.

Q.       I understand that's your position that's exactly what it says.  But I'm just trying to understand what your position is as to the meaning.

Did I articulate it correctly just

now?

A.        Yes.

Q.        Now, with respect to those membership interests that already existed in the collateral before the February 18th loan, YSA had the rights to take UCCs on those; correct?

A.        Yes, on the unencumbered properties, YSA had the right to file UCC-1s on my membership interests.  Yes, they did.

Q.        And the UCC findings -- if you moved the collateral to a different entity, UCC would give YSA the right to pursue that collateral even if it was in another entity's hands, would it not?  Is that your understanding?

A.        No, that is not correct, because if you look at the UCC financing statement, it specifies the entities.  So the concern that YSA was addressing in February is I have all these investors, I have all of these -- I have all of these entities.  So let's take an example, Capitol on 28th.  I have an investment in Capitol on 28th.  It's an apartment complex.  So let's say their -- their concern was, let's say, I have -- my membership interests in Capitol on 28th.  But what happens if I take one of

M. Kulick - Cross

78

the properties that didn't have collateral with YSA and I go to one of my investors or partners and I say hey, look, I've got this $400,000 investment in Capitol on 28th, it's encumbered by UCC with YSA Investments 1, LLC, why don't I zero that out, we'll give you the credit for it, and I get interest in another deal or something like that.

The concern that YSA had was that the UCC was not strong enough limited to just my membership interest.  So they wanted to know -- and that was in the texts and emails.  They couldn't keep track of the unencumbered versus the encumbered.  They didn't want to be responsible for constantly looking at their collateral.

So the idea was okay, great, if it's in my universe, it's on this sheet, it's yours.

Q.      So your position is that UCC would not have protected them if you moved the collateral around within your organization?

A.      No.  If we read the wording in the UCC, it certainly would not have.

Q.      Okay.

A.      If I wanted to, I'm not saying obviously that I would do that, but if I had wanted

M. Kulick - Cross

79

to, yeah, you could move the collateral around.

Q.      At deposition, you didn't say that. You told me you didn't really know how the UCCs worked; right?

A.      At the deposition I had not seen the UCCs.  I have since seen them.  But I don't also think I said I don't know how UCCs work.  UCCs are a part of our day-to-day business.

Q.      So let's take a look at the text message which is contained in Tab 7.

Before we look at the text message, is it fair to say -- we'll see it in the text message email -- you were the one who proposed the joinder?

A.      Yes.

Q.      I understand you didn't draft it, but you were the one who proposed it conceptually?

A.      Yes, correct.

Q.      Now, if we look at this text message string that's here, Tab 7, which is JX 12, it looks like Mr. Miley sent you a snapshot of what the collateral was under the existing CPSA; right?

A.      Yes.

Q.      He says, "Where this had previously included 17 total entities (4 unencumbered), are we

M. Kulick - Cross

80

expanding to rest of portfolio?  If so, can you please send me a paragraph that I can copy into it with the other entities?  If just names, it's easier.  If we want to include the capital contribution for each as in prior version[s] though, that's more tedious and I need the exact numbers.  Thanks, guys."  Right?

A.          Correct.

Q.          And there are several statements in here, in this text message, that suggest that you were in quite a hurry to get this loan closed; right?

A.          Oh, yes.

Q.          For example, you say, "Efraim can we please get sign off so we can push this ahead[]," "Can we find a way to fund still," "Honestly would be game changing for me to still be able to turn this around."

Those are statements you made in this text message; correct?

A.          Yes.

Q.          So you were a source of time pressure?

A.          Yes.

Q.          And Mr. Miley was telling you that it might be tedious to sort of go through this process of listing out all of the additional entities that would be added; correct?

M. Kulick - Cross

81

A.        Well, if taken on face value, what he's specifically saying is the "capital contributions."  So he's clearly not discussing anything other than my membership interests in other deals.

But again, the context that you're not seeing from the phone calls behind that is that we were addressing how to keep the collateral -- how to maintain the collateral.  And that's what we were working on.  And that's why I wanted a joinder to my portfolio as a whole.

There was zero discussion about bringing it to title owners or second mortgages.  That concept is not discussed at all on texts, phone, email.  But we were trying to solve a problem very quickly.  I thought a joinder was the right method.

Q.        Well, in response to the text that we read from Robert, you said you didn't mention any of the title owners.  But you do say here, "The answer is yes and no.  I suggest that we keep that the same" -- meaning language of the CPSA -- "but maybe add a joinder to the portfolio as a whole."

A.        Yes.

Q.        Correct?

M. Kulick - Cross

82

A.          That is correct.

Q.          Okay.  And on the Vesta website there's a reference to "Portfolio," is there not?

A.          Yes.

Q.          And that lists all the properties themselves --

A.          Yes.

Q.          -- a portfolio, does it not?

A.          Yes.

Q.          Now, going back to the text string here, after your comment regarding the joinder to the portfolio as a whole, Robert says to you, "can yall give me consensus on the entity language for collateral agreement.  I can't get in weeds on it, but I can copy and paste whatever we want ...."  Right?  It goes on and on.

A.          Where is --

Q.          And you respond, "Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?"

Is that what you said?

A.          Yes, it is.

Q.          Okay.  Now, you don't say in that

M. Kulick - Cross

statement -- you don't ask about a joinder for any affiliate of mine to be responsible for the same collateral that's already listed in the CPSA; right?

A.  Of course I did.  I said "the collateral all needs to remain the same."

Q.  You didn't say a joinder for any affiliate of mine to be responsible for the same collateral listed in the CPSA?  That's not what you said?

A.  Well, Joel, Mr. Tasca, I --

Q.  It's a simple yes or no.

A.  We're not having this conversation --

Q.  It's a yes or no question.

A.  We're not having this conversation understanding that a year later or a year and change later we're going to end up in court.  I felt like I was being as clear as I possibly could be.  There were a lot of conversations happening in a condensed time frame.  There were a lot of requests firing back and forth.

And, quite frankly, Mr. Miley and Mr. Diveroli were not always on the same terms, and we were keeping a lot of conversations together.  I think what I said -- could it have been clearer?  Sure.  I

M. Kulick - Cross

84

think, looking backwards, if I could do it over again, I would have sent two paragraphs saying exactly what I meant to say.

But I believe I was clear.  I was not offering additional collateral for this loan.  I had felt like they were overcollateralized for the initial loan.  The collateral given to them was still far in excess of the money that they were lending to me. They had taken a fee in addition to that, so they were further derisked.  They had made money, substantial money off of me in the lead-up to this loan.  So that had further derisked them.

I was not of the opinion that they needed additional collateral.  I was not of the opinion I was going to give them additional collateral.  But this was meant to solve an issue that was stopping us from getting the loan done that I desperately needed.

Q.    Mr. Kulick, you used the words "joinder with any asset controlled by any affiliate of mine."

If you're joining an asset, how's the asset going to back up the collateral?  It's an asset, not an entity; right?

M. Kulick - Cross

85

You said that it was the entity -- if you transferred it to another entity, that was the idea of the joinder, that it would be protected. You don't say "entity" here. You say "asset [] [of] any affiliate of mine."

And your testimony is you were not suggesting additional collateral?

A.      That is correct. We discussed that at length during the deposition as well.

Q.      Then there's an email after the text messages; right?

A.      Yes.

Q.      And this is Tab 8, Joint Exhibit 13. And if you look on the very first page there, again, it's an email between -- a bunch of emails between you and Robert and Efraim; right?

A.      Correct.

Q.      And in the second to the last email, Robert says in part, "Marc suggested adding joinder to his portfolio as a whole."

Then you say, "Robert the entity list would remain exactly the same" -- meaning the list of collateral in the CPSA; correct? Right?

A.      Yes, that is correct.

M. Kulick - Cross

86

Q.        Okay.  So you say "No change to that document at all except to add a joinder that joins" -- you say it again -- "any asset controlled by any affiliate of mine."

You used the word "asset."  This is the second time that day you used it; right?

A.        Yeah.  If that's an imprecise -- if the imprecision with words was -- as I said, knowing where this ended up, I would have changed every word and, you know, dictated my language to the nth degree.

But again, on this email, Mr. Miley is saying to me, hey, we've got -- he says, by the way -- or "Btw, concern that Marc gave a proposed solution for — collateral agreement included list of encumbered and unencumbered entities ...."  I don't have a paragraph ready to go with the contribution amounts for the full suite of entities.

So they're still trying -- this is a continuation of them trying to get more of my membership interests, nothing more than my membership interests.

Then he says, "nor am I clear on which entities are encumbered vs [not]encumbered."  So again, we're going back to this conversation that we

M. Kulick - Cross

87

had at the start where Asset Holder, LLC has unencumbered interests and Vesta Holdings has encumbered interests.

When we go back to my response, I'm saying as resolutely as I can, I'm not changing the entity list, I'm not adding other deals that are going to give you more collateral, but what I will do is a portfolio-wide joinder that does exactly -- and I think that's why I would love to review the language of the joinder line by line again because it says exactly what this says.  It is we're adding the joinder as an additional form of protection, not an additional form of collateral.

Q.      When you first articulated that theory to me at the deposition, had you not taken a break right before that?

A.      I don't believe we had taken a break before then.  But that's not a theory.  That's something that I've been resolute about dating back to the first email that I got -- that I sent to my attorneys on November 9th.

Q.      Did you speak with your counsel during the one break at the first session of the deposition?

A.      You've asked that several times.  You

M. Kulick - Cross

88

know, we spoke -- we were in the mens' restroom together at the law office, we were speaking.  But no, not about my testimony.  He wasn't giving me some crazy theory to throw at you.

This is what happened and how the joinder came to be about, and it's what the joinder says.

Q.        But that theory wasn't articulated in your litigation papers before the deposition, was it?

A.        As I've explained before, look --

Q.        Just yes or no.  It's yes to the question; right?

A.        Yes, but I don't know how much -- look, I've never been in litigation before, so I don't know -- here is what I will say.  I was -- in my explanation to my lawyers on November 9th, where I spent all weekend working on my responses, that was in there.

I don't believe that my attorneys fully understood what I was saying until December when we were doing discovery prep and they were seeing the emails and they were talking to me more and our communication was solely about this matter and they finally understood, oh, this is what it says.

M. Kulick - Cross

89

Q.        Take a look at Tab 9, which is Joint Exhibit 3.

And we've seen this before at deposition.  This is a compilation of all your emails with Efraim Diveroli, correct, over a long period of time, a year and a half or so?

A.        I believe these are text messages, but yes.

Q.        Did I say emails?  I meant text messages.  Sure.

Flip to page 83 of 127.  This is a text string that day between you and Mr. Diveroli. And you're discussing with Mr. Diveroli potential scenarios to get additional financing from YSA; is that fair?

A.        Uh-huh.

Q.        Yes?

A.        Yes.  Sorry.  I'm so sorry about that. Yes.

Q.        And then you stated to him, "The problem im having is you already have way more secure loan docs than anything else I've ever used."

That's what you told Mr. Diveroli?

A.        Yes.

M. Kulick - Cross

90

Q.      And that was -- I believe the dates of these text messages was June 16, 2025.

A.      Yes.

Q.      Three days before that, you had obtained a loan from an entity named Toval, did you not?

A.      I don't know the days, but it was probably -- it was in June that I received the Toval loan as well.

Q.      Okay.  And you gave a second mortgage to Toval; correct?

A.      Yes.

Q.      And despite that second mortgage, you were telling Mr. Diveroli that he was more secure than anybody you had ever dealt with before; correct?

A.      Well, what I was meaning was -- Mr. Diveroli and his legal team were more scrupulous about the loan documents and about the power of attorney and everything we saw in the lead-up to the negotiation.  I didn't think there was anything more I could give them to make them comfortable for that loan.  That's not -- but there was a separate agreement that I had with a different lender.  It's a totally different loan agreement.

M. Kulick - Cross

91

Q.       So after the initial loan in October of 2024, you kept coming back to YSA for more loans.  I believe we established that, your counsel did, on direct.

A.       Yes.

Q.       Nobody forced you to keep going back to YSA for loans; correct?

A.       No, no.

Q.       And the loans -- there was one on October 8.  And then in 2025 there was one on January 21, January 24, January 30, February 4, February 10, February 18, March 19, April 9, June 19, June 30, July 16, and July 31.  Correct?

A.       Yes, that is correct.

Q.       And you testified that the interest rates on these loans, they were based on basically the payment that you were going to make for the loan and the interest rate was reverse engineered, was it not?

A.       That is true, yes.

Q.       And wasn't it the case that you often suggested the amount that should be paid as part of the loans?

A.       Yes, I absolutely made the offers.  I made the offers as a fee.

M. Kulick - Cross

92

For instance, on the July 31, 2025, loan, I offered Mr. Diveroli essentially 20 percent of the loan amount as a fee within five days.  And then when they turned the loan documents, they reverse engineered that to a 7,000 percent interest rate.

Q.        As 2025 wore on, I believe you even said this on your direct, your financial situation became more strained; correct?

A.        That is correct, yes.

Q.        And so the terms of the loans you were able to get became less favorable; is that fair?

A.        Not necessarily.  The July 16th loan was less interest than the -- on a facial value was slightly lower than the April loan, much lower than the July 31st loan.  I think our -- you know, I think it's safe to say that in July my mindset was I want to make deals with Efraim, or Mr. Diveroli, that work for both parties; I need financing.  And I thought he was very happy with how things were going.  I knew that my payment history wasn't perfect.  But when I missed payments -- as you can clearly see in the text message thread, when I missed payments, I always tried to give him additional money or tried to make an offer.  I felt like we were in good standing moving towards --

M. Kulick - Cross

93

by July and August I thought we were moving towards a larger financing agreement, more stable, more secure and, you know, better position.

Q.      You didn't use counsel for any of the loans with YSA after that initial October 8 loan; correct?

A.      That's correct.

Q.      Nothing stopped you, though, from getting counsel to advise you on those loans; correct?

A.      No.

Q.      YSA didn't use counsel either on those loans, the subsequent loans, right, as far as you know?

A.      I know that Robert Miley took lead.  I do think Christopher -- my understanding is that Christopher Rogers remained involved.  But that's an understanding and it could be incorrect.

Q.      Take a look at Tab 20 of your binder, which is JX 150.

        This is a text message that's dated September 19, 2025; correct?

A.      Yes.

Q.      And it's with you and a guy named Duane.  Is it fair to say you were asking about

M. Kulick - Cross

94

potential loan with Duane?

A.        Yes.

Q.        And one of the things he says there is, "What kind [of] money u need" at the bottom of the first page.

Do you see that?

A.        Yes.

Q.        And you say, "250,[000]."

And then he says, "When can I get it back"?

And you say, "One week.  I'll pay 100,[000] for it."

A.        Correct.

Q.        Do you see that?

A.        Yes.

Q.        Now, that works out to an annual interest rate of over 2,000 percent, does it not?

A.        It does.

Q.        That was your proposal?

A.        Correct.  I'm not playing the victim on paying high interest rates on my loans.  I understand that, you know, my cash position was bad, it was stressed.  I was having trouble getting investors to fund pro rata capital calls.  And I

CHANCERY COURT REPORTERS
500 N. King Street, Ste 11400, Wilmington, DE
(302) 255-0526

M. Kulick - Cross

95

made -- I offered deals that worked for me, and my hope was that they worked for other parties.

Q.      Well, I'm glad to hear you say that because in your papers you have consistently accused YSA of being extortionate, of being loan sharks, have you not?

A.      Actually, I believe that every other -- my course of dealings with every other lender that I've taken loans with would show that nobody else has acted in a way that YSA has.  Nobody else has tried to accelerate an annual interest rate of 7,000 percent.  Nobody else has tried to compound daily. Nobody else has filed second mortgages across my portfolio.  Nobody else is taking the level of extremes that YSA has taken.

Up until October, whatever it was, I would have considered Mr. Diveroli a dear friend of mine and someone who was helping my business and someone who was making money alongside of me in the hopes that we were going to do something greater together.

Q.      We're going to get to this, but you have been sued quite a bit in the last several months; right?

M. Kulick - Cross

96

A.          Absolutely.  And people are not accelerating interest.  They are not doing the things that YSA is doing.  They are naming Vesta Capital or Vesta Holdings and me in a lawsuit for the terms and the conditions that I am okay with.

Q.          To be clear, your problem is not with the interest rates on the loans that YSA made; rather, it's about the acceleration and the -- sort of what you would characterize as aggressive tactics recently?

A.          I mean, Mr. Tasca, if we look at my texts with Efraim, as I mentioned earlier, when I was late on a loan, I would offer -- I took responsibility.  I'd said, Efraim, I'm so sorry I'm late.  I can't pay this back.  I'm going to add an additional $25,000 fee here.  I'm going to add an additional $25,000 fee there.  I think a couple times I had offered an additional 50,000 fee.  That's how I've operated, and that's been an acceptable way of dealing with loans for every other lender that I've had.

So when you say that I don't have an issue with the interest rate, if Mr. Diveroli was saying, hey, Marc, you owe me -- you know, you owe me -- I don't know.  Let's say on the July 31st loan,

M. Kulick - Cross

97

if he said I want an additional couple hundred grand because you wasted my time and I didn't get the money as quickly as I wanted, I wouldn't argue that for a heartbeat.  But when you are going after a billion dollars on that, it's quite a different sorry.  When you are filing second mortgages and ruining my business, it's quite a separate story.

Q.      But there was no talk of accelerating the loan until, like, October of 2025; correct?

A.      In truth, I don't know.  If you look at the April  --

Q.      When was the first time you heard that?

ATTORNEY BRODSKY:  Can we let the witness finish, Your Honor.

THE COURT:  Yes.

A.      If you look at the April -- the payment history on the April 8 loan, Mr. Diveroli got way more than he ever bargained for, because I was continuously late.  My understanding of the April 8 loan is that it's fully paid off.

And if you look at the text thread with Mr. Diveroli and I, you'll see where I made -- absolutely I had to make additional payments.  I've

M. Kulick - Cross

98

never once complained about the additional payments I had to make to him.

But now it's turning on a -- he's looking for 10x interest on a loan that's been paid back in full with additional penalties. So I don't know what date Mr. Diveroli decided that he was going to accelerate these loans. I don't know if he was making these loans for the purpose of doing what he eventually did. I don't know if Philadelphia was ever real. That's beyond what I know.

Q. When did you first hear that he was accelerating the loan? October?

A. In the meeting in the conference room of the hotel in Tulsa, yes.

Q. That was October -- by that time the last loan was on July 31st; correct?

A. That is correct, yes.

Q. And you had not brought that loan current at that point, had you?

A. Correct. My understanding was that Mr. Diveroli understood where I was at financially. He was going to come to Tulsa. We were going to figure out -- we were going to finalize the Philadelphia deal, and we were going to finalize the

M. Kulick - Cross

99

tranche funding that I so desperately needed.

Q.        Just to be clear, in October, when the representatives of YSA came out, they weren't asking for $900,000 at that point, right -- $900 million?

A.        They did.

Q.        In October?

A.        Correct.

Q.        Let's talk about -- you said that you are being harmed by the second mortgages because of this possibility of full recourse; is that right?

A.        There are several significant harms. Full recourse is definitely something that's concerning.

Q.        And just so the Court understands, full recourse means that the senior lender would hold you responsible personally for -- was it the loan amount?

A.        Yeah.  So let's look at Muntage as a great example, because that's the one that really -- probably fastest could happen.  Muntage, if we were forced to sell it today on the market, would get no more than $6 million.  If it was sold at $6 million, the lender, which is Bancorp, would come after myself and the other guarantor for whatever the balance is

M. Kulick - Cross

between the payoff amount and the money that they got from the prospective sale.

Q.      So the nonrecourse liability is money damages; correct?

A.      I'm not sure I understand the question.

Q.      Sure.  What your concern is -- if you were held liable on the nonrecourse obligation, you'd have to pay a lot of money; right?

A.      That's correct, yes.

Q.      And the full recourse, none of the senior lenders have demanded that of you at this point; correct?

A.      They have --

Q.      They have?

A.      -- threatened.

Q.      But none of them have followed through and demanded the full recourse?

A.      Well, interestingly enough, on Lofts at North Penn and Village Creek, which are both under senior loans by CREO, which is the acronym for the entity that Cohen & Company owns those two notes through, both of those deals have significant value above the senior debt, both of those deals are in

M. Kulick - Cross                101

maturity default, both of those deals are in
foreclosure.

And I can't -- I have a sale for one
and a refinance for the other.  They are ready to go.
They are putting pressure on us on a daily basis to
close.  And there is one impediment to those closes
that can't be overcome.  Any other impediments to
those closes, if they do exist, would be easy to
overcome.

Q.        Okay.  We're going to talk about that
in a second.  You haven't paid any full recourse
liability at this point to any senior lender?

A.        No.

Q.        Okay.  So another way you say you've
been harmed -- you just touched on it -- is that the
second mortgages are inhibiting you from being able to
sell the properties or refinance the properties;
correct?

A.        Yes, that is correct.

Q.        But each of those second mortgages,
they have a monetary amount attached to them, do they
not?

A.        They do.

Q.        Okay.  So you could pay those

M. Kulick - Cross

102

mortgages off, and if they were found to be wrongful, you could then sue YSA for money damages, could you not?

A.      Mr. Tasca, do you happen to know the amount of the second mortgage that's placed on Muntage?

ATTORNEY TASCA:  Your Honor, I'm on limited time here.  I'd ask you to direct the witness to just answer my questions, please.

THE COURT:  Sir, if you can't answer based on the question posed, then just say you can't answer.

THE WITNESS:  Okay.  I'm sorry about that, Your Honor.

A.      It's impossible to answer that question.  The numbers are too large.

Q.      Right.  But the problem that you're having is just that it would be too big of a monetary amount for you to pay off; is that right?

A.      It's too big of a monetary amount relative to the transactions.  It's an egregious monetary amount.  Yes.

Q.      In theory, if you had all the money in the world and you were willing to pay off those second

CHANCERY COURT REPORTERS
500 N. King Street, Ste 11400, Wilmington, DE
(302) 255-0526

M. Kulick - Cross

103

mortgages, you could pay them off and then sell those properties without any problem; correct?

A.        Yes.

Q.        And have any of the sellers or title companies talked to you about escrowing the money until this issue is resolved here and then perhaps the money would be released back to you on escrow or to the buyer?  Is that not something you've explored?

A.        That is actually not acceptable.

Q.        Other than your own testimony that it's not acceptable, have you brought any evidence forward from a title company that says that's not acceptable in this case?

A.        No.  But clean title is a requisite for any sale.

Q.        Right.  And that's your testimony.  No title company has come in to this court and said that they can't make arrangements to deal with these second mortgages, such as by escrowing the money?

A.        No, they have not.

Q.        No senior -- or none of the buyers have come in here and said that; correct?

A.        No, we don't have any buyers in here.

Q.        And, by the way, you mentioned --

M. Kulick - Cross

we're going to get to this, but you mentioned innocent third parties in your papers, like the other investors in your properties; correct?

A.       Yes.

Q.       Okay.  This has been going on since November.  We haven't heard from any of them by way of declaration, by way of testimony today that they have any problem with what's happening; is that right?

A.       They are allowing us -- the most expeditious way that we could figure out to solve the second mortgages was how we have done it.  Opening up other parties to similar type of depositions in discovery felt like a bad decision.

So we want this done as quickly as humanly possible.  But there are other parties that definitely would want to be heard.

Q.       But they haven't been heard; right? They haven't come in here and expressed that this is an injustice to them, have they?

A.       Only insofar as they are allowing us to do that, as long as it's successful.

Q.       All through you?

A.       Correct.

Q.       Now, we talked about the Muntage

M. Kulick - Cross

105

property.  That was the property that you featured back in November when you asked for an injunction as one that couldn't be sold as a result of YSA's second mortgages; correct?

A.      That is correct.

Q.      But again, you didn't present any evidence at that time, and you still haven't presented any evidence, from a title insurer or from the buyer that they wouldn't buy Muntage due to those second mortgages?

A.      That's -- we have not.  It's a fact.

Q.      It's a fact --

A.      The fact that you can't buy a property with second mortgages encumbering the property.

Q.      Okay.

A.      That's not an opinion.  It's not a -- it's a fact.

Q.      It's a fact that you're testifying to, not anyone else, correct, on your behalf?

A.      Absolutely.

Q.      Okay.  You actually tried to get a declaration from a title company, did you not, in support of your injunction?

A.      We did, yes.

M. Kulick - Cross

106

Q.        Okay.  And she ultimately wouldn't give you one.  That's in Tab 21, Exhibit JX 178; right?

A.        In this exhibit, I don't see the back-and-forth with Tamie that you're describing, but I do see the draft declaration.

Q.        Did you submit a declaration from Tamie or anyone else from that title company or any other in support of your injunction motion?

A.        No, we did not.

Q.        Instead, you submitted your own declaration, right, which is Tab 22, Exhibit JX 181?

A.        Correct.

Q.        And you admitted that you were able to sell Thrive Argenta; correct?

A.        Yes.

Q.        That was because the buyer didn't see the second mortgages?

A.        There were no second mortgages on the title.  I don't know why, how.  We were in the middle of negotiating a loan extension, similar as we've done with all -- not loan extensions, sorry, a purchase and sale extension, like we've had to do with these other instances.

M. Kulick - Cross
107

And the buyer called me and they said, "Marc, we don't know why you're wanting an extension. We're not seeing a second mortgage on the title."

And I said if you guys are comfortable closing and if your title agent doesn't see it and if title is clear, we're clear to close.

Q.      Right.  But you saw that package of mortgages that your counsel handed you.  There is a mortgage on that property; correct?

A.      I mean, I don't know the answer because I don't know what makes a second mortgage. It's certainly not on title.  And from my perspective, if it's not on title, it doesn't exist.

Q.      You also mentioned documents -- you mentioned Lofts at North Penn, Village Creek as potential transactions.  Have you produced any documents in this case regarding the proposed sale of those properties?

A.      I would assume that it was in the discovery -- I would assume that that would have been turned over in discovery.  I can't -- I mean, I don't know with 100 percent certainty of that, but I would assume that that would have been in your discovery.

Q.      Okay.  And if it wasn't in there, then

M. Kulick - Cross

108

you didn't produce any such documents?

A.        That's correct.  That's correct.

Q.        Now, we discussed earlier the joinder is a central issue in this case.  We also discussed that when you moved for injunctive relief on an expedited basis and filed your complaint, you didn't mention the joinder in any of the multiple submissions you made; correct?

A.        I did not testify to that.  I don't know when the joinder was first mentioned.  As I said in my testimony, my earliest recollection of that discussion would have been Vice Chancellor Zurn on the telephonic hearing.

Q.        Okay.  Do you have any reason to disagree with me when I represent to you that there's no discussion of the joinder in those initial papers?

A.        I truly don't know.

Q.        In fact, in those submissions you actually cited the loan right before the loan when the joinder was added.  And your lawyers made the representation that all the loans were the same, even though that loan that was cited in your papers wasn't even in default.

A.        I do have a recollection that my

M. Kulick - Cross

109

attorneys had conflated the date of one of the loans in question.

Q.      You also came into this court to get your injunction -- and if we look at paragraph 23, here's the original.

A.      Where are we looking it?

Q.      I'm sorry.  Tab 23, JX 176.  This is your motion for expedited relief.

And if you look at page 13 of this document, at the bottom there, it goes on to page 14, "Plaintiffs do not have the authority to unilaterally mortgage the Properties held by the Title Owners."

That's what you said; right?

A.      That is correct.

Q.      Then in your reply brief, which is back on Tab 5 -- and that is JX 209.

A.      Tab ...

Q.      Tab 5.

A.      Tab 5?  I apologize.  Okay.

Q.      If you turn to page 5 of 13 there, once again, you say "neither Kulick nor any of his entities have the right to unilaterally mortgage the properties ...."

Do you see that?

M. Kulick - Cross

110

A.          That is correct.

Q.          And then the next day, your counsel stood up in front of Judge Zurn and said the same thing; correct?

A.          To my understanding.

Q.          Right.  And you only had a few arguments that you made, and this is one of them; right?

A.          Yes.

Q.          Okay.  And after making that argument, you obtained your TRO; correct?

A.          Yes.

Q.          And even in the amended complaint -- just to save time, I'll just read to you what I have here, and you tell me if you disagree.

But you allege there that "even if Defendant were receive such control rights through Kulick, Asset Holder, and/or Vesta Holdings, none of their control rights contain the right to unilaterally mortgage the Properties held by the Title Owners."

Any reason to disagree that's in the complaint -- the amended complaint?

A.          No.  I believe so.

Q.          But discovery has shown that on your

M. Kulick - Cross                              111

own you repeatedly gave second mortgages without consulting any of the other equityholders, the title owners; correct?

A.      As we discussed during depos, I did have -- it was during this process that I've learned where my authority extends and where it does not.  I don't believe it's fair to say that I didn't consult anybody because in depositions we did discuss who I consulted in second mortgages that I've granted.  But I do think that I've overstepped my authority and it's something that we're doing the best we can to fix.

Q.      Two weeks before you came to this court and repeatedly represented that you had no ability to give second mortgages unilaterally, you signed an agreement for Jenk's Best Living, right, one of the title owners, to give that to Pratt Street Capital, give them a second mortgage?

A.      Pratt Street Capital is the co-venture partner in the Thrive-Jenk's transaction.  So that second mortgage was approved by both myself and the co-operating partner.  So that would be, I believe -- I'm not 100 percent sure.  I believe under the operating agreement, those would be the two people that would need to sign off on that second mortgage.

M. Kulick - Cross                112

Q.        But the point is that you gave a second mortgage two weeks before you came into this court and said you couldn't do it; right?

A.        I believe what we have said is unilaterally.

Q.        And you don't regard that as unilaterally?

A.        In that instance, certainly not.

Q.        And that's because a mortgage was given -- the person who was getting a mortgage was in favor of it?

A.        Right.  And per the operating agreement, he would be the other person that would have to consent.

Q.        You offered many other mortgages, as we saw in your deposition -- we don't have time to go through them all, but there was text message after text message where you were offering people second mortgages or an equity pledge; right?

A.        Yes.

Q.        Now, the other thing -- excuse me one second.

Just to save time here, Mr. Kulick, do you recall at deposition when we talked about the

M. Kulick - Cross                          113

Pratt Street mortgage?

A.        Yes.

Q.        And there was something attached to it called a certificate and agreement -- a limited liability company authority certificate and agreement; right?

A.        Yes.

Q.        And it was signed on behalf of your wholly owned company Louis Investments, LLC?

A.        Yes.

Q.        And the certificate and agreement contained a provision entitled "Affiliates"; correct?

A.        I don't have it in front of me.  I'm familiar with the concept.

Q.        And you represented in that provision that Louis directly or indirectly owns or controls those entities which are listed on Exhibit A "and has full power and authority to bind the Affiliates by the signature of the undersigned below."  Correct?

A.        I don't see that.

That's actually factually inaccurate, but they drafted that document.  As much as I've ever been in a rush in anything, that was a very big rush. And they even said to me when they drafted the

M. Kulick - Cross

114

documents that not everything might be accurate but that they felt like they had enough collateral that they didn't really care.

Q.        And those affiliates were defined as all the title owners; correct?

A.        When you showed it to me on deposition, there were actually a lot of -- there were mistakes in that presentation.

Q.        Right.  And you pointed those mistakes out at me.  But the mistakes weren't that the title owners shouldn't have been on that list; correct?

A.        Well, in that particular instance -- actually, I think it's the most clear argument.  That joinder or that concept is so different than what YSA is trying to do.  They listed it out very clearly, delineated the additional entities, delineated what they are trying to do; whereas trying to -- you know, end run around a concept that clearly didn't exist in the first place.

So it's a different -- it's a very different transaction.  And again, admittedly, on both sides of that transaction, we were just going at a lightning speed.  We didn't know how to get comfortable.  And they just said, you know what, if

M. Kulick - Cross

115

you are comfortable signing this -- the meat and potatoes of it are the Thrive second mortgage.  The loan amount is very small, so it was absolutely covered by the Thrive second mortgage.  And they just said, we want you to sign everything else in this. And I said okay.

Q.       So you signed a document which you represented that you had authority on behalf of the title owners to sign by --

A.       Correct.

Q.       Now, as part of one of the June 2025 loans, you also agreed to a confidential side letter.

Do you remember that?

A.       Yes, I do.

Q.       And in that confidential side letter, you assigned YSA, among other things, reserve deposits associated with the various properties on which YSA recorded second mortgages; correct?

A.       There was nothing about second mortgages on that document.  But, yes, I agreed to the reserves.

Q.       So it was property belonging to the title-owning entities that you pledged onto that side agreement, correct, by your own signature alone?

M. Kulick - Cross

116

A.        It's a little more complicated than that, because, as we talked about at the deposition, I have to make -- Vesta Holdings makes loans to the properties to keep them afloat consistently.  Of the 34 properties we currently own and operate, I would say 32 of them are requiring cash from Vesta Holdings on a consistent basis.

And so when I was considering -- when we were pledging the reserves, typically what happens is I have to make a loan to the property, Vesta Holdings makes a loan to the property, the property gets their reserve funded and then pays back the loan.

So my reason for being very okay with that concept was great, Vesta Holdings is going to get money back from the property escrows, and then it's going to use that money to satisfy the debt that it has to YSA.

Q.        Now, at deposition, you recall I asked you what prospects for sale existed on the properties at issue prior to YSA reporting its second mortgages?

A.        I do.  I don't remember which deposition that happened in.

Q.        It was the very first day, in case that refreshes your recollection.  But in that

M. Kulick - Cross

117

testimony, you didn't mention Thrive Argenta, did you?

A.        Thrive Argenta had already sold at the day of our first deposition.  Our first deposition was December 30th, if I'm not mistaken.

Q.        Right.  But you didn't mention it, though, when I was asking you about sales of the properties.

A.        Correct.

Q.        Your counsel also sent a letter dated December 1, 2025 -- and this is at Tab 24, Joint Exhibit 211 -- where he tells the Court that -- urges the Court for a hearing as soon as possible and talks about the Thrive Argenta sale which is being stymied.

Do you see that?

A.        Yes, I do.

Q.        And then after the sale closed in mid-December, there was no corrective letter ever sent to the Court, was there?

A.        No, nothing else.

Q.        Going back to the April 9 loan, that was for you to purchase Parc 1010, is it?

A.        That is correct.

Q.        And you didn't actually make that purchase, did you?

M. Kulick - Cross                           118

A.          No.  It fell apart.

Q.          But you didn't return YSA's money after that, did you?

A.          Well, I think it's very clear when you look at the payment -- the repayment history, YSA's money was more than returned.

Q.          So your position is that YSA did get its money back from the Parc 1010 loan?

A.          Yes.  A quick review of the document that you guys provided on February 6, 2026, would show the payments received under the April loan.

Q.          Asset Holder.  You said that's an entity that you created specifically to act as borrower for the initial loan from YSA; right?

A.          That is correct, yes.

Q.          And you testified that you transferred assets into Asset Holder, LLC, which then were pledged to YSA as the unencumbered assets?

A.          As a clarification -- and I think I said this in the deposition -- that transfer and everything regarding the structure of Asset Holder, LLC was done by my counsel.

Q.          You haven't produced any documentation to show either that you transferred interest into

M. Kulick - Cross

119

Asset Holder or that Vesta Holdings, LLC had the interests that were pledged, those 17 interests, have you?

A.      I don't know that it's been requested. Again, in all of the discovery that has been presented both in this and in the lead-up to the June -- in the Philadelphia term sheet, I would assume that you guys have that.  But I'm unaware if you were needing that. I don't think that's ever been requested, if it's missing.

Q.      And then one of the things that I -- I can't recall if we discussed this at the deposition, but if you look at the recital in the February 18th loan, it says that Vesta Holdings at that point -- well, at some point the assets that were owned by Asset Holder in the earlier loans were then owned by Vesta Holdings, LLC.

Do you recall that?

A.      No.

Q.      Let's take a look at that, then. Let's take a look at, for example, Tab 11, which is JX 63.  And if you go to the CPSA there, Recital B lists all the unencumbered assets.

Do you see that?

M. Kulick - Cross

120

A.        Yes.   Together the unencumbered interests and encumbered interests comprise the capital I "Interests."

Q.        And then if you look at Tab 17, and specifically this is divided up by sub tabs.  Look at Tab 17.3.

A.        I see, okay.

Q.        That would be JX 110.

So in this document, YSA -- or Vesta Holdings is both the "Borrower" and the "Pledgor"; correct?

A.        I have no idea on that.  That was -- these docs were drafted by YSA.  I didn't have counsel.  I didn't make one edit.  As you guys have seen through discovery, when I was presented with these documents, I forwarded it to my team, and they signed on my behalf.

Q.        But in Recital B here, you represent the "Borrower" here.  You are representing that the very same unencumbered assets that we saw that Asset Holder owned, you're now representing that Vesta Holdings holds them; right?

A.        I didn't notice that.  Again, I didn't draft this.  I made no edits to this.  That would be a

M. Kulick - Cross                    121

question for Mr. Miley or Mr. Rogers.

Q.          Did you read it, Mr. Kulick, before you signed it?

A.          No.  We were using the same documents ad infinitum.  There didn't seem to me to be any reason to read them.

Q.          Well, you were switching who the "Borrower" was?

A.          I didn't.  I will swear under oath that that was absolutely done on the YSA side.  I have no knowledge of why that was done.  I have no knowledge of when that was done.  I have no knowledge of anything relating to that.

Q.          We discussed at your deposition that you made -- you obtained a number of merchant cash advances; correct?

A.          Yes.

Q.          And that you pledged future receivables of Vesta Holdings, LLC?

A.          Yes, that is true.

Q.          And we discussed that Vesta Holdings, LLC, though, has no revenue; correct?

A.          That is correct, yes.

Q.          So you were going to these MCA lenders

M. Kulick - Cross

122

and pledging essentially nothing for the loans; correct?

A.        No.  If you -- I mean, I think it's in your binder here.  But no, it was not intentional to do that.  I actually spent considerable amount of time trying to educate merchant cash advance lenders that the holding companies were not what they wanted.

It's an interesting study in human psychology.  The more I told them "no, you guys don't want the holdings entities because they don't have revenue," the more they said "no, we need a holdings entity to be the face of the contract."  Nobody wanted to make the face the contract.

So, yes, Vesta Holdings with one particular MCA lender ended up being the face holder of the loans.

Q.        Okay.  But you didn't tell me that at deposition, did you?

A.        I mean, I don't have -- look, I don't have the deposition in front of me.  I believe I was clear with you that, look, I didn't intentionally not pledge anything.  The lender drafted it.  The lender sent me what they wanted me to sign.

And as you guys know, I mean, I was

M. Kulick - Cross

123

desperate for money.  I'm trying my best to make a real estate portfolio work, and somebody is offering me cash and they say they want Vesta Holdings to be the borrower.  Even if I know that that's not what they really want, I've made a good faith effort to tell them that.  And that's -- I think that's where my obligation ends.

Q.      But what you didn't tell me -- and we talked quite a bit about the MCA loans at the three days of your deposition.

A.      True.

Q.      You never told me that the MCA lenders wanted the holding company to be the face of the --

A.      I believe we did.  I believe we spoke about it specifically with LendSpark because LendSpark wanted Vesta -- Vesta Realty is actually the face holder of the LendSpark notes.

And I believe that that was something we specifically discussed.  I could be mistaken, but I believe that to be the case.

Q.      Okay.  The deposition will speak for itself.

But do you remember when I asked you, "So -- so basically, I mean, to answer my question,

M. Kulick - Cross

124

you basically didn't pledge anything under this particular agreement with these particular entities; is that fair?"

And you said to me, "I would agree ... based on my understanding, yes."

A.    Yes.  And that's actually literally what I was just about to say again.  Based on my understanding of how their document works and how it correlates with the other entities that they listed on that document -- and this was one particular lender. This was not all the MCA lenders.  This was one particular lender who seems to have made a mistake in how he structured the loans.

Q.    Well, you did it more than once?

A.    That same lender, yes.  That same lender did it more than once, but it was not multiple lenders that made that error.

Q.    You didn't do that to both LendSpark and BH Capital?

A.    First of all, I didn't do anything to them.  We had a fair negotiation as to what would go into the loan.  That is a blatant mischaracterization of what happened with LendSpark, considering that you guys have the discovery on that.

M. Kulick - Cross                    125

My counsel was involved in the LendSpark transaction.  There was days, days spent negotiating who the borrower would be and who their collateral would be.  They made a decision to still make the loan even though we were clear that those loans had to be done to the investor-level entities and not the title owners.  They made a decision to continue to lend.  We made our position clear.  That is a blatant mischaracterization.

Q.     So I asked you both about the LendSpark and the BH Capital Group MCAs.  And then on page 213 of your deposition, I asked you, "So, again like with the LendSpark one, you were -- you're essentially pledging nothing?

"Answer:  That is correct."

A.     Yeah.  You know, I don't want to be argumentative.  I'm trying to give you answers.

Factually speaking, yeah, I don't think that LendSpark -- with LendSpark having the investor entities as their receivables, I don't -- if I were them, I would not make that loan.  But to say that we did that somehow surreptitiously or to say that we did that without full transparency is blatantly incorrect.

M. Kulick - Cross

126

Q.      So you also testified that with the MCA loans you were double-pledging assets that had already been pledged to your senior lenders.

Do you remember that testimony?

A.      Yes.

Q.      You were also triple pledging those same assets to other MCA lenders later on; correct?

A.      Yeah.  I didn't realize -- I had thought that merchant cash advances were a creative way to get financing when I'm not giving second mortgages and when I can't further encumber the properties because there were future receivable sales, which I thought was okay.

It was only probably September of 2025 when I learned that that's not okay because senior lenders have everything.  They are first on future receivables; they are first on collected receivables. And so I had thought I had found a creative way to help, but obviously not.

Q.      So the MCA loans -- I think we looked at a bunch of them -- they all have those anti-stacking provisions; right?

A.      Yes.  And as we discussed, they all knew about each other.  So they have an anti -- you

M. Kulick - Cross

127

have an anti-stacking provision from a lender who's calling you saying, hey, I'm okay being seventh in position.

I don't know exactly what to make of that.  It's a very odd industry, and one that I don't quite understand fully.

Q.    We talked about -- or maybe we didn't talk about this specifically, but you recall that there is a provision in a number of the YSA loan documents that requires you to provide written notice to YSA of debts that you or your affiliates incur in excess of $50,000?

A.    Yes.  We talked about that multiple times during the deposition.

Q.    Right.  And you told me repeatedly that you did not provide that notice; correct?

A.    That is not what I said.  Mr. Tasca, what I said repeatedly was that I know Mr. Diveroli was aware I was looking at other financing.  There is proof in our correspondences that Mr. Diveroli knew I was taking other financing.

What I failed to do was do it in the correct way under the documents in writing like I should have done.

M. Kulick - Cross

128

Q.    So your testimony is that you advised Mr. Diveroli of every loan you took throughout --

A.    No, I think Mr. Diveroli -- I'm sorry.

Q.    So your testimony is that you advised Mr. Diveroli that in general you were seeking financing, but you didn't actually provide him written notice or notice otherwise each time you took out a loan over $50,000; correct?

A.    That is correct.  I did not take that step.

Q.    Okay.  And during the course of that period, YSA was continuing to make more loans to you; correct?

A.    Correct.

Q.    Now, you've personally made millions of dollars of loans through Vesta Holdings, LLC to the properties; correct?

A.    Yes.

Q.    Okay.  And you've collected on your own loans before having your affiliates pay YSA back; correct?

A.    Again, I think that the payment history with YSA shows every good faith intention to pay YSA back.  I think we do not have anything close

M. Kulick - Cross
129

to an agreement of what I owe YSA, if I owe YSA, what YSA is owed.

I think I am very comfortable -- I understand where we are in the Court of Chancery, and eventually there will be a ruling on how much I owe YSA, if anything.  But I think the payment history shows I made very good faith efforts to continue to pay YSA until I was physically unable to continue.

Q.      But you have collected on your own loans before paying YSA money; correct?

A.      I continue to make loans to this day. But it is correct that I have money flowing back and forth on my own loans.

Q.      And the subordination clause which we looked at earlier, would you agree with me that that would prohibit that?

A.      I don't know.  I don't know because I'm still making loans and I'm a net lender, not a net -- well, I'm net lending money to the assets, not net borrowing -- or not net getting repayments from the entities.  So I don't know.

Q.      The subordination clause, it also has a provision that makes you trustee, if the loans are in default, to collect money for the benefit of YSA.

M. Kulick - Cross

130

Do you remember we talked about that at your deposition?

A.      We discussed that, and I told you I don't believe that to be accurate.

Q.      Okay.  So you have not collected any money that is owed to, say, Vesta Holdings, LLC for the benefit of YSA?

A.      That is correct.

Q.      Okay.  The MIPAA, as you called it, that you testified to -- which I think your counsel was trying to make the point, why would this have been necessary if you already had a pledge under the joinder.

Do you recall that testimony?

A.      Yes, I do.

Q.      The MIPAA, it actually assigns YSA property.  It's not just a pledge; correct?

A.      No.  It's just a pledge.

Q.      Okay.  But it's called an assignment. We can look at it.

A.      Membership interest pledge assignment.

Q.      Right.  So "assignment" is in the title.  The document is going to speak for itself. But do you think any component of that agreement made

M. Kulick - Cross                              131

it an assignment?

A.        Legally, I don't know the difference. I know it's a pledge and I know it's a pledge of membership interests.  That's what I know about the MIPAA.

Q.        Now, we saw in your deposition numerous occasions where you were talking to your accountants, your accounting team, about moving money around; correct?

A.        Yes.

Q.        So you moved money around to pay debts of one property with money that you obtained from other properties at times?

A.        The majority of my portfolio owes Vesta Holdings or some of my -- or any of my entities a substantial amount of money.  And so in any given day, what we do is we look at the bank accounts and we say there's X amount in this account, we're going to put it back into the Vesta Holdings lending pool and we're going to continue to make loans.

Q.        So the answer to my question is yes?

A.        The answer to your question is yes.

Q.        Also at deposition you told me that you would often incur overdrafts; correct?

M. Kulick - Cross

132

A.         Yes.

Q.         And you also would use security deposits of tenants sometimes for operational expenses of the properties; correct?

A.         That is a mischaracterization of what I said in the deposition on the security deposits. What I said was that there might be any number of reasons why we use security deposits, which would include the characterization you just made.  But also there are times when the security deposit accounts are overextended because we haven't properly taken money from people who left and owed us.  There are times where the properties are just overvalued on the security deposit accounts.

There's also -- we've transitioned to -- security deposits are a legacy for us.  We do surety bonds and we do kind of not alternatives to security deposits.  So there are times where people cede security deposit and get a bond.  I mean, all of those are potential reasons why a security deposit account would be drained.

Q.         Including taking the security deposit and using it for expenses?

A.         Including as a loan, yes.

M. Kulick - Cross                                        133

Q.        Okay.  Now, as I mentioned earlier, there's been a slew of litigations filed against you or your entities recently; right?

A.        Yes.

Q.        And that includes senior lenders.  I think in three actions they've gotten a receiver over your properties; correct?

A.        Receivers are presigned in loan agreements.

Q.        Understood.  The question is:  Have they gotten receivers in some of those cases?

A.        We are in control of all but two where we signed -- where we actually jointly signed for a receiver.

Q.        Okay.  Then you're also being sued by contractors from your former attorney for unpaid legal fees.

A.        Yes.

Q.        Your landlord sued you.  American Express has sued you.  Several of your business partners have sued you.  There are a number of mechanic's liens on all of the properties.

Any reason to disagree with anything I just said?

M. Kulick - Cross

134

A.          No.  I mean, on the contrary, as the second mortgages have continued to -- you know, our goal was to sell properties, liquidate some of the negative cash flow properties, pay off vendors, get money back to -- get money that Vesta Holdings and its affiliates have loaned to the properties and kind of recirculate.

As we've been choked off from that business plan, things have continued to get worse. That is absolutely true.

Q.          The latest suit was just last week; right?  Ronald Marks sued you for $4 million?

A.          That is correct, yes.

Q.          Now, the last thing I want to go over is that in the past two to three months, a number of news articles have come out about Vesta Realty; correct?

A.          Yes.

Q.          So much so that you actually gave a sit-down interview with a local news organization; correct?

A.          I think that the sequencing is incorrect.  I think that my decision to sit for that led to a lot more news interest because what we're

M. Kulick - Cross

135

getting is these news organizations think that if they batter us enough, I'm going to sit down.  And they keep requesting that I come for sit-downs.

And everyone in my organization has told me that it was a big mistake.  I did it -- I sat down for that interview because I thought our side of the story was pertinent and important, and I thought it would help our tenants to know that there was an email address for our corporate office that they could contact if they were having real issues with our property management team.

But yes, our cash is extremely tight. We are struggling to survive at this point.  And that is our day-to-day struggle.

Q.      Did you see the most recent one from yesterday?

A.      No.  I don't --

THE COURT:  You can -- I'm sorry, Counsel, what is your objection?

ATTORNEY BRODSKY:  I perhaps stood up too soon.  I was going to make a hearsay objection.

THE COURT:  I think the question is whether you saw it.  Did you see it?

THE WITNESS:  No, I did not.  I try

M. Kulick - Cross

136

implicitly not to read this stuff.

BY ATTORNEY TASCA:

Q.     But in general, would you agree with me that these articles talk about people not having hot water, people having -- trash not being picked up and creating an unsanitary situation.

I'm just asking you if you've seen those articles.

A.     Yes.

THE COURT:  Wait.  When your counsel stands up, it's because he has an objection.

THE WITNESS:  I'm sorry.

ATTORNEY BRODSKY:  Hearsay.

ATTORNEY TASCA:  Your Honor, I'm not submitting those articles for the truth of the matter asserted in them.  I'm just asking him if he's seen them.  That's all.

THE COURT:  Have you seen those articles?

THE WITNESS:  I'm aware of them.  I, again, try not to read them.

BY ATTORNEY TASCA:

Q.     One of the properties recently was actually declared unfit for human habitability and it

M. Kulick - Cross

137

was taken over by the City of *Stillwater*.

Q.          No, that is not factually correct.  It was not taken over by the City of *Stillwater*.

Q.          Was it found unfit for human habitability?

A.          That particular asset is a great example of how the news is twisting everything about us.  I think that the details, particularly in this court, are very important.  We experienced at the end of October rolling issues with our pipes underneath of the buildings going from the boilers to the buildings. From late October until the end of December we put a lot -- we put hundreds of thousands of dollars into fixing the pipes.  It didn't work.  And in early July we had a vendor -- Integrity Services Solutions said the problem is the pipes are corroded, there is no saving them, the only thing you can do is install individual hot water heaters in every unit.  That is a million-dollar project.

To date, we have spent $544,000 to get those water heaters back into units.  We are undertaking a massive expense.  And we've done it quickly and judiciously.

That news -- the news taking that on

**M. Kulick - Redirect**

138

is an example of how they are -- of how they are miscalculating or mischaracterizing what is happening at the sightline.

Q.      So you are being targeted by the news organizations?

A.      Yes, absolutely.  They've got enough truth behind the struggles of our properties that everything is -- everything we do -- the trash you mentioned.  How long was the trash issue?  It was three days because a vendor stopped servicing us for a debt that we had across the entire portfolio and woke up one day and said, we look at you as a -- we're looking at this as all your properties, we're not going to service even the properties that are current, we're going to stop servicing.  It took me three days to get them fully paid.  I got them paid, and the trash got picked up.

ATTORNEY TASCA:  No further questions, Your Honor.

**REDIRECT EXAMINATION**

BY ATTORNEY BRODSKY:

Q.      Very briefly, Mr. Kulick.  Do you recall there was lots of questions on cross-examination about what was said at the

**M. Kulick - Redirect**

139

November 25th, 2025, preliminary injunction hearing in front of Vice Chancellor Zurn?

A.      Yes.

Q.      And you were on that hearing?

A.      Until I lost reception, yes.

Q.      And do you recall me specifically telling Vice Chancellor Zurn that the documents are not ambiguous?

A.      It was my memory that you said that. It was a hard line of questioning for me because I wasn't taking notes.  I wasn't --

Q.      And do you remember Mr. Tasca saying the joinder is actually not confusing; it's a one-sentence provision that means exactly what it says?

A.      Yes, I do.

Q.      With respect to the title owners, are there individual shareholders in these intermediate holding companies?

A.      What's the question?

Q.      In the intermediate holding company, are there individual shareholders?

A.      Yes.

Q.      Dozens?

A. Yes.

Q. Hundreds?

A. Hundreds.

Q. Have you heard from these investors about this lawsuit?

A. This lawsuit?

Q. Yes.

A. Yes.

Q. Have you heard from many, many people being deeply distressed by the second mortgages?

ATTORNEY TASCA: Objection. Leading.

THE COURT: I thought you were going to say hearsay.

What is your response?

ATTORNEY BRODSKY: I asked him if he had heard that, which I don't think was leading.

THE COURT: When you suggest -- you can answer the question.

So my rule on leading questions is that you can ask them, I'll let you ask them all you want, but it's hard for me to assess the witness's credibility concerning what's being asked if they are, in fact, leading.

ATTORNEY BRODSKY: That's fair.

M. Kulick - Redirect

141

THE COURT:  Why don't you answer the question.

THE WITNESS:  Thank you, Your Honor.

A.        I hear from investors every single day on this.  I hear from my bigger partners who have more equity at stake much more frequently.

But I mean, even Mr. Brodsky's time has been utilized -- we've had to jump on calls with no less than 10 of my investors and their attorneys to justify what I signed to show them where we are in the case, to help them feel comfortable that I didn't -- that I didn't pledge what YSA is saying I pledged.

So it's been -- it takes a lot of time, there's a lot of pressure, and it's been very difficult for us.

Q.        There were questions asked about whether you knew how much you owed and when.

Do you recall that?

A.        Yes.

Q.        Did you make multiple requests for payoffs from YSA?

A.        Yes.  As a matter of fact, on November 8th, the day after we received the lawsuit from -- the email from Mr. Tasca, I was on a call with

M. Kulick - Redirect                                   142

Mr. Miley and I said, "How can you even do this? You've never even showed me how much I owed." And we had a conversation, we were going to sit at the computers and go over it.

And he stopped short and he said, "I can't go over it with you. I don't have the information in front of me."

And I said, "You don't track the payments I made?"

And he very interestingly said, "We track the payments you've missed."

Q.    And after you had that call, did you make more requests for a payoff?

A.    Personally, I'm not sure. But definitely through counsel, yes.

Q.    And do you know whether we sought judicial relief to get a payoff?

A.    Yes, I believe we filed a motion to compel.

Q.    And after all that, the first time you got a payoff was in February of 2026?

A.    That is correct.

Q.    With respect to your authority, is it fair to say that almost every one of the operating

M. Kulick - Redirect

143

agreements of the title owners expressly prohibits you from giving a second mortgage?

ATTORNEY TASCA:  Objection, leading.

THE COURT:  You can ask it.

Q.       What do the vast majority of the operating agreements say about your authority to give a second mortgage?

A.       Look, what I now know is that I do not have the authority that I thought I did.  These are -- many of these are managed -- manager-managed LLCs. And as such, I thought we had greater authority.

What I now understand, after diving into everything, particularly for this case, but also -- you know, Vesta has brought in a third-party consultant to help us understand corporate governance and help us, you know, with our management and help us with all of our problems.  I do not believe that I have the authority.

Q.       There was discussions about a cascade of lawsuits in recent months.  Is there anything that you can think of that caused this cascade of lawsuits?

A.       I mean, yes.  It's actually very interesting that Mr. Tasca ended on asking me about the lawsuit with Ronald Marks.  Ron Marks is one of my

**M. Kulick - Redirect**

144

big investors, very -- one of -- has been one of my closest friends for the last three years, four years maybe.  And we had multiple agreements with him that we were going to help get him paid back off of some of these sales.

And he got tired of waiting, and he gave me until the end of December to pay him back or he was going to get litigious.  And I prayed that this would be over by then.  It wasn't.  I asked them for more time and more grace, and it just didn't -- it didn't exist.

ATTORNEY BRODSKY:  Nothing further.

THE COURT:  All right.  We're going to take an hour for lunch.

(Luncheon recess taken at 12:27 p.m.)

**M. Kulick - Redirect**

145

(Resumed at 1:30 p.m.)

THE COURT:  Please be seated.  Thank you.  Is our examination of Mr. Kulick complete?

ATTORNEY BRODSKY:  Nothing further from the plaintiffs, Your Honor.

ATTORNEY TASCA:  Nothing further from our side, Your Honor.

THE COURT:  Great.  You may be excused from the stand, Mr. Kulick.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Let's call our next witness.

ATTORNEY BRODSKY:  The plaintiffs rest, Your Honor.

ATTORNEY TASCA:  Your Honor, we would call Efraim Diveroli to the stand.

**EFRAIM DIVEROLI, having first been duly affirmed, was examined and testified as follows:**

ATTORNEY MARTIN:  Your Honor, if I may approach, I will give witness binders.

THE COURT:  Yes.

ATTORNEY TASCA:  Joel Tasca, Your Honor.

E. Diveroli - Direct

146

DIRECT EXAMINATION

BY ATTORNEY TASCA:

Q.      Mr. Diveroli, can you tell the Court what you do for a living.

A.      So I help run a family office in which myself, three of my siblings work as well, as well as some others.  And we invest in various alternative asset classes in addition to some publicly traded equities.

Q.      Do your activities include private commercial lending?

A.      From time to time.

Q.      What is YSA Investments 1, LLC?

A.      So YSA was actually a company that we had formed, I guess you call it an SPV, right, for the purpose of a specific investment in a company called YSA couple years ago, a few years ago, that we never ended up using for that purpose.

So it was sort of a Delaware entity that we had on the shelf, so to speak.

Q.      Take a look at Tab 1, which is Joint Exhibit 3.  Do you recognize this document?  I know it's a lengthy document.  But look through it.

A.      Okay.

E. Diveroli - Direct                    147

Q.        What is that?

A.        This is a -- appears to be -- it is a series of text messages between myself and Marc Kulick.

Q.        Okay.  And in the interest of time, I'm probably not going to ask you about every single text message in there, but we might look at a few.

Did there come a time when YSA made a loan to either Mr. Kulick or his affiliates?

A.        Yes.

Q.        Okay.  Tell me about that.

A.        So I was approached by, I guess a mutual associate of ours, a gentleman by the name of David Ruttenberg, about making some short-term loans -- high-interest, short-term loans to a multifamily owner/operator out of the midwest.

And then I was introduced, and I think one day Marc just reached out to me by text and said, "I got your name from David and can we set up a time to speak?"  Knowing -- somewhat of a rapport with David, so out of respect to him, I took the meeting -- excuse me, took the call.  Then we did a Zoom as well.

Q.        Okay.  At some point YSA made a loan to one of Mr. Kulick's affiliates or multiple

E. Diveroli - Direct                    148

affiliates?

A.          We did.  Sometime in first week of October.  First, second week of October.

Q.          Okay.  And again, just to avoid having to go through all these text messages, you've reviewed this document, have you not, Tab 1, Joint Exhibit 3?

A.          I have.

Q.          And there were a series of loans made over time by YSA to Mr. Kulick; correct?

A.          That's correct.

Q.          And based on the text messages that you reviewed and, you know, your own personal knowledge, was it you going back to Mr. Kulick to make loans or was it him coming to you to make continued loans?

A.          He would typically approach us.  I mean, I think that happened almost in every instance.  Now, there certainly were times where he would initiate the discussion and sort of make it known that he needed funding and he needed it quickly, and I would follow up with him just to see, hey, are we doing this or not, especially considering we have limited bandwidth.

So there were certainly times I asked

E. Diveroli - Direct

149

him, but generally he initiated all those discussions, from my recollection.

Q.      Did there come a time when a loan was made by YSA to one or more of Mr. Kulick's affiliates on February 18th, 2025?

A.      Yes.

Q.      Okay.  Was there anything different about that loan from the prior ones?

A.      Yes.  The dollar amount was significantly more than what we had previously lent. And we had already had some delay in making the initial payment.  He had already been delinquent on the first loan, and then he was also asking, I think it was double or more than double of what he originally had asked for.  So those were ...

Q.      Okay.  And anything different about the documents on the February 18, 2025, loan?

A.      Yes.

Q.      What was that?

A.      Starting from February, we made it clear to him that -- I mean, there's the joinder provision, right.  That was where it came from.

Q.      Tell me about the lead-up to the joinder provision.

E. Diveroli - Direct

150

A.      Sure.  So we made it crystal clear that we were in no way, shape, or form going to accept the same scope of collateral and security that had been, right, had been previously pledged due to the significantly -- significant increase in the loan amount.

And we were doing, you know, rigorous due diligence.  I believe I basically had my office cease almost all other activities to just laser focus on getting comfortable with the full Vesta portfolio, you know, all of the assets that we were discussing pledging for the purpose of that loan.

Q.      Did you have any conversations with Mr. Kulick about the issue of collateral for that February 18th, 2025, loan?

A.      Yes, we did.

Q.      Tell me about those discussions.

A.      It was, hey, simply not going to -- what was previously pledged is simply not going to be adequate.  I mean, these quote/unquote capital contributions that were there were, you know, finite, so to speak.  I mean, they weren't going to get more valuable is what we had felt, right.  Clearly there was some level of distress already over there.  As I

E. Diveroli - Direct
151

said, he missed a previous payment.

And we were just clear that we needed, you know, significantly more collateral. Because also as a lender, you have to appreciate that in the event things do go south -- and in a distressed situation like this, they do, all right. We're here today, in fact. So, you know, always you want to be substantially over-collateralized, not under-collateralized.

Q.      Would you consider the loans that YSA made to Mr. Kulick's affiliates high risk or low risk?

A.      I -- at the onset of the relationship, in the early part, I would consider them high risk. And eventually we got to extremely high risk.

Q.      Did you ever consider not making additional loans to Mr. Kulick even though he kept coming back for them?

A.      Yes.

Q.      Why did you continue to make them?

A.      He was very persist -- first of all, I'll give it to Marc that he's a fantastic salesman. And I've never -- I've always -- never really raised capital myself, so I wouldn't say it's an art form of mine.

E. Diveroli - Direct

152

But he's very good at that.  And he's very persuasive.  And he's a very affable guy who presents as trustworthy.  And, frankly, we formed what I considered a friendship and a bond over, you know ...

Q.      Going back to the joinder for a moment.  Did you at any point believe that the joinder was intended to keep the collateral the same as it had been on prior loans but just make more of Mr. Kulick's entities responsible for that same collateral?

A.      No.  Absolutely not.

Q.      Did Mr. Kulick ever tell you that that was what he was proposing with the joinder?

A.      Absolutely not.  And I would have, frankly -- you know, I would have ceased negotiations at that point because that would have been insulting -- and concerning, excuse me.

Q.      I'm sorry.

A.      Pardon.

Q.      Would that proposal that I just articulated make any sense to YSA?

A.      No, for the reason I just said.  It would be both insulting and concerning, would be that -- I mean, we already had UCCs recorded, as Marc well

E. Diveroli - Direct

153

knew.  We had UCCs recorded on those assets at that point.  We had no ability to further encumber those assets, right.  Those were directly pledged as unencumbered assets.

So if he was to tell me, "Hey, I want to add language in there to essentially not defraud you," right -- like, "Hey, I'm gonna put some additional -- I'm not gonna defraud you and I'm not going to repledge these assets to another group," I mean, I would have terminated the discussions immediately.

Q.        You may have answered this to some extent already.  But as time went on with the loans, the interest rates seemed to get higher; is that fair?

A.        Yes.

Q.        Why was that?

A.        For starters, it just got more and more risky.  The defaults started to become more and more frequent.  We had situations where there was wires that had purportedly gone out with fed reference numbers that funds were never delivered.  We had checks that bounced.  We had Marc himself proposing higher rates.  I mean, I think he was very keenly aware of how big of a risk and how distressed he was.

E. Diveroli - Direct

154

And he -- you know, he knew that we're not typically lenders. And I run a small family office. We do a very, you know, finite amount of investments. And, you know, we're not a typical, you know, debt lender, if you will, right. We're more equity-focused and the returns had to be substantial to be interesting for us. And I genuinely believe he couldn't find the funds anywhere else, as well.

Q. How were the interest rates on these loans arrived at?

A. In most instances I believe he proposed -- he proposed a rate, typically a very short duration note, right. So it would be whatever it is, anywhere from a couple of days to a few months. And he would propose a rate and then that rate would be -- you know, we'd negotiate in some instances.

And we always found -- seemed to always find common ground at some point on the numbers, and then they'd be inserted into the document. Right.

Q. And did that include the last two loans, that that was, you know, a proposal that was discussed between the two of you and you arrived at an agreement as to what the payments would be?

E. Diveroli - Direct

155

A.          Correct.  After the -- through the course of the ten or so loans we did here, that was the standard practice.  He'd propose an amount for a certain other amount, and that would equate to a rate, and we would insert a rate in there.  And, you know, he advised that that was also commensurate with rates that he was getting from other lenders.

Q.          And what was the course of conduct in terms of communications between you and Marc when these negotiations were taking place?

A.          Very friendly -- I mean, I would say. It was a very friendly -- pardon me.

Q.          Did they take place over email? Phone?

A.          Oh, excuse me.

Q.          Text?

A.          Typically -- I mean, typically -- really a combination of both.  I mean, we would talk -- some days we'd talk three, four, five times. There were days we would text ten times and not talk at all where we're both busy guys.

So I don't know that there was any set formula *per se*, right.  But it was really a combination of both, circumstance dependent.

E. Diveroli - Direct

156

Q.        Was it your impression that when Mr. Kulick wanted a loan that, you know, he was in a hurry to get the loan or was it that he would proceed deliberately and systematically to get it?

A.        It was typically a Chinese fire drill. It was almost universally last minute, right now, house is on fire, we need the fire department to put it in a -- you know.

Q.        Tell me about the April 9th, 2025, loan.  That would be the one -- I believe it was the Parc 1010 transaction.

A.        Yeah.  So that one in particular was a loan that was supposed -- was dedicated to a very specific purpose.  Because there was already a default at that stage.  It was a loan for a very specific purpose for acquiring a new asset, right.  A new asset.

And in that instance we said, hey, if you're acquiring a new asset, we've already got all this other collateral on the entirety of your portfolio, right, vis-a-vis the joinder in the February 18th loan, which it was a continuing process, right, that we're going to need something even more, right.

**E. Diveroli - Direct**

157

And he knew full well — Marc — that hey, I've already given you everything, what else can we do?

And I said, well, you can assign us, right -- because the difference between a pledge -- my understanding, right, not being an attorney, but my understanding as a businessman is that there is a material difference between an assignment and a pledge, right.  Pledge, you have to actually wait for a default.  You need to take action against the collateral once a default is -- you know, occurs.

Whereas an assignment is we actually get title to that asset immediately, whatever that asset might be.  So we'd have title, custody, possession.

Q.     And was there a document as part of the April 9th, 2025, loan package called a MIPAA, the membership interest pledge and assignment agreement?

A.     I recall there was.

Q.     Was that the document that accomplished what you just described, an actual assignment beyond just a pledge?

A.     I believe it is.  I'd want to look at it to be certain, but I believe that's exactly what

E. Diveroli - Direct                158

it's intended to do and did.

Q.        Now, eventually, YSA stopped making loans to Mr. Kulick; correct?

A.        Correct.

Q.        And why was that?

A.        I mean, number of reasons.  For starters, I mean, the balance had gotten significant. But beyond that, I just felt like we were getting the runaround; right.

It was just -- it was one excuse after another.  It was, you know, like I said, fed reference numbers, right, of wire transfers that never occurred. It was bounced checks.  It was, you know, just checks in the mail, promise after promise to pay, which just did not materialize.

So at some point we just said enough is enough here.

Q.        So of all the loans that YSA made to Mr. Kulick's entities, are there any that are in default right now?

A.        Yes.

Q.        Okay.  How many are in default?

A.        I believe it's four.

Q.        And what's the total amount owed on

E. Diveroli - Direct
159

those loans right now?

A.      We agreed to cap -- because the collateral per the joinder addition on February 18th was meant to expand to the entirety of the real estate portfolio, notwithstanding that we had the right to -- obviously we have a personal guaranty where we can pursue Marc individually as well -- we had agreed at a gentleman's agreement in good faith, which we're going to -- we are still prepared to honor, frankly, as I explained to you, and I think we have told the other side, we would cap it at the value -- we agreed to cap it, excuse me, at the value of the real estate that was pledged vis-a-vis the joinder.

So roughly $900 million I believe, as he represented the value of the portfolio to us.

Q.      Now, the last loan was made July 31st; correct?

A.      I believe that was the date.

Q.      When did you approach Mr. Kulick with this $900 million figure?

A.      I believe it was October.  October sometime.

Q.      You mentioned that you had a rapport or got friendly with Mr. Kulick.  What changed to make

E. Diveroli - Direct

160

you accelerate the loan like you did?

A.    A lot.  I mean, we had gone back and forth from that time.  Even in July, we had obviously significant concerns, which were reflected in the terms, the additional rates, right.  But beyond that, at some point I just started to believe he wasn't being completely forthright with us anymore.

Now, I had maintained the belief -- I knew day one meeting Marc that, hey, there's some issues here; otherwise this opportunity wouldn't present.  But those issues metastasized in ways that were just, frankly, breathtaking.

And I went from also -- to me, fundamentally, principally, there's a difference between somebody being overextended and there's a difference between somebody being dishonest.  And the minute -- I pride myself on being a very straight shooter in business.  And the minute somebody is not with me, that's when I lose my patience typically.

Q.    Did you conclude that Mr. Kulick was being dishonest with you?

A.    I did.

Q.    What specifically made you think that?

A.    It was withholding material

E. Diveroli - Direct                161

information.

Q.      One of the provisions --

A.      And misrepresenting things -- well,
excuse me.

Q.      Go ahead.

A.      Also misrepresenting things.  But
mainly withholding -- you know, material omissions
that, had they been disclosed, we would have never
entered in some of the loans, let alone spent a
tremendous amount of time and resources trying to
obtain a bigger -- facilitate a much bigger loan
package for him at much more favorable rates.  None of
that would have occurred had he been fully transparent
with us.

Q.      Does YSA have unlimited resources to
spend on these deals?

A.      Absolutely not.

Q.      Did you feel like your time was being
wasted at some point?

A.      My time, my team, on a near-daily
basis.

Q.      Now, one of the provisions in the loan
documents provides that the borrower, Mr. Kulick, any
of Mr. Kulick's affiliates, had to advise you if they

E. Diveroli - Direct

162

incurred a debt in excess of $50,000.

Are you familiar with that provision?

A.    I am.

Q.    Was that an important provision for YSA in the loan documents?

A.    Completely.  I believe we even went back and forth on that in the original loan docs as part of a redline and negotiation points.

Q.    And why was that important to YSA?

A.    It's critical.  We knew Mr. Kulick was distressed.  We knew Marc was distressed, right.  So if he's out there -- I mean, there's only so many assets to go around clearly, right.  It was a finite number of assets.

If he's continuing to go out into the world and take loan after loan after loan and other funding sources and not report that to us, we can't make a bona fide risk assessment as to whether or not we want to call in a defaulted loan, make another loan.  I mean, to us, that would have been incredibly material.

Q.    Another provision in the loan documents was a subordination clause, was it not?

A.    Yes.

**E. Diveroli - Direct**

163

Q.      What was your understanding of how that clause worked?

A.      My understanding of how that works is that once there is an event of default, right, once he has defaulted on any material obligation in the loan documents, he would have to subordinate all of his claims -- excuse me, any claims that Marc might have -- and mind you, those were represented to us to be tens of millions of dollars in loans that were personally owed to him.

So there was tens of millions -- and that was some of the collateral that we were banking on, right, was the value of those loans that were personally owed to him where he agreed to serve as our trustee and our fiduciary in collecting on those loans and transferring the proceeds of those loans over to us to satisfy his debt obligations with us.

Q.      Is it your understanding that Mr. Kulick is now trying to sell -- and in fact has sold -- some of those loans at a discount, some of his own loans?

A.      I know he was trying to sell them during the -- the answer is yes.  We know that from discovery because it was not disclosed to us that that

E. Diveroli - Direct

164

ever happened.  The only disclosure that had happened prior to that was where he told me he was trying to sell his loans to satisfy our debts.  Never told us that the sale actually went through.  Apparently he sold them.

And only after we compelled documents in discovery did we find out he sold them and has apparently pocketed those funds for his own use.

Q.      Now, we talked about that $50,000 debt provision, written notice required.  Was Mr. Kulick, though, talking to you about financing, like looking for other financing?

A.      Yes, he was.

Q.      Okay.  What was the nature of those discussions?

A.      I mean, that was always in the context of him, you know, trying to refi, find money, okay, to repay our loans.  He was saying, "Hey, I'll have somebody take out your loans; I'll find liquidity to pay you."  Right?

It was never a conversation of, "Hey, I'm going to raise -- I'm going to obtain all these other funding sources and continue to be in default with you."  I mean, obviously that would make zero

E. Diveroli - Direct

165

sense. He wouldn't be telling me that.

In fact, we know now -- and again, this is what radically changed my opinion about Marc, unfortunately, is that he did not -- he was not forthright. All right. He made it seem like all those efforts to raise any money to satisfy his debts with us failed.

We were never informed, "Hey, I've raised the money, I want to make good with you," despite the fact that he's saying he did and that he didn't have any money and now we know he did.

Q.      Was there a time when you made a trip to Oklahoma to look at the Vesta properties?

A.      Yes.

Q.      Okay. And what did you observe about the properties while you were there?

A.      To me, they looked -- some of them looked delapidated to the point of being unlivable. You know, some of them -- I mean, I saw roaches running up the wall. As a matter of fact, I took a couple photos of this. I sat and talked with a tenant for 10 minutes, an old lady there. I almost got to tears.

And in fact, I spoke to Marc right

E. Diveroli - Direct

166

there on the spot and told him this is shameful; this is shameful what's going on here.  Roaches running around.  Pools with no water on them and no gating.  Okay.  So just any child can just fall in there at any moment.

I'll also say this.  I am not a real estate expert by any means.  Okay.  I've never been a huge fan of real estate.  So we brought Mr. Detweiler with us, who knew this stuff.  And he was, you know, frankly, appalled.  And he impressed upon me how serious these violations were from not just a valuation, but also just a safety and health perspective, which we found to be very alarming.

Q.    Was one of the reasons for the Oklahoma trip also to try to resolve your debts -- or resolve Mr. Kulick's affiliates' debts to YSA?

A.    Yes.

Q.    Were you able to resolve it?

A.    We were not.

Q.    Do you remember what you proposed to resolve it?

A.    We were open to a number of scenarios.  But, you know, our offer was, hey, you've pledged all these assets to us, you are now many months in

E. Diveroli - Direct

167

default.  We've tried with you repeatedly to work this out with you amicably at very, very low numbers relative to what was owed to us at that time.  You've strung us along.  We've -- you know, we don't trust that you're qualified, frankly, to operate this business from both a financial or, you know, practical boots-on-the-ground standpoint.  And what we would be willing to accept to release you from your personal guaranty is an assignment of the properties.  Let's avoid lengthy protracted litigation.  Right.  We'll take the property; we were open to discussing that.

We were trying to find a way for him to also come out with some kind of -- you know, call it a safety net, golden parachute, what have you.  We were open to many different, you know, machinations of a settlement agreement.  But all of them involved him being removed as the operator because we just felt that would have just been fatal.

Q.     Just a couple more questions, Mr. Diveroli.  Why did YSA feel it had to take -- record the mortgages that it recorded on the Vesta properties?

A.     I mean, because there were -- absent that, we would have had -- we believe, and our

E. Diveroli - Direct

168

attorneys, frankly, and others -- the experts that we engaged on this, all categorically concluded if you do not exercise your rights under the security agreement and the power of attorney and so on, your odds of a recovery are going to become essentially zero.

And even with taking these prophylactic measures, there certainly is no assurance of any recovery based on how dire the circumstances are.  But give yourself a chance.  You bargained for these rights, give yourself a chance.

So we followed the advice of the professionals.

Q.      If those mortgages were removed, what would the consequences be to YSA?

A.      Devastating.  We'd have essentially no recovery.  I mean, knowing what we know now, which seems to be getting worse by the day, you know, everything from these -- I think it's a lawsuit every other day, at least a couple a week, coming down on the Vesta portfolio, Marc himself individually. There's receivership actions pending over there. There's uninhabitable -- a property, I believe, has been deemed uninhabitable.

I mean, this thing is -- what we've

E. Diveroli - Cross                  169

been advised -- again, I'm not purporting to be an expert on this.  But we've been advised, and just as a human, I can see this and I can say that this looks like a wildfire.  And sooner or later, we're going to become part of the debris completely and then there will be just nothing to recover.  So, yeah.

ATTORNEY MARTIN:  No further questions at this time, Your Honor.

**CROSS-EXAMINATION**

BY ATTORNEY BRODSKY:

Q.      Ben Brodsky on behalf of the plaintiffs.  Good afternoon, Mr. Diveroli.

A.      Good afternoon.

Q.      I think you said that you formed a friendship and a bond with Mr. Kulick?

A.      We did.  In my opinion.  I mean, obviously it takes two to tango, right.

Q.      I'm showing you Exhibit 28, which I also showed Mr. Kulick.

The man with whom you formed a friendship and a bond, you charged him $919 million of interest on a $317,000 loan over 42 days?

A.      First of all, I believe you're mischaracterizing that because I think this is four

E. Diveroli - Cross

170

different loans.  Right?  We reduced this greatly from the numbers that Marc himself proposed in multiple instances.

And this was only after -- like I just testified to a few moments ago, this was only after it became very clear to us that, A, we had been, you know, deceived maliciously by Marc.  And even after that, we attempted settlement negotiations that were much, much lower than these numbers here.

And only after all of those efforts -- those events transpired and those efforts failed did we said, hey, we're going to go for a significant number because this guy doesn't deserve any additional generosity, so to speak.

Q.    So the $919,740,361.28, that's the interest that accrued on a $317,000 principal balance note; correct?

A.    That's what it appears to be.  I didn't prepare this.  This was prepared by our expert witnesses.  But that's what the document says.

Q.    And that's 42 days of interest.  The person with whom you had a friendship and a bond, you're charging him nearly a billion dollars of interest; is that fair?

E. Diveroli - Cross

171

A.      Not really, no, because, again, you're mischaracterizing -- misrepresenting the fact that he proposed these rates.  Your client proposed these rates, number one.

Number two is, this was after -- this was after, again, many -- after many misrepresentations that occurred to us and many attempts to resolve this for a much, much lower amount of money.

And, frankly, I think you're being very disingenuous by not presenting all the workouts that occurred before this, all the prelitigation attempts to resolve this for less than eight figures. So to put this up here now and present this as the whole picture really, I think, is not ...

Q.      Well, your lawyer, Joel Tasca, sent an email to me on November 7th before we filed this lawsuit saying that if we didn't -- and that is Marc -- didn't turn over every single property through a deed-in-lieu, you were going to file an amended complaint naming his wife and his business partner as defendants, and you were going to send preservation notices to his rabbi and everybody he knows, accusing him of misconduct.

E. Diveroli - Cross

172

Is there anything incorrect about what I just said?

A.      Again, you're mischaracterizing that and taking it out of context.  So I'll put it in context here.  Yes, that is inaccurate.

So, first of all, the complaint named him and his wife because the wife represented herself as being his partner in the business.  Ben Didier, the COO, was his partner in the business.  There's no question about that.  Okay.  He said that's his partner.

On top of that, we had received financial statements at that point that showed very -- our expert witnesses said there were very suspect transactions that may constitute money laundering and tax evasion between the Chabad rabbi and Marc Kulick.

So if you say all of that, Mr. Brodsky, then that would be an accurate statement, and that's why our attorneys at Greenberg advised us to take that sort of heavy-handed dragnet approach.

Beyond that, as you know, okay, after a conversation with Marc, out of respect, we did not file that, even though I feel -- my attorneys advised that we should.

E. Diveroli - Cross

173

Q.      Part of the reason why this number, this interest charge of 919 million over 42 days on a $317,000 debt, one of the reasons it's so high is because the interest compounds daily; right?

A.      I believe the loan documents had compounding in them.  And I believe those were documents that your client provided to us and was accustomed to paying compounding rates with many of his other lenders.  So if that's what you're asking, then I believe so.

Q.      But in July, YSA changed the compounding from monthly to daily; right?

A.      I don't know that.  I'd have to see the documents.  I don't know that.  I'll tell you this:  I certainly did not do that, nor did I advise anybody to do that.

Q.      Okay.  But the documents presented to Mr. Kulick in July changed the compounding from monthly to daily.  Would with you agree with that?

A.      I'm not looking at the document, number one, so I don't want to guess.  Number two is, like I said, if that did happen, I don't know how that happened.  I did not advise on that.  I will -- I can say that categorically, unequivocally, I never advised

E. Diveroli - Cross                    174

anybody to do that.

And I will say that Marc obviously reviewed these documents thoroughly, made edits, made redlines, on a -- you know, on a pretty consistent basis.  So if you're suggesting we hoodwinked him in any way or pressured him to take these loans, I think the evidence couldn't contradict that more.

Q.      When you visited in October, part of the purpose was to determine whether you were going to enter into a bigger transaction with Marc, or at least that's what you told him; right?

A.      That was something we had been discussing in the months prior to that.  That's something we had discussed and that was something that we did pursue in earnest.

Like I said a few moments ago when Joel was questioning me, we did make significant efforts that are well-documented to try to do that.  Unfortunately, those efforts stalled and eventually failed because Marc failed to disclose many material things, failed to provide material documents.

So while there was still a theoretical possibility of that occurring, we had significant doubts.  And that's why we went there, largely in part

**E. Diveroli - Cross**

175

to sit down and have a face-to-face, eye-to-eye conversation. And I wanted to try to read the guy as a man, so to speak.

Q.    So by October you were already owed $927,667,606.85 in interest. You're going there to tour the properties. You weren't really going there to work out a deal with Marc. You were there to tell him: I'm taking this, this is mine now. Right?

A.    Absolutely not. We did not come with legal documents in hand. I'm going to have to obviously discuss with my attorneys what we can share and so on. But there was no lawsuit drafted at that point.

Only after we met with Marc, and it was based on his conduct when we met him in person, okay, where it was just haphazardly spending money, he was just asking us to play a high-stakes poker game. I mean, he literally asked us, "Hey, guys, do you want to play high-stakes poker tonight with me while I'm in dire straits and needing capital?"

So it was those red flags. Then, as I described, the condition of the properties as I said a few moments ago, that's when we said to ourselves, we're not going to make it with this guy. Okay. This

E. Diveroli - Cross

176

is not going to make it, all right, in terms of the viability of the, you know, the Vesta enterprise that had pledged its assets to us.

Q.      It's YSA's position that it has the right to record the second mortgages by virtue of the joinder; right?

A.      Not -- my understanding is it's not exclusively -- not just a joinder itself, but a combination of documents and different remedies within the documents that were bargained for.

Q.      Okay.  Well, what's the document that expanded YSA's collateral from the 17 membership interests that had been used before to everything that Marc had?  Where could we look to see where that collateral is added?

A.      I mean, the joinder itself says it. And all the communications with Marc were very clear that --

Q.      Okay.

A.      Well, you asked a question.  Can I answer?

Q.      Of course.

A.      Okay.  The discussions we had with Marc, which were reflected by the messages, that it

E. Diveroli - Cross

177

would be any asset of any company of his, any affiliate, any company he owns, controls, in whole or in part.  He represented that he had the authority and that he would, in fact, pledge those assets in full, okay, in order to obtain that much more significant loan of 1.5 million, I believe it was, on February 18th.

Q.        Okay.  I want to keep you focused. I'm asking you where in the loan documents did the collateral expand from 17 membership interests to everything in the universe that Marc Kulick owns and controls?  What provision?

A.        Again, I'm not an attorney.  But my understanding is it was the joinder along with the power of attorney, right?

Q.        Great.

A.        My understanding also is through the -- potentially through the PG as well.  But, again, I'm not an attorney, so that's just -- right?  That's just my lay understanding of that.

Q.        So tell us where in the joinder we could see that all of this additional collateral was being pledged.  Where would one find that, if he, she, or it were to look?

E. Diveroli - Cross

178

A.        Well, this is very grainy for some reason on the screen.

Q.        You should have a copy in front of you.  It's at Tab 10, if you'd prefer to look at it.

A.        I think I'm going to do that.

Q.        Tab 10, page 22.

A.        Page 22.  Okay, I'm there.

Q.        So tell us where in this document your collateral expanded from 17 membership interests to every asset that Mr. Kulick owns and controls.

A.        I mean, it says that he -- it says that all these -- "The undersigned, as a manager, member or [] authorized person of any and all Guarantor Entities" -- and I believe that is a defined term somewhere -- "and any other entities in which the undersigned [] now own or control ... herein after" -- excuse me, "herein after" -- also not the best for whatever reason -- "after own or control during the term of that certain Collateral Pledge [] Security Agreement dated February 18, 2025 (the 'Collateral Pledge and Security Agreement'), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge [] Security Agreement for all purposes thereof on the terms set

E. Diveroli - Cross

179

forth therein and to be bound by the terms of the

Collateral Pledge [] Security Agreement ... as if the

undersigned had personally and individually executed

and delivered the Collateral Pledge and Security

Agreement as of the date thereof."

Q.      Who is the pledgor?

A.      In this case, I think they all became

the pledgor.  That was clearly the intent of the

document.

Q.      I'm asking you:  Who is defined as the

pledgor under this document?

A.      There's various loan documents.  I'd

have to go through each one.  But my understanding is

that it doesn't -- my understanding is it doesn't

matter because the whole purpose of the joinder, as

evidenced by all the text messages and conversations

and subsequent text messages, was that all entities,

the entire Vesta universe, as I think Marc's described

it, he's called it "the portfolio," he said all of his

assets, they were all pledging all of their assets.

That's what was made crystal clear to us.

I'd prefer not to play lawyer here and

just rely on my understanding.

Q.      Well, I'm here to -- and I think I'm

E. Diveroli - Cross

180

entitled to ask you what your understanding is.  You told me that the rights came at least through the joinder; right?  Yes?

A.    At least.  Again, that's my understanding.

Q.    And that joinder provides that Marc Kulick on behalf of all of his entities are becoming jointly and severally liable for the obligations of Pledgor, capital P; correct?

A.    I mean, that's what the document says.  But I don't want to speculate as to what the legal implications of that are.  But I just want to reiterate that he -- understanding the agreement and the due diligence that went into it in subsequent communications all make it very clear that the intent of these documents, okay, was to join every entity and every asset that Marc owns, controls, directly or indirectly, and make them equally liable -- equally liable, all right, in the event of a default.  I want to be clear.  That was my understanding.

Q.    Thank you.

So the answer is the pledgor is Vesta Holdings under the loan document, correct, under the CPSA?  That's the defined term for "Pledgor"?

E. Diveroli - Cross

181

A.        There's a number of different documents here.

Q.        Look at the CPSA right in the first paragraph.

A.        I'm looking for it.

Q.        It's on page 9 of 16.

A.        Okay.

Q.        Is "Pledgor" defined there right at the top?

A.        It does say -- yep.  It says "Vesta Holdings, LLC, an Oklahoma ...."

Q.        Okay.  And Vesta Holding, as pledgor, its obligations under this agreement were to pledge the membership units it held in 13 limited liability companies; correct?

A.        I'd have to read this carefully.  I thought it was 17 for some reason.  That was the original -- for the smaller loan that preceded the February 18th loan, that was our understanding.

Q.        Okay.

A.        Once we increased the amounts of the loan more than double and we had already had a delinquent payment from Marc, that's why we insisted on the collateral expanding to cover all entities that

CHANCERY COURT REPORTERS
500 N. King Street, Ste 11400, Wilmington, DE
(302) 255-0526

E. Diveroli - Cross

182

he's in any way affiliated with.

And the way this happened was Marc was in a tremendous rush to get this done.  So he suggested that in lieu of putting all those additional entities in here -- which is what we wanted to do -- he said no need for that because -- let's put a joinder in and join in every asset that any affiliate of mine owns.

So we were satisfied that we were getting the benefit of our bargain, which was that pledge of everything.

Q.      Robert Miley prepared a first draft of this joinder; correct?

A.      I believe so.  But I believe he was in discussion with Marc during the time, and I know Marc certainly took a look at it.

Q.      Okay.  Mr. Miley prepared the first draft; correct?

A.      I don't know for sure, but that's my understanding.

Q.      You were an email with Mr. Miley where he sent this first draft to you, Mr. Kulick, and Mr. Rogers, your attorney?

A.      I believe so.

**E. Diveroli - Cross**

183

Q.      And then Mr. Rogers himself made further changes to Mr. Miley's draft?

A.      I do not specifically recall that. But if the email says it, then perhaps.

Q.      And then Mr. Kulick signed it without making any changes; correct?

A.      I don't know.  Again, if I had the emails, I could tell you.  I don't want to speculate.

ATTORNEY BRODSKY:  May I approach, Judge?

Q.      Do you recognize Exhibit 15?

A.      I'm just reading it, here.  Okay.

Q.      Okay.

A.      I've just read the first page.

Q.      Okay.  You were a carbon copy on this email; correct?

A.      I was.  I was.

Q.      And it's an email from Mr. Rodgers to Robert Miley, copying you and Marc; correct?

A.      Correct.

Q.      And Mr. Rogers says, "Robert, See attached revised collateral agreement in clean and redlines."

Do you see that right at the top?

E. Diveroli - Cross

184

A.　　　Yes.

Q.　　　And that's sent at 4:58 on the day the loan documents were signed, 4:58 p.m.; correct?

A.　　　That's what it says, yep.

Q.　　　Then if you turn to the last page of the exhibit, you'll see the clean version that Mr. Rogers drafted, which is identical to the one that Mr. Kulick signed; correct?  Turn to the last page.

A.　　　The last page.  Okay.  Okay, I see it.

Q.　　　You'd agree?

A.　　　Is that identical to the one he signed?  I mean, it seems to be.

Q.　　　If you could go back to Joint Exhibit 16, page 7.

A.　　　I would say -- page 7.

Q.　　　So you see where I've highlighted on Section 11.9?

A.　　　Yeah.

Q.　　　You would agree that these documents are fully integrated?  That is, the parties agreed that prior discussions, agreements, whatever, were superseded by what's actually within the loan documents themselves?

A.　　　Again, I'm not going to -- I don't

**E. Diveroli - Cross**

185

feel comfortable opining on exactly what this -- what this means.  But I would say there was other correspondence, right.

I would say, again, that Marc was rushing everybody to get this done.  There was written correspondence where he said specifically that it would include all assets of all entities.  And had that not been there, we would not have made that loans.  And he did further acknowledge it in writing.

So assuming this even says what you're purporting it to say, there was subsequent acknowledgment where he acknowledged, hey, you've got the most collateral out of anybody, for example, right?  And that is in writing.  And that was pursuant to another loan that he got.

So there was -- even if you want to say, hey, writing -- it is in writing.  Not to mention, it was our clear understanding -- and Marc had really -- it was our understanding that Marc essentially controlled -- and I think the facts in this case have made it very clear he really controlled every single entity.  Right?  There was no real, you know, corporate formalities here, and stuff like that seemed to be out the window.

E. Diveroli - Cross

186

Q.      So --

A.      That's another reason why that joinder needed to be so broad as well, because he admitted he didn't even seem to know his own corporate structure. So we needed to either put, you know, hundreds of entities potentially in a document two minutes before the wire cutoff, while he's begging us to get a wire transfer out, or we had to come up with something broad.  And he's the one who suggested that and said this would cover all of my assets.

Q.      I think you said that what expanded the collateral in the later loan documents was the joinder and the power of attorney; right?

A.      Well, the -- I think that the power of attorney made it very -- makes it very clear that we have the right to do -- and the purpose of it was that, you know, in the event of a default, right -- so in the event there's a default and it's uncured in this case -- which was unfortunately what happened -- that we would have the right to take whatever steps we needed to take, right, obviously lawful, reasonable steps, right, to collect, you know, any and all monies that were owed to us.

Q.      Okay.  So the power of attorney is

E. Diveroli - Cross

187

bounded by what's lawful; right?  You can't do something illegal to collect your debt; right?

A.        Of course not.

Q.        You couldn't take the property of somebody else, could you?

A.        Somebody who was not a pledgor in an entity that Marc owned or controlled?

Q.        Correct.  You couldn't go and just take anybody's property to satisfy your debt; right?

A.        This isn't anybody's property.  Marc owns these properties.  Marc is really the -- no, but he had the -- well, you could take the property of somebody who had the authority and did, in fact, guaranty.  So he guarantied, right -- he pledged and he guarantied, through the joinder, all of the assets of all those entities.

Also it's pretty clear that he's held himself out at various times as the owner.  If I wanted to answer your question more fulsomely, Ben, he also held himself out as the owner of these properties individually.  So I'd say also under the personal guaranty, it would also have been "lawful."

When you say "lawful," I mean, obviously, right, everything we did is after close

**E. Diveroli - Cross**

188

examination by a number of attorneys, as you know, by our expert witnesses, who determined that these were, you know, well within our rights and they were necessary measures and remedies that we had to avail ourselves of or we would have been just stuck and we would have gotten zero.

Q. Last thing. Exhibit 28, which is an email from your counsel dated February 6, 2026.

Do you see that?

A. I do.

Q. This is the first payoff of which you're aware that YSA ever gave to Mr. Kulick and his entities; correct?

A. No, that's not correct. As I testified to earlier, we attempted multiple workouts with him.

Q. I'm asking for a payoff.

A. Oh, those were payoffs.

Q. Oh.

A. Yeah, those were payoffs.

Q. By saying --

A. Okay. Long after the default, as I said earlier -- and there are -- there is emails to back that up. And I was involved in -- personally

E. Diveroli - Cross

189

involved in those discussions and negotiations.  There were offers made to Marc long after he was in default, long after he made -- broke many promises to pay, long after bounced checks and phantom wire transfers, long after that, we offered him payoffs that were, I believe, in the five -- I want to say somewhere in the 5-to-$10 million range.

It was only when we discovered the fraud and the deceit and the fact that this gentleman -- and the deplorable conditions of the properties in Oklahoma and Marc being unreasonable is when we took a more firm stance to enforce these documents more in accordance with their terms.

Q.        Are you aware that we made numerous requests to your counsel to get a payoff in writing?

A.        We complied with that, from what I understand.

Q.        On February 6th; right?

A.        We gave you -- I'm not going to speak for my counsel.  My understanding is we fully complied.

And since you're bringing that up, I think you know that you were very deficient in your document discovery.  And my understanding is from my

E. Diveroli - Redirect

190

attorneys that you still are, and that motion to compel you filed was just a ploy to try to make us look like bad actors.  Because we had no problem providing a payoff amount to you.  We did, in fact, provide a payoff amount to you.

ATTORNEY BRODSKY:  No further questions, Judge -- Chancellor.  I'm sorry.

**REDIRECT EXAMINATION**

BY ATTORNEY TASCA:

Q.      Mr. Diveroli, Mr. Brodsky asked you a lot of questions about interpreting documents and rights on the documents, which -- you're not a lawyer, as you said; correct?

A.      I'm not.

Q.      So one thing, though, that I wanted to ask you about.  Is it your understanding -- again, recognizing you're not a lawyer -- that a key provision in your ability to take mortgages -- the second mortgages at issue is in the power of attorney provision?

A.      That's correct.

Q.      And is that provision through exercise of this irrevocable power of attorney?  "Lender may take whatever steps that it deems necessary in its

CHANCERY COURT REPORTERS
500 N. King Street, Ste 11400, Wilmington, DE
(302) 255-0526

E. Diveroli - Redirect

191

sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender."

A.    That's correct.

Q.    In what I read, was the word capital C "Collateral" anywhere in that sentence?

A.    No.

Q.    Was it significant to you -- again, based on your understanding, a nonlawyer -- that this provision actually uses the word "secure"?

A.    Absolutely.

ATTORNEY TASCA:  No further questions.

THE COURT:  You may be excused.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

ATTORNEY TASCA:  Your Honor, are you ready for our next witness?

THE COURT:  Yeah.  We have limited time, so let's roll.

ATTORNEY TASCA:  Okay.  We call Mr. Robert Miley.

R. Miley - Direct

192

**ROBERT MILEY, having first been duly affirmed, was examined and testified as follows:**

**DIRECT EXAMINATION**

BY ATTORNEY TASCA:

Q.      Mr. Miley, we don't have a ton of time, so I'm going to keep this relatively brief.  Can you just tell the Court what you do for a living.

A.      Yes.  I work as chief compliance officer for Diveroli Investment Group and a number of affiliated entities that are all part of the same family office.

Q.      Were you involved in negotiating YSA's loans to Marc Kulick's affiliates?

A.      I was, yes.

Q.      As you know, the joinder is a big issue in this case.  What was your understanding of what the parties were trying to accomplish through the joinder?

A.      My understanding is that because the February 18th loan was so much larger than the prior loans, that we had discussed it would be secured by the entirety of the Vesta portfolio with the properties and the entities.

Q.      I'd like to direct you, Mr. Miley, to

R. Miley - Direct

193

Tab 1, Joint Exhibit 222 in your binder.

ATTORNEY BRODSKY:  We would object to this exhibit as hearsay.

THE COURT:  It depends on how they're going to use it.  What is your intent with this exhibit?

ATTORNEY TASCA:  Sure, Your Honor. We're going to show you an exhibit that's contemporaneous in time with when the joinder was being negotiated that Mr. Miley sent internally, and it talks about the collateralization of the Vesta real estate portfolio.

And we are not offering it for the truth of the matter asserted at all.  We're offering it to show -- I mean, whether in fact the real estate was pledged is a determination Your Honor will have to make.  But what we're trying to show you here is Mr. Miley's state of mind at the time, because what we're trying to do here, particularly on the issue of parol evidence, is get to the bottom of what the parties' intentions were.  And this is evidence of what was in Mr. Miley's head at the time of this transaction.

So, again, it's not being offered to

R. Miley - Direct

194

say, oh, look, this must be -- this is it, this absolutely means that the real estate was collateralized.  It is showing what Mr. Miley was thinking at the time about it.

THE COURT:  So are you using it to refresh the witness's recollection?

ATTORNEY TASCA:  I'm using it, Your Honor, pursuant to, I believe it's Delaware Rule of Evidence 8033.  It's a statement of the declarant's then-existing state of mind, which is not hearsay.

ATTORNEY BRODSKY:  The issue of their state of mind that is the intent is the factual question that they're offering it in evidence for; that is, this was our intent.

That is being offered for the truth of the matter asserted:  I intended X.  Not what did I -- it's not relevant to anything other than parol evidence to determine the construction of the contract.

ATTORNEY TASCA:  The other issue I'd point -- I'm sorry.

THE COURT:  So we're letting in a lot of parol evidence, right, for the purpose of understanding the parties' intent.  And the fact that

R. Miley - Direct

195

it speaks to his intent and his state of mind is not a reason to exclude it; right?

ATTORNEY BRODSKY:  I would submit that it's inadmissible hearsay, but I understand the Court's position.

THE COURT:  I'll allow it to speak to the witness's recollection of negotiations in this case.

BY ATTORNEY TASCA:

Q.      Mr. Miley, take a look at that exhibit that I just directed you to.  Again, it's Tab 1, Joint Exhibit 222.

Can you just tell me -- take a look at it.  Tell me if you recognize it.

A.      I do.

Q.      And what's going on here in this email?

A.      In this email, I was emailing one of our internal personnel, Maha Fuquari, asking her to identify counsel that could assist us with the due diligence related to a larger loan than the ones that had been previously being discussed.

In this email, I had listed out what I understood to be the criteria of the kind of attorney

R. Miley - Direct

196

we were looking for, and also provided her with a draft email.  In that draft email, I had specified that the intent was for the entirety of the Vesta portfolio to be used as collateral for the loan.  That was the purpose of the email.

Q.        What is the date of this email?

A.        This is February 10th.

Q.        So this is a lead-up toward the loan that was ultimately made on February 18?

A.        That's correct.  In the weeks prior to February 18, there had been a couple of discussions about entering into a loan.  Ultimately, the large February 18th loan was delayed until February 18.  I think there was a smaller loan a couple weeks prior to that.  But all of this was in the lead-up toward a bigger loan that would be secured by the portfolio.

Q.        Okay.  As part of that draft email that you sent to your colleague, you said, "Through our affiliate, YSA Investments 1, LLC, we are negotiating a loan whereby we would be providing funding to a multifamily real estate investment firm which would be secured by the firm's real estate portfolio."

Do you see that?

R. Miley - Direct                    197

A.       I do, yes.

Q.       Why did you say that?

A.       I said this because we had been referring to the Vesta properties as the portfolio. That was typically how we referred to it.  My intent there was to say that all of these properties that comprised that portfolio would be used to security.

Q.       Another thing you say there is "this will be a more substantial transaction than the prior loans."  What did you mean by that?  You already explained this to some extent, but would you just sum up what that means.

A.       This loan involved a significantly larger principal amount.  The principal amount was, I think, $1.5 million.  There was an origination fee, I think, day one, but that was still significantly larger, being in seven figures, compared to the prior loans.

Q.       Just a couple more statements here we'll go over.  One of the things you say is, "In particular, we would like to ensure that we are asking the right questions and getting necessary answers regarding the portfolio collateralizing the loan.  We [] want to ensure that we are correctly valuing the

R. Miley - Direct                                198

collateral as necessary to minimize our risk."

What did you mean by that?

A.        We had limited firsthand experience with lending related to real estate assets.  So our intent here was to make sure that we were asking the correct due diligence questions to underwrite something like this larger loan, and also understanding the collateral underneath it.

Q.        And then the last statement I want to go over is that you say here, "They have been forthcoming and have provided us with a number of documents regarding their portfolio[.]"  The "they" there, who are you referring to?

A.        "They" does refer to Vesta.

Q.        Okay.  And what documents had they sent you regarding their portfolio?

A.        I believe at this time we had received various documents, including mortgage statements, tax returns.  I believe T12 statements.  The information was sent again a couple days later on February 12th.

So my memory is a little bit hazy on what we received prior to February 10th versus a few days later.  But I think that was generally what we possessed at that time: tax returns, mortgage

R. Miley - Direct

199

statements, and I think a T12.

Q.      What's the T12?  Explain that to the Court.

A.      The T12 statement summarized essentially the profit and loss of the portfolio, what the net operating income was for the portfolio.  I think that it was a consolidated T12 that summarized the entirety of the portfolio as opposed to being broken down by property, but I believe we did later receive property-specific T12s as well.

Q.      Does the T12 relate to the performance of the real property?

A.      It does, yes.

Q.      So, Mr. Miley, when you sent this email to your colleague on February 10th, what was your understanding regarding how, if at all, the collateral was going to change from how it had been in the past to how it was going to be on the February 18th loan?

A.      Whereas previously it would have been secured by a number of membership interests and specific entities comprising the Vesta portfolio, this was going to be more extensive.  Where each of those properties involved numerous different entities, I

R. Miley - Cross

200

think there could be anywhere from three to five to more -- closer to three for the actual Vesta-controlled entities related to a given property, we wanted to make sure that the February 18th loan would cover all of those entities in describing the collateral as well as the property.

THE COURT:  As a quick follow-up, when you sought diligence as to the underlying entities, who I think we're calling the title owners, did you ask for the operating agreements for those entities?

THE WITNESS:  I can't recall asking for the operating agreements at that point.

ATTORNEY TASCA:  No further questions, Your Honor.  Thank you.

**CROSS-EXAMINATION**

BY ATTORNEY BRODSKY:

Q.      Mr. Miley, I think you said that the February 18th loan was a much larger loan; right?

A.      It was.

Q.      Previous principal balances were around 750 or 800?

A.      Thereabouts.

Q.      Okay.  And this was another $700,000; right?

R. Miley - Cross

201

A.          The February 18th loan I think had a $1.5 million principal amount.  It was 1.28 million, something like that, net of I think the origination fee.

Q.          So the $750,000 loans, what was the value of the collateral you had for those?

A.          The value of the collateral, it was -- certainly don't remember the specifics for each of the entities.  I know that there were four unencumbered membership interests, there were 13 encumbered membership interests.  I'm failing to recall what those were specifically valued at.

I know that the unencumbered membership interests specifically included $400,000 capital contributions made to each of them.

Q.          Okay.  So you had $1.6 million in collateral plus membership interests in another 13 limited liability companies as collateral for the $750,000 loan; right?

A.          That's correct.

Q.          And then when you increased the amount from $750,000 to $1.5 million, you needed $900 million of collateral to secure that?

A.          We wanted significantly more

R. Miley - Cross

202

collateral to make sure that we were protected where we were not typically involved in dealing with multifamily real estate.  I seem to remember that in January there had been a given loan that I think the payment from the October loan ended up being a week or two late in January.  So I think that was probably a factor in how we evaluated the risk here as well.

Q.      Right.  You needed to be 600 times collateralized compared to the principal balance of the loan you were making, that's how secure you needed to be?

A.      We had agreed previously that it would be the entirety of the Vesta portfolio.

Q.      Therefore, you needed to be collateralized 600 times the value of the amount you were advancing; right?

A.      That was how we had negotiated the documents.

Q.      You went to law school; right?

A.      I did, yes.

Q.      You prepared this joinder; right?

A.      I can't recall whether I had taken the provision or typed it myself.  I was involved, I think, in the initial draft.  After the concept of the

R. Miley - Cross
203

joinder had been introduced over text, I believe I had inserted the first draft of the joinder paragraph prior to passing that to counsel.  I think I passed it contemporaneously to counsel, to Mr. Kulick, and to Mr. Diveroli.

Q.    And then after you did the initial draft, you had your lawyer do a revision; right?

A.    Yes.  He did make edits to the provision.

Q.    And you could have made that joinder as detailed as you wanted it to be; right?

A.    I wouldn't say we could make it as detailed as we wanted it to be.  We were under tremendous pressure that day to close on the February 18th loan.  I seem to remember that initial drafts didn't start circulating until as late as, I think, 2:00 p.m. that day, February 18th, and there was still pressure to try to close and fund the loan by end of day on February 18th.

In fact, I think I even looked for help to have all of the -- where the prior CPSA had specified each of the entities, I think I had even asked, over text, for a list of all of the entities' capital contributions so that all of them could be

R. Miley - Cross

204

named in B and C, the recitals in the first page.

The response I got back was "yes and no."  I took "yes" to mean that, yes, this was secure in the portfolio; no, we didn't have the information available to plug in to those two paragraphs.

Q.    So this is what I'm trying to understand.  You're the lender, not the borrower.  The fact that the borrower wants the money fast doesn't mean the lender can't take the time to draft the documents properly; would you agree with that?

A.    In this situation, I don't think I would where we were, again, under tremendous pressure to fund.  I think I received multiple texts, emails, phone calls -- I don't have a tally, but where we had agreed to fund and finalize the loan documents.  The plan was to do what we could to finish before close of business.

Q.    Right.  And you could have told Mr. Kulick, "I'm sorry, we don't have enough time today, we'll work on it tonight and we'll give it to you tomorrow morning."  Right?

A.    I don't think that that was an acceptable answer at the time.  I think that the pressure was on to finalize those documents that day.

R. Miley - Cross

205

Q.        What would Mr. Kulick do to you if you didn't fund him?

A.        I mean, we are over 1,000 miles away, I think, between Oklahoma and North Carolina.  But nonetheless, with the business relationship where we were under pressure, where I was getting multiple asks for what was the status of these documents, the time crunch was real, as evidenced in my texts.

Q.        Just to be clear, the joinders don't specifically list any additional collateral, do they?

A.        They don't name collateral, but they do say that the undersigned is signing on behalf of all entities that he owns and controls, I believe.

Q.        Right.  But there's literally no description of collateral in that document; would you agree?

A.        Well, in the document there is the description of the collateral on the first page, but there's nothing on the joinder, which is where the joinder did have the pledgors assume the obligations. And those obligations did include the power of attorney to be able to act in the name of the undersigned, the pledgor entities.

Q.        Doesn't list any of the title owner

R. Miley - Redirect

206

names; right?

A.        No, it doesn't.

Q.        Doesn't list the property?

A.        No, it doesn't.

Q.        The property address?

A.        No.

Q.        You had a spreadsheet, what you said, with the T12 where you could have just copied and pasted and dumped that in there; right?

A.        I mean, I initially had tried to get the names of all the entities to plug into the first page.  I don't believe there was time to create an exhibit.  And I think that the understanding at the time was that the joinder would bind all of the entities.

ATTORNEY BRODSKY:  Nothing further. Thank you.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY ATTORNEY TASCA:

Q.        Just a couple questions, Mr. Miley. Basically, your testimony, it sounds like you were rushing to try to get the loan done as an accommodation to Mr. Kulick; right?

R. Miley - Redirect

207

A.          That's correct.

Q.          Okay.  And in terms of the description of the collateral that Mr. Brodsky was asking you about, was there something that Mr. Brodsky was required to provide under the guaranty that listed all of his real estate interest?

A.          Under the guaranty, Mr. Kulick was required to provide an SREO, a schedule of real estate owned -- terminology I learned during the course of our relationship with Vesta.  But there was a duty to provide that information that would break things down by property by a certain date.

Q.          And did that list either the title owners or the properties themselves?

A.          I believe it listed the properties themselves.

ATTORNEY TASCA:  No further questions.

THE COURT:  Thank you.

Mr. Miley, you may be excused.

THE WITNESS:  Thank you.

(Witness excused.)

ATTORNEY KLEIMAN:  Your Honor, defendants are going to call John Hall to the stand next.

J. Hall - Direct

208

**JOHN HALL, having first been duly**

**affirmed, was examined and testified as follows:**

**DIRECT EXAMINATION**

ATTORNEY KLEIMAN:  This is Kerry Kleiman for the defendant YSA.

BY ATTORNEY KLEIMAN:

Q.      Good afternoon, Mr. Hall.

Can you please begin by telling the Court your educational background.

A.      Yes.  I earned my Bachelor's degree from Willamette University in 2003, and my MBA from Atkinson Graduate School of Management in 2005.

Q.      Do you have any professional certifications?

A.      I do.

Q.      What are they?

A.      I am a certified fraud examiner.  I have a certificate in distressed business valuation. And I am a certified insolvency and restructuring advisor.

Q.      Are you a member of any professional organizations?

A.      I am.

Q.      What are those?

**J. Hall - Direct**

209

A.        I am a full member of the National Association of Federal Equity Receivers, and I am a member of the Association of Certified Fraud Examiners, as well a member of the Association of Insolvency & Restructuring Advisors.

Q.        Who is your current employer?

A.        American Fiduciary Services, LLC.

Q.        And what is your role at -- can I call it AFS?

A.        You may.

Q.        What is your role at AFS?

A.        I'm the co-founder and the chief financial officer.

Q.        What types of services does AFS provide?

A.        We provide professional consulting services in disputes and investigations.  We primarily work in the federal and district courts.

Q.        Have you ever served as a testifying expert on issues of forensic accounting and insolvency?

A.        I have.

Q.        And have you ever been proffered as an expert in a case where that proffer was rejected?

J. Hall - Direct

210

A.      No.

Q.      Have you been retained for work in connection with this action?

A.      I have.

Q.      Who has retained you?

A.      YSA investments 1, LLC.

Q.      What is your understanding of the relationship between YSA and the plaintiffs Mr. Kulick, Vesta Holdings, and Asset Holder?

A.      It would be a relationship of a lender and a borrower.

Q.      What was the scope of your retention by YSA?

A.      I was asked to review certain business records, bank records, and other relevant materials related to Vesta enterprises and various other entities.

Q.      And did you prepare any reports or memos that included your expert opinions in this case?

A.      I did.

Q.      And did you also prepare a payout calculation in this case?

A.      I did.

Q.      Did you apply your background and

**J. Hall - Direct**

211

experience in forensic accounting to those reports and that payoff calculation?

A.      I did.

ATTORNEY KLEIMAN:  Your Honor, at this time we would tender John Hall as an expert in forensic accounting and insolvency.

ATTORNEY FISHER:  Your Honor, Michael Fisher for the plaintiffs.  We have no objection.

THE COURT:  Thank you.  Please continue.

ATTORNEY KLEIMAN:  Thank you.

BY ATTORNEY KLEIMAN:

Q.      What documents did you review in forming your opinions in this case?

A.      I reviewed my reports.  I reviewed certain documents that were provided to me by counsel. I reviewed certain media that's just generally available on Google.

Q.      Did you also have an opportunity to review certain bank statements from Vesta Holdings?

A.      I did.

Q.      Did you also review any deposition transcripts?

A.      I did.

**J. Hall - Direct**

Q.      Do you recall whose deposition transcripts those were?

A.      I believe I reviewed one deposition of Mr. Kulick -- but now I understand there's more than one -- and of the two accountants that he employs.

Q.      Did you also have an opportunity to review the loan documents themselves?

A.      I did.

Q.      And you've been in court today all day listening to the testimony; is that correct?

A.      I have.

Q.      Did AFS develop the payoff calculation that has been shown in court at various times today?

A.      It did.

ATTORNEY KLEIMAN:  May I approach, Your Honor, with just a simple printout of this slide?

Q.      What I've handed to you is joint Exhibit 28.  And the first page is an email that I sent.  And the remaining pages, do those appear to be the calculation that AFS provided?

A.      Yes.

Q.      You've heard a lot of testimony today about the interest rates in this loan payoff calculation; is that correct?

**J. Hall - Direct**

213

A.          I have.

Q.          As a financial expert, do you have an opinion about the reasonableness of the interest rates, given the negotiations between the parties to this transaction?

ATTORNEY FISHER:  Objection, Your Honor.  This is beyond the scope of the expertise of the witness.

THE COURT:  Response?

ATTORNEY KLEIMAN:  Your Honor, we would posit that as a financial and forensic accounting expert, he is well aware of what may be reasonable in loan transactions.

THE COURT:  So there's no report; right?  We just have the statement?

ATTORNEY KLEIMAN:  This statement is the payoff.  There were reports that were provided to opposing counsel as well.

THE COURT:  All right.  I'll let the testimony in, but you can -- without prejudice to the objection.  You can develop it later and argue that it should be stricken or speak to the weight of the evidence.

ATTORNEY FISHER:  Thank you, Your

**J. Hall - Direct**

Honor.

BY ATTORNEY KLEIMAN:

Q.      Mr. Hall, do you have any opinion about the reasonableness of the interest rates?

A.      Yes.

Q.      What is that opinion?

A.      Given the circumstances of the business, they seem fairly reasonable.  The intention, especially of the 12th loan, was to be just several days.

So the fact that the interest rate was 7000 percent annually would have been a term beyond what the -- excuse me.  The term of the loan was so short that it wasn't really -- if you read the loan, it doesn't seem like it should last a full year to begin with.

THE COURT:  So have you ever seen a 7000 percent annual interest rate before?

THE WITNESS:  This is the first time I've seen a 7000 percent one.  I've seen many over 1000.

THE COURT:  And the 919,740,361.28, the number that was accrued in 42 days, you're testifying that that too is reasonable?

**J. Hall - Direct**

215

THE WITNESS:  Well, I mean, that's just math, Your Honor.  I think that based on that interest rate, the principal amount would double between every three and four days.

THE COURT:  I understand the math.  I thought you were testifying as to what's reasonable.

THE WITNESS:  Sure, it seems reasonable.  I think the term was five days for the loan.

BY ATTORNEY KLEIMAN:

Q.      Mr. Hall, is your opinion that had that loan been repaid on time, this amount of interest would not have accrued?

ATTORNEY FISHER:  Objection, Your Honor.  Same objection.  This is not within his written report or anything.

THE COURT:  I think this might be an obvious sort of answer.

You can answer the question.  I think I can too.

THE WITNESS:  Yes.

BY ATTORNEY KLEIMAN:

Q.      When you and AFS were developing this payoff calculation, did you take into account any

**J. Hall - Direct**

216

payments that Mr. Kulick claims were made?

A.        Yes.

Q.        If you'll turn to page 4 of the document in front of you, does that document note the payments that were made by Mr. Kulick?

A.        Yes.

Q.        Is there anything in this document or in any of the documents that you reviewed that substantiates what Mr. Kulick testified to earlier, which is that he fully paid off Notes 7, 9, and 11?

A.        No, I don't believe so.  I think -- you know, my research showed that these were defaulted.

Q.        And looking again at this table on page 4, is it fair to say that the principal amounts initially due under these four loans is approximately $2.4 million?

A.        Yes.

Q.        And you were able to identify payments that total approximately $1.7 million; is that correct?

A.        That's correct.

Q.        Okay.  I'm done with that exhibit.

Earlier today you heard Mr. Kulick

J. Hall - Direct

217

testify to a number of things, including that he was desperate for money throughout 2025 to come into his business.  Do you recall that?

A.      I do.

Q.      Do you recall him also testifying about directing his accounting team to move money between accounts?

A.      I do.

Q.      Do you recall him testifying to frequently incurring overdraft charges?

A.      I do.

Q.      And do you also recall him testifying to using funds that were in the tenant security deposit accounts for various operational purposes and other reasons?

A.      I do recall, yes.

Q.      Do you also recall shortly before the lunch break Mr. Kulick testified that "Vesta Holdings makes loans to the properties to keep them afloat consistently.  Of the 34 properties we currently own and operate, I would say 32 of them are requiring cash from Vesta Holdings on a consistent basis"?

Do you recall that?

A.      I recall hearing something very close

**J. Hall - Direct**                                    218

to that, if not that exactly.

Q.        In your experience as a forensic accounting and expert in insolvency, what, if anything, did those statements indicate to you?

A.        Those are all flags for deepening insolvency.

Q.        Are those also similar to the opinions that you formed after reviewing the Vesta bank statements?

A.        Yes.

Q.        What opinions, if any, have you formed about the level of control that Mr. Kulick exerts over the Vesta portfolio?

A.        I would say he exerts sole control, especially given the depositions of the two accountants.  They appear that there is not another employee at Vesta that has the full financial picture of what's going on.

Q.        And when you say that there is not another employee, you mean other than Mr. Kulick himself?

A.        Other than Mr. Kulick, yeah.

Q.        When you reviewed the various loan documents, did you see the power of attorney clause

**J. Hall - Direct**                    219

that has been discussed today?

A.        Yes.

Q.        Is a power of attorney clause typical in loans of this variety, in your experience?

THE COURT:  Let's hear from counsel.

ATTORNEY FISHER:  Objection.  I mean, this is way outside the scope of his written reports, of his expertise.  This is -- as their own witness said, this goes into legal conclusions and interpretations of contracts for which he is certainly not an expert.

THE COURT:  Can you direct me to the portion of the report where he speaks on this issue.

ATTORNEY KLEIMAN:  Yes, Your Honor, if you give me a moment to pull up his report.  In the interest of time, I will withdraw that question.

THE COURT:  Thank you.

BY ATTORNEY KLEIMAN:

Q.        You've heard testimony today about the need to secure and protect interests; is that fair? Have you heard that phrase?

A.        Yes.

Q.        In your experience with insolvency and dealing with insolvent businesses, what could a lender

**J. Hall - Direct**                                          220

do to secure and protect its interests?

ATTORNEY FISHER:  Objection, Your Honor.  Again, this is outside the scope of his expertise.  This goes into secured transactions and what a lender and a borrower might negotiate.  And again, just not in his report whatsoever.

THE COURT:  Can you direct me to the portion of his report that this speaks to, Counsel.

ATTORNEY KLEIMAN:  Your Honor, in Mr. Hall's report, which was based on the initial complaint that was filed by the plaintiffs, many of the issues that were raised in their opening brief were not in the papers leading up to today's hearing.

THE COURT:  So this isn't in his report?

ATTORNEY KLEIMAN:  This is not in his report, but I suggest that this is within -- well within the scope of his expertise as an insolvency creditor.

THE COURT:  He did not supplement the report?

ATTORNEY KLEIMAN:  Not once we received the plaintiffs' opening brief, no.

THE COURT:  Counsel?

**J. Hall - Direct**                                    221

ATTORNEY FISHER:  Your Honor, I believe the only two reports that we have on the exhibit list are from February 6 and February 19, which postdate the amended complaint.  So I'm not exactly sure how this can be within the scope of his testimony and his proffered expertise.

THE COURT:  I'm going to sustain the objection.  If you could stick to the issues in the report, I think that would be helpful.  If you believe that you are entitled to a supplemental report based on arguments raised for the first time in briefing, I'll consider that, but I think it's only fair to put the other side on notice of what the witness is going to testify to through discovery, so ...

ATTORNEY KLEIMAN:  And that is fair, Your Honor.  And in that vein, we would raise the objection that many of the opening brief's arguments were not contained in any of the items that led up to discovery.

And, Your Honor, I would say that at this point we will pass the witness.

THE COURT:  Thank you.

ATTORNEY FISHER:  Your Honor, we have no questions.

222

THE COURT:  Thank you.

Thank you very much.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  All right.  So I think if I'm not mistaken, that's our last witness of the day. All right.  You can take a seat.

So we're at the end of our trial. There's still work to do.  I'm going to look to you to put supplemental briefs into the record, marshaling the evidence that's been presented today in a meaningful way.  Cite to the JXs, do so thoroughly. Cite to the trial transcript.  You'll have to get a copy of it to do so.  Our court reporters are just world class and can get that to you promptly.  But you have to request it and give them a little bit of time.

One of the issues that's been raised in briefing, and today, is the argument that the scope of YSA's ability is limited -- to issue second mortgages is limited by Mr. Kulick's own ability to do so and that he lacked that authority as to many of the title owners.  Am I stating that argument correctly, Counsel?

ATTORNEY BRODSKY:  May I use the

223

podium?

THE COURT:  Yes.

ATTORNEY BRODSKY:  While I believe it's true that Mr. Kulick did not have the authority to give second mortgages, in candor to the Court, in our initial brief we stated that we were not going to be proceeding on that argument at trial and we were proceeding on the plain language of the security agreement and the loan documents that do not give YSA the rights they claim.

THE COURT:  So that's what you meant by this statement:  "The real dispute between the parties on the authority issue is not whether Mr. Kulick had the actual authority to give second mortgages — he did not — but rather whether he had [the] apparent authority or his conduct was ratified by the Title Owners"?  That's from your reply brief.

ATTORNEY BRODSKY:  Correct.  In our initial brief, we dropped a footnote saying we're not proceeding on the authority argument.  The purpose of responding to that in the reply was there was some indication that we had misled the Court about Mr. Kulick's authority and that evidence, unclean hands.  We provided to the Court -- and there was no

224

evidence at all that Mr. Kulick, in fact, had the authority under the operating agreements. He didn't. We elected not to argue actual authority because we wanted quick relief, and a discussion about apparent authority or ratification might take several days.

THE COURT: Right. I was going to say you would have had to prove up the limits of his authority; right?

ATTORNEY BRODSKY: And we just said we feel very confident about what the documents say.

THE COURT: Understood. Thank you. All right. I was confused by the statement in the reply brief as to whether that was a live issue. Now I have better insight into it.

Are there any questions?

ATTORNEY MARTIN: Your Honor, any guidance on timing of when you would like post-trial briefing? If you'd like, we can do simultaneous briefs, if you'd like, but ...

THE COURT: I want you to join issue. So it's hard to do that when you submit simultaneous briefs. Because the plaintiffs bear the burden, I think that they should get the first and last brief in the typical structure.

225

ATTORNEY MARTIN:  Understood, Your Honor.

ATTORNEY BELLEW:  On that note, Your Honor, is it possible to secure an oral argument date to work back from?  We're trying to move this as quickly as possible.  So with the indulgence of the Court, if we could get a date.  We will make sure that the briefing is done in advance.

THE COURT:  You can call Ms. Rizzo to get a date on my calendar.  It's going to be hard.

ATTORNEY BELLEW:  I understand, but thank you.

THE COURT:  Thank you.

ATTORNEY BRODSKY:  May I, Your Honor?

THE COURT:  Yes.

ATTORNEY BRODSKY:  Our only request is we would request the briefing schedule be expedited, given the urgency of the situation from our perspective.

THE COURT:  I understand, and I am treating this as an expedited case.  But if you want oral argument, which it sounds like you do, you're going to have to get a date on my calendar, which is going to be hard.

226

ATTORNEY BRODSKY:  We'll waive oral argument in the interest of speed.

THE COURT:  Why don't you call and see what dates you can get.  And then if it's sufficiently quick, or soon, then you can work backward on a briefing schedule.  And if it's not, then we'll deal with it then.

All right.  Anything further?

ATTORNEY MARTIN:  Nothing from us, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  I wish those who are returning safe travels.  We are adjourned.

(Court in recess at 3:11 p.m.)

- - -

227

I N D E X

WITNESSES:                                              Page

MARC KULICK
     Direct by Attorney Brodsky                         6
     Cross by Attorney Tasca                            49
     Redirect by Attorney Brodsky                      138

EFRAIM DIVEROLI
     Direct by Attorney Tasca                          146
     Cross by Attorney Brodsky                         169
     Redirect by Attorney Tasca                        190

ROBERT MILEY
     Direct by Attorney Tasca                          192
     Cross by Attorney Brodsky                         200
     Redirect by Attorney Tasca                        206

JOHN HALL
     Direct by Attorney Kleiman                        208

228

## CERTIFICATE

We, DENNEL NIEZGODA, and KAREN L. SIEDLECKI, Official Reporters for the Court of Chancery of the State of Delaware, do hereby certify that the foregoing pages numbered 3 through 228 contain a true and correct transcription of the proceedings as stenographically reported by us at the trial in the above cause before the Chancellor of the State of Delaware, on the date therein indicated.

IN WITNESS WHEREOF we have hereunto set our hands at Wilmington this 5th day of March, 2026.

/s/ Dennel Niezgoda
---------------------------
Official Court Reporter

/s/ Karen L. Siedlecki
---------------------------
Official Court Reporter