# COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A.   Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B.   Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C.   Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D.   Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

| 1

E.  Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F.  In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1.  PLEDGE.

    1.1  SECURITY INTEREST.

        (a)  Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

        (b)  For clarity, it is acknowledged and agreed that the Collateral does not include a personal

residence.

1.2 ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. OBLIGATIONS.

2.1 SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1 FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of

Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

---

[1] Accessible as of February 18, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/0nvozc8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=gc5mto1sbrm efbwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

4.2    <u>COSTS</u>. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3    <u>DEBT OBLIGATIONS</u>. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4    <u>OTHER LOAN DEFAULT AND MATERIAL ACTIONS</u>. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

> YSA Investments 1, LLC
> C/O Capital Fund Law Group, P.C.
> Attn: Christopher Rogers
> 405 Lexington Ave, 26th Floor
> New York, New York 10174
> email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5    <u>RIGHT OF LENDER TO NOTIFY OTHERS</u>. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6    <u>POWER OF ATTORNEY</u>. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7    <u>NO WAIVER BY LENDER</u>. No renewal or extension of or any other indulgence with respect to the

Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8    INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9    TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

4.10   DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5.    DEFAULT.

5.1    EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a)    a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b)    a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c)    a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d)    a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e)    Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver,

or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f)      an Event of Default occurs under the Note or any other Loan Document.

5.2      <u>REMEDIES UPON DEFAULT</u>.  While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property.  Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a)      Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale.  Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b)      Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law.  Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c)      Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d)     It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e)     Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)     Lender conducts the sale in the State of Delaware;

(ii)    the sale is conducted in accordance with the laws of the State of Delaware;

(iii)   at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv)    the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v)     the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi)    Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f)     Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6.      LIMITATION AS TO PLEDGOR.

| 8

6.1    OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2    LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7.    MISCELLANY.

7.1    CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2    PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3    WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4    TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5    CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation,

execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6    CLAIMS UNDER SEAL.  Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7    DEFAULT BY LENDER.  Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8    ADDITIONAL WAIVERS.  BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9    MODIFICATIONS.  No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender.  No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10   SEVERABILITY.  In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11   FURTHER ASSURANCES.  Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12   LIMITATIONS OF LAW.  If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will

| 10

not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13    NOTICES.  Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14    INTERPRETATION.  Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender.  Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement.  All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document.  The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement.  The terms "include" and "including" shall be interpreted as if followed by the words "without limitation."  All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency.  For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons.  Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties.  Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15    EXECUTION AND STORAGE.

(a)    This Agreement may be executed in counterpart signature pages.  Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes.  Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law.  Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b)    A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored.  All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

**ASSET HOLDER, LLC**, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

**PLEDGOR**

**VESTA HOLDINGS LLC**, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
                   )
COUNTY OF TULSA    )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

[signature pages continue]

12

**LENDER**

**YSA INVESTMENTS 1, LLC**, a Delaware limited liability company

By: _Robert Miley_

Name: Robert Miley

Title: Authorized Representative

| 13

## JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: _____
Name: Marc Kulick
Date:

STATE OF OKLAHOMA          )
                                                     )
COUNTY OF TULSA            )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as and individual.

_____
(Signature of notarial officer)

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)